IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAYVON RUTHERFORD and REGINALD GALLMAN,    )
                                           )
                                           )
          Plaintiffs,                      )
                                           )
          v.                               )No. 18 CV 10706
                                           )JURY TRIAL
DET. CAMILO R. ANTONINI, Badge No. D111;   )DEMANDED
DET. SGT. SEAN J. FEGAN, Badge No. DS001;  )
P.O. ROBERT G. PUFF, Badge No. 2154;       )
THE CITY OF MOUNT VERNON; POLICE OFFICER   )
BRIANNA M. MECCA, Badge No. 2177; DET.     )
KENNETH BRUCE, Shield No. D126; P.O.       )
DELFIM FERREIRA, Shield No. 2078; P.O.     )
JOSHUA D. HOWARD, Shield No. C2163, P.O.   )
PATRICK KING, Shield No. 2113; DET. PETER  )
VITELLI, Shield No. 2055; DET. JESUS GARCIA, )
Shield No. D161; DET. OSVALDO MEDINA,      )
Shield No. D170; P.O. JOSEPH B. VALENTE,   )
Shield No. 2059;   POLICE COMMISSIONER     )
SHAWN HARRIS; POLICE COMMISSIONER GLENN    )
SCOTT; and unidentified Mount Vernon       )
Police Department employees and officers,  )
          Defendants.                      )


[PROPOSED] SECOND AMENDED COMPLAINT

NOW COME Plaintiffs RAYVON RUTHERFORD and REGINALD GALLMAN,

and complaining of DEFENDANTS CAMILO ANTONINI, SEAN J. FEGAN,

ROBERT G. PUFF, THE CITY OF MOUNT VERNON (hereinafter, "City"),

BRIANNA M. MECCA, KENNETH BRUCE, DELFIN FERREIRA, JOSHUA D.

HOWARD, PATRICK KING, PETER VITELLI, JESUS GARCIA, OSVALDO

MEDINA, JOSEPH B. VALENTE, POLICE COMMISSIONER SHAWN HARRIS,

POLICE COMMISSIONER GLENN SCOTT, and UNKNOWN MOUNT VERNON POLICE

DEPARTMENT EMPLOYEES AND OFFICERS, allege as follows:

**Introduction**

1.    The City of Mount Vernon, through members of the Mount Vernon Police Department, including Defendants Camilo Antonini, Sean J. Fegan, Robert G. Puff, the other Defendant Officers, and other members of the Mount Vernon Police Department, routinely engages in a range of illegal conduct against the city's majority Black residents.  This misconduct includes fabricating crimes, falsifying reports, illegally detaining individuals who have committed no crime, and using excessive force against citizens, particularly Black citizens.

2.    Of these illegal practices, one of the most shocking is the routine use of illegal strip searches and visual and physical body cavity searches[1] of Mount Vernon's citizens, particularly Black citizens, in violation of the law and in violation of the City of Mount Vernon's own purported policies.

3.    The United States Constitution requires that all searches be reasonable.  The United States Constitution requires that, to justify the strip search of an arrestee, law enforcement officials must point to specific, objective facts

---

[1] A "strip search" occurs when a suspect is required by law enforcement to remove his clothes. A "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them.  A "manual body cavity search" or a "physical body cavity search" includes some touching or probing of a body cavity that causes a physical intrusion beyond the body's surface.

and rational inferences that establish particularized reasonable suspicion for that arrestee. The standard for visual body cavity searches is even higher: law enforcement must have a "specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity." That is because courts have long recognized that, while strip searches are "uniquely intrusive," visual body cavity searches are "invasive and degrading, occasioning a serious invasion of privacy and working a significant harm to a person's bodily integrity." Finally, to justify the most invasive of the three types of searches – a manual or physical body cavity search – law enforcement must have probable cause and a warrant if no exigency exists, and must conduct the invasive body cavity search in private in a safe, medically proper, and hygienic manner.

4. Invasive and degrading searches, whether strip or body cavity searches, "cannot be routinely undertaken as incident to all drug arrests or permitted under a police department's blanket policy that subjects persons suspected of certain crimes to these procedures." Yet this is just what the City of Mount Vernon has done, not only for all arrestees charged with narcotics offenses, but also for those charged with non-narcotic

crimes as well as violations, including such minor violations as loitering.  This is not only illegal, but intolerable.

5.    Nor does a search warrant for a premises, a search warrant naming an individual, or an all-persons present warrant, without more, justify strip and/or body cavity searches.  There still must exist particular, individualized facts that justify subjecting an arrestee to these searches, "i.e., specific facts to support a reasonable suspicion that a particular person has secreted contraband beneath his or her clothes or in a body cavity."

6.    The MVPD routinely conduct these illegal strip and/or body cavity searches in public spaces such as the back of an unmarked police car on a public street; in private homes in view of or in close proximity to others, including members of the opposite sex, family members, and even children; and at the police department.  They are conducted in connection with arrests for violations, misdemeanors, and felonies.  They are conducted in connection with non-violent offenses, some of which are drug-related and some of which are not.  These factors exacerbate the already invasive and degrading nature of these searches.

7.    Despite the clear legal requirements for strip or body cavity searches, and the Mount Vernon Police Department's

ostensible written policy setting forth numerous, specific, particularized limits on the use of strip and/or body cavity searches, the Defendant Officers and other MVPD Officers routinely strip and/or body cavity search detainees and arrestees without any semblance of the legal prerequisites necessary to support these invasive and demeaning searches and in the absence of the necessary preconditions required to make them safe and private.  These illegal searches have been conducted with the knowledge and permission of those at the top of the chain of command of the Mount Vernon Police Department.

8.   Conducting strip and/or body cavity searches on persons, including Plaintiffs, without particularized suspicion borne of the facts in an individual case, is humiliatingly invasive, degrading, unconstitutional, and flatly prohibited by settled law.

9.   Rayvon Rutherford and  Reginald Gallman bring this civil rights action pursuant to the United States Constitution, as amended, the Civil Rights Act of 1871, 42 U.S.C. § 1982, and the New York State Constitution.  Plaintiffs seek redress for Defendants' deprivation, under color of state law, of their rights, privileges, and immunities secured by the Constitution and laws of the United States and the State of New York.

**Jurisdiction and Venue**

5

10. This action arises under the Fourth and Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the New York State Constitution and laws of the State of New York.

11. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and 1343.

12. Venue is proper under 28 U.S.C. § 1391(b). On information and belief, all of the parties reside in the Southern District of New York, and the events giving rise to the claims asserted herein all occurred within this district.

**Parties**

13. Plaintiff Rayvon Rutherford is a 34 year old African-American man who has spent the majority of his life in Mount Vernon, New York.

14. Plaintiff Reginald Gallman is a 38 year old African-American man who has spent the majority of his life in Mount Vernon, New York.

15. Defendant Detective Camilo Antonini is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

16. Defendant Detective Sergeant Sean J. Fegan is a duly sworn police officer of the MVPD at all times relevant to this

action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

17.  Defendant Police Officer Robert G. Puff is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

18.  Defendant Police Officer Brianna M. Mecca is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of her employment as a Mount Vernon police officer.

19.  Defendant Detective Kenneth Bruce is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

20.  Defendant Police Officer Delfim Ferreira is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

21.  Defendant Police Officer Joshua D. Howard is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

22.   Defendant Police Officer Patrick King is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

23.   Defendant Detective Peter Vitelli is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

24.   Defendant Detective Jesus Garcia is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

25.   Defendant Detective Osvaldo Medina is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

26.   Defendant Police Officer Joseph B. Valente is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

27.   Defendant City of Mount Vernon is a New York municipal corporation, duly organized and existing under and by virtue of

the laws of the State of New York, with its principal place of business in Mount Vernon, New York.

28.    Defendant City of Mount Vernon maintains the City of Mount Vernon Police Department (MVPD), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the aforementioned municipal corporation, City of Mount Vernon.

29.    Defendant Police Commissioner Shawn Harris was a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as the Mount Vernon Police Commissioner.

30.    Defendant Police Commissioner Glenn Scott is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as the Mount Vernon Police Commissioner.

31.    Unidentified MVPD Officers and Employees are current and/or former employees, officers, and/or supervisors of the Mount Vernon Police Department who at all relevant times were acting under color of law and within the scope of their employment.

32.    Collectively, Defendants Antonini, Fegan, Puff, Mecca, Bruce, Ferreira, Howard, King, Vitelli, Garcia, Medina, Valente,

Harris, Scott and the Unidentified MVPD Officers and Employees are referred to herein as the "Defendant Officers." Each of the Defendant Officers is sued in his, her, and/or their individual capacities.

33. At all times hereinafter mentioned, the Defendant Officers were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages, and/or practices of the State of New York and/or the City of Mount Vernon.

34. Each and all of the acts defendants alleged herein were done by said defendants while acting within the scope of their employment by Defendant City of Mount Vernon.

**Rayvon Rutherford and Reginald Gallman are Violently Abused and Illegally Searched During the Execution of a Search Warrant at Michelle Campbell's Apartment**

35. On the night of March 31, 2017, the Defendant Officers executed a search warrant or warrants at 145 South 1st Avenue, apartments 5D and 5E, in Mount Vernon, New York. At the time of this event, Michelle Campbell was the leaseholder of Apartment 5E. Ms. Campbell had no connection to the occupants of Apartment 5D, apart from being neighbors. Neither Plaintiff was a resident of either of these apartments.

36.  On March 31, 2017, Plaintiffs Rutherford and Gallman, together with several other individuals, were visiting Ms. Campbell's apartment.  Sometime after 10:30pm that night, Plaintiffs heard a loud bang and saw the front door of the apartment burst open.  Defendant Officers entered with guns drawn.

37.  Plaintiffs Gallman and Rutherford, fearful that they could be shot, immediately got down on the floor. They were handcuffed by Defendant Officers.

38.  Defendants Antonini and Puff then began to violently assault Messrs. Gallman and Rutherford, by slapping, kicking, and punching them.  This violent assault of Plaintiffs Gallman and Rutherford by Defendants Antonini and Puff went on for at least 5 minutes.  In addition to beating Mr. Gallman in the living room, Defendant Antonini also took him into the bathroom where he continued to beat him.

39.  In addition to kicking, slapping and hitting Plaintiff Gallman with his hands and fists, Defendant Antonini also hit Plaintiff Gallman about the head and face multiple times while holding firearm in his hand.  During the course of the beating, Defendant Antonini stated, in substance, "You think you're fucking slick, I'll get the last laugh you stupid nigger."

Defendant Antonini further stated, in substance, "You know what you did . . . you know what that's for."

40.   Defendant Officers then began to strip and body cavity search the occupants of the apartment.  Some, but not all, of these searches were recorded by Defendant Officers. Defendant Officers asked Mr. Rutherford whether he had any drugs or weapons, and he informed the Defendant Officers that he did not. Defendant Officers then informed Mr. Rutherford that he would be strip searched, and Plaintiff Rutherford objected. Defendant Officers brought Mr. Rutherford to the bathroom where Defendant Puff attempted to strip search the still-handcuffed Mr. Rutherford.  Mr. Rutherford again objected to Defendant Puff's efforts to strip search him and Defendant Puff called Defendant Antonini into the bathroom to assist.  Defendants Puff and Antonini forced Mr. Rutherford to the floor and forcibly pulled down his pants and underwear, with Defendant Antonini placing his knee on Mr. Rutherford's neck, forcing his neck and face into the floor, and pulling his arm behind his back.  Mr. Rutherford could not breathe and feared that Defendant Antonini would break his arm.  Simultaneously, Defendant Puff violently stuck his fingers into Mr. Rutherford's rectum multiple times, causing extreme pain.  Mr. Rutherford, in pain, moved away from Defendant Puff.  Defendant Puff would repeat the physical body

cavity search, stating, in substance "Stop moving, you are making it take longer." Eventually, Defendants Puff and Antonini let Mr. Rutherford up and pulled up his underwear and pants.

41. No drugs, weapons, or other contraband were found during these illegal and intrusive searches of Mr. Rutherford's body.

42. Mr. Rutherford's genitals, anus, and nude lower body were visible to Defendants Puff and Antonini.

43. Upon leaving the bathroom, Mr. Rutherford complained about the strip and body cavity search conducted by his subordinates to Defendant Fegan, who responded, in substance, "Stop crying, it's called a cavity search and it's totally legal."

44. Defendant Officers also illegally searched Plaintiff Gallman while he was handcuffed. Defendant Officers asked Mr. Gallman whether he had any drugs or weapons, and he informed the Defendant Officers that he did not. Defendant Officers forcibly removed his pants and underwear and ordered him to squat and cough, in full view of the Defendant Officers, who visually inspected the naked lower half of Mr. Gallman's body, including his genitals and anus. Mr. Gallman's nude lower body, including his genitals and anus, were also visible to any other person in

the apartment.  This illegal search was recorded by a video camera, though the camera was purposely pointed away from Plaintiff Gallman during the search so only the audio of the search was captured.

45.  No drugs, weapons, or other contraband were found during these illegal and intrusive searches of Mr. Gallman's body.

46.  Defendant Antonini confronted Ms. Campbell in a threatening manner, attempting to coerce her into blaming Mr. Gallman for any drugs in her possession.  Defendant Antonini told Ms. Campbell that if she said the drugs belonged to Mr. Gallman, she would be able to stay home that night, i.e., not be arrested.  Defendant Antonini further threatened and terrified Ms. Campbell by telling her that he would take her to the hospital where machines would be used to confirm his belief that she had drugs inside of her body, and that the machine would "burn" the drugs and "scar" her body.  Defendant Antonini groped Ms. Campbell's genitals over her closed and told her that he knew that she had drugs there.

47.  Fearful of Antonini, Ms. Campbell admitted to having drugs inside of her body, but repeatedly informed the Defendant Officers that the drugs were hers and hers alone, and stating definitively that the drugs did not belong to anyone else,

including Mr. Gallman.  Ms. Campbell likewise informed the Defendant Officers that any other drugs or contraband found in the apartment belonged to her and her alone.

48.   Detective Antonini directed Defendant Mecca to take Ms. Campbell into the bathroom and perform a strip and body cavity search on her.

49.   Defendant Mecca brought Ms. Campbell into the bathroom where she conducted a strip and body cavity search of Ms. Campbell.  Defendant Mecca ordered Ms. Campbell to remove her pants and underwear and to remove the contraband from her body. Ms. Campbell began to remove a bag containing drugs from her vagina, but had difficulty doing so and told Defendant Mecca that she was having trouble and in pain.  Defendant Mecca told Ms. Campbell to move out of the way and proceeded to remove the drugs from Ms. Campbell's body herself.  In so doing, Defendant Mecca touched the outside and inside of Ms. Campbell's genitalia and caused Ms. Campbell pain.

50.   Despite the fact that Ms. Campbell informed Defendant Officers that she was solely responsible for the drugs in the apartment, Defendant Officers arrested all of the occupants of the apartment and took them to the Mount Vernon Police Department.

51.   Despite having been previously and invasively strip
and body cavity searched, Mr. Rutherford was again searched at
the police station.  On this occasion, Mr. Rutherford's
handcuffs were removed by an unknown officer and he was
individually placed in a cell at the Mount Vernon Police
Department.  Mr. Rutherford was directed to remove each article
of clothing and hand it to an MVPD officer to be searched, after
which it was returned to him.  Mr. Rutherford was then directed
to turn around, lift his genitals, squat, and cough.  As a
result, Mr. Rutherford's buttocks, anus, and genitals were
exposed to the unknown officer.

52.   Each of the Plaintiffs, together with the other
occupants of the apartment at the time of the search, were
charged with Criminal Possession of a Controlled Substance in
the Third Degree, in violation of Penal Law 220.16, a B Felony.

53.   Each of the Plaintiffs was incarcerated at the
Westchester County Jail following their arrest.  Upon
arraignment, each of the Plaintiffs pleaded not guilty.

**The Defendant Officers Create False Sworn Records and Testify
Falsely Under Oath in Order to Levy Criminal Charges Against the
Plaintiffs**

54.   At no time during the raid of Ms. Campbell's apartment
did Mr. Gallman possess drugs.  As such, at no time did Mr.

Gallman give Ms. Campbell drugs and at no time did Ms. Campbell state that Mr. Gallman had given her drugs.

55.  Despite this, Defendant Antonini falsely alleged in his sworn incident report that he witnessed Mr. Gallman hand Ms. Campbell a bag of drugs.  Defendant Antonini further falsely alleged in his sworn incident report that Ms. Campbell told him while she was in the kitchen that the drugs belonged to Mr. Gallman and that he told her to put them in her vagina when the MVPD burst into the apartment.  Defendant Antonini knew these statements were false when he made them in his sworn report.

56.  Indeed, these false statements were contradicted by Defendant Vitelli at Mr. Gallman and Ms. Campbell's felony hearing, where Defendant Vitelli testified that Ms. Campbell did not say anything while she was in the kitchen.  Instead, Defendant Vitelli falsely testified at the felony hearing that he heard Ms. Campbell tell the MVPD officer who conducted her strip and body cavity search – Defendant Mecca – that Mr. Gallman had told her to put the drugs in her vagina.  But Defendant Vitelli's sworn testimony directly contradicted the sworn testimony of Defendant Mecca, who testified under oath that Ms. Campbell did not tell her that the drugs she had were Mr. Gallman's.  Likewise, Defendant Mecca testified that she did

not hear Ms. Campbell make any statements prior to entering the bathroom for her strip and body cavity search.

<b>The Criminal Cases Are Resolved</b>

57.  Mr. Rutherford was released on his own recognizance approximately two weeks after his arrest; Mr. Gallman was released on bail some time thereafter; Ms. Campbell was held in Westchester County jail until she pleaded guilty three months later.

58.  On August 28, 2017, Mr. Gallman pleaded guilty to Criminal Possession of a Controlled substance in the 7th Degree, a violation of Penal Law 220.03, an A Misdemeanor and was subsequently sentenced to 3 years of probation.  Mr. Gallman was innocent of this crime, but he feared he would be wrongfully convicted by the Defendant Officers were he to fight the case.

59.  On September 28, 2017, the charges against Mr. Rutherford were dismissed.

<b>Defendant Officers Targeted and Abused Messrs. Gallman and<br>Rutherford in Retaliation for Their Refusal to Act As<br>Confidential Informants for the MVPD</b>

60.  Upon information and belief, Defendant Antonini abused Messrs. Gallman and Rutherford because they would not act as confidential informants for him.

61.  Defendant Antonini also targeted Mr. Gallman for arrest, naming him in the search warrant application despite, on

18

information and belief, not having the requisite probable cause, because he would not act as a confidential informant.

62.  Beginning in or about 2015, Defendant Antonini sought to coerce Mr. Rutherford into acting as a confidential informant for him.  Defendant Antonini told Mr. Rutherford, in substance, that if he acted as a confidential informant, Defendant Antonini would allow him to work as a drug dealer.

63.  Defendant Antonini arrested Mr. Gallman on multiple occasions in 2016.  On June 29, 2016, Defendant Antonini arrested Mr. Gallman, claiming that he was in possession of crack cocaine.  Mr. Gallman was brought to the MVPD headquarters, where Defendant Antonini attempted to coerce Mr. Gallman to work as a confidential informant.

64.  Following his June 2016 arrest and release, Mr. Gallman did not provide Defendant Antonini with any information about illegal activities as Defendant Antonini had requested. On several occasions thereafter, when Mr. Gallman would see Defendant Antonini, Defendant Antonini would threaten Mr. Gallman, stating, in substance, that he was going to "get him" unless he started to provide information as a confidential informant.

65.  On November 16, 2016, Defendant Antonini and other MVPD officers executed a purported search warrant at 145 South

First Avenue, Apartment 1D, an apartment Mr. Gallman was visiting. On information and belief, Mr. Gallman was named on this search warrant. As in the instant case, Defendant Antonini and other MVPD officers broke down the apartment door and entered with guns drawn. As in the instant case, Defendant Antonini brutally beat Mr. Gallman, choking him and slamming his head against the coffee table.

66. No drugs (except a personal use amount of marijuana), guns, or other contraband were found in the apartment, despite an extensive, and destructive, search of the apartment. Defendant Antonini and the other MVPD officers took the marijuana and cash from the apartment and, on information and belief, did not voucher the marijuana or the cash.

67. Having not found any drugs, guns, or other contraband during the search of the apartment, Defendant Antonini left the apartment. When he re-entered the apartment, Defendant Antonini had a plastic bag containing what appeared to be crack cocaine and stated, in substance, that Mr. Gallman and the others would be charged with the drugs. Mr. Gallman and the two other adults in the apartment were then arrested, despite the fact that no drugs, weapons, or other contraband had been found in the apartment, and Defendant Antonini knew that the drugs he was charging them with did not belong to them.

68.  Defendant Antonini again attempted to coerce Mr. Gallman to work as a confidential informant for him.

69.  Between the November 2016 raid and March 31, 2017 (the date of the instant arrest), Mr. Gallman never worked as a confidential informant for Detective Antonini, despite Detective Antonini's efforts to coerce him to do so.

70.  On information and belief, it was Mr. Gallman's refusal to work as a confidential informant that caused Detective Antonini to target him for arrest by naming him the search warrant for Ms. Campbell's apartments.  These aforementioned false arrests were identified as a substantial basis for Defendant Antonini's search warrant application in the instant case.  Plaintiff pleads in the alternative that Defendant Antonini's search warrant application was otherwise based on false information.  Given the above facts and circumstances, Defendant Antonini knew at the time of his search warrant application that he lacked probable cause to support a search warrant in this case.

71.  Mr. Rutherford also had prior contact with Defendant Antonini, in which Defendant Antonini tried to coerce Mr. Rutherford to agree to act as a confidential informant.

72.  In August 2012, Defendant Antonini arrested Mr. Rutherford, alleging he possessed drugs.  Upon taking Mr.

Rutherford to the MVPD headquarters, Defendant Antonini told Mr. Rutherford that if he agreed to work as a confidential informant, he would not be charged with any crime. Mr. Rutherford agreed and, on information and belief, signed a confidential informant agreement.

73. Over the approximately three weeks following his release, Mr. Rutherford did not provide any information to Defendant Antonini or any other member of the MVPD. As a result, he was subsequently arrested on September 22, 2012 and falsely charged with Criminal Possession of a Controlled Substance in the Third Degree, despite not then possessing any drugs at all. Despite being factually innocent, Mr. Rutherford pleaded guilty in this case because he feared he would be wrongfully convicted by the Defendant Officers were he to fight the case, and his plea agreement allowed him to avoid the risk of a significant prison sentence were he to be convicted at trial.

74. Thereafter, Mr. Rutherford had no contact with Defendant Antonini until the events described herein.

**Defendant City of Mount Vernon Has For Decades Ignored the Pattern of Illegal Strip and Body Cavity Searches, False Arrests, Excessive Force, Misuse of Confidential Informants, and Malicious Prosecutions, Instead Rewarding Officers Engaged in this Illegal Conduct**

75.   Defendant City of Mount Vernon has long been on notice about the illegal misconduct of MVPD officers and employees, including Defendants Antonini, Fegan, and Puff.  This illegal misconduct includes, as here, illegally strip and body cavity searching arrestees, fabricating crimes, falsifying reports, illegally detaining individuals who have committed no crime, and using excessive force against citizens, particularly Black citizens.

76.   With respect to the routine, illegal strip and body cavity searches of arrestees, MVPD's official policy regarding searches of arrestees could not be more different than what goes on in practice.  The MVPD policy governing the search of arrested persons (Procedure No. 3.045), issued on January 4, 1993, provides, in relevant part:

  a. "a person arrested will not be subject to a full strip search unless there is a rational basis for doing so";

  b. "The Desk Officer or supervisor present will decide if a strip search should be conducted and is responsible that the search is conducted properly";

  c. "A 'Strip Search' will be utilized when the arresting officer reasonably suspects that weapons, contraband or evidence may be concealed upon the

person or in their underclothing, in such a manner that they may not be discovered by the previous search methods.  Other factors that should be considered in determining the necessity for a 'Strip Search' include, the nature of the crime (serious violent felony), arrest circumstances, subject's reputation (extremely violent person), act of violence, and discoveries from previous searches."

d. "A 'Strip Search' will be conducted by a member of the same sex as the arrested person in a secure area in outermost privacy and with no other arrestee present.  It should not be necessary to touch the subject's body, except for the examination of the hair."

e. "If a 'Strip Search' is conducted, such information will be entered under 'Details' in the Arrest Book.  A subsequent 'Strip Search' will not be conducted unless there is reasonable belief that the subject has acquired a weapon or contraband."

f. "Under no condition shall a 'Body Cavity Search' be conducted by any Member of the Department.  As a general rule, a warrant must be obtained before a 'Body Cavity Search' is performed.  For a 'Body

Cavity Search' to be justified, there must be more
than a mere chance of finding something.  The
standard to be applied is "reasonableness' on the
facts.  Only where the arrestee or police officer
would clearly be in danger or if there was a clear
indication that evidence would be destroyed, should
a 'Body Cavity Search' be conducted."

g. "Compelling, exigent circumstances must be presented
before the warrant requirement can be waived."

h. "Due to availability of judges in Mount Vernon, a
warrant will be obtained before a 'Body Cavity
Search' is conducted."

i. "A 'Body Cavity Search' must be conducted by a
medical doctor in privacy, in an examining room
(doctor's office, hospital) so as to insure hygienic
surroundings and minimal discomfort."

j. "If a 'Body Cavity Search' is considered necessary,
the Duty District Attorney and Captain will be
advised and their instructions complied with and
entered in the Arrest Book."

77.  But this policy is so regularly and routinely
disregarded that it is not, in fact, the policy of the City.

78.  The City has long been on actual and/or constructive notice that MVPD officers including the Defendant Officers routinely conduct illegal strip and/or body cavity searches of detainees and arrestees in Mount Vernon and has endorsed these illegal searches.

79.  As far back as 1999, if not earlier, an illegal strip search conducted by members of the MVPD Narcotics Squad of the MVPD – the same MVPD division to which defendants Antonini, Fegan, and Puff belonged – gave rise to a successful civil rights lawsuit.  *See Flores v. City of Mount Vernon, et al.,* 41 F. Supp.2d 439 (1999).  Since then, numerous civil rights lawsuits have alleged illegal strip and body cavity searches by Mount Vernon Police Department Officers, including defendants Antonini, Fegan, and Puff.  *See, e.g., Scott v. City of Mount Vernon et al.*, 14 CV 4441 (SDNY) (Members of a single family alleged that defendant Antonini and other members of the Mount Vernon Police Department unlawfully entered their home, detained them without reason, and unlawfully strip searched one member of the family.  This case was settled for $175,000.[2]); *Williamson v. Mount Vernon Police Dept. et. al.*, 15 CV 5635 (S.D.N.Y. 2015),

---

[2] Ernie Garcia, "Mount Vernon to pay $175,000 in alleged home invasion", LoHud.com, Aug. 16, 2017, https://www.lohud.com/story/news/local/westchester/mount-vernon/2017/08/16/strip-search/570586001/

(pro se complaint alleging Defendants Antonini, Fegan, and others conducted illegal physical body cavity searches on him in an apartment following an illegal arrest); *Long v. City of Mount Vernon*, 18-cv-09068 (same).

80. The City has also long been on actual and/or constructive notice that MVPD officers including the Defendant Officers routinely fabricate crimes, falsify reports, illegally detain individuals who have committed no crime, and use excessive force against citizens, particularly Black citizens.

81. Pending and settled civil rights cases have alleged just this type of misconduct. In addition to *Scott*, described above, examples include: *Nunez v. City of Mount Vernon et al.*, 14 CV 08530 (SDNY) (Two brothers allege they were wrongly arrested and beaten by Mount Vernon Police Department Officers. This case was settled for $250,000.); *Fonseca v. City of Mount Vernon et al.*, 5459/2013 (N.Y. Sup.)(An individual alleged false arrest, malicious prosecution and excessive force. This case was settled for $75,000.); *Giles v. City of Mount Vernon et al.*, 20 CV 5119(2020)(Plaintiff alleges that defendant Antonini, together with others, framed him for a narcotics offense, criminal charges that were ultimately dismissed.); *Govan v. City of Mount Vernon, et al.*, 19 CV 8830 (S.D.N.Y.)(Plaintiff alleges that defendant Antonini, together with others, framed him for a

narcotics offense, falsely arrested and maliciously prosecuted him, and used excessive force against him.)

82.   Audio recordings made by a whistleblower MVPD officer contain statements by other MVPD officers (who did not know they were being recorded) to the effect that MVPD narcotics officers, including Defendant Antonini and others, engage in just the type of misconduct alleged herein.  These tapes include allegations that innocent civilians were beaten, criminal charges were fabricated, and MVPD officers allowed certain drug dealers to operate with impunity in exchange for those drug dealers providing information to law enforcement sufficient to identify alleged drug buyers.[3]

83.   Defendant City of Mount Vernon has also received numerous complaints by civilians about illegal strip and/or body cavity searches through formal and informal channels, as well as complaints about MVPD officers fabricating crimes, falsifying reports, illegally detaining individuals who have committed no crime, and using excessive force against citizens.[4] These

---

[3] *See* George Joseph, "The Mount Vernon Police Tapes:  In Secretly Recorded Phone Calls, Officers Say Innocent People Were Framed", Gothamist, June 3, 2020, https://gothamist.com/news/mount-vernon-police-tapes-innocent-people-were-framed.

[4] *See* George Joseph, "Corruption and Brutality Allegations Against Mount Vernon Detective Are Echoed by Civilian Complaints", GOTHAMIST, March 11, 2020, https://gothamist.com/news/corruption-and-brutality-allegations-against-mount-vernon-detective-are-echoed-civilian-complaints.

complaints, made over years, demonstrated a clear and obvious pattern of the type of misconduct at issue in this case.

84. Recent media reports document the common practice of the MVPD's illegal strip and/or body cavity searches. In one recent article, Defendant Fegan defended the strip and body cavity searches at issue in this case, in which MVPD video recordings show MVPD officers, including Defendants Antonini and Puff strip and visual body cavity search a handcuffed individual in what appears to be the living room of Ms. Campbell's apartment. According to the article, "Fegan, the supervisor on scene during the operation, defended the officers' actions. He argued that the searches recorded on video were strip searches with 'visual inspections.' He said police have conducted these kinds of searches at search warrant locations for as long as he could remember. But when pressed about Mount Vernon's police rules, which say strip searches should be conducted inside police facilities, Fegan declined comment."[5]

---

[5] *See* George Joseph, "The Mount Vernon Police Tapes: In Secretly Recorded Calls, Officers Allege Beatings in Custody and Illegal Strip Searches," Gᴏᴛʜᴀᴍɪsᴛ, Sept. 1, 2020, https://gothamist.com/news/mount-vernon-police-tapes-secretly-recorded-calls-officers-allege-beatings-custody-and-illegal-strip-searches. Defendant Fegan's statements to the press echo his incorrect justification of the illegal strip and physical body cavity search to Mr. Rutherford and his apparent authorization of the other strip and body cavity searches described herein.

85.  In addition to the above, the undersigned has also spoken with numerous individual residents of Mount Vernon who have described being required to submit to strip and/or body cavity searches while detained by MVPD officers, including Defendants Antonini, Fegan, and Puff, and upon arrest by Mount Vernon Police Department officers, including Defendants Antonini, Fegan, and Puff.

86.  Defendants know and at all times material herein have known that they may not institute, enforce, or permit enforcement of a policy or practice of conducting strip and/or visual body cavity searches without particularized reasonable suspicion.

87.  Defendants further know and at all times material herein have known that they may not institute, enforce, or permit enforcement of a policy or practice of conducting physical body cavity searches without probable cause and/or a warrant, or an exigent circumstance, and may not do so except if they are conducted in private in a safe, medically proper, and hygienic manner

88.  Despite having been put on notice of the common use of illegal strip and body cavity searches of, and other misconduct against, citizens by these complaints and lawsuits, the City of Mount Vernon ignored the existence of a clear pattern of illegal

conduct, and did not recommend discipline for any of the subject officers.

89.  In addition, supervisors within the Department, specifically including Defendant Fegan, had knowledge of the repeated complaints of strip and body cavity searches and other misconduct.  Indeed, as Defendant Fegan admitted to a journalist, he was present for countless illegal strip and body cavity searches.

90.  In fact, numerous illegal strip and body cavity searches were conducted at the Mount Vernon Police Department, where supervisors were knowledgeable of the illegal searches.

91.  Indeed, upon information and belief, many of these illegal searches were video recorded by the MVPD.

92.  Defendants know and at all times material herein have known that they may not institute, enforce, or permit enforcement of a policy or practice of conducting strip and/or visual body cavity searches without particularized reasonable suspicion.

93.  Defendants further know and at all times material herein have known that they may not institute, enforce, or permit enforcement of a policy or practice of conducting physical body cavity searches without probable cause and/or a warrant, or an exigent circumstance, and may not do so except if

they are conducted in private in a safe, medically proper, and hygienic manner

94.   Despite their knowledge of these illegal searches and other misconduct, policymakers took no action to train, supervise, or discipline the officers who committed these knowingly illegal searches.

95.   Instead, certain of the Defendant Officers were rewarded with promotions for their aggressive police tactics and jobs well-done by their Supervisors.

96.   Despite such notice, Defendant City failed to take corrective action.   This failure caused the officers in the present case to violate Plaintiffs' civil rights.

97.   Moreover, Defendant City was aware, prior to Plaintiffs' arrests, that the individual defendants lacked the objectivity, temperament, maturity, discretion, and disposition to be employed as police officers.   Despite such notice, Defendant City retained these officers, and failed to adequately train and supervise them.

98.   In particular, Defendant City was also aware from numerous complaints, lawsuits, and from public sources, including recorded conversations of MVPD officers that were provided to MVPD, that Defendant Antonini was, *inter alia*, known to have unlawfully strip searched arrestees, fabricated

evidence, planted narcotics, coerced false identifications, acted in a racist and discriminatory manner, used excessive force, and generally engaged in misconduct in other cases and arrests, yet MVPD continued to employ Defendant Antonini and failed to take any  corrective action despite such notice.

99.  As a direct result of the aforementioned failures, Plaintiffs' rights were violated.

100. All of the aforementioned acts of Defendants, their agents, servants, and employees were carried out under the color of state law.

101. The acts complained of were carried out by the aforementioned Defendant Officers in their capacities as police officers, with the entire actual and/or apparent authority attendant thereto.

102. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice procedure, or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

### Mount Vernon's Policies and Widespread Practices

103. The constitutional violations that caused the illegal strip and body cavity searches, false arrest, and malicious prosecution at issue here were not isolated events.  To the

contrary, they were the result of the City of Mount Vernon's policies and widespread practices of illegally strip and body cavity searching detainees and arrestees, falsely arresting innocent people, planting evidence, and falsifying police reports and other official documents.

104. The constitutional violations that caused the illegal strip and body cavity searches, false arrest, and malicious prosecution at issue here were the result of the City of Mount Vernon's policies and widespread practices of failing to adequately train and supervise MVPD employees on their obligations not to illegally strip and body cavity search detainees and arrestees, falsify and plant evidence, fabricate and falsify official documents, and falsely arrest, or maliciously prosecute individuals.

105. These constitutional violations were also the result of the City's policies and widespread practices of failing to discipline officers who illegally strip and body cavity search detainees and arrestees, falsify and plant evidence, fabricate and falsify official documents, and falsely arrest, or maliciously prosecute individuals.

106. The constitutional violations that caused the Plaintiffs' illegal strip and body cavity searches and the claims set forth in this Complaint were also the result of the

City's policies and widespread practices of failing to intervene to prevent individual employees from violating citizens' constitutional rights.

107. In accordance with these policies and widespread practices, City employees refused to report misconduct committed by their colleagues, including the misconduct at issue in this case.

108. The City's failure to train, supervise, and discipline its officers and employees effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiffs in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and policies, as alleged above.

109. The City and their employees failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken to remedy Plaintiffs' ongoing injuries.

110. The policies and practices described in the foregoing paragraphs were consciously approved by City policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

111. As a result of the illegal strip and body cavity searches, violent abuse, and false arrest and malicious prosecution described herein, Mr. Rutherford suffered physical injuries, post-traumatic stress disorder, emotional distress, anxiety, humiliation, shame and terror, as well as reputational harm.

112. Mr. Rutherford is now fearful of people, particularly police officers. He is afraid that he can be arrested for no reason at all, and can suffer violent beatings and public, intrusive bodily searches as a result of such false arrests. Indeed, Mr. Rutherford's fear of further abuse by the Defendant Officers or other MVPD officers caused him to move away from his lifelong home of Mount Vernon, NY, in order to avoid being in the same area as Defendant Officers.

### *Reginald Gallman*

113. As a result of the illegal strip and body cavity searches, and violent abuse described herein, Mr. Gallman suffered physical injuries, emotional distress, anxiety, humiliation, shame and terror, as well as reputational harm.

114. Mr. Gallman is now fearful of people, particularly police officers. He is afraid that he can be arrested for no reason at all, and can suffer violent beatings and public,

intrusive bodily searches as a result of such false arrests.
Indeed, Mr. Gallman's fear of further abuse by the Defendant
Officers or other MVPD officers caused him to move away from his
lifelong home of Mount Vernon, NY, in order to avoid being in
the same area as Defendant Officers.

115. As a result of the foregoing, Plaintiffs have suffered
emotional, physical, psychological, and reputational damages,
all caused by the Defendant Officers' misconduct.

## Count I – 42 U.S.C. § 1983
### Fourth Amendment/Illegal Search and Seizure – All Plaintiffs

116. Each Paragraph of this Complaint is incorporated as if
restated fully herein.

117. As described in the preceding paragraphs, the conduct
of the Defendant Officers, while acting individually, jointly,
and in conspiracy with one or more persons, known and unknown,
as well as under color of law and within the scope of their
employment, violated the Plaintiffs' Fourth Amendment rights in
that they seized the Plaintiffs without justification and
without probable cause and conducted illegal strip and body
cavity searches of their bodies, which included the unlawful
touching, and close observation, of their buttocks and
genitalia.

118. As described in the preceding paragraphs, the Defendants violated Plaintiffs' Fourth Amendment rights in that they seized Plaintiffs without justification and without probable cause and conducted an illegal search of their bodies by strip searching and visually and physically body cavity searching Plaintiffs Rutherford and Campbell, and by strip searching and visually body cavity Plaintiff Gallman.

119. The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and reckless indifference to the rights of others.

120. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered great mental anguish, humiliation, degradation, emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

121. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Mount Vernon in the manner more fully described below in Count VII.

## Count II – 42 U.S.C. § 1983
### Excessive Force – All Plaintiffs

122. Each Paragraph of this Complaint is incorporated as if restated fully herein.

123. As described in the preceding paragraphs, the conduct of the Defendant Officers, while acting individually, jointly,

and in conspiracy with one or more persons, known and unknown, as well as under color of law and within the scope of their employment, constituted excessive force in violation of the United States Constitution.

124. The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and reckless indifference to the rights of others.

125. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered great mental anguish, humiliation, degradation, emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

126. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Mount Vernon in the manner more fully described below in Count VII.

## Count III – 42 U.S.C. § 1983
## False Arrest/Unlawful Imprisonment – Plaintiff Rayvon Rutherford

127. Each Paragraph of this Complaint is incorporated as if restated fully herein.

128. As described in the preceding paragraphs, the Defendant Officers, while acting individually, jointly, and in conspiracy with one or more persons, known and unknown, as well as under color of law and within the scope of their employment, falsely arrested and unlawfully detained Rayvon Rutherford.

129. The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and reckless indifference to the rights of others.

130. Upon information and belief, the search warrant or warrants underlying the instant search contained false information that Defendant Antonini knew to be false, or had reason to know was false, at the time he swore to it.

131. As a result of Defendants' misconduct described in this Count, Plaintiff suffered great mental anguish, humiliation, degradation, emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

132. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Mount Vernon in the manner more fully described below in Count VII.

### Count IV – 42 U.S.C. § 1983
### Malicious Prosecution – Plaintiff Rayvon Rutherford

133. Each Paragraph of this Complaint is incorporated as if restated fully herein.

134. As described in the preceding paragraphs, the Defendant Officers, while acting individually, jointly, and in conspiracy with one or more persons, known and unknown, as well as under color of law and within the scope of their employment, caused Plaintiff Rutherford to be unreasonably seized and

improperly subjected to judicial proceedings for narcotics crimes for which there was no probable cause.  These judicial proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of his innocence.

135. The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and reckless indifference to the rights of others.

136. As a result of Defendants' misconduct described in this Count, Plaintiff suffered great mental anguish, humiliation, degradation, emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

137. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Mount Vernon in the manner more fully described below in Count VII.

### Count V — 42 U.S.C. § 1983
### Violation of the Right to Fair Trial — Plaintiffs Rayvon Rutherford and Reginald Gallman

138. Each Paragraph of this Complaint is incorporated as if fully restated herein.

139. Defendant Officers created false evidence against Plaintiffs Rutherford and Gallman and withheld exculpatory evidence against Plaintiffs Rutherford and Gallman.

140. Defendant Officers forwarded this false evidence to, and withheld exculpatory evidence from, the Westchester County District Attorney's Office to be used against Plaintiffs Rutherford and Gallman in legal proceedings, and it was used to perpetuate the proceedings against them.

141. As a result of Defendants' creation and use of false evidence, and withholding of exculpatory evidence, Plaintiffs Rutherford and Gallman were deprived of their liberty and suffered a violation of their constitutional rights to a fair trial, as guaranteed by the United States Constitution.

142. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

143. The misconduct described in this Count was undertaken by Defendants within the scope of their employment and under color of law such that their employers, City of Mount Vernon, are liable for their actions.

### Count VI - 42 U.S.C. § 1983
### Failure to Intervene – All Defendants

144. Each Paragraph of this Complaint is incorporated as if restated fully herein.

145. In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation

of Plaintiffs' constitutional rights, even though they had the duty and the opportunity to do so.

146. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth, Plaintiffs Gallman and Rutherford's innocence, and the Plaintiffs' constitutional rights.

147. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered great mental anguish, humiliation, degradation, emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

148. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Mount Vernon in the manner more fully described below in Count VII.

## Count VII – 42 U.S.C. § 1983
### Section 1983 Monell Claim – All Plaintiffs

149. Each Paragraph of this Complaint is incorporated as if fully restated herein.

150. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

151. As described in detail above, the City of Mount Vernon is liable for the violation of Plaintiffs' constitutional rights because Plaintiffs' injuries were caused by the policies, practices, and customs of the City of Mount Vernon as well as by the actions of policy-making officials for the City.

152. At all times relevant to the events described in this Complaint and for a period of time prior thereto, the City had notice of a widespread practice by their officers and agents of illegally and intrusively searching individuals without cause, using excessive force against individuals, manufacturing false evidence, suppressing exculpatory evidence, and instigating false criminal charges, including the falsification of statements and reports, fabricating false evidence to implicate defendants in criminal conduct, and pursuing wrongful convictions through profoundly flawed investigations.

153. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately screen, hire, retain, train, supervise, and control their officers, agents, and employees, and by failing to adequately punish and discipline prior instances of

similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiffs.

154. The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

155. At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City failed to promulgate proper or adequate rules, regulations, policies, and procedures for the searching of detainees and arrestees; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings.  In addition or alternatively, the City failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the City, with respect to these subjects.

156. These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the City.

157. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City in that the constitutional violations committed against Plaintiffs were committed with the knowledge or approval of persons with final policymaking authority for the City or were actually committed by persons with such final policymaking authority.

158. As a result of the policies and practices of the City, numerous individuals have been illegally and intrusively searched and wrongly prosecuted and imprisoned for, as well as convicted of, crimes that they did not commit.

159. Plaintiffs' injuries were directly and proximately caused by officers, agents, and employees of the City, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### Count VIII – 42 U.S.C. § 1983
### Supervisory Liability – All Plaintiffs

160. Each Paragraph of this Complaint is incorporated as if fully restated herein.

161. Defendants Antonini, Fegan, Puff, Harris, Scott, and other unidentified supervisory MVPD employees and officers personally caused Plaintiffs' constitutional injury by being

deliberately or consciously indifferent to the rights of others
in failing to properly supervise and train their subordinate
employees.

162. As a result of the misconduct described in this Count,
Plaintiffs have suffered damages, including but not limited to
emotional distress and anguish.

**WHEREFORE**, Plaintiffs, RAYVON RUTHERFORD and REGINALD
GALLMAN, respectfully request that this Court enter judgment in
their favor and against Defendants, CAMILO ANTONINI, SEAN J.
FEGAN, ROBERT G. PUFF, CITY OF MOUNT VERNON, BRIANNA M. MECCA,
KENNETH BRUCE, DELFIM FERREIRA, JOSHUA D. HOWARD, PATRICK KING,
PETER VITELLI, JESUS GARCIA, OSVALDO MEDINA, JOSEPH B. VALENTE,
POLICE COMMISSIONER SHAWN HARRIS, POLICE COMMISSIONER GLENN
SCOTT and unknown Mount Vernon Police Department employees and
officers, awarding compensatory damages and attorneys' fees
against each Defendant, punitive damages against each of the
Defendant Officers, as well as any other relief this Court deems
just and appropriate.

**JURY DEMAND**

Plaintiffs RAYVON RUTHERFORD and REGINALD GALLMAN hereby
demand a trial by jury pursuant to Federal Rule of Civil
Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

/s/ Karen A. Newirth
LOEVY & LOEVY
Attorneys for Plaintiffs
311 N. Aberdeen Street
Third Floor
Chicago, IL 60607
(718) 490-0028