IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAYVON RUTHERFORD and REGINALD GALLMAN,    )
                                           )
                                           )
          Plaintiffs,                      )
                                           )
          v.                               ) No. 18 CV 10706
                                           ) JURY TRIAL
DET. CAMILO R. ANTONINI, Badge No. D111;   ) DEMANDED
DET. SGT. SEAN J. FEGAN, Badge No. DS001;  )
P.O. ROBERT G. PUFF, Badge No. 2154;       )
THE CITY OF MOUNT VERNON; POLICE OFFICER   )
BRIANNA M. MECCA, Badge No. 2177; DET.     )
KENNETH BRUCE, Shield No. D126; P.O.       )
DELFIM FERREIRA, Shield No. 2078; P.O.     )
JOSHUA D. HOWARD, Shield No. C2163, P.O.   )
PATRICK KING, Shield No. 2113; DET. PETER  )
VITELLI, Shield No. 2055; DET. JESUS GARCIA, )
Shield No. D161; DET. OSVALDO MEDINA,      )
Shield No. D170; P.O. JOSEPH B. VALENTE,   )
Shield No. 2059,                           )
          Defendants.                      )

SECOND AMENDED COMPLAINT

NOW COME Plaintiffs RAYVON RUTHERFORD and REGINALD GALLMAN,

and complaining of DEFENDANTS CAMILO ANTONINI, SEAN J. FEGAN,

ROBERT G. PUFF, THE CITY OF MOUNT VERNON (hereinafter, "City"),

BRIANNA M. MECCA, KENNETH BRUCE, DELFIN FERREIRA, JOSHUA D.

HOWARD, PATRICK KING, PETER VITELLI, JESUS GARCIA, OSVALDO

MEDINA, JOSEPH B. VALENTE, allege as follows:

**Introduction**

1.   The City of Mount Vernon, through members of the Mount

Vernon Police Department, including Defendants Camilo Antonini,

Sean J. Fegan, Robert G. Puff, the other Defendant Officers, and

other members of the Mount Vernon Police Department, routinely engages in a range of illegal conduct against the city's majority Black residents.  This misconduct includes fabricating crimes, falsifying reports, illegally detaining individuals who have committed no crime, and using excessive force against citizens, particularly Black citizens.

2.   Of these illegal practices, one of the most shocking is the routine use of illegal strip searches and visual and physical body cavity searches[1] of Mount Vernon's citizens, particularly Black citizens, in violation of the law and in violation of the City of Mount Vernon's own purported policies.

3.   The United States Constitution requires that all searches be reasonable.  The United States Constitution requires that, to justify the strip search of an arrestee, law enforcement officials must point to specific, objective facts and rational inferences that establish particularized reasonable suspicion for that arrestee.  The standard for visual body cavity searches is even higher:  law enforcement must have a "specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a

---

[1] A "strip search" occurs when a suspect is required by law enforcement to remove his clothes. A "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them.  A "manual body cavity search" or a "physical body cavity search" includes some touching or probing of a body cavity that causes a physical intrusion beyond the body's surface.

body cavity." That is because courts have long recognized that, while strip searches are "uniquely intrusive," visual body cavity searches are "invasive and degrading, occasioning a serious invasion of privacy and working a significant harm to a person's bodily integrity." Finally, to justify the most invasive of the three types of searches – a manual or physical body cavity search – law enforcement must have probable cause and a warrant if no exigency exists, and must conduct the invasive body cavity search in private in a safe, medically proper, and hygienic manner.

4. Invasive and degrading searches, whether strip or body cavity searches, "cannot be routinely undertaken as incident to all drug arrests or permitted under a police department's blanket policy that subjects persons suspected of certain crimes to these procedures." Yet this is just what the City of Mount Vernon has done, not only for all arrestees charged with narcotics offenses, but also for those charged with non-narcotic crimes as well as violations, including such minor violations as loitering. This is not only illegal, but intolerable.

5. Nor does a search warrant for a premises, a search warrant naming an individual, or an all-persons present warrant, without more, justify strip and/or body cavity searches. There still must exist particular, individualized facts that justify subjecting an arrestee to these searches, "i.e., specific facts

3

to support a reasonable suspicion that a particular person has secreted contraband beneath his or her clothes or in a body cavity."

6.   The MVPD routinely conduct these illegal strip and/or body cavity searches in public spaces such as the back of an unmarked police car on a public street; in private homes in view of or in close proximity to others, including members of the opposite sex, family members, and even children; and at the police department.  They are conducted in connection with arrests for violations, misdemeanors, and felonies.  They are conducted in connection with non-violent offenses, some of which are drug-related and some of which are not.  These factors exacerbate the already invasive and degrading nature of these searches.

7.   Despite the clear legal requirements for strip or body cavity searches, and the Mount Vernon Police Department's ostensible written policy setting forth numerous, specific, particularized limits on the use of strip and/or body cavity searches, the Defendant Officers and other MVPD Officers routinely strip and/or body cavity search detainees and arrestees without any semblance of the legal prerequisites necessary to support these invasive and demeaning searches and in the absence of the necessary preconditions required to make them safe and private.  These illegal searches have been

4

conducted with the knowledge and permission of those at the top of the chain of command of the Mount Vernon Police Department.

8.   Conducting strip and/or body cavity searches on persons, including Plaintiffs, without particularized suspicion borne of the facts in an individual case, is humiliatingly invasive, degrading, unconstitutional, and flatly prohibited by settled law.

9.   Rayvon Rutherford and  Reginald Gallman bring this civil rights action pursuant to the United States Constitution, as amended, the Civil Rights Act of 1871, 42 U.S.C. § 1982, and the New York State Constitution.  Plaintiffs seek redress for Defendants' deprivation, under color of state law, of their rights, privileges, and immunities secured by the Constitution and laws of the United States and the State of New York.

### Jurisdiction and Venue

10.   This action arises under the Fourth and Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the New York State Constitution and laws of the State of New York.

11.   This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and 1343.

12.   Venue is proper under 28 U.S.C. § 1391(b).  On information and belief, all of the parties reside in the

Southern District of New York, and the events giving rise to the claims asserted herein all occurred within this district.

## Parties

13.   Plaintiff Rayvon Rutherford is a 34 year old African-American man who has spent the majority of his life in Mount Vernon, New York.

14.   Plaintiff Reginald Gallman is a 38 year old African-American man who has spent the majority of his life in  Mount Vernon, New York.

15.   Defendant Detective Camilo Antonini is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

16.   Defendant Detective Sergeant Sean J. Fegan is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

17.   Defendant Police Officer Robert G. Puff is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

18.   Defendant Police Officer Brianna M. Mecca is a duly sworn police officer of the MVPD at all times relevant to this

action, acting under color of law and within the scope of her
employment as a Mount Vernon police officer.

19.   Defendant Detective Kenneth Bruce is a duly sworn
police officer of the MVPD at all times relevant to this action,
acting under color of law and within the scope of his employment
as a Mount Vernon police officer.

20.   Defendant Police Officer Delfim Ferreira is a duly
sworn police officer of the MVPD at all times relevant to this
action, acting under color of law and within the scope of his
employment as a Mount Vernon police officer.

21.   Defendant Police Officer Joshua D. Howard is a duly
sworn police officer of the MVPD at all times relevant to this
action, acting under color of law and within the scope of his
employment as a Mount Vernon police officer.

22.   Defendant Police Officer Patrick King is a duly sworn
police officer of the MVPD at all times relevant to this action,
acting under color of law and within the scope of his employment
as a Mount Vernon police officer.

23.   Defendant Detective Peter Vitelli is a duly sworn
police officer of the MVPD at all times relevant to this action,
acting under color of law and within the scope of his employment
as a Mount Vernon police officer.

24.   Defendant Detective Jesus Garcia is a duly sworn
police officer of the MVPD at all times relevant to this action,

acting under color of law and within the scope of his employment as a Mount Vernon police officer.

25.   Defendant Detective Osvaldo Medina is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

26.   Defendant Police Officer Joseph B. Valente is a duly sworn police officer of the MVPD at all times relevant to this action, acting under color of law and within the scope of his employment as a Mount Vernon police officer.

27.   Defendant City of Mount Vernon is a New York municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business in Mount Vernon, New York.

28.   Defendant City of Mount Vernon maintains the City of Mount Vernon Police Department (MVPD), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the aforementioned municipal corporation, City of Mount Vernon.

29.   Collectively, Defendants Antonini, Fegan, Puff, Mecca, Bruce, Ferreira, Howard, King, Vitelli, Garcia, Medina and Valente are referred to herein as the "Defendant Officers."

Each of the Defendant Officers is sued in his, her, and/or their individual capacities.

30.  At all times hereinafter mentioned, the Defendant Officers were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages, and/or practices of the State of New York and/or the City of Mount Vernon.

31.  Each and all of the acts defendants alleged herein were done by said defendants while acting within the scope of their employment by Defendant City of Mount Vernon.

**Rayvon Rutherford and Reginald Gallman are Violently Abused and Illegally Searched During the Execution of a Search Warrant at Michelle Campbell's Apartment**

32.  On the night of March 31, 2017, the Defendants Antonini, Fegan, Puff, Mecca, Bruce, Ferreira, Howard, King, Vitelli, Garcia, Medina, and Valente executed a search warrant or warrants at 145 South 1st Avenue, apartments 5D and 5E, in Mount Vernon, New York.  At the time of this event, Michelle Campbell was the leaseholder of Apartment 5E.  Ms. Campbell had no connection to the occupants of Apartment 5D, apart from being neighbors.  Neither Plaintiff was a resident of either of these apartments.

33.  On March 31, 2017, Plaintiffs Rutherford and Gallman, together with several other individuals, were visiting Ms.

9

Campbell's apartment.  Sometime after 10:30pm that night,
Plaintiffs heard a loud bang and saw the front door of the
apartment burst open.  Defendant Officers Antonini, Fegan, Puff,
Mecca, Bruce, Ferreira, Howard, King, Vitelli, Garcia, Medina,
Valente entered with guns drawn.

34.   Plaintiffs Gallman and Rutherford, fearful that they
could be shot, immediately got down on the floor. They were
handcuffed by Defendant Officers.

35.   Defendants Antonini and Puff then began to violently
assault Messrs. Gallman and Rutherford, by slapping, kicking,
and punching them.  This violent assault of Plaintiffs Gallman
and Rutherford by Defendants Antonini and Puff went on for at
least 5 minutes.  In addition to beating Mr. Gallman in the
living room, Defendant Antonini also took him into the bathroom
where he continued to beat him.

36.   In addition to kicking, slapping and hitting Plaintiff
Gallman with his hands and fists, Defendant Antonini also hit
Plaintiff Gallman about the head and face multiple times while
holding firearm in his hand.  During the course of the beating,
Defendant Antonini stated, in substance, "You think you're
fucking slick, I'll get the last laugh you stupid nigger."
Defendant Antonini further stated, in substance, "You know what
you did . . . you know what that's for."

10

37.   Despite also being in the apartment and therefore in
close proximity to Defendants Antonini and Puffs' illegal and
violent attack on Plaintiffs, and despite having a reasonable
opportunity to intervene and prevent the illegal and violent
attack on Plaintiffs, and knowing that the violent attack on
Plaintiffs was both illegal and in violation of Plaintiffs'
civil rights, Defendants Fegan, Mecca, Bruce, Ferreira, Howard,
King, Vitelli, Garcia, Medina and Valente took no steps to
intervene to prevent the violations of Plaintiffs'
constitutional rights.

38.   Defendant Fegan, who held the rank of Detective
Sergeant, was the highest ranking officer on the scene and the
direct supervisor of Defendant Officers including Defendants
Antonini and Fegan. Despite his authority over the Defendant
Officers, Defendant Fegan did nothing to prevent, correct, or
constrain the illegal misconduct of Defendants Antonini and
Puff.  Indeed, Defendant Fegan's inaction during all times
relevant to this Complaint represents a total abdication of his
supervisory authority.

39.   Defendants Antonini, Fegan, Puff, Mecca, Bruce,
Ferreira, Howard, King, Vitelli, Garcia, Medina and Valente
then began to strip and body cavity search the occupants of the
apartment.  Some, but not all, of these strip and body cavity

11

searches were recorded by unknown Defendant Officers at the
direction of other unknown Defendant Officers.

40. These strip and body cavity searches were conducted at
the direction of Defendant Officers, including Defendants Fegan
and Antonini.

41. For example, Defendant Mecca completed a supplemental
police reported swearing that she conducted an illegal strip and
body cavity search of Michelle Campbell at the direction of
Defendant Fegan.  Defendant Mecca also testified under oath at
Plaintiff Gallman's felony hearing that Defendant Antonini
directed her to "search [Campbell] because she has crack cocaine
up her vagina."

42. Defendant Officers asked Mr. Rutherford whether he had
any drugs or weapons on his person, and he informed the
Defendant Officers that he did not.  Defendant Officers
conducted a pat down search of Mr. Rutherford which did not
reveal any weapons, drugs, or other contraband.

43. Defendant Officers then informed Mr. Rutherford that
he would be strip searched, and Plaintiff Rutherford objected.
Defendant Officers brought Mr. Rutherford to the bathroom where
Defendant Puff attempted to strip search the still-handcuffed
Mr. Rutherford.  Mr. Rutherford again objected to Defendant
Puff's efforts to strip search him and Defendant Puff called
Defendant Antonini into the bathroom to assist.  Defendants Puff

12

and Antonini forced Mr. Rutherford to the floor and forcibly pulled down his pants and underwear, with Defendant Antonini placing his knee on Mr. Rutherford's neck, forcing his neck and face into the floor, and pulling his arm behind his back.  Mr. Rutherford could not breathe and feared that Defendant Antonini would break his arm.  Simultaneously, Defendant Puff violently stuck his fingers into Mr. Rutherford's rectum multiple times, causing extreme pain.  Mr. Rutherford, in pain, moved away from Defendant Puff.  Defendant Puff would repeat the physical body cavity search, stating, in substance "Stop moving, you are making it take longer."  Eventually, Defendants Puff and Antonini let Mr. Rutherford up and pulled up his underwear and pants.

44.  No drugs, weapons, or other contraband were found during these illegal and intrusive searches of Mr. Rutherford's body.

45.  Mr. Rutherford's genitals, anus, and nude lower body were visible to Defendants Puff and Antonini.

46.  Upon leaving the bathroom, Mr. Rutherford complained about the strip and body cavity search conducted by his subordinates to Defendant Fegan, who responded, in substance, "Stop crying, it's called a cavity search and it's totally legal."

47.   Despite also being in the apartment and therefore in close proximity to Defendants Antonini and Puffs' illegal and violent strip and physical body cavity search of Mr. Rutherford, and despite having a reasonable opportunity to intervene and prevent the illegal and violent search, and knowing that the search was both illegal and in violation of Mr. Rutherford's civil rights, Defendants Fegan, Mecca, Bruce, Ferreira, Howard, King, Vitelli, Garcia, Medina and Valente took no steps to intervene to prevent the violations of Plaintiffs' constitutional rights.

48.   Defendant Fegan, who held the rank of Detective Sergeant, was the highest ranking officer on the scene and the direct supervisor of Defendant Officers including Defendants Antonini and Fegan. Despite his authority over the Defendant Officers, Defendant Fegan did nothing to prevent, correct, or constrain the illegal misconduct of Defendants Antonini and Puff.  Indeed, Defendant Fegan's inaction during all times relevant to this Complaint, as reflected by his statement characterizing the illegal search as "perfectly legal", represents a total abdication of his supervisory authority.

49.   Defendant Officers also illegally searched Plaintiff Gallman while he was handcuffed.  Defendant Officers asked Mr. Gallman whether he had any drugs or weapons, and he informed the Defendant Officers that he did not.  Defendant Officers

14

conducted a pat down search of Mr. Rutherford which did not reveal any weapons, drugs, or other contraband.

50.   Defendant Officers forcibly removed his pants and underwear and ordered him to squat and cough, in full view of the Defendant Officers, who visually inspected the naked lower half of Mr. Gallman's body, including his genitals and anus. Mr. Gallman's nude lower body, including his genitals and anus, were also visible to any other person in the apartment.  This illegal search was recorded by a video camera, though the camera was purposely pointed away from Plaintiff Gallman during the search so only the audio of the search was captured.  An unknown Defendant Officer videotaped the search at the direction of another unknown Defendant Officer.

51.   No drugs, weapons, or other contraband were found during these illegal and intrusive searches of Mr. Gallman's body.

52.   Despite also being in the apartment and therefore in close proximity to the Defendant Officers conducting these illegal strip searches of Mr. Gallman, and despite having a reasonable opportunity to intervene and prevent the illegal search, and knowing that the search was both illegal and in violation of Mr. Rutherford's civil rights, the other Defendant Officers took no steps to intervene to prevent the violations of Plaintiffs' constitutional rights.

15

53.   Defendant Fegan, who held the rank of Detective Sergeant, was the highest ranking officer on the scene and the direct supervisor of Defendant Officers on the scene at all times relevant to this Complaint. Despite his authority over the Defendant Officers, Defendant Fegan did nothing to prevent, correct, or constrain the illegal misconduct of the Defendant Officers conducting the illegal strip search of Plaintiff Gallman.

54.   During the execution of the search warrant, Defendant Antonini confronted Ms. Campbell in a threatening manner, attempting to coerce her into blaming Mr. Gallman for any drugs in her possession.  Defendant Antonini told Ms. Campbell that if she said the drugs belonged to Mr. Gallman, she would be able to stay home that night, i.e., not be arrested, even if she herself possessed drugs.  Defendant Antonini further threatened and terrified Ms. Campbell by telling her that he would take her to the hospital where machines would be used to confirm his belief that she had drugs inside of her body, and that the machine would "burn" the drugs and "scar" her body.  Defendant Antonini groped Ms. Campbell's genitals over her clothes and told her that he knew that she had drugs inside her body.

55.   Fearful of Antonini but unwilling to falsely accuse Mr. Gallman, Ms. Campbell admitted to having drugs inside of her body, but repeatedly informed the Defendant Officers that the

16

drugs were hers and hers alone, and stating definitively that the drugs did not belong to anyone else, including Mr. Gallman. Ms. Campbell likewise informed the Defendant Officers that any other drugs or contraband found in the apartment belonged to her and her alone.

56. Defendant Fegan or Defendant Antonini directed Defendant Mecca to take Ms. Campbell into the bathroom and perform a strip and body cavity search on her. Defendants Fegan and Antonini, holding the ranks of Detective-Sergeant and Detective, respectively, were Defendant Mecca's senior ranking officers.

57. Defendant Mecca brought Ms. Campbell into the bathroom where she conducted a strip and body cavity search of Ms. Campbell. Defendant Mecca ordered Ms. Campbell to remove her pants and underwear and to remove the contraband from her body. Ms. Campbell began to remove a bag containing drugs from her vagina, but had difficulty doing so and told Defendant Mecca that she was having trouble and in pain. Defendant Mecca told Ms. Campbell to move out of the way and proceeded to remove the drugs from Ms. Campbell's body herself. In so doing, Defendant Mecca touched the outside and inside of Ms. Campbell's genitalia and caused Ms. Campbell pain.

58. In failing to report her touching of Ms. Campbell's genitals in her account of her strip and cavity search of Ms.

Campbell, Defendant Mecca created false evidence against Ms.
Campbell, which was forwarded to prosecutors.

59.   Despite the fact that Ms. Campbell informed Defendant
Officers that she was solely responsible for the drugs in the
apartment, Defendant Officers including Defendants Antonini,
Fegan, and Puff arrested all of the occupants of the apartment
and took them to the Mount Vernon Police Department.

60.   Despite also being in the apartment and therefore in
close proximity to the events described herein, and despite
having a reasonable opportunity to intervene and prevent the
illegal arrests of Plaintiffs, Defendants Mecca, Bruce,
Ferreira, Howard, King, Vitelli, Garcia, Medina and Valente took
no steps to intervene to prevent the violations of Plaintiffs'
constitutional rights.

61.   Defendant Fegan, who held the rank of Detective
Sergeant, was the highest ranking officer on the scene and the
direct supervisor of Defendant Officers including Defendants
Antonini and Fegan. Despite his authority over the Defendant
Officers, Defendant Fegan did nothing to prevent, correct, or
constrain the illegal arrests of Plaintiffs.

62.   Despite having been previously and invasively strip
and body cavity searched, Mr. Rutherford was again searched at
the police station.  On this occasion, Mr. Rutherford's
handcuffs were removed by an unknown officer and he was

18

individually placed in a cell at the Mount Vernon Police Department.  Mr. Rutherford was directed to remove each article of clothing and hand it to an MVPD officer to be searched, after which it was returned to him.  Mr. Rutherford was then directed to turn around, lift his genitals, squat, and cough.  As a result, Mr. Rutherford's buttocks, anus, and genitals were exposed to the unknown officer.

63.  Each of the Plaintiffs, together with the other occupants of the apartment at the time of the search, were charged with Criminal Possession of a Controlled Substance in the Third Degree, in violation of Penal Law 220.16, a B Felony.

64.  Each of the Plaintiffs was incarcerated at the Westchester County Jail following their arrest.  Upon arraignment, each of the Plaintiffs pleaded not guilty.

**The Defendant Officers Create False Sworn Records and Testify Falsely Under Oath in Order to Levy Criminal Charges Against the Plaintiffs**

65.  At no time during the raid of Ms. Campbell's apartment did Plaintiffs possess drugs.  As such, at no time did Mr. Gallman give Ms. Campbell drugs and at no time did Ms. Campbell state that Mr. Gallman had given her drugs.

66.  Despite this, Defendant Antonini falsely alleged in his sworn incident report that he witnessed Mr. Gallman hand Ms. Campbell a bag of drugs.  Defendant Antonini further falsely

alleged in his sworn incident report that Ms. Campbell told him
while she was in the kitchen that the drugs belonged to Mr.
Gallman and that he told her to put them in her vagina when the
MVPD burst into the apartment.  Defendant Antonini knew these
statements were false when he made them in his sworn report.  It
was on the basis of these and other false facts contained in
this report that Plaintiffs were arrested.

67.  Defendant Fegan, knowing that Defendant Antonini's
sworn incident report contained false statements, signed the
incident report as Defendant Antonini's supervisor.  Despite
this and despite having a reasonable opportunity to intervene
and prevent the inclusion of false facts in this sworn incident
report, and knowing that the inclusion of these false facts was
both illegal and in violation of Plaintiffs' civil rights, and
despite being Defendant Antonini's direct supervisor, Defendant
Fegan took no steps to intervene to prevent the violations of
Plaintiffs' constitutional rights.

68.  Indeed, some of these false statements were
contradicted by Defendant Vitelli at Mr. Gallman and Ms.
Campbell's felony hearing, where Defendant Vitelli testified
that Ms. Campbell did not say anything while she was in the
kitchen.  Instead, Defendant Vitelli falsely testified at the
felony hearing that he heard Ms. Campbell tell the MVPD officer
who conducted her strip and body cavity search – Defendant Mecca

– that Mr. Gallman had told her to put the drugs in her vagina. But Defendant Vitelli's sworn testimony at the felony hearing directly contradicted the sworn testimony of Defendant Mecca, provided at the same felony hearing, who testified under oath that Ms. Campbell did not tell her that the drugs she had were Mr. Gallman's.  Likewise, Defendant Mecca testified that she did not hear Ms. Campbell make any statements prior to entering the bathroom for her strip and body cavity search.

**Plaintiff Rutherford's False Arrest and Malicious Prosecution**

69.  As described herein, Plaintiff Rutherford was falsely arrested insofar as Defendant Antonini and the other Defendant Officers lacked probable cause to arrest him, and despite lacking such probable cause, nevertheless intended to, and did, arrest him.  At all times relevant to this complaint, Plaintiff Rutherford was conscious of his confinement and did not consent to his confinement.

70.  In connection with the events described herein, Mr. Rutherford was then falsely charged by felony complaint with Criminal Possession of a Controlled Substance in the Third Degree in violation of PL 220.16, a B felony, and Criminal Possession of a Controlled Substance in the Seventh Degree, an A misdemeanor.  The felony complaint was sworn to by Defendant Antonini and contained materially false statements alleging that

21

Plaintiff Rutherford possessed drugs at the relevant time when, in fact, Defendant Antonini knew that Plaintiff Rutherford did not so possess drugs. As described more fully herein, contrary to Defendant Antonini's false statements, Mr. Rutherford did not possess drugs at any time during the events described herein. Mr. Rutherford has at all times denied the allegations in this felony complaint, asserts that the claims contained in the first felony complaint are false, and that Defendant Antonini knew they were false when he swore out the complaint.

71. Defendants Fegan, Puff, Mecca, Bruce, Ferreira, Howard, King, Vitelli, Garcia, Medina and Valente having observed the events leading up to Plaintiff's false arrest and malicious prosecution, knew that Defendant Antonini lacked probable cause to arrest Plaintiff Rutherford because they knew that Plaintiff Rutherford did not possess any drugs during the relevant period, or otherwise engage in illegal conduct. Based on their personal knowledge, Defendants Fegan, Puff, Mecca, Bruce, Ferreira, Howard, King, Vitelli, Garcia, Medina and Valente further knew the facts described in the felony complaint were fabricated and that the false arrest and the fabricated complaint violated Plaintiff Rutherford's rights. Despite this knowledge, Defendants Fegan, Puff, Mecca, Bruce, Ferreira, Howard, King, Vitelli, Garcia, Medina and Valente took no steps

22

to intervene to prevent the violation of Plaintiff Rutherford's rights despite having the ability and opportunity to do so.

72.   While Defendant Antonini and, potentially, others created material, false information and forwarded it to a prosecutor in order to justify Plaintiff Rutherford's false arrest, and to initiate and maintain a malicious prosecution against Plaintiff Rutherford, Defendant Officers Fegan, Puff, Mecca, Bruce, Ferreira, Howard, King, Vitelli, Garcia, Medina and Valente withheld material exculpatory information from the prosecutor. Defendant Antonini also withheld material exculpatory information from the prosecutor.

73.   As described elsewhere in this complaint, Defendant Fegan was at all relevant times Defendant Antonini's supervisor. As such, in taking no action to prevent or correct Defendant Antonini's misconduct, Defendant Fegan failed to carry out his supervisory duties in accordance with the law and MVPD policy.

74.   Mr. Rutherford pleaded not guilty to the charges against him was released on his own recognizance approximately two weeks after his arrest.

75.   On September 28, 2017, the charges against Mr. Rutherford were dismissed because there was no basis in law or in fact to have charged Mr. Rutherford, as he was innocent, having not possessed drugs at any point during the relevant period.

23

**The Criminal Cases Against Plaintiff Gallman and Ms. Campbell
Are Resolved**

76.   Mr. Gallman was released on bail at some point more
than two weeks after his arrest.  Ms. Campbell was held in
Westchester County jail until she pleaded guilty three months
after her arrest.

77.   On August 28, 2017, Mr. Gallman pleaded guilty to
Criminal Possession of a Controlled substance in the 7th Degree,
a violation of Penal Law 220.03, an A Misdemeanor and was
subsequently sentenced to 3 years of probation.  Mr. Gallman was
innocent of this crime, but he feared he would be wrongfully
convicted by the Defendant Officers were he to fight the case.

**Defendant Officers Targeted and Abused Messrs. Gallman and
Rutherford at Least in Part in Retaliation for Their Refusal to
Act As Confidential Informants for the MVPD**

78.   Upon information and belief, Defendant Antonini
targeted and abused Plaintiffs Gallman and Rutherford because
they would not act as confidential informants for him.

79.   Defendant Antonini also targeted Mr. Gallman for
arrest, naming him in the search warrant application despite, on
information and belief, not having the requisite probable cause,
because he would not act as a confidential informant.

80.   Beginning in or about 2015, Defendant Antonini sought
to coerce Mr. Rutherford into acting as a confidential informant

for him.   Defendant Antonini told Mr. Rutherford, in substance, that if he acted as a confidential informant, Defendant Antonini would allow him to work as a drug dealer and that he would not have to fear arrest or criminal charges for this illegal conduct.

81.   Defendant Antonini arrested Mr. Gallman on multiple occasions in 2016.   On June 29, 2016, Defendant Antonini arrested Mr. Gallman, claiming that he was in possession of crack cocaine.   Mr. Gallman was brought to the MVPD headquarters, where Defendant Antonini attempted to coerce Mr. Gallman to work as a confidential informant.

82.   Following his June 2016 arrest and release, Mr. Gallman did not provide Defendant Antonini with any information about illegal activities as Defendant Antonini had requested. On several occasions thereafter, when Mr. Gallman would see Defendant Antonini, Defendant Antonini would threaten Mr. Gallman, stating, in substance, that he was going to "get him" unless he started to provide information as a confidential informant.

83.   On November 16, 2016, Defendant Antonini and other MVPD officers executed a purported search warrant at 145 South First Avenue, Apartment 1D, an apartment Mr. Gallman was visiting.   On information and belief, Mr. Gallman was named on this search warrant.   As in the instant case, Defendant Antonini

and other MVPD officers broke down the apartment door and entered with guns drawn.  As in the instant case, Defendant Antonini brutally beat Mr. Gallman, choking him and slamming his head against the coffee table.

84.  No drugs (except a personal use amount of marijuana), guns, or other contraband were found in the apartment, despite an extensive, and destructive, search of the apartment. Defendant Antonini and the other MVPD officers took the marijuana and cash from the apartment and, on information and belief, did not voucher the marijuana or the cash.

85.  Having not found any drugs, guns, or other contraband during the search of the apartment, Defendant Antonini left the apartment.  When he re-entered the apartment, Defendant Antonini had a plastic bag containing what appeared to be crack cocaine and stated, in substance, that Mr. Gallman and the others would be charged with the drugs.  Mr. Gallman and the two other adults in the apartment were then arrested, despite the fact that no drugs, weapons, or other contraband had been found in the apartment, and Defendant Antonini knew that the drugs he was charging them with did not belong to them.

86.  Following this arrest, Defendant Antonini again attempted to coerce Mr. Gallman to work as a confidential informant for him.

87.   Between the November 2016 raid and March 31, 2017 (the date of the instant arrest), Mr. Gallman never worked as a confidential informant for Detective Antonini, despite Detective Antonini's efforts to coerce him to do so.

88.   On information and belief, it was Mr. Gallman's refusal to work as a confidential informant that caused Detective Antonini to target him for arrest by naming him the search warrant for Ms. Campbell's apartments and further caused him to illegally brutalize him.   These aforementioned false arrests were identified as a substantial basis for Defendant Antonini's search warrant application in the instant case. Plaintiff pleads in the alternative that Defendant Antonini's search warrant application was otherwise based on false information.

89.   Given the above facts and circumstances, Defendant Antonini knew at the time of his search warrant application that he lacked probable cause to support a search warrant in this case.  As Defendant Antonini's direct supervisor, Defendant Fegan knew or had reason to know about the illegal conduct described herein, and despite having a reasonable opportunity to intervene and prevent the illegal conduct described herein, and knowing that the illegal conduct described herein would lead directly to the violation of Plaintiffs' civil rights, Defendant

27

Fegan took no steps to intervene to prevent the violations of Plaintiffs' constitutional rights.

90.  Mr. Rutherford also had prior contact with Defendant Antonini, in which Defendant Antonini tried to coerce Mr. Rutherford to agree to act as a confidential informant.

91.  In August 2012, Defendant Antonini arrested Mr. Rutherford, alleging he possessed drugs.  Upon taking Mr. Rutherford to the MVPD headquarters, Defendant Antonini told Mr. Rutherford that if he agreed to work as a confidential informant, he would not be charged with any crime.  Mr. Rutherford agreed and, on information and belief, signed a confidential informant agreement.

92.  Over the approximately three weeks following his release, Mr. Rutherford did not provide any information to Defendant Antonini or any other member of the MVPD.  As a result, he was subsequently arrested on September 22, 2012 at the direction of Defendant Antonini, and falsely charged with Criminal Possession of a Controlled Substance in the Third Degree, despite not then possessing any drugs at that time.

93.  As Defendant Antonini's direct supervisor, Defendant Fegan knew or had reason to know about the illegal conduct described herein, and despite having a reasonable opportunity to intervene and prevent the illegal conduct described herein, and knowing that the illegal conduct described herein would lead

28

directly to the violation of Plaintiffs' civil rights, Defendant
Fegan took no steps to intervene to prevent the violations of
Plaintiffs' constitutional rights.

94.   Despite being factually innocent, Mr. Rutherford
pleaded guilty in this case because he feared he would be
wrongfully convicted by the Defendant Officers were he to fight
the case, and his plea agreement allowed him to avoid the risk
of a significant prison sentence were he to be convicted at
trial.

95.   Thereafter, Mr. Rutherford had no contact with
Defendant Antonini until the events described herein.

**Defendant City of Mount Vernon Has For Decades Ignored the
Pattern of Illegal Strip and Body Cavity Searches, False
Arrests, Excessive Force, Misuse of Confidential Informants, and
Malicious Prosecutions, Instead Rewarding Officers Engaged in
this Illegal Conduct**

96.   Defendant City of Mount Vernon has long been on notice
about the illegal misconduct of MVPD officers and employees,
including Defendants Antonini, Fegan, and Puff.  This illegal
misconduct includes, as here, illegally strip and body cavity
searching arrestees, fabricating crimes, falsifying reports,
illegally detaining individuals who have committed no crime, and
using excessive force against citizens, particularly Black
citizens.

97.   According to the Mount Vernon Police Department Manual, Defendants Antonini, Fegan, and Vitelli, by virtue of their ranks, were obligated to supervise other members of the Mount Vernon Police Department, including Defendant Officers named herein, and in so supervising others, ensure that their duties were carried out legally, to "develop and improve" individuals under their command, inspect the work of others, and report misconduct.

98.   Despite these responsibilities, neither Defendant Antonini, Fegan, or Vitelli took any action to address the illegal misconduct described herein, which was rampant during the relevant period within the Mount Vernon Police Department.

99.   With respect to the routine, illegal strip and body cavity searches of arrestees, MVPD's official policy regarding searches of arrestees could not be more different than what goes on in practice.  The MVPD policy governing the search of arrested persons (Procedure No. 3.045), issued on January 4, 1993, provides, in relevant part:

> a. "a person arrested will not be subject to a full strip search unless there is a rational basis for doing so";
>
> b. "The Desk Officer or supervisor present will decide if a strip search should be conducted and is responsible that the search is conducted properly";

30

c. "A 'Strip Search' will be utilized when the arresting officer reasonably suspects that weapons, contraband or evidence may be concealed upon the person or in their underclothing, in such a manner that they may not be discovered by the previous search methods.  Other factors that should be considered in determining the necessity for a 'Strip Search' include, the nature of the crime (serious violent felony), arrest circumstances, subject's reputation (extremely violent person), act of violence, and discoveries from previous searches."

d. "A 'Strip Search' will be conducted by a member of the same sex as the arrested person in a secure area in outermost privacy and with no other arrestee present.  It should not be necessary to touch the subject's body, except for the examination of the hair."

e. "If a 'Strip Search' is conducted, such information will be entered under 'Details' in the Arrest Book. A subsequent 'Strip Search' will not be conducted unless there is reasonable belief that the subject has acquired a weapon or contraband."

f. "Under no condition shall a 'Body Cavity Search' be conducted by any Member of the Department.  As a

general rule, a warrant must be obtained before a 'Body Cavity Search' is performed.  For a 'Body Cavity Search' to be justified, there must be more than a mere chance of finding something.  The standard to be applied is "reasonableness' on the facts.  Only where the arrestee or police officer would clearly be in danger or if there was a clear indication that evidence would be destroyed, should a 'Body Cavity Search' be conducted."

g. "Compelling, exigent circumstances must be presented before the warrant requirement can be waived."

h. "Due to availability of judges in Mount Vernon, a warrant will be obtained before a 'Body Cavity Search' is conducted."

i. "A 'Body Cavity Search' must be conducted by a medical doctor in privacy, in an examining room (doctor's office, hospital) so as to insure hygienic surroundings and minimal discomfort."

j. "If a 'Body Cavity Search' is considered necessary, the Duty District Attorney and Captain will be advised and their instructions complied with and entered in the Arrest Book."

100. But this policy is so regularly and routinely disregarded that it is not, in fact, the policy of the City.

32

101. The City has long been on actual and/or constructive notice that MVPD officers including the Defendant Officers routinely conduct illegal strip and/or body cavity searches of detainees and arrestees in Mount Vernon and has endorsed these illegal searches.

102. As far back as 1999, if not earlier, an illegal strip search conducted by members of the MVPD Narcotics Squad of the MVPD – the same MVPD division to which defendants Antonini, Fegan, and Puff belonged – gave rise to a successful civil rights lawsuit. *See Flores v. City of Mount Vernon, et al.,* 41 F. Supp.2d 439 (1999). Since then, numerous civil rights lawsuits have alleged illegal strip and body cavity searches by Mount Vernon Police Department Officers, including defendants Antonini, Fegan, and Puff. *See, e.g., Scott v. City of Mount Vernon et al.,* 14 CV 4441 (SDNY) (Members of a single family alleged that defendant Antonini and other members of the Mount Vernon Police Department unlawfully entered their home, detained them without reason, and unlawfully strip searched one member of the family. This case was settled for $175,000.[2]); *Williamson v. Mount Vernon Police Dept. et. al.,* 15 CV 5635 (S.D.N.Y. 2015), (pro se complaint alleging Defendants Antonini, Fegan, and

---

[2] Ernie Garcia, "Mount Vernon to pay $175,000 in alleged home invasion", LoHud.com, Aug. 16, 2017, https://www.lohud.com/story/news/local/westchester/mount-vernon/2017/08/16/strip-search/570586001/

others conducted illegal physical body cavity searches on him in an apartment following an illegal arrest); *Long v. City of Mount Vernon*, 18-cv-09068 (same).

103. The City has also long been on actual and/or constructive notice that MVPD officers including the Defendant Officers routinely fabricate crimes, falsify reports, illegally detain individuals who have committed no crime, and use excessive force against citizens, particularly Black citizens.

104. Pending and settled civil rights cases have alleged just this type of misconduct.  In addition to *Scott*, described above, examples include:  *Nunez v. City of Mount Vernon et al.*, 14 CV 08530 (SDNY) (Two brothers allege they were wrongly arrested and beaten by Mount Vernon Police Department Officers. This case was settled for $250,000.); *Fonseca v. City of Mount Vernon et al.*, 5459/2013 (N.Y. Sup.)(An individual alleged false arrest, malicious prosecution and excessive force.  This case was settled for $75,000.);  *Giles v. City of Mount Vernon et al.*, 20 CV 5119(2020)(Plaintiff alleges that defendant Antonini, together with others, framed him for a narcotics offense, criminal charges that were ultimately dismissed.); *Govan v. City of Mount Vernon, et al.*, 19 CV 8830 (S.D.N.Y.)(Plaintiff alleges that defendant Antonini, together with others, framed him for a narcotics offense, falsely arrested and maliciously prosecuted him, and used excessive force against him.)

34

105. Audio recordings made by a whistleblower MVPD officer contain statements by other MVPD officers (who did not know they were being recorded) to the effect that MVPD narcotics officers, including Defendant Antonini and others, engage in just the type of misconduct alleged herein.  These tapes include allegations that innocent civilians were beaten, criminal charges were fabricated, and MVPD officers allowed certain drug dealers to operate with impunity in exchange for those drug dealers providing information to law enforcement sufficient to identify alleged drug buyers.[3]

106. Defendant City of Mount Vernon has also received numerous complaints by civilians about illegal strip and/or body cavity searches through formal and informal channels, as well as complaints about MVPD officers fabricating crimes, falsifying reports, illegally detaining individuals who have committed no crime, and using excessive force against citizens.[4] These complaints, made over years, demonstrated a clear and obvious pattern of the type of misconduct at issue in this case.

---

[3] *See* George Joseph, "The Mount Vernon Police Tapes:  In Secretly Recorded Phone Calls, Officers Say Innocent People Were Framed", Gothamist, June 3, 2020, https://gothamist.com/news/mount-vernon-police-tapes-innocent-people-were-framed.

[4] *See* George Joseph, "Corruption and Brutality Allegations Against Mount Vernon Detective Are Echoed by Civilian Complaints", GOTHAMIST, March 11, 2020, https://gothamist.com/news/corruption-and-brutality-allegations-against-mount-vernon-detective-are-echoed-civilian-complaints.

107. Recent media reports document the common practice of the MVPD's illegal strip and/or body cavity searches.  In one recent article, Defendant Fegan defended the strip and body cavity searches at issue in this case, in which MVPD video recordings show MVPD officers, including Defendants Antonini and Puff strip and visual body cavity search a handcuffed individual in what appears to be the living room of Ms. Campbell's apartment.  According to the article, "Fegan, the supervisor on scene during the operation, defended the officers' actions.  He argued that the searches recorded on video were strip searches with 'visual inspections.'  He said police have conducted these kinds of searches at search warrant locations for as long as he could remember.  But when pressed about Mount Vernon's police rules, which say strip searches should be conducted inside police facilities, Fegan declined comment."[5]

108. In addition to the above, the undersigned has also spoken with numerous individual residents of Mount Vernon who have described being required to submit to strip and/or body cavity searches while detained by MVPD officers, including

---

[5] *See* George Joseph, "The Mount Vernon Police Tapes:  In Secretly Recorded Calls, Officers Allege Beatings in Custody and Illegal Strip Searches," GOTHAMIST, Sept. 1, 2020, https://gothamist.com/news/mount-vernon-police-tapes-secretly-recorded-calls-officers-allege-beatings-custody-and-illegal-strip-searches.  Defendant Fegan's statements to the press echo his incorrect justification of the illegal strip and physical body cavity search to Mr. Rutherford and his apparent authorization of the other strip and body cavity searches described herein.

Defendants Antonini, Fegan, and Puff, and upon arrest by Mount Vernon Police Department officers, including Defendants Antonini, Fegan, and Puff.

109. Defendants know and at all times material herein have known that they may not institute, enforce, or permit enforcement of a policy or practice of conducting strip and/or visual body cavity searches without particularized reasonable suspicion.

110. Defendants further know and at all times material herein have known that they may not institute, enforce, or permit enforcement of a policy or practice of conducting physical body cavity searches without probable cause and/or a warrant, or an exigent circumstance, and may not do so except if they are conducted in private in a safe, medically proper, and hygienic manner

111. Despite having been put on notice of the common use of illegal strip and body cavity searches of, and other misconduct against, citizens by these complaints and lawsuits, the City of Mount Vernon ignored the existence of a clear pattern of illegal conduct, and did not recommend discipline for any of the subject officers.

112. In addition, supervisors within the Department, specifically including Defendant Fegan, had knowledge of the repeated complaints of strip and body cavity searches and other

misconduct.  Indeed, as Defendant Fegan admitted to a journalist, he was present for countless illegal strip and body cavity searches.

113. In fact, numerous illegal strip and body cavity searches were conducted at the Mount Vernon Police Department, where supervisors were knowledgeable of the illegal searches.

114. Indeed, upon information and belief, many of these illegal searches were video recorded by the MVPD.

115. Defendants know and at all times material herein have known that they may not institute, enforce, or permit enforcement of a policy or practice of conducting strip and/or visual body cavity searches without particularized reasonable suspicion.

116. Defendants further know and at all times material herein have known that they may not institute, enforce, or permit enforcement of a policy or practice of conducting physical body cavity searches without probable cause and/or a warrant, or an exigent circumstance, and may not do so except if they are conducted in private in a safe, medically proper, and hygienic manner

117.  Despite their knowledge of these illegal searches and other misconduct, policymakers took no action to train, supervise, or discipline the officers who committed these knowingly illegal searches.

38

118. Instead, certain of the Defendant Officers were rewarded with promotions for their aggressive police tactics and jobs well-done by their Supervisors.

119. Despite such notice, Defendant City failed to take corrective action.  This failure caused the officers in the present case to violate Plaintiffs' civil rights.

120. Moreover, Defendant City was aware, prior to Plaintiffs' arrests, that the individual defendants lacked the objectivity, temperament, maturity, discretion, and disposition to be employed as police officers.  Despite such notice, Defendant City retained these officers, and failed to adequately train and supervise them.

121. In particular, Defendant City was also aware from numerous complaints, lawsuits, and from public sources, including recorded conversations of MVPD officers that were provided to MVPD, that Defendant Antonini was, *inter alia*, known to have unlawfully strip searched arrestees, fabricated evidence, planted narcotics, coerced false identifications, acted in a racist and discriminatory manner, used excessive force, and generally engaged in misconduct in other cases and arrests, yet MVPD continued to employ Defendant Antonini and failed to take any  corrective action despite such notice.

122. As a direct result of the aforementioned failures, Plaintiffs' rights were violated.

39

123. All of the aforementioned acts of Defendants, their agents, servants, and employees were carried out under the color of state law.

124. The acts complained of were carried out by the aforementioned Defendant Officers in their capacities as police officers, with the entire actual and/or apparent authority attendant thereto.

125. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice procedure, or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

### Mount Vernon's Policies and Widespread Practices

126. The constitutional violations that caused the illegal strip and body cavity searches, false arrest, and malicious prosecution at issue here were not isolated events.  To the contrary, they were the result of the City of Mount Vernon's policies and widespread practices of illegally strip and body cavity searching detainees and arrestees, falsely arresting innocent people, planting evidence, and falsifying police reports and other official documents.

127. The constitutional violations that caused the illegal strip and body cavity searches, false arrest, and malicious prosecution at issue here were the result of the City of Mount

Vernon's policies and widespread practices of failing to adequately train and supervise MVPD employees on their obligations not to illegally strip and body cavity search detainees and arrestees, falsify and plant evidence, fabricate and falsify official documents, and falsely arrest, or maliciously prosecute individuals.

128. These constitutional violations were also the result of the City's policies and widespread practices of failing to discipline officers who illegally strip and body cavity search detainees and arrestees, falsify and plant evidence, fabricate and falsify official documents, and falsely arrest, or maliciously prosecute individuals.

129. The constitutional violations that caused the Plaintiffs' illegal strip and body cavity searches and the claims set forth in this Complaint were also the result of the City's policies and widespread practices of failing to intervene to prevent individual employees from violating citizens' constitutional rights.

130. In accordance with these policies and widespread practices, City employees refused to report misconduct committed by their colleagues, including the misconduct at issue in this case.

131. The City's failure to train, supervise, and discipline its officers and employees effectively condones, ratifies, and

41

sanctions the kind of misconduct that the Defendant Officers
committed against Plaintiffs in this case.  Constitutional
violations such as those that occurred in this case are
encouraged and facilitated as a result of the City's practices
and policies, as alleged above.

132. The City and their employees failed to act to remedy
the abuses described in the preceding paragraphs, despite actual
knowledge of the pattern of misconduct.  They thereby
perpetuated the unlawful practices and ensured that no action
would be taken to remedy Plaintiffs' ongoing injuries.

133. The policies and practices described in the foregoing
paragraphs were consciously approved by City policymakers who
were deliberately indifferent to the violations of
constitutional rights described herein.

### Plaintiffs' Damages
### *Rayvon Rutherford*

134. As a result of the illegal strip and body cavity
searches, violent abuse, and false arrest and malicious
prosecution described herein, Mr. Rutherford suffered physical
injuries, post-traumatic stress disorder, emotional distress,
anxiety, humiliation, shame and terror, as well as reputational
harm.

135. Mr. Rutherford is now fearful of people, particularly
police officers.  He is afraid that he can be arrested for no

42

reason at all, and can suffer violent beatings and public, intrusive bodily searches as a result of such false arrests. Indeed, Mr. Rutherford's fear of further abuse by the Defendant Officers or other MVPD officers caused him to move away from his home of Mount Vernon, NY, in order to avoid being in the same area as Defendant Officers.

### *Reginald Gallman*

136. As a result of the illegal strip and body cavity searches, and violent abuse described herein, Mr. Gallman suffered physical injuries, emotional distress, anxiety, humiliation, shame and terror, as well as reputational harm.

137. Mr. Gallman is now fearful of people, particularly police officers.  He is afraid that he can be arrested for no reason at all, and can suffer violent beatings and public, intrusive bodily searches as a result of such false arrests. Indeed, Mr. Gallman's fear of further abuse by the Defendant Officers or other MVPD officers caused him to move away from his lifelong home of Mount Vernon, NY, in order to avoid being in the same area as Defendant Officers.

138. As a result of the foregoing, Plaintiffs have suffered emotional, physical, psychological, and reputational damages, all caused by the Defendant Officers' misconduct.

### Count I – 42 U.S.C. § 1983

**Fourth Amendment/Illegal Search and Seizure – All Plaintiffs**

139. Each Paragraph of this Complaint is incorporated as if restated fully herein.

140. As described in the preceding paragraphs, the conduct of the Defendant Officers, while acting individually, jointly, and in conspiracy with one or more persons, known and unknown, as well as under color of law and within the scope of their employment, violated the Plaintiffs' Fourth Amendment rights in that they seized the Plaintiffs without justification and without probable cause and conducted illegal strip and body cavity searches of their bodies, which included the unlawful touching, and close observation, of their buttocks and genitalia.

141. As described in the preceding paragraphs, the Defendants violated Plaintiffs' Fourth Amendment rights in that they seized Plaintiffs without justification and without probable cause and conducted an illegal search of their bodies by strip searching and visually and physically body cavity searching Plaintiffs Rutherford and Campbell, and by strip searching and visually body cavity Plaintiff Gallman.

142. The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and reckless indifference to the rights of others.

44

143. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered great mental anguish, humiliation, degradation, emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

144. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Mount Vernon in the manner more fully described below in Count VII.

## Count II – 42 U.S.C. § 1983
## Excessive Force – All Plaintiffs

145. Each Paragraph of this Complaint is incorporated as if restated fully herein.

146. As described in the preceding paragraphs, the conduct of the Defendant Officers, while acting individually, jointly, and in conspiracy with one or more persons, known and unknown, as well as under color of law and within the scope of their employment, constituted excessive force in violation of the United States Constitution.

147. The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and reckless indifference to the rights of others.

148. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered great mental anguish, humiliation, degradation, emotional pain and suffering, loss of

45

liberty, and other grievous and continuing injuries and damages as set forth above.

149. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Mount Vernon in the manner more fully described below in Count VII.

### Count III – 42 U.S.C. § 1983
### False Arrest/Unlawful Imprisonment – Plaintiff Rayvon Rutherford

150. Each Paragraph of this Complaint is incorporated as if restated fully herein.

151. As described in the preceding paragraphs, the Defendant Officers, while acting individually, jointly, and in conspiracy with one or more persons, known and unknown, as well as under color of law and within the scope of their employment, falsely arrested and unlawfully detained Rayvon Rutherford.

152. The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and reckless indifference to the rights of others.

153. Upon information and belief, the search warrant or warrants underlying the instant search contained false information that Defendant Antonini knew to be false, or had reason to know was false, at the time he swore to it.

154. As a result of Defendants' misconduct described in this Count, Plaintiff suffered great mental anguish, humiliation, degradation, emotional pain and suffering, loss of

46

liberty, and other grievous and continuing injuries and damages as set forth above.

155. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Mount Vernon in the manner more fully described below in Count VII.

### Count IV – 42 U.S.C. § 1983
### Malicious Prosecution – Plaintiff Rayvon Rutherford

156. Each Paragraph of this Complaint is incorporated as if restated fully herein.

157. As described in the preceding paragraphs, the Defendant Officers, while acting individually, jointly, and in conspiracy with one or more persons, known and unknown, as well as under color of law and within the scope of their employment, caused Plaintiff Rutherford to be unreasonably seized and improperly subjected to judicial proceedings for narcotics crimes for which there was no probable cause.  These judicial proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of his innocence.

158. The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and reckless indifference to the rights of others.

159. As a result of Defendants' misconduct described in this Count, Plaintiff suffered great mental anguish, humiliation, degradation, emotional pain and suffering, loss of

liberty, and other grievous and continuing injuries and damages as set forth above.

160. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Mount Vernon in the manner more fully described below in Count VII.

### Count V – 42 U.S.C. § 1983
### Violation of the Right to Fair Trial – Plaintiff Rayvon Rutherford

161. Each Paragraph of this Complaint is incorporated as if fully restated herein.

162. Defendant Officers created false evidence against Plaintiff Rutherford and withheld exculpatory evidence against Plaintiff Rutherford.

163. Defendant Officers forwarded this false evidence to, and withheld exculpatory evidence from, the Westchester County District Attorney's Office to be used against Plaintiff Rutherford in legal proceedings, and it was used to perpetuate the proceedings against them.

164. As a result of Defendants' creation and use of false evidence, and withholding of exculpatory evidence, Plaintiff Rutherford was deprived of his liberty and suffered a violation of his constitutional right to a fair trial, as guaranteed by the United States Constitution.

165. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

166. The misconduct described in this Count was undertaken by Defendants within the scope of their employment and under color of law such that their employers, City of Mount Vernon, are liable for their actions.

<strong>Count VI – 42 U.S.C. § 1983<br>Failure to Intervene – All Defendants</strong>

167. Each Paragraph of this Complaint is incorporated as if restated fully herein.

168. In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the duty and the opportunity to do so.

169. Defendant Officers failed to intervene to prevent the violations of Plaintiffs' constitutional rights as set forth in this Complaint, including in paragraphs 40, 50, 55, 63, 70, 74, 92, and 96.

170. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth, Plaintiffs Gallman and Rutherford's innocence, and the Plaintiffs' constitutional rights.

171. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered great mental anguish, humiliation, degradation, emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

172. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Mount Vernon in the manner more fully described below in Count VII.

### Count VII – 42 U.S.C. § 1983
### Section 1983 Monell Claim – All Plaintiffs

173. Each Paragraph of this Complaint is incorporated as if fully restated herein.

174. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

175. As described in detail above, the City of Mount Vernon is liable for the violation of Plaintiffs' constitutional rights because Plaintiffs' injuries were caused by the policies, practices, and customs of the City of Mount Vernon as well as by the actions of policy-making officials for the City.

176. At all times relevant to the events described in this Complaint and for a period of time prior thereto, the City had

notice of a widespread practice by their officers and agents of illegally and intrusively searching individuals without cause, using excessive force against individuals, manufacturing false evidence, suppressing exculpatory evidence, and instigating false criminal charges, including the falsification of statements and reports, fabricating false evidence to implicate defendants in criminal conduct, and pursuing wrongful convictions through profoundly flawed investigations.

177. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately screen, hire, retain, train, supervise, and control their officers, agents, and employees, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiffs.

178. The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

179. At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto,

the City failed to promulgate proper or adequate rules,
regulations, policies, and procedures for the searching of
detainees and arrestees; the collection, documentation,
preservation, testing, and disclosure of evidence; the writing
of police reports and taking of investigative notes; obtaining
statements and testimony from witnesses; and maintenance of
investigative files and disclosure of those files in criminal
proceedings.  In addition or alternatively, the City failed to
promulgate proper and adequate rules, regulations, policies, and
procedures for the training and supervision of officers and
agents of the City, with respect to these subjects.

180. These failures to promulgate proper or adequate rules,
regulations, policies, and procedures were committed by officers
and agents of the City.

181. In addition, the misconduct described in this Count
was undertaken pursuant to the policies and practices of the
City in that the constitutional violations committed against
Plaintiffs were committed with the knowledge or approval of
persons with final policymaking authority for the City or were
actually committed by persons with such final policymaking
authority.

182. As a result of the policies and practices of the City,
numerous individuals have been illegally and intrusively

52

searched and wrongly prosecuted and imprisoned for, as well as convicted of, crimes that they did not commit.

183. Plaintiffs' injuries were directly and proximately caused by officers, agents, and employees of the City, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## Count VIII – 42 U.S.C. § 1983
## Supervisory Liability – All Plaintiffs

184. Each Paragraph of this Complaint is incorporated as if fully restated herein.

185. Defendants Antonini, Fegan, and Puff personally caused Plaintiffs' constitutional injury by being deliberately or consciously indifferent to the rights of others in failing to properly supervise and train their subordinate employees.

186. As a result of the misconduct described in this Count, Plaintiffs have suffered damages, including but not limited to emotional distress and anguish.

**WHEREFORE,** Plaintiffs, RAYVON RUTHERFORD and REGINALD GALLMAN, respectfully request that this Court enter judgment in their favor and against Defendants, CAMILO ANTONINI, SEAN J. FEGAN, ROBERT G. PUFF, CITY OF MOUNT VERNON, BRIANNA M. MECCA, KENNETH BRUCE, DELFIM FERREIRA, JOSHUA D. HOWARD, PATRICK KING,

PETER VITELLI, JESUS GARCIA, OSVALDO MEDINA and JOSEPH B.
VALENTE, awarding compensatory damages and attorneys' fees
against each Defendant, punitive damages against each of the
Defendant Officers, as well as any other relief this Court deems
just and appropriate.

**JURY DEMAND**

Plaintiffs RAYVON RUTHERFORD and REGINALD GALLMAN hereby
demand a trial by jury pursuant to Federal Rule of Civil
Procedure 38(b) on all issues so triable.


RESPECTFULLY SUBMITTED,

/s/ Karen A. Newirth
LOEVY & LOEVY
Attorneys for Plaintiffs
311 N. Aberdeen Street
Third Floor
Chicago, IL 60607
(718) 490-0028