**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| Rutherford & Gallman, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-10706-AEK |
| | ) | |
| v. | ) | Hon. Andrew E. Krause |
| | ) | United States Magistrate Judge |
| City of Mt. Vernon, *et al.*, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

---

# EXHIBIT 8

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



**KENTUCKIANA**
— COURT REPORTERS —

# CASE NO. 1:20-CV-9251

## ALAN SEWARD

## V.

## DET. CAMILO R. ANTONINI, ET AL.

### DEPONENT:

## DET. CAMILO R. ANTONINI

### DATE:

## January 03, 2022



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2              SOUTHERN DISTRICT OF NEW YORK

3                 CASE NO. 1:20-CV-9251

4                 HON. KENNETH M. KARAS

5              UNITED STATES DISTRICT JUDGE

6

7                     ALAN SEWARD,

8                      Plaintiff

9

10                       V.

11

12          DET. CAMILO R. ANTONINI, ET AL.

13                   Defendants.

14

15

16

17

18

19

20

21

22

23   DEPONENT:  DET. CAMILO R. ANTONINI

24   DATE:      JANUARY 3, 2022

25   REPORTER:  AALAYAH PURNELL



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 4 of 82
The Deposition of DET. CAMILO R. ANTONINI, taken on January 09, 2022

2..5

Page 2

```
 1                    APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF, ALAN SEWARD:
 4   Heather Lewis Donnell
 5   Loevy & Loevy
 6   311 North Aberdeen Street
 7   Third Floor
 8   Chicago, Illinois 60607
 9   Telephone No.: (312) 243-5900
10   E-mail: heather@loevy.com
11   (Appeared via videoconference)
12
13   AND
14
15   Angela Perkins
16   The Law Offices of Jarrett Adams
17   40 Fulton Street
18   Floor 23
19   New York, New York 10038
20   Telephone No.: (646) 880-9707
21   E-mail: angela@jarrettadamslaw.com
22   (Appeared via videoconference)
23
24
25
```

Page 4

```
 1              APPEARANCES (CONTINUED)
 2
 3   Also Present:
 4   Krystal Barnes, Videographer
 5   Alan Seward, Plaintiff
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              APPEARANCES (CONTINUED)
 2
 3   ON BEHALF OF THE DEFENDANTS, DETECTIVE CAMILO R.
 4   ANTONINI, POLICE OFFICER ROBERT F. PUFF, DETECTIVE
 5   SERGEANT SEAN J. FEGAN, UNIDENTIFIED MOUNT VERNON POLICE
 6   DEPARTMENT EMPLOYEES AND OFFICERS, THE CITY OF MOUNT
 7   VERNON, POLICE OFFICER MICHAEL HUTCHINS, POLICE
 8   COMMISSIONER GLENN SCOTT, POLICE OFFICER RAVIN PALMER,
 9   POLICER OFFICER PATRICK KING, POLICE OFFICER JOSPEH
10   VALENTE, SERGEANT JOSE QUINOY, POLICE COMMISSIONER SHAW
11   HARRIS, POLICE OFFICER SEBASTIAN SALAZAR, AND POLICE
12   OFFICER ROBERT F. KRESSMAN:
13   Steven Bushnell
14   Marykate Acquisto
15   The Quinn Law Firm
16   399 Knollwood Road
17   Number 220
18   White Plains, New York 10603
19   Telephone No.: (914) 997-0555
20   E-mail: sbushnell@quinnlawny.com
21   macquisto@quinnlawny.com
22   (Appeared via videoconference)
23
24
25
```

Page 5

```
 1                      INDEX
 2                                             Page
 3   PROCEEDINGS                                  7
 4   DIRECT EXAMINATION BY MS. DONNELL            8
 5
 6                    EXHIBITS
 7   Exhibit                                    Page
 8   2 - Municipal Policy 3.045                  112
 9   5 - Detective Division Standard Operational
10       Procedures 2015                         126
11   9 - Incident Report                         178
12   11 - Felony Complaint                       187
13   15 - [MARKED IN CONFIDENTIAL PORTION]
14   16 - [MARKED IN CONFIDENTIAL PORTION]
15   24 - [MARKED IN CONFIDENTIAL PORTION]
16   13 - Defendant's Limited Disclosures        138
17   *26 - Video                                 197
18
19   *WILL FORWARD UPON RECEIPT
20
21
22
23
24
25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 5 of 82
The Deposition of DET. CAMILO R. ANTONINI, taken on January 3, 2022
6..9

Page 6

```
 1              STIPULATION
 2
 3    The VIDEO deposition of DET. CAMILO R. ANTONINI was
 4    taken at KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER
 5    DRIVE, 22ND FLOOR, CHICAGO, ILLINOIS 60606, via
 6    videoconference in which all participants attended
 7    remotely, on MONDAY the 3rd day of JANUARY 2021 at 10:00
 8    a.m. EST; said deposition was taken pursuant to the
 9    FEDERAL Rules of Civil Procedure. The oath in this
10    matter was sworn remotely pursuant to FRCP 30.
11
12    It is agreed that AALAYAH PURNELL, being a Notary Public
13    and Court Reporter for the State of ILLINOIS, may swear
14    the witness and that the reading and signing of the
15    completed transcript by the witness is not waived.
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1              PROCEEDINGS
 2        VIDEOGRAPHER:  We are now on the record.  Good
 3    morning.  My name is Krystal Barnes.  I'm the online
 4    video technician and Aalayah Purnell is the court
 5    reporter.  We're representing Kentuckiana Court
 6    Reporters, located at 730 West Main Street, Suite
 7    101 in Louisville, Kentucky 40202.  Today is the 3rd
 8    day of January 2022.  And the time is 10:00 a.m.  We
 9    are convened by video conference to take the
10    deposition of detective Camilo R. Antonini in the
11    matter of Alan Seward v. Detective Camilo R
12    Antonini, et al., pending in the United States Court
13    for the Southern District of New York, case number
14    1:20-cv-9251.  Will everyone but the witness please
15    state your appearance, how you are attending, and
16    the location you are attending from, starting with
17    the plaintiff's Counsel?
18        MS. DONNELL:  Hi.  Good morning.  My name is
19    Heather Lewis Donnell, D-O-N-N-E-L-L, and I
20    represent the plaintiff Allen Seward in this matter.
21    And with me also is Ms. Angela Perkins.  She will be
22    present for the deposition, but will be just
23    observing.
24        MR. BUSHNELL:  Good morning.  This is Steven
25    Bushnell from The Quinn Law Firm.  I represent
```

Page 8

```
 1    Detective Antonini and all named Defendants,
 2    participating via Zoom from White Plains, New York.
 3    Also with me in the room is attorney MaryKate
 4    Acquisto.  She can put her appearance on.
 5        MS. ACQUISTO:  Hi, I'm Marykate Acquisto.  Last
 6    name is A-C-Q-U-I-S-T-O, also appearing virtually
 7    from The Quinn Law Firm in White Plains, New York.
 8        MR. BUSHNELL:  And, you know, for the purposes
 9    of defending the deposition, I will be the only one
10    with speaking objections, et cetera.
11        VIDEOGRAPHER:  Absolutely.  Detective Antonini,
12    will you please raise your right hand so that
13    Aalayah can swear you in?  Go ahead.
14        COURT REPORTER:  Sir, do you solemnly swear or
15    affirm that the testimony you are about to give will
16    be the truth, the whole truth, and nothing but the
17    truth?
18        THE WITNESS:  I do.
19        COURT REPORTER:  Thank you.  Counsel, you may
20    begin.
21              DIRECT EXAMINATION
22    BY MS. DONNELL:
23        Q    Okay.  Good morning, Detective Antonini.  We
24    met just before we went on the record, but again, my
25    name's Heather Donnell.  I represent Alan Seward in this
```

Page 9

```
 1    matter.  And because we're doing this via the Zoom
 2    format, I just want to make sure and make clear to you
 3    that if for some reason you don't hear one of my
 4    questions, either because of the Zoom or because of the
 5    technology, will you please let me know?  And I'm happy
 6    to state my question again or restate it for you; is
 7    that okay?
 8        A    Yes.
 9        Q    And the same thing is true, if you don't
10    understand one of my questions, will you also let me
11    know?  And then I'm happy to reframe it.  Okay?
12        A    Okay.
13        Q    Otherwise, I'm going to assume that you
14    understood the question I asked and answered it
15    truthfully.  Okay?
16        A    Okay.
17        Q    And then I imagine we're going to go for a
18    while today.  So if you need a break, just let me know.
19    I'm happy to accommodate a break.  I just request that
20    you answer one of my questions -- any pending question
21    before we take a break.  Okay?
22        A    Okay.
23        Q    And I don't know if you want the thumbs up
24    sign, but maybe for the purposes of our video, we could
25    take that off your Zoom screen.  Cool.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 6 of 82
The Deposition of GIACOMO ANTONINI, taken on January 6, 2022

10..13

Page 10

```
 1     A    Take the what?  I'm sorry.
 2          MR. ACQUISTO:  Because --
 3     Q    I'm not sure how that happened --
 4          MS. ACQUISTO:  I'll actually just take a look
 5     at it, because I know when you --
 6          THE WITNESS:  Oh, the thumbs up?
 7          MS. DONNELL:  It's off now.
 8          MS. ACQUISTO:  It is?  Oh, it's off.
 9          MS. DONNELL:  It was just -- the thumbs up
10     sign.
11          MS. ACQUISTO:  When you get sworn in and you do
12     it, then it, like, has a thing.
13          MR. BUSHNELL:  Oh, okay.
14     BY MS. DONNELL:
15     Q    I was like, maybe your verbal answers --
16     verbal answers, not Zoom emoji answers for me.  Okay.  So
17     Detective Antonini, how many times -- have you been
18     deposed before?
19     A    Yes.
20     Q    On how many prior occasions have you sat for
21     your deposition?
22     A    Can't recall.
23     Q    Are you able to estimate how times?
24     A    I want to say probably less than five, maybe.
25     Q    Okay.  So somewhere -- five or less, you've
```

Page 11

```
 1     been deposed; is that right?
 2     A    Five or less.
 3     Q    Okay.  And in those five or less depositions,
 4     were those all involving lawsuits that were inquiring
 5     into your work as a Mount Vernon police officer?  Or did
 6     some of those cases have to do with some other -- like a
 7     private lawsuit outside your work?
 8     A    Work related.
 9     Q    Okay.  And all of the prior depositions, have
10     they been work related since your employment with the
11     Mount Vernon Police Department?
12     A    Yes.
13     Q    Okay.  Do you remember the names of any of
14     those cases -- the plaintiffs in any of the actions
15     where you've been deposed previously?
16     A    No, I do not.
17     Q    In all of the prior occasions when you've been
18     deposed, were you a named Defendant?
19     A    Can't recall whether I was or I wasn't.
20     Q    Have you ever testified at a civil trial
21     related to your work as a Mount Vernon police officer?
22     So I'm not asking about criminal trials, but any civil
23     cases?
24     A    I don't recall ever testifying in a civil
25     trial.
```

Page 12

```
 1     Q    Did you review -- well, I'm going to ask you
 2     some questions about what you did to prepare for your
 3     deposition today.  But I just want to be clear; I'm not
 4     asking you to divulge or disclose any of your
 5     communications with Steve, or Marykate, or any of your
 6     other lawyers; is that clear?
 7     A    Yes.
 8     Q    Okay.  So did you -- first of all, did you
 9     meet with your attorneys to prepare for your deposition?
10     A    Yes.
11     Q    How many occasions did you meet with your
12     attorneys to prepare for today?
13     A    I'll say, maybe twice.
14     Q    Okay.  Were those in person meetings?
15     A    Yes.
16     Q    And how long ago was the first meeting that
17     you had with your attorneys to prepare for today?
18     A    I wasn't timing it.
19          MR. BUSHNELL:  She's asking you when.  When was
20     it?
21     A    When was it?  Prior to the new year.
22     Q    Okay.  Was it prior to Christmas?
23     A    Yes.
24     Q    And how long was that meeting?
25     A    I wasn't timing it.  I'm sorry.
```

Page 13

```
 1     Q    Was it more than an hour?
 2     A    Just about an hour, give or take.
 3     Q    Okay.  And that was the first meeting you
 4     recall having, preparing for your deposition, correct?
 5     A    Maybe -- yes.
 6     Q    And that was so time before Christmas -- was
 7     it in the month of December?
 8     A    One of them.  Yes.
 9     Q    And that meeting, you'd estimate was
10     approximately an hour long?
11     A    Give or take.
12     Q    Did you look at any documents during that
13     first meeting you've just testified to?
14     A    Yes.
15     Q    Okay.  What documents did you look at?
16     A    Reports.
17     Q    What kind of reports?
18     A    Department reports, anything that had possibly
19     my name, reports that I wrote, or the complaints that
20     were filed.
21     Q    And when you're saying, "Complaints that were
22     filed," what are you referring to?
23     A    Complaints that were filed against me.
24     Q    Are you talking about citizen complaints that
25     were filed against you?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 7 of 82
The Deposition of GRELLON R. ANTONINI, taken on January 07, 2022

14..17

Page 14

1    A    Correct.
2    Q    Do you recall any of the citizen complaints
3  that you reviewed during your first meeting to prepare
4  for your deposition?
5    A    No.
6    Q    I'm sorry, can you repeat that for me?
7    A    No, I don't.
8    Q    Do you remember how many citizen complaints
9  you reviewed during your first meeting with your
10 attorneys?
11   A    I don't, sorry.
12   Q    And when you said you reviewed police reports,
13 what kind?  Were those police reports related to the
14 incident that's at issue in Mr. Seward's complaint?
15   A    That is correct.
16   Q    And then you reviewed citizen complaints that
17 had to do with other individuals, correct?
18   A    Correct.
19   Q    Any other documents that you reviewed?
20   A    No.
21   Q    Did you look at any video or photographs?
22   A    Video.
23   Q    Okay.  What video did you -- this was during
24 the first meeting you reviewed some video; is that
25 right?

Page 15

1    A    It's the same video. Just --
2    Q    What do you mean it's the same video?
3    A    Video pertaining to this case.
4    Q    Okay.  Did you review more than one video or
5  just one video?
6    A    The only video.
7    Q    Okay.  And describe the video that you
8  observed?
9    A    The video is of the search of the apartment.
10   Q    Are you present in that video?
11   A    My voice is, but I am present in that
12 apartment.  Yes.
13   Q    Are you the one operating the video cam
14 recorder?
15   A    I am.
16   Q    Okay.  Prior to your meeting with your
17 Counsel, sometime in December of 2021, where you looked
18 at police reports, and citizen complaints, and watched
19 the video from the search on First Avenue, did you have
20 an independent recollection of the events that are the
21 subject of this lawsuit?
22   A    No.
23   Q    So -- and as you sit here today -- when
24 I'm questioning you today, do you have an independent
25 recollection of any of the events pertaining to

Page 16

1  Mr. Seward's lawsuit?  Or is your memory limited to
2  what's in the documents and in the video?
3    A    Other than what was presented to me in the
4  report and video, that particular incident didn't have
5  any significance of me -- for me to remember it.  There
6  was -- other than me recording the apartment and --
7  that's to the extent of my recollection of that
8  incident.
9    Q    Okay.  So is it accurate to say that your
10 memory of the events of November 7, 2017 is limited to
11 what was -- how your memory was refreshed through the
12 police reports you reviewed and the video you reviewed?
13   A    Yes, pretty much.
14   Q    Do you have a memory of any of the events of
15 November 7, 2017, outside of what you read in the police
16 reports or observed in the video?
17   A    No.
18   Q    And so looking at those documents and
19 reviewing those videos did not refresh your recollection
20 in any way, as to events that occurred outside of what's
21 documented in the reports or in the video; is that
22 right?
23   A    That is right.
24   Q    How about the second meeting you had with your
25 attorneys to prepare for today in person meeting?  When

Page 17

1  was that meeting?
2    A    I don't recall a specific day.
3    Q    Was it last week?
4    A    No.  Last week was Christmas.
5    Q    Well, last week -- Monday was the 27th,
6  Christmas was Saturday the 25th.
7    A    I was on vacation.  So no, it wasn't last
8  week.
9    Q    Okay.
10        MR. BUSHNELL:  Heather, could we take one
11 second, please?
12        MS. DONNELL:  You want to take a break?
13        MR. BUSHNELL:  Yeah, real quick.
14        MS. DONNELL:  Sure.  We can go off the record.
15        (OFF THE RECORD)
16        VIDEOGRAPHER:  The time is now 10:14 a.m.
17 BY MS. DONNELL:
18   Q    Okay.  Now you can -- Detective Antonini, is
19 there a prior answer you'd like to clarify?
20   A    Yes.  I will admit one prior time in
21 preparation for this deposition.  In regards to this
22 case, yes.
23   Q    Okay.  And did you meet with your attorneys
24 before the deposition commenced this morning?
25   A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 8 of 82
THE DEPOSITION OF GREGORY ANTONINI taken on January 6, 2022

18..21

Page 18

1    Q    Did you look at any documents this morning?
2    A    Briefly reviewed through the documents.  Yes.
3    Q    What documents did you look at this morning?
4    A    Same documents that were presented to me
5  before.
6    Q    And that means the police report from the
7  November 7, 2017 incidents?
8    A    Yes.
9    Q    Did you look at the video today?
10   A    No.
11   Q    Okay.  Have you had any -- again, so just to
12  clarify, I'm not asking you to divulge or disclose any
13  of your communications with your attorneys.  But have
14  you had any meetings with your attorneys, in which other
15  of the defendant officers named in this lawsuit were
16  present?
17       MR. BUSHNELL:  Objection.  Go ahead.
18   A    I don't recall.  Possibly, somebody coming in
19  and me going out.  Or the other way around, me coming in
20  and the other person leaving.
21   Q    Other than the conversations you've had to
22  prepare for your deposition with your attorneys, have
23  you had any conversations with any of your work
24  colleagues about your deposition today or the subject
25  matter of your deposition today?

Page 19

1    A    No.
2    Q    Okay.  Are you aware of a federal
3  investigation by the United States Department of Justice
4  into the Mount Vernon Police Department regarding
5  certain policies and practices?  Do you have any
6  knowledge or awareness of that investigation?
7    A    I am aware.  Knowledge of what they're
8  investigating, no.
9    Q    I'm sorry.  Can you clarify the last part of
10  your answer?  You don't know what they're investigating?
11   A    No.
12   Q    So as you sit here today, you have no
13  knowledge of what particular patterns or practices the
14  United States Department of Justice is investigating for
15  the Mount Vernon Police Department?
16       MR. BUSHNELL:  Objection.  You can answer.
17   A    That is correct.
18   Q    Okay.  Is this -- I will represent to you that
19  one of the things the Department of Justice is looking
20  into is a pattern and practice of unlawful strip
21  searches.  Are you -- is this the first time you're
22  hearing that?
23   A    Is that the comment that was expressed on the
24  news media outlets?
25   Q    Well, I'm just asking you.  Have you not had

Page 20

1  any awareness, that that's one of the patterns and
2  practices the Department of Justice is investigating?
3    A    I am aware that the Department of Justice is
4  investigating the city of Mount Vernon.  What they're
5  investigating, I'm not -- you know, I'm not aware.
6    Q    Okay.  So then I'm just going to repeat my
7  question.  I'm going to represent to you that one of the
8  things they're looking into is -- they're looking at and
9  investigating the possible pattern or practice of
10  unlawful strip searches by the Mount Vernon Police
11  Department.  Is this, right now, the first time you're
12  being made aware of that?
13   A    I was made aware of the Department of Justice
14  investigating the seat of Mount Vernon Police Department
15  through the same media outlets that, you know, I saw on
16  the news.  Nobody, you know, specifically or directly
17  expressed anything in regards to me.
18   Q    Okay.  I just want to make sure that
19  you're understanding my question.  So my question is,
20  because I've made a representation to you about one of
21  the subject matters of the Department of Justice's
22  investigation, is that clear to you?
23   A    Yes.
24   Q    Okay.  And it has to do with a possible
25  pattern and practice of unlawful strip searches by the

Page 21

1  Mount Vernon Police Department.  Do you hear that?
2    A    Yes.
3    Q    Okay.  My question to you is, is right now, me
4  making that information available to you, the first time
5  you're being made aware that that is one of the patterns
6  and practices that Department of Justice is
7  investigating?
8    A    No.
9    Q    Or did you know that before?
10   A    I didn't know that before.
11   Q    Okay.  So it's correct to say this is the
12  first time, here in your deposition, that you're
13  learning that information?
14   A    What I heard on the news when they, you know,
15  came out and said what they were going to do.
16   Q    Okay.  And just to be clear, you told me
17  earlier, you knew there was an investigation, but you
18  didn't know the subject matter of the investigation,
19  correct?
20   A    Correct.
21   Q    Okay.  And then I made a representation to
22  you, of a particular subject matter they are
23  investigating related to unlawful strip searches, right?
24   A    Yes.
25   Q    And then my question is, is right now the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK  Document 187-8  Filed 12/24/22  Page 9 of 82
The Deposition of  CAMILO R. ANTONINI, taken on January 5, 2022

22..25

Page 22

1  first time you are learning that information?  And I
2  don't feel like I've gotten an answer quite -- whether
3  it's clear to me, whether you're just learning that
4  information for the first time now, or you knew about it
5  earlier?
6      A    When I learn -- the same.  When I learned it
7  on the news.  When they came out and said it.
8      Q    Okay.  So --
9          MR. BUSHNELL:  Maybe it would be more helpful -
10  - can you ask him what he learned from the news
11  report that you're referring to?
12  BY MS. DONNELL:
13      Q    Sure.  It sounded like -- I asked you if you
14  had known any of this subject matter that the Department
15  of Justice was looking into.  And you said, no, you just
16  generally knew about the investigation.  Can you clarify
17  for me, what you learned when you listened to the news
18  report about what the Department of Justice was
19  investigating -- your understanding of their
20  investigation?
21      A    Practicing policies that were -- you know,
22  Mount Vernon -- the City of Mount Vernon Police
23  Department were having at the time, or whenever this
24  pattern was happening.  And one of the patterns is
25  illegal strip searches and anything to that nature.

Page 23

1      Q    Okay.  So then you did know that they were
2  looking into a possible pattern and practice of unlawful
3  strip searches when you listened to the news?  That's
4  when you became aware of that information, correct?
5      A    I became aware when I heard the news.
6      Q    Okay.  Got it.  So you knew that before your
7  deposition today, correct?
8      A    Yes.
9      Q    Okay.  Have you been interviewed by the
10  Department of Justice for its investigation?
11          MR. BUSHNELL:  Objection.  Go ahead.
12      A    No.
13      Q    Have you -- do you have any awareness of
14  whether the Department of Justice has sought to
15  interview you?
16          MR. BUSHNELL:  Objection.  You can answer.
17      A    No.
18      Q    Okay.  Do you -- have you retained Counsel,
19  for purposes of the Department of Justice's
20  investigation?
21          MR. BUSHNELL:  Objection.  You can answer.
22      A    No.
23      Q    Have you ever been interviewed the FBI, for
24  your work as a police officer with Mount Vernon?
25      A    No.

Page 24

1      Q    Have you had any contact with the Southern
2  District of New York US Attorney's Office?
3      A    No.
4      Q    Have you had any interviews --
5          MR. BUSHNELL:  Sorry -- let -- let her finish
6  her question.
7      Q    Have you been interviewed by anyone from the
8  Southern District of New York US Attorney's Office?
9          MR. BUSHNELL:  In regard -- sorry -- can we --
10      Q    In regard to your work as a Mount Vernon
11  police officer?
12      A    No.
13      Q    All right.  You became a sworn officer with
14  the Mount Vernon Police Department in January of 2008;
15  is that correct?
16      A    That is correct.
17      Q    Okay.  Prior to that, you were employed with
18  the NYPD -- the New York Police Department, right?
19      A    Yes.
20      Q    And is it accurate to say you were employed
21  with the New York Police Department from January 9, 2006
22  to January 3, 2008?
23      A    Yes.
24      Q    Okay.  So it was just a little shy of two
25  years, right?

Page 25

1      A    Yes.
2      Q    Have you ever been employed by any other law
3  enforcement agencies other than NYPD and Mount Vernon?
4      A    No.
5      Q    Have you applied to join any other law
6  enforcement agencies other than the New York Police
7  Department and the Mount Vernon Police Department?
8      A    While employed?
9      Q    No.  Just at any other time in your life, have
10  you tried to -- have you made an application to any
11  other law enforcement agencies other than those two?
12      A    Oh, yes.  LAPD, border patrol, DEA, to name a
13  few, you know --
14      Q    Yeah.  What other ones?  LAPD, border patrol -
15  - that's for the US government?
16      A    Correct.  DEA.  But this was all while I was
17  still in the United States Marine Corps.  So we're going
18  back to possibly 2002, 2003.
19      Q    Okay.  How long were you active duty with the
20  Marine Corps?
21      A    Four years.
22      Q    Three years?
23      A    Four years.
24      Q    Oh, four years.  Sorry, I misheard you.  What
25  years were you active duty with the US Marine Corps?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 26

1   A   December 1999 to December 2003.

2   Q   And what was the status of your discharge?

3   A   Honorably.

4   Q   Did you do any tours overseas?

5   A   Yes.

6   Q   Where did you serve?

7   A   Iraq.

8   Q   Did you do one or more than one tour in Iraq?

9   A   One tour.

10  Q   How long was your tour?

11  A   October 2002 to March or April 2003.  One of

12  the two, or longer than that, if I recall.

13      Q   After you left the Marine Corps in December

14  2003, where did you work -- did you work before your

15  employment with the New York Police Department in

16  January 2006?

17  A   W.B. Mason.

18  Q   I'm sorry, you'll have to repeat that for me.

19  A   W.B. Mason.

20  Q   W.B. Mason?  What is W.B. Mason?

21  A   W.B. Mason is a paper supply company.

22  Q   Where is it located?  Or where were you

23  working for W.B. Mason?

24  A   At the time I was sta -- the company was

25  located in Secaucus, New Jersey.

Page 27

1   Q   Secaucus, New Jersey?

2   A   Yes.

3   Q   And what position did you have with the W.B.

4   Mason company?

5   A   I was a delivery -- delivery truck driver.

6   Q   How long were you employed by W.B. Mason as a

7   delivery truck driver?

8   A   As soon as I was discharged from the military

9   until I was hired by the NYPD.  So it was pretty much my

10  waiting period for the hiring.

11  Q   When did you first apply to NYPD?

12  A   Oh, I don't -- I can't remember.  It's a long,

13  long time ago.

14  Q   Was it a long time before you were employed

15  with them in 2006?

16  A   Oh, no.  I want to say, probably a year prior

17  of being hired, give or take, somewhere around that time

18  frame.

19  Q   And was that the same time period that you

20  were also applying to the other agencies you mentioned?

21  The LAPD, border patrol, DEA?

22  A   No, I was applying to them, while I was still

23  employed -- while I was still inside the military.

24  Q   Okay.  Did you-

25  A   I wanted somehow to transition from doing my

Page 28

1   military duty into a law enforcement career.  But the

2   process was so long that -- you know, from me coming

3   back from war time, didn't have enough time for me to

4   transition into a law enforcement career.  So my time

5   ended, and I had to pretty much just come back to New

6   York, stay with -- and find another job while I was

7   applying to NYPD.

8   Q   So it sounds like the agencies you mentioned

9   before, LAPD, border patrol, and DEA, you applied to

10  while you were active duty with the Marine Corps,

11  correct?

12  A   Correct.

13  Q   Did you also apply it -- to the NYPD, while

14  you were active duty with the Marine Corps?

15  A   I don't think so, no.

16  Q   Were there any other law enforcement agencies,

17  other than the three that you earlier testified to?

18  A   I can't remember, no.

19  Q   Okay.  Were you offered positions with LAPD?

20  A   I had a formal interview, and right after

21  that, I believe it was -- you know, I had to wait a

22  little bit.  The last thing I remember was having a

23  formal interview and then waiting for the call back.  But

24  during, like, my end of, you know, contract with the

25  Marine Corps came in, so I couldn't stay in California.

Page 29

1   I just came back to New York.  So the time between was

2   not close enough.

3   Q   Got it.  Were you stationed out of San Diego

4   with the Marine Corps?

5   A   San Diego, California.  Yes.

6   Q   Okay.  How about border patrol?  Did you get a

7   formal interview with border patrol?

8   A   I don't think so.  I don't remember, no.

9   Q   How about the DEA?

10  A   No, they were looking for college,

11  unfortunately.

12  Q   Oh, I haven't even asked you that.  Can you

13  describe for me your educational background?  Do you

14  have a high school diploma?

15  A   High school diploma.

16  Q   When did you graduate?  Or where did you

17  attend high school?

18  A   George Washington High School.

19  Q   Where is that located?

20  A   City of New York.

21  Q   Did you graduate from George Washington High

22  School?

23  A   Yes.

24  Q   What year?

25  A   1999.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1  Q    Okay.  Have you attended any post-high school
2  classes in college?
3  A    No.  Other than what I attended in the Marine
4  Corps.
5  Q    And what did you -- you mean like basic
6  training?
7  A    Basic training and supplemental training.  That
8  was a college credit.
9  Q    What kind of college credit did you get?  What
10 courses?
11 A    Can't remember that.
12 Q    Okay.  So you were -- let's talk about your
13 employment with the New York Police Department.  Did you
14 -- you wrote your swear in date was January 9, 2006; is
15 that right?
16 A    I believe so.
17 Q    Did you attend the academy -- the police
18 academy?
19 A    Yes.
20 Q    How long was that?
21 A    Roughly, six months, I think.
22 Q    Is that run by NYPD?
23 A    Yes.
24 Q    How much of the six months is classroom
25 coursework?  Is that all classrooms for six months?  Or

Page 31

1  are you on the street for part of that?
2  A    All classroom.
3  Q    So it's six months of classroom?
4  A    Yes.
5  Q    And then you are assigned as a probationary
6  officer in the patrol division; is that right?
7  A    Yes.
8  Q    Where were you assigned as a probationary
9  officer in the patrol division of the New York Police
10 Department?
11 A    23rd Precinct.
12 Q    And you'll have to tell me the geographic area
13 of the 23rd Precinct, because I'm not as familiar with
14 NYPD's precincts.
15 A    East Harlem.
16 Q    East Harlem?  Thank you.  Did you get through
17 your probationary period?
18 A    Yes.
19 Q    Where were you assigned after your
20 probationary period ended?
21 A    Soon after the 23rd Precinct, I was stationed
22 at the 26th Precinct, which is on the west side of
23 Manhattan -- Upper West Side.  I was there for a brief -
24 - brief time.  And then I was assigned to the Manhattan
25 North Task Force.

Page 32

1  Q    The Manhattan what task force?
2  A    Manhattan North.
3  Q    What is the Manhattan North Task Force?
4  A    It's sort of like a unit that's pretty much
5  tasked with responding to, like, major incidents, all
6  the hot zones throughout the whole northern Manhattan.
7  And they address -- I don't know, areas where they're
8  being -- you know, like, they have the most crimes.
9  Q    Is it a tactical unit?  Or it's just a special
10 unit within patrol?
11 A    Special unit within patrol.
12 Q    Okay.  And it sounds like you get called out
13 to incidents that might need additional patrol officers?
14 A    Correct.
15 Q    Is it a uniformed position?
16 A    At the time, yes.
17 Q    How long did you work for the New York Police
18 Department assigned to the Manhattan North Task Force?
19 A    All the way up to the -- my transfer to -- all
20 the way up to my resignation.
21 Q    So I was going to ask, you resigned from the
22 New York Police Department?
23 A    Yes.
24 Q    Why did you choose to resign from the New York
25 Police Department?

Page 33

1  A    In order to be hired by the Mount Vernon
2  Police Department.
3  Q    Why did you want to leave NYPD to go to Mount
4  Vernon?
5  A    Why?
6  Q    Yeah.
7  A    Better pay -- at the time it was better pay.
8  Q    Any other reason other than at the time it was
9  better pay for police officers at Mount Vernon?
10 A    No.  Well, the purpose was to leave New York
11 City in order to come into the Westchester County.
12 Q    Okay.
13 A    It's better benefits, better pay.  Everything
14 is better at the time.
15 Q    Okay.  Is it different now?  Is it -- you're
16 saying at the time, it was better benefits, better pay.
17 Is it different now?  Does New York police get paid
18 better -- better pay now?
19 A    NYPD?
20 Q    Yeah.
21 A    Compared to City of Mount Vernon?
22 Q    Yeah.
23 A    I don't know how you want me to answer that.
24 Q    If you know.  Well, you're saying at the time
25 -- at the time it was better pay, and I was just curious



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 12 of 82
The Deposition of DET. CAMILO N. ANTONINI, taken on January 13, 2022

34..37

Page 34

1  if something has changed now where --
2      A    Well, it's always changing, but you know, if
3  you give a choice to somebody in NYPD right now, whether
4  they would like to transfer out of there to another
5  department?  I don't think any cop will hesitate.  So I
6  -- obviously, you know, I'm speculating, but the
7  sentiment between the younger generation police officer,
8  they'd rather go to other departments that are better
9  pay, less stress -- you know, you don't have to deal
10 with a lot of interaction or -- you know, it is a whole
11 different mentality.
12     Q    Okay.  When did you first apply to the Mount
13 Vernon police department?
14     A    So I was hired sometime in January, correct.  I
15 want to say six months prior to that, if I remember, I
16 took the test.
17     Q    Okay.  Before we move on, I forgot to ask.  Did
18 you have -- are you aware of whether you had citizen
19 complaints filed against you when you were a New York
20 police officer?  I'm sorry.  What's that?
21     A    That's a big zero.  Never.
22     Q    Oh, that's a zero.  Okay.
23          MR. BUSHNELL:  You got -- you've got to do
24     verbal answers.
25     Q    You have to give me a verbal answer.

Page 35

1  Otherwise, I -- the transcript -- Aalayah will -- needs
2  your verbal answer.  But okay, got it.  So had -- you
3  have awareness of -- did you have any disciplinary
4  actions against you, while you were a New York Police
5  Department officer?
6      A    Never.
7      Q    Okay.  All right.  So let's go back to Mount
8  Vernon then.  Okay.  So you started with Mount Vernon, I
9  have it January 8, 2008.  Does that sound right to you?
10     A    Give or take, yes.
11     Q    Now when you became a Mount Vernon
12 police officer, you -- did you have to go back to the
13 academy?
14     A    No.
15     Q    Okay.  Did you start right away then, as a
16 patrol officer with the Mount Vernon Police Department?
17     A    My probationary period was shorter than
18 somebody that would've graduated from the Westchester
19 County Police Academy.
20     Q    Got it.  But basically your time with the New
21 York Police Department Police Academy, you were able to
22 waive attending any academy at Westchester because you'd
23 done six months with NYPD, correct?
24     A    Correct.
25     Q    Okay.  Was there any additional training that

Page 36

1  you got on the policies and practices for the Mount
2  Vernon Police Department when you first started?
3      A    The refresher into their own policies,
4  department -- departmental policies at the time, yes.
5      Q    How long was that -- what you're saying, like,
6  refresher on the Mount Vernon police office -- Mount
7  Vernon Police Department policies?
8      A    In house training, I can't remember a specific
9  time frame, but did I want to say probably a couple of
10 weeks, maybe.
11     Q    So you were in classroom a couple weeks,
12 before you went out on the street?
13     A    Correct.  Yes.
14     Q    Okay.  And so somewhere between two to three
15 weeks, you think?
16     A    I can't remember the time frame, but the --
17     Q    Were you at the police academy with other
18 cadets being trained or were you getting --
19     A    No.
20     Q    -- individual training?
21     A    It was the whole -- their graduating class at
22 the time, plus I believe it was me and another
23 individual that were NYPD transfers.  So I can't
24 remember the number of guys that they had graduated, but
25 it was roughly somewhere in between 15, maybe 20

Page 37

1  altogether.  And we were all being in-house trained at
2  the time in Mount Vernon PD.
3      Q    And that was being run by Mount Vernon PD?
4      A    Yes.
5      Q    I see.  So it was --
6      A    By their training unit.
7      Q    I see.  Let me just clarify.  So for people
8  who were new police officers, they got trained by
9  Westchester County at the police academy and then you
10 plus another individual transferring from NYPD, all of
11 you came together for some additional classroom training
12 by just Mount Vernon?
13     A    Correct.
14     Q    Okay.  And that portion, the Mount Vernon
15 portion, you think was approximately two to three weeks?
16     A    Give or take.  I can't remember the exact
17 amount -- the exact time.
18     Q    Okay.  Do you recall any of the subject matter
19 that you were trained on by Mount Vernon?
20     A    It was pretty much all of their policies and
21 procedures.
22     Q    Do you remember being trained on how to
23 conduct pat-down searches by Mount Vernon?
24     A    I -- specific subjects, I don't remember.
25     Q    Okay.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 13 of 82
The Deposition of DET. CAMILO H. ANTONINI, taken on January 13, 2022

38..41

Page 38

1    A    But I can tell you that it was all their
2  practices, policies, everything that had to be Mount
3  Vernon related was, you know, pretty much just given to
4  us during that timeframe, so...
5    Q    But -- oh, I didn't want to interrupt you.
6  Continue.
7    A    Everybody that graduated from the academy was
8  -- they graduated based on becoming a police officer.
9  Nothing specific related to the Mount Vernon Police
10  Department.  Anything Mount Vernon Police Department
11  related was given to us at the Mount Vernon Police
12  Department in-house training.
13    Q    Okay.  But say -- let -- so, but as you sit
14  here today, are you able to identify for me, based on
15  your memory, any of the specific subject matter that you
16  were trained on by Mount Vernon?
17    A    Give you an example right now.  How to use the
18  -- how to use the Ten-codes, which is pretty much how do
19  we use the codes on the radio.  That was one of them
20  that I can remember.
21    Q    Okay.
22    A    They taught us how the city of Mount Vernon is
23  broken into sectors, how to respond on the radio, how --
24  you know, what commands do we usually use, you know. And
25  then, you know, they went into depth in regards to like

Page 39

1  policies, procedures, in regards to uniform, anything
2  that, you know -- everything Mount Vernon related.
3    Q    Okay.  Did you, during this Mount Vernon
4  training, get trained on Mount Vernon's policies and
5  practices with respect to conducting custodial searches;
6  if you recall?
7    A    Correct.  I don't recall, but I'm sure we did.
8  Okay.
9    Q    Well, I only want to know what you actually
10  remember, so...
11    A    So no, I don't remember.  No.
12    Q    Okay.  And did you -- do you have a specific
13  recollection of being trained on Mount Vernon's policy
14  and practice with respect to conducting strip searches?
15    A    I don't remember.
16    Q    And how about the same question with respect
17  to Mount Vernon's policies and practices with body
18  cavity searches?
19    A    I don't remember.
20    Q    Okay.  Do you remember any of the individuals
21  who provided that training to you and the other
22  officers?
23    A    Yes, but they are long since retired.  I mean,
24  I keep -- but that -- those Lieutenant Vincent Manzione.
25    Q    Vincent Manzione?

Page 40

1    A    Manzione.  I remember he was --
2    Q    Manzione.
3    A    Manzione.  Yes
4         MR. BUSHNELL:  M-A-N-Z-I-O-N-E.
5    Q    Okay.  Got it.  Any other individuals that you
6  recall as you sit here today?  That -- even if they're
7  retired.
8    A    Joseph Cappuccilli was another one of the
9  training officers.
10         MR. BUSHNELL:  I don't know how to spell that
11  one.
12    A    I don't know how to spell his name.
13    Q    I think -- I got it close enough.  Cappuccilli
14  -- Joseph Cappuccilli.  Anyone else?
15    A    I can't think of the other officer's name, but
16  there was -- there were two officers -- was the
17  Lieutenant Vincent Manzione.  That's all I can remember.
18    Q    Okay.  Thank you.  Again, obviously, I'm
19  asking questions, some of this from a long time ago, so
20  it's just to the best of your ability.
21    A    Correct.
22    Q    Okay.  All right.  So then, after you
23  completed this, you know, refresher, however you've
24  described it, but this time on Mountain Vernon's
25  specific policies, were you given an assignment -- your

Page 41

1  first assignment with Mount Vernon Police Department?
2    A    Patrol.
3    Q    And were you initially a probationary officer?
4    A    Be -- for a short period of time, yes.
5    Q    Do you remember how long that period of time
6  was?
7    A    Everybody's -- I believe everybody's
8  probationary period at the time was 18 months. I believe
9  we had a six-month probationary period.
10    Q    When you're saying six months, are you're
11  referring to the other individuals that was coming with
12  you from NYPD?
13    A    Yes.  There was only two.
14    Q    Who was that other individual?
15    A    Can't remember his name specific because he
16  didn't last too long in Mount Vernon.
17    Q    Okay.
18    A    He transferred somewhere else.
19    Q    Got it.  Okay.  So you were assigned to
20  patrol, and you were probationary for approximately six
21  months.  Where were you assigned to patrol initially?
22    A    Patrol.  Uniform patrol.
23    Q    Is Mount Vernon just -- have one division,
24  like one patrol division?
25    A    No.  No, we have the patrol division, the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 14 of 82
The Deposition of DET. CAMILO H. ANTONINI, taken on January 13, 2022

42..45

Page 42

1  detective division, the support services division.  They
2  have the training unit.
3         MR. BUSHNELL:  I think she's asking about
4     precincts.
5     Q    I'm sorry.  Precinct.  Does -- is the patrol
6  division divided up into various precincts from Mount
7  Vernon?
8     A    No, there's only one police department in the
9  City of Mount Vernon.
10    Q    One police department.  Is there one district?
11 Only one district for the whole city?
12    A    Yes.
13    Q    So there's just -- okay.  And are there
14 different beats within that -- within -- sorry, let me
15 strike that.  Let me just make sure I got this here.  For
16 Mount Vernon, there's just one police department, one
17 police district.  The city's not subdivided into
18 different stations or districts?
19    A    No, it's 4.4 square miles.  Only has one
20 police.
21    Q    Okay.  How many officers -- sworn officers,
22 does Mount Vernon have right now; if you know?
23    A    I can't tell you a number to tell you the
24 truth.  I -- roughly -- somewhere under 200.
25    Q    Under 200?  And is it -- do you -- does Mount

Page 43

1  Vernon work in three shifts?  Patrol -- does patrol work
2  in three shifts?
3     A    Yes.
4     Q    What are the shifts for patrol at Mount -- in
5  Mount Vernon?
6     A    Midnight to 0800, 0800 to 1600, which is 4:00.
7     Q    Is that second shift?  That was first shift
8  was midnight to --
9     A    The first shift will be the midnight shift.
10    Q    Yep.
11    A    Second shift will be from 0800 to 1600.
12    Q    Okay.
13    A    And the third shift will be from 1600 to 2400
14 hours.
15    Q    Got it.  Okay.  So you were assigned -- how
16 long were you assigned as a patrol officer for the Mount
17 Vernon Police Department?
18    A    I was assigned to patrol for six months.  And
19 right after that I was sent to the Westchester County
20 Police Academy as a class counselor for six months.  In
21 other words, to be sort of, like, a support or
22 instructor to the class academy attending the police
23 academy at the time.
24    Q    Okay.  That was for six months?
25    A    Six months.

Page 44

1     Q    Okay.  And what was your next assignment?
2     A    After that, I came back to Mount Vernon, was
3  assigned back to patrol for another six months, give or
4  take.  And I believe I was then reassigned to the
5  detective division narcotics unit.
6     Q    Did you have to make an application to be
7  assigned to the detective division narcotics unit?
8     A    No.
9     Q    Do you know how you got reassigned to the
10 detective divisions narcotics unit?
11    A    Well, you have to -- in -- the department puts
12 out a notice saying any individual or any officer
13 willing -- just wants to be part of the detective
14 division, specifically the narcotics unit, submit an MV5
15 (phonetic) or, you know, request in order to be, you
16 know, looked at it or however we --
17    Q    Did you submit -- I'm so sorry.  I thought you
18 were done.  Go ahead.  Did you submit a request?
19    A    I don't remember submitting a request in.
20    Q    You -- okay.  So you think you may have just
21 been reassigned without putting in the request?
22    A    I don't remember.  I don't recall putting in a
23 request.  I was given the choice.  They said, listen, we
24 like your -- you know, the way you handle yourself on
25 patrol, with your activity level whatnot, blah, blah,

Page 45

1  blah.  We'd like to extend an invitation to be part of
2  the narcotic unit.  I said, okay, yes, sure.
3     Q    When did you join the narcotics unit for the
4  Mount Vernon Police Department?
5     A    Specific date, I don't remember, but I believe
6  the year was 2009.  Give or take somewhere February,
7  January, somewhere there.
8     Q    So it was approximately a year after you'd
9  been working with Mount Vernon Police Department?
10    A    Yes.
11    Q    Are you still a member of the narcotics unit?
12    A    No.
13    Q    Okay.  How long did you serve in the detective
14 division, in the narcotics unit, with the Mount Vernon
15 Police Department?
16    A    I want to say pretty much my whole entire
17 career.
18    Q    Okay.  I'm sorry -- but where are you assigned
19 now?
20    A    I am assigned at the real time crime unit
21 attached to the Westchester County police department.
22    Q    When did you get assigned to the real time
23 crime unit for the Westchester County Police Department?
24    A    I want to say, it's coming up on a year --
25 close to a year now.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK    Document 187-8   Filed 12/24/22    Page 15 of 82
The Deposition of DET. CAMILO N. ANTONINI, taken on January 13, 2022

46..49

Page 46

1    Q    So sometime in January or February of 2021,
2  you got reassigned?
3    A    I think it was February.
4    Q    Are you still -- you know, you're still a
5  Mount Vernon Police Department police officer, but
6  you're seconded over to Westchester County; is that
7  right?
8    A    Correct.
9    Q    But your paycheck and everything is still
10 through Mount Vernon?
11   A    Yes.
12   Q    Okay.  Did you put in a request for that
13 transfer to the real time crime unit?
14   A    Yes.
15   Q    Why?
16   A    It's -- it was a unit that I wanted to be part
17 of.
18   Q    Why?
19   A    Because it involved not going out on the
20 streets anymore.
21   Q    Why didn't you want to go out on the streets
22 anymore?
23   A    You ever heard of this virus called
24 Coronavirus?
25   Q    I have.

Page 47

1    A    It's very contagious.  No, listen, I -- I'm
2  coming up -- I -- you know, I think I reached a point in
3  my career where it's -- I want to try different stuff,
4  different things.  And I, you know, believe that this is
5  one of those places, where it gives me that opportunity.
6    Q    Is there an -- a promotion by being reassigned
7  to the real time crime unit?
8    A    No, it's not a promotion.  It's just a
9  reassignment from one unit to another.
10   Q    Okay.  And is there -- was there any increase
11 in pay?
12   A    No increase in pay.
13   Q    Was there an increase in pay when you got
14 moved to the narcotics unit from patrol?  Did that
15 increase your pay at all?
16   A    No.  There's no increase in pay.
17   Q    Okay.  And it -- did it increase -- change
18 your rank at all?  You weren't like a detective?  You're
19 still patrol, just narcotics?
20   A    You are assigned to the detective division as
21 a patrol officer, which you go through a probationary
22 period of, give or take, 18 months under -- you know,
23 attached to the detective division.  Once you pass your
24 probationary period, you are -- you know, if you are --
25 you know, if you're good at your job, you get designated

Page 48

1  a detective.
2    Q    Did you get designated a detective?
3    A    Yes.
4    Q    But what -- is that different than being given
5  the promotion of detective, being designated detective?
6    A    Well, it's -- it is a promotion, but it's that
7  designation.  It's not something you have to take a test
8  for.
9    Q    I see.  So you never took a test at Mount
10 Vernon to become a detective, correct?
11   A    No.
12   Q    Any reason why you never took that test?
13   A    Because there's no test to become a detective.
14   Q    In Mount Vernon, there's no test?
15   A    No, there's no test to become a detective in a
16 lot of police departments.  It's just a designation -- a
17 designation.
18   Q    A designation.  I see.  Did you -- when you
19 get that designation, does your pay increase?
20   A    Probably 25 cents a paycheck.
21   Q    Okay.  Not much.  Okay.  So -- okay.  So let
22 me see.  So it sounds like you worked as a -- with the
23 narcotic units of the Mount Vernon Police Department
24 from approximately January or February 2009 to January
25 or February of 2021.  Does that sound about right to

Page 49

1  you?  Twelve years?
2    A    There's a break in between.
3    Q    What's the break in between?
4    A    January or February 2010.
5    Q    What did you do?  What was the break for?
6    A    This was the -- this is at the time where I
7  was placed on modified duty.
8    Q    I'm sorry, I didn't hear that last part.  What
9  did you say, you're placed on what?
10   A    Modified duty.
11   Q    What's that?
12   A    You are placed on modified duty, it -- it
13 depends on the situation.
14   Q    Why were you placed on modified duty in
15 January 2010?
16   A    Because I was under investigation for an
17 incident.
18   Q    How long were you placed on modified duty?
19   A    I was on modified duty for two years.
20   Q    Were you taken off the street and put on a
21 desk job?
22   A    Yes.
23   Q    Okay.  And so you had a desk job for two years
24 for -- from approximately January 2010 to January 2012?
25   A    January or February time frame, give or take.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 16 of 82
The Deposition of DET. DAMON H. ANTONINI, taken on January 19, 2022

50..53

Page 50

1    Q    What were you being investigated for?
2    A    I -- the -- it was an incident that took place
3  that was being investigated.
4    Q    What was the incident that took place that was
5  being investigated?
6    A    Off duty incident.  Altercation.
7    Q    Was the off-duty altercation being
8  investigated?
9    A    It was an altercation with a -- with an
10 acquaintance of mine -- close friends of mine.
11   Q    Okay.  Did -- was it a -- you said a close
12 friend.  Was it a romantic relationship?
13   A    No.
14   Q    Okay.  No.
15   A    No.
16   Q    Okay.  It wasn't -- it was an altercation.  Was
17 there a fight with a friend?
18   A    Fight.  Yes.
19   Q    A fist fight?
20   A    Yes.
21   Q    Did anybody get injured?
22   A    Yes.
23   Q    Did you or the other person -- was it you and
24 just one other person or multiple people?
25   A    No, just me and another person.

Page 51

1    Q    And did you get injured, or did the other
2  person, or both of you?
3    A    The other person got injured.
4    Q    What injuries did the other person sustain?
5         MR. BUSHNELL:  Objection.  Go ahead.  You can
6  answer.
7    A    Facial.
8    Q    Facial injuries?
9    A    Facial injuries.
10   Q    Any broken bones?
11        MR. BUSHNELL:  Objection.  You can answer.
12   A    I can't recall whether it was broken bones.
13   Q    Did Mount Vernon Police respond to the scene
14 or did this -- well, sorry.  Did the incident occur in
15 Mount Vernon?
16   A    No.
17   Q    Where did it occur?
18   A    Town of Greenburgh.  Westchester County, New
19 York.
20   Q    Did any law enforcement respond to the
21 altercation?
22   A    No -- not to my knowledge, no.
23   Q    Did -- how did the -- how did it come to be
24 known by Mount Vernon that you'd been involved in this
25 altercation?  Was there a complaint filed?

Page 52

1    A    I -- to my know -- I'm not clear about how
2  they came about to know -- or how, you know, somehow
3  police got involved.  I can't remember how that
4  happened.
5    Q    Okay.  Was there an internal investigation?
6    A    I believe it was, yes.
7    Q    Did you -- do you know the outcome of the
8  internal investigation?
9    A    I do not recall the outcome of the
10 investigation.
11   Q    Were you interviewed in person during the
12 course of the internal investigation by internal
13 affairs?
14   A    I don't remember being interviewed about it.  I
15 do not.
16   Q    Do you know why you were on modified duty for
17 two years?  Why it took two years for the investigation?
18   A    I always wonder the same question.  But no, I
19 don't remember why.
20   Q    Do you remember the outcome of the
21 investigation?
22   A    There was no outcome.
23   Q    Well, did they just take you off modified duty
24 and did they tell you any, you know -- I'm sorry, let me
25 strike that.  You don't remember -- you don't remember

Page 53

1  learning the outcome of the investigation?
2         MR. BUSHNELL:  Objection.  Go ahead.
3    A    Correct.
4    Q    Were any criminal charges placed on you?
5    A    No.
6    Q    And you have no idea as you sit here today,
7  how Mount Vernon came to know about the altercation with
8  your acquaintance?
9    A    Correct.
10   Q    What was the individual's name who you had the
11 altercation with?
12        MR. BUSHNELL:  Objection.  Go ahead.
13   A    Miguel Sanchez.
14   Q    And do you remember what the subject -- or why
15 you guys got into a fight?
16        MR. BUSHNELL:  Objection.  You can answer.
17   A    I don't.  Tell the truth, it was so long ago.
18   Q    Were there -- were -- had you or -- had you
19 been drinking prior to the altercation?
20        MR. BUSHNELL:  Objection.  You can answer.
21   A    I don't remember if we were drinking or not.
22   Q    Is Miguel Sanchez -- was he a friend of yours
23 at that time?
24   A    Yes.
25   Q    Is he now?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 17 of 82
The Deposition of DET. CARMELO N. ANTONINI, taken on January 13, 2022

54..57

Page 54

1      A    We haven't spoken since the incident.
2      Q    And do you have knowledge of whether Mr.
3   Sanchez reported this off-duty incident to Mount Vernon?
4      A    No.
5      Q    Okay.  So other than that break for modified
6   duty for approximately two years in the winter months of
7   2010 to the winter months of 2012, you were assigned to
8   the narcotics unit at the Mount Vernon Police Department
9   from January, February 2009 to your transfer -- or your
10  secondment over to the real time crime unit in 2021,
11  correct?
12     A    Can you repeat the whole question again?
13     Q    Yeah.  Sorry.  That was a long one.  So other
14  than the time where you were placed on modified duty --
15     A    Yes.
16     Q    -- is it accurate to say that you were
17  assigned to the narcotics unit of the Mount Vernon
18  Police Department from January or February 2009 all the
19  way until when you've just recently been seconded to the
20  real time crime unit of Westchester County?
21     A    Yes.
22     Q    And so other than the time of modified duty,
23  you -- did you have any other assignments other than the
24  narcotics unit?
25     A    Narcotics unit.

Page 55

1      Q    Okay.  Okay.  When you first came to the
2   narcotics unit in 2009, how many officers were assigned
3   to the narcotics unit?
4      A    I can't give a specific number.
5      Q    How about approximately?
6      A    Between six, eight.
7      Q    Did the narcotics unit operate on more than
8   one shift?
9      A    No.  Just one shift.
10     Q    What shift?
11     A    It varied.  It all depend.  So we either came
12  in -- we usually used to come in between 10:00 and 6:00
13  or 1:00 to 9:00, depending on the needs of the --
14  whatever investigation was, you know, being conducted at
15  the time.
16     Q    Okay.  So -- and is that true the entire time
17  you were assigned to the narcotics unit, that it just
18  operated one shift?
19     A    One shift.
20     Q    But I mean, I'm saying that's the entire
21  duration of your assignment, it was always just one
22  shift?
23     A    One shift.
24     Q    Okay.  Okay.  And there were, you think,
25  somewhere between six to eight narcotics officers when

Page 56

1   you first were assigned in 2009, correct?
2      A    Correct.
3      Q    How about when you had your secondment to
4   Westchester County in 2021, how many narcotics unit
5   officers were assigned?
6      A    I -- about the same.
7      Q    And was there always a lieutenant on duty with
8   the narcotics unit?
9      A    A what?
10     Q    A lieutenant or a sergeant.  Did you have,
11  like, a supervising officer with --
12     A    Yes.
13     Q    Okay.  Who was the supervising officer when
14  you got to the narcotics unit in 2009?
15     A    At the time, Sergeant Daniel Fischer.
16     Q    Can you repeat the name for me?
17     A    Daniel Fischer.
18     Q    Daniel Fischer.  Okay.  How long did you work
19  with Daniel Fischer?
20     A    All the way up to 2009.
21     Q    Well, you started there -- oh, the whole year
22  of 2009?
23     A    Correct.
24     Q    And then who became the next supervising
25  officer of the narcotics unit?

Page 57

1      A    No.  When I was placed on modified duty, the
2   next supervisor after that was Vinny -- Vincent Stufano.
3      Q    Okay.  Did you ever work under Vincent
4   Stufano?
5      A    No.
6      Q    Okay.  That was during your modified duty?
7   Okay.
8      A    Correct.
9      Q    How about -- who was the next supervising
10  officer for the narcotics unit?
11     A    The second time that I came up?
12     Q    Yep.
13     A    Anthony Mitchell -- Sergeant Anthony Mitchell.
14     Q    Okay.  And so you worked under Sergeant
15  Anthony Mitchell in -- when you came back in 2012?
16     A    Yes.
17     Q    How long did you work under Sergeant Anthony
18  Mitchell as a narcotics officer?
19     A    Briefly.  Possibly, a couple of months.
20     Q    Okay.  Who was next?
21     A    At the time, Sergeant Anthony McEachin.
22     Q    McKitchy?
23     A    McEachin.
24     Q    McEachin.
25     A    M-E-C-Q --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK    Document 187-8    Filed 12/24/22    Page 18 of 82
The Deposition of DET. CAMILO N ANTONINI, taken on January 18, 2022

58..61

Page 58

1        MR. BUSHNELL:  M-C-E-A-C-H-I-N, I believe.  Or
2   McEachin.
3        A    Give or take.
4        Q    All right.  Who was the next supervising --
5   how long did you work under Sergeant Anthony McEachin?
6        A    Maybe a year and a half -- a year, give or
7   take.
8        Q    Who is next?
9        A    Sean Fegan.  Sergeant Sean Fagan.  Yeah.
10       Q    How long did -- was Sergeant Sea -- Sergeant
11  Sean Fegan the supervising officer of the narcotics
12  unit?
13       A    Until two years ago, 2019 -- December 2019.
14       Q    Well did Sergeant -- what happened to Sergeant
15  Fegan then?  Did he leave the narcotics unit?
16       A    Yes.  He got a -- he's assigned to the general
17  investigations unit.
18       Q    Do you know why he was reassigned from
19  narcotics to general investigations?
20       MR. BUSHNELL:  Objection.  You can answer.
21       A    Needs of the department
22       Q    And who replaced Sergeant Fegan?
23       A    Two sergeants came in right after Sergeant
24  Fegan.
25       Q    Who were they?

Page 59

1        A    That's going -- there were -- they are
2   currently Pedro Abreu and Wendell Griffith.
3        Q    Pedro Abrelo?
4        A    Pedro Abreu.
5        Q    Abreu.  Okay.  How do you spell Abreu; if you
6   know?
7        A    A-B-R-E-U.
8        Q    Okay.  Okay.  And I'm sorry, the second one,
9   Griffin?
10       A    Wendell Griffin.
11       Q    Wendell Griffin.  Okay.  And did you work
12  under both Sergeant Pedro Abreu and Sergeant Wendell
13  Griffin prior to your secondment to Westchester County?
14       A    No.  We were -- they -- both, Pedro Abreu and
15  Wendell Griffin were in the narcotics unit prior to them
16  being promoted to sergeant.  So we used to work
17  together, too.  So -- but by the time they took over the
18  unit, I was reassigned to the general investigations
19  unit.  So this was --
20       Q    So I maybe missed this.  Did you go to general
21  investigations before you went to Westchester County?
22       A    Yes.  I was -- I went to Westchester County
23  from the general investigation unit.
24       Q    How long were you in general investigations?
25       A    Maybe a year.

Page 60

1        Q    Did you go with Shawn Fegan together?
2        A    No, he's still the supervisor in the general
3   investigation too.
4        Q    I'm sorry.  Did you and Sean Fegan move from
5   narcotics over to general investigations together?
6        A    He was there first.
7        Q    And then you went and joined him?
8        A    Correct.
9        Q    And then you were in general investigations
10  for about a year, before you went to Westchester?
11       A    Give or take, yes.
12       Q    Okay.  So when did you leave narcotics for
13  general investigations?
14       A    The beginning of 2020.
15       Q    Okay.  Okay.  How long do you plan to
16  be with the real time crime unit?
17       MR. BUSHNELL:  Objection.  You can answer.
18       A    How long do I plan to be there?
19       Q    Yeah.  How long do you plan to stay -- do you
20  have plans to stay there for a certain length of time?
21       A    It is on the needs of the department.  So if
22  they want to keep me there for the duration, I'll be
23  there for the duration.  If they need me back in their
24  department, back at -- you know, working in Mount
25  Vernon, they'll request me back in Mount Vernon.

Page 61

1        Q    When is your -- when is your -- how long do
2   you plan to work as a police officer with Mount Vernon?
3        MR. BUSHNELL:  Objection.  You can answer.
4        A    Until I'm ready to retire.
5        Q    Is there -- do they count -- does Mount Vernon
6   count the years you served with NYPD towards your
7   service with them for -- towards a pension?
8        A    I believe they do.  That's not -- Mount Vernon
9   doesn't count it, it's the state.
10       Q    Oh, the state.  I'm sorry.  Thank you for
11  clarifying.  Okay.  So you -- officers in New York get
12  their pensions through the state, not through the
13  municipality?
14       A    Correct.
15       Q    I see.  Okay.  Little different here in
16  Chicago.  Okay.  Okay.  Let's talk about Sean Fegan.  Did
17  you know Sean Fegan before you got to the narcotics
18  unit?
19       A    When?
20       Q    Like when you were working patrol, did you --
21  was he on patrol with you?
22       A    No.
23       Q    Okay.  Did you -- and so the first time you
24  really worked with him was when you were assigned to
25  narcotics?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 19 of 82
The Deposition of DET. CARMINE ANTONINI, taken on January 19, 2022

62..65

Page 62

1    A    Yes.
2    Q    And was he already a narcotics officer before
3  he became the sergeant of the unit?
4    A    Yes.
5    Q    Okay.  So did you guys work together as
6  narcotics officers before his promotion to sergeant?
7    A    Yes.
8    Q    So you were -- is it fair to say you worked
9  with Sergeant Fegan for a good portion of your career?
10   A    When we first were in the same unit together,
11 me as a police officer and him as a detective, maybe
12 eight months before he was, you know, reassigned to the
13 detective -- to the general investigations unit or the
14 major case unit, which -- one of those two at the time.
15 So we probably worked together for maybe six to eight
16 months.  And then the next time we worked together was
17 when he be -- he was assigned the narcotics unit
18 supervisor sometime in 2013.
19   Q    Okay.  Do you consider -- you know, apart from
20 being a work colleague, are you social friends with Sean
21 Fegan?
22   A    No.  We'll socially say, hi, how you doing?
23 Stuff like -- hanging out after work?
24   Q    Yes.
25   A    Outside of work?  No.

Page 63

1    Q    Yes.
2    A    We don't do that.
3    Q    How about the other defendants, like Robert
4  Puff, are you social friends with Officer Puff?
5    A    No.  We don't -- we don't associate outside of
6  work.
7    Q    How about Patrick King?
8    A    No.
9    Q    Sergeant Jose Quinoy?
10   A    No.
11   Q    Sebastian Salazar?
12   A    Who?
13   Q    Is it Sebastian Salazar?
14   A    I don't even know who that is, but no.
15   Q    Okay.  Are you -- how about Jose Valente?
16   A    Who?
17   Q    Jose Valente?
18   A    Joseph Valente?
19   Q    Joseph Valente, sorry.
20   A    No.
21        MS. DONNELL:  Okay.  I'm going to switch gears,
22 but I want to just take a short, five minute break.
23 So let's go off the record.
24        THE WITNESS:  Okay.
25        MR. BUSHNELL:  So --

Page 64

1        VIDEOGRAPHER:  Okay.  We -- oh, pardon.  Go
2  right ahead.
3        MR. BUSHNELL:  Heather, when do you want to
4  come back?  Do you want to give a specific time?
5        MS. DONNELL:  I just need five minutes.  So I
6  just need a quick bathroom break.  So let's go off
7  the record, though.
8        VIDEOGRAPHER:  Okay.  Off record at 11:12.
9        (OFF THE RECORD)
10       VIDEOGRAPHER:  All right, we are now back on
11 the record at 11:21 a.m.
12 BY MS. DONNELL:
13   Q    Okay.  Okay.  Detective Antonini, can you
14 define for me a pat-down search.
15   A    A pat down?
16   Q    Yes, please.
17   A    That is a pat down of the outer most garment,
18 where you pat down the outer most garment of pockets --
19 everywhere that -- you know, with your hands.
20   Q    And what's the -- your understanding of the
21 purpose of a pat-down search?
22   A    In order to feel what -- any -- you know,
23 whoever it is you're patting down, may or may not have
24 in his pockets or outer most garment.
25   Q    When do you conduct pat-down searches?

Page 65

1    A    I'm sorry, can you repeat that question?
2    Q    Yeah.  When do you use pat-down searches?
3    A    When necessary.
4    Q    And when do you consider it necessary?
5    A    It just -- I mean, the situation -- it depends
6  on the situation you're in.  It could be somebody on the
7  street that you detain for whatever reason, questioning
8  -- you know.  You explain to him, listen, I'm going to
9  pat you down for your safety and mine, and just go
10 through the pat-down routine and go from there.
11   Q    So -- what sort of justification do you need
12 to have for -- in order to conduct a pat-down search --
13 your understanding?
14   A    The safety of the individual that you are
15 detaining and your safety.
16   Q    Okay.  What's your definition of a strip
17 search?
18        MR. BUSHNELL:  Objection.  You can answer.
19   A    The definition of a strip search?
20   Q    Yes, please.
21   A    An individual stripped of his clothes.
22   Q    So an individual has to remove their clothes?
23   A    Correct.
24        COURT REPORTER:  I'm sorry, sir.  I didn't
25 catch that answer.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 20 of 82
The Deposition of DET. DAMION N. ANTONINI, taken on January 20, 2022

66..69

Page 66

1    A    The definition of a strip search.  I mean, a
2  strip -- stripping down the individual's clothing.
3    Q    Okay.  Anything else, in terms of your
4  understanding of a strip search?
5    A    Stripping down the individual's clothing.
6    Q    Is that it?
7    A    Yes.
8    Q    And what is your understanding of when -- of
9  what is necessary, in order to conduct a strip search?
10       MR. BUSHNELL:  Objection.  You can answer.
11   A    There might be a -- circumstances where it
12  might be known that the individual in question may or
13  may not have any weapons or contraband.  That might, you
14  know, request a more thorough strip search.  So in other
15  words, rather than just going through the pat-down
16  routine, you want to go more in-depth into the seams of
17  the -- let's say -- give an example, seams of the
18  clothing, you know, hidden pockets, or stuff like that.
19   Q    And is there any approval necessary to conduct
20  a strip search prior to doing it?
21   A    A supervisor is always present during any
22  search.
23   Q    During any strip search?
24   A    Correct.
25   Q    So you have to have a supervisor physically

Page 67

1  present?
2    A    Correct.
3    Q    Any other requirements?
4    A    As far as?
5    Q    Do you have to have any -- what justification
6  do you have to have to seek -- conduct a strip search of
7  an individual?
8        MR. BUSHNELL:  Objection.  Asked and answered.
9   You can answer it.
10   A    Probable cause.
11   Q    Probable cause for what?
12   A    To conduct a strip search.
13   Q    Well, what does that mean?  Explain.
14   A    You know, you cannot just detain an individual
15  and search him for the sake of searching.  You need to
16  have probable cause in order to conduct -- you could
17  conduct a pat down of the outer most -- outer most
18  garment.  But in order to conduct a strip search, the
19  individual either, A, might be in custody -- police
20  custody for whatever reason.
21   Q    So it has to be pursuant to already having a -
22  - had probable cause to arrest an individual?
23   A    Correct.
24   Q    Do you have to have something more than just
25  probable cause to arrest someone for a crime, in order

Page 68

1  justify a strip search?  Does there have to be something
2  more?  Or is probable cause that a crime was committed -
3  - any crime committed, sufficient to justify a strip
4  search?
5        MR. BUSHNELL:  Objection.  You can answer.
6    A    Do you mind repeating that again?
7    Q    Oh yeah, no problem.  I - sometimes I speak a
8  little quickly too.  So you said that you have to have
9  probable cause before you can conduct a strip search.
10  And you also said that there needs to be a supervisor
11  physically present, in order to conduct a strip search.
12  My question to you was, is probable cause that an
13  individual committed a criminal offense sufficient to
14  justify a strip search?  Or do you need something more?
15   A    Prior knowledge that the individual may be --
16  may have a history of concealing either weapons or
17  contraband.  You know, for the safety of the officers
18  involved in the strip search or the - or the safety of
19  the individual being strip-searched, as it is.
20   Q    Anything else that you can think of other than
21  what you've testified to?
22   A    No.
23   Q    What is your - so just to repeat, your
24  understanding of a strip search is that it can only be
25  conducted of somebody's been arrested or there's

Page 69

1  probable cause for an arrest; is that correct?
2        MR. BUSHNELL:  Objection.  You can answer.
3    A    Under police custody, yes.
4    Q    So the individual has to be in police custody.
5  And then the second thing you said is the supervisor has
6  to be physically present for the strip search; is that
7  right?
8    A    Correct.
9    Q    And when I asked - inquired about the
10  justification, you said it had to do with individual
11  safety or office safety, for concealing a weapon or
12  contraband, correct?
13   A    Correct.
14   Q    Okay.  Is there any other - what - is there
15  anything else - other than what you've testified,
16  anything else in order to conduct a strip search?
17   A    No.
18   Q    Okay.  What is your understanding of a body
19  cavity search?
20   A    We don't do body cavity searchers.
21   Q    That's fine.  But what is your understanding
22  of what constitutes a body cavity search?
23   A    What is my understanding of a body cavity
24  search?
25   Q    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK  Document 187-8  Filed 12/24/22  Page 21 of 82
The Deposition of DET. DANQUON N ANTONINI, taken on January 13, 2022

70..73

Page 70

1    A    We don't conduct them.
2         MR. BUSHNELL:  Objection.  You can -
3    Q    I understand you don't conduct it, but what's
4  your understanding of what constitutes - what is the
5  definition of a body cavity search in your
6  understanding?
7         MR. BUSHNELL:  Objection.  You can answer, if
8  you can.
9    A    The searching of a body cavity.  You - would
10  you like me to describe what a body cavity is?
11   Q    Yeah.  What is your understanding of what
12  constitutes a body cavity search?
13   A    All right.  It could be your mouth.  It could
14  be, you know, your ears, your nostrils.  It could be
15  your anus.  You know, it can also be - we're speaking on
16  gender-wise, female-wise, obviously there's two sides to
17  that.  But same thing, facial, anywhere there's, you
18  know, a cavity.
19   Q    So your understanding of a body cavity search
20  is any sort of body cavity, be it mouth, ear, nostrils,
21  anus, vagina.  That's a body cavity search?
22   A    Correct.
23   Q    Okay.  And you earlier testified that we don't
24  conduct those, meaning you as a police officer are not
25  authorized to conduct a body cavity search, is that your

Page 71

1  understanding?
2         MR. BUSHNELL:  Objection.  You can answer.
3    A    Correct.
4    Q    Okay.  So if you thought an individual was
5  secreting some drugs in their mouth cavity, you wouldn't
6  search an individual's mouth?
7         MR. BUSHNELL:  Objection.  You can answer.
8    A    Mouth?
9    Q    Yes.
10   A    We could ask the individual to open his mouth.
11   Q    Okay.  So you - that is something you're
12  permitted to do, correct?
13   A    Obviously, yes.  You know, I could ask you,
14  can you open your mouth for me?  If you choose to, yes,
15  of course.
16   Q    Okay.  How about -- so when I'm -- I'm going
17  to ask you some scenarios and I want you to tell me what
18  -- whether -- what is -- if it's a strip search or not.
19  If you ask an individual -- or, if an individual is --
20  clothing is removed, their pants and underwear, and
21  they're asked to bend over and spread their buttocks
22  cheeks for a visual inspection of their anus.  Is that a
23  strip search or not?
24   A    A strip search?
25   Q    Is that a strip search?

Page 72

1    A    Strip search would be, we'd remove the
2  clothing so we could search all their cavities in --
3  within the clothing.
4    Q    Okay.  How about asking individual to spread
5  their buttocks for a visual inspection of their anus, to
6  see if there's any contraband or weapon secreted in
7  their buttocks?  Is that a strip search?
8    A    No.
9    Q    Is that - why not?
10   A    A strip - like I said, a strip search would
11  constitute of the removing of the clothing.
12   Q    And not searching anybody's body?
13   A    No.
14   Q    Have you - and what about asking someone to
15  bend down and cough?
16   A    No, we'll -
17   Q    While their - while their clothing's removed?
18   A    Correct.
19   Q    What is that?
20   A    We'll ask an individual to, you know, bend
21  down on your knees, cough.  Other than that, we don't
22  physically search any cavities in -
23   Q    But do you ask individuals when - when you're
24  - when somebody's being strip-searched, do you ask
25  individuals to kneel, or squat, or cough while their

Page 73

1  clothing is removed -
2    A    Correct.
3    Q    -- during a strip search?
4    A    Correct.
5    Q    You're saying, correct?
6    A    Correct, yeah.
7    Q    Yes, that is something you do?
8    A    Yes.  Yes.
9    Q    Okay.  Do you ever ask individuals in the
10  course of a strip search, to themselves spread their
11  buttock cheeks?
12   A    No.
13        MR. BUSHNELL:  Objection.  Just for
14  clarification, you're talking about every time
15  there's a strip search?
16        MS. DONNELL:  No.  I'm just saying in general.
17  If it's a - if that conduct constitutes a strip
18  search or it can be done as part of a strip search.
19  I can make my question clearer.
20  BY MS. DONNELL:
21   Q    Okay.  Detective Antonini, is it in your view,
22  permissible as part of a strip search to ask the
23  individual who's been unclothed - their clothing taken
24  off, to bend down, or squat, or kneel?
25   A    While still secure in handcuffs.  Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK  Document 187-8  Filed 12/24/22  Page 22 of 82
The Deposition of DET. CAMILO H. ANTONINI taken on January 23, 2022

74..77

Page 74

1    Q    Okay.  And is that something you have asked
2  individuals to do when you've conducted strip search as
3  a Mount Vernon police officer?
4         MR. BUSHNELL:  Objection.  You can answer.
5    A    Yes.
6    Q    Okay.  How about asking an individual to bend
7  over from the waist, so that their buttocks is more
8  exposed for a visual inspection?  Have you ever asked an
9  individual to do that during the course of a strip
10  search?
11    A    It - depending on a circumstances, but yes.
12    Q    Okay.  So the answer is yes, you have done
13  that before, depending on the circumstances, correct?
14    A    Depending on - it - what I mean by that is,
15  some individuals may have leg injuries where they cannot
16  bend down.  They cannot squat down due to some - you
17  know, some physical - you know.
18    Q    So you're saying if somebody was not
19  physically able to kneel or squat -
20    A    Correct.
21    Q    -- you may request for them to bend over --
22    A    That's a yes.
23    Q    -- at the waist?  Okay.  So - so far during
24  the course of a strip search, when somebody's unclothed
25  in your view, it's permissible to ask them to kneel

Page 75

1  down, squat, or bend over at the waist to expose their
2  buttocks for visual inspection, correct?
3    A    Well -
4         MR. BUSHNELL:  Well, objection - objection.  In
5    what circumstance?  I mean, we're talking about --
6         MS. DONNELL:  Well no, what I'm saying is --
7    I'm sorry, go ahead, Steven.  I didn't mean to
8    interrupt you.
9         MR. BUSHNELL:  Yeah.  I mean, we're talking
10    about the scenario devoid of any, you know, prior
11    knowledge of the officer, et cetera, important
12    circumstances of an arrest.  This is very general
13    and I don't think that it's specific enough.
14         MS. DONNELL:  Okay, I hear your objection.  I
15    am asking - I am asking these questions, I think
16    they're general questions, but I want to know what
17    constitutes, in the witness' mind, conduct that is
18    part of a strip search.  So I'm going to keep
19    asking.
20  BY MS. DONNELL:
21    Q    But I'll try and make my questions more clear,
22  Detective Antonini.  And if you don't understand them,
23  or if they not clear, let me know.  Okay.  So in the
24  course of a strip search - well, why don't we do it this
25  way.  Why don't you describe for me what is the

Page 76

1  permissible actions that you as an officer are permitted
2  to do in the course of a strip search, to inspect for
3  contraband or weapons that might be secreted on the
4  person?
5    A    Prior knowledge, criminal history, severity of
6  the crime committed.
7    Q    I apologize.  I think you might not have
8  understood my question.  It sounds like you're providing
9  to me the factors that go into determining whether to
10  conduct a strip search, right?
11    A    Correct.
12    Q    Okay.  I appreciate that.  I do want to know
13  that.  But what I asked was, can you describe for me the
14  actions that you, the police officer, are permitted to
15  request the individual being strip-searched to do, in
16  the course of your strip search?
17    A    The actions -
18    Q    Assume for me that you've already requested a
19  strip search, and you're in the process of conducting a
20  strip search.  Describe for me how you can conduct a
21  strip search?
22    A    How I can conduct it?
23    Q    Yes.
24    A    Meaning how I go about conducting it?
25    Q    Yes, please.

Page 77

1    A    Well, first you start with the pat down of the
2  outer most garment, the individual still being secure in
3  handcuffs, obviously.  If the individual is already in
4  police custody, he's going to be placed - he's already
5  under arrest with charges pending, then the search is
6  more of a - you know, goes into more depth in other
7  words.  So you conduct a more thorough search of the
8  outer garment, top of the body, mouth, ears, what -
9  wherever you can think that the individual may or may
10  not be hiding something.  And again, this is all based
11  on prior knowledge and experience, where an individual
12  might be able to hide either contraband or weapons.
13  Okay?  So once you start with the top, then you begin to
14  the bottom, you remove all belts, jewelry, any metal
15  objects from all pockets, and whatnot.  And you become -
16  - you conduct a strip search, you remove all the
17  clothing items from the individual, socks, shoes,
18  shoelaces.  They're permitted to keep one item of
19  clothing, which obviously in this case will be a pair of
20  socks, pair of underwears, one top, i.e., either a
21  sweater or T-shirt.  No belts.  That's one of the other
22  reasons why we have to remove all the clothing items.
23  Once that's done, we have removed everything, we ask the
24  individual, do me a favor, can you squat down, cough?
25  Once they squat and cough, they come back up and we

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 23 of 82
The Deposition of DEK PANGTION of ANTONINI taken on January 25, 2022

78..81

Page 78

1  begin the process of just getting them -- getting the
2  individual, you know, redressed, or put the clothes back
3  on, whatever clothes are permitted to be kept at the
4  time.  So shoes without shoelaces or sneakers without
5  shoe laces, pair of socks, underwear, pants, shirt, or
6  whatever they wearing on top, and -- pretty much
7  constitute a strip search.
8       Q    Okay.  Are you as an officer permitted to
9  physically touch the individual, in the course of the
10  strip search?
11      A    Yes.  I have to hold onto his arm.  Make sure
12  he doesn't fall down.
13      Q    So you're holding onto the arm, while the
14  person is either squatting and coughing?
15      A    Yes.  We wouldn't want the individual to fall
16  down, get injured, or anything like that.
17      Q    Are you -- and I think I asked this, but I'm
18  just going to be clear.  Are you permitted to ask an
19  individual to spread their buttock cheeks and to
20  visually inspect the individual anus, or in between
21  their --
22      A    No.  We don't allow -- no.  We hold on to
23  their arms as they're squatting down -- squat down.
24      Q    Have you ever asked anybody to bend over to
25  expose their buttock cheeks to you, and to spread their

Page 79

1  buttock cheeks and expose their anus?  Have you ever
2  done that?
3       A    Squat and cough.
4       Q    I know.  Have you ever asked anyone to bend
5  over to ex -- to spread their butt cheeks, so you could
6  visually inspect their anus?  Have you ever done that?
7       A    No.
8       Q    Okay.  Have you ever touched an individual who
9  you're conducting a strip search and spread their
10  buttocks to inspect their anus?  Have you ever done
11  that?
12      A    Have I ever spread their cheeks?
13      Q    Yes.
14      A    No.  No.
15      Q    Have you ever run your hand, whether gloved or
16  not, between an individual's buttocks cheeks to inspect
17  for weapons or contraband?
18      A    No.
19      Q    Okay.  So the only way that you have ever
20  conducted a strip search, it's your testimony today, is
21  by asking the individual, after they're undressed to
22  squat and cough?  That's the only way you have ever done
23  a strip search?
24      A    Correct.
25      Q    But then you said sometimes -- earlier, you

Page 80

1  said sometimes, if someone's not able for medical
2  reasons or physical reasons to squat and cough, you've
3  asked them to bend over from the waist, correct?
4       A    Correct.
5       Q    Okay.  So you have done it.  And then during
6  it, you just asked them to bend over from the waist and
7  then you just visually inspect?
8       A    Bend over from the waist, cough, visually
9  inspect.
10      Q    And you -- okay.  Have you conducted strip
11  searches like you've described -- or the way in which
12  you described, out in the field?
13           MR. BUSHNELL:  Objection.  You can answer.
14      A    Depending on the circumstance, search
15  warrants.
16      Q    So is the answer, yes, you have conducted
17  strip searches out in the field?
18      A    Yes.
19      Q    Okay.  Have you conducted strip searches at
20  the Mount Vernon Police Department?
21      A    Yes.
22      Q    Okay.  Let's talk about strip search in the
23  field.  How many strip searches have you conducted --
24  been part of conducting in the field?
25           MR. BUSHNELL:  Objection.  You can answer.

Page 81

1       A    That would be like asking me how many arrests
2  have I had.
3       Q    Is it --
4       A    So you can't put a number to that, obviously.
5  This -- in the field?
6       Q    Yes.
7       A    I mean -- I mean, there's been a few,
8  obviously.  Think about it, the number of search
9  warrants that I've been involved in throughout my career
10  has been a lot, so...
11      Q    Do you conduct a strip search every time you
12  have a search warrant?
13      A    Not every time, no.
14      Q    Okay.  So are you able, as you sit here today,
15  to estimate the number of strip searches you've
16  conducted in the field as a Mount Vernon police officer?
17      A    No.
18           MR. BUSHNELL:  Objection.  You can answer.
19           MR. BUSHNELL:  Okay.
20           MR. BUSHNELL:  Sorry.  Just noting my
21  objection.
22      Q    Are you able to put a -- are you able to say
23  if it's more or less than a hundred?
24           MR. BUSHNELL:  Objection.  You can answer.
25      A    No.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 24 of 82
The Deposition of DET. DANGLO N. ANTONINI, taken on January 30, 2022

82..85

Page 82

1    Q    You're not able to -- one way or the other,
2  you can't say?
3    A    No.
4    Q    Is that true, you can't say one way or the
5  other?
6    A    Yes.
7    Q    Okay.  So it could be more than a hundred out
8  in the field?
9        MR. BUSHNELL:  Objection.  You can answer.
10   A    No.
11   Q    It's less than a hundred?
12   A    Possibly, less than a hundred.  Yes.
13   Q    But you don't know one way or the other?
14   A    One way or the other?  No.
15   Q    How about -- how about strip searches you've
16  been present for, but not yourself conducted out in the
17  field, like one of your other fellow narcotics officers
18  did.  Do -- can you say how many you've been present
19  for, for those?
20       MR. BUSHNELL:  Objection.  You can answer.
21   A    No.
22   Q    Right.  Is it too many to count?
23       MR. BUSHNELL:  Objection.  You can answer.
24   A    What I'd say -- can't say.
25   Q    You can't say.  How about -- you said you'd

Page 83

1  been part of conducting strip searches.  You yourself
2  have conducted strip searches at the Mount Vernon Police
3  Department, right?
4    A    Yes.
5    Q    And are you -- can you estimate how many strip
6  searches you've conducted at the Mount Vernon Police
7  Department?
8    A    No.  I can't estimate that.
9    Q    Why not?
10       MR. BUSHNELL:  Objection.  You can answer.
11   A    It's not something that we keep count on.
12   Q    Okay.  When you conduct a strip search,
13  whether in the field or in the Mount Vernon Police
14  Department, do you document it in any kind of official
15  police report?
16   A    Yes.
17   Q    Where do you document it?
18   A    Police report.
19       MR. BUSHNELL:  Can we -- can we take a quick
20  two-minute break please?
21       VIDEOGRAPHER:  We --
22       MS. DONNELL:  Um --
23       COURT REPORTER:  Oh?
24       MS. DONNELL:  Well, can I finish this line of
25  questioning, or do you need to talk to the witness

Page 84

1  right now?
2        MR. BUSHNELL:  I mean, how long do you
3  anticipate the line of questioning going?
4        MS. DONNELL:  Well, I mean, for a while.  But I
5  would like to follow up on this, at least this one
6  aspect about reporting or documenting strip
7  searches.  Could I ask a few more questions on that
8  subject?
9        MR. BUSHNELL:  Yeah, that's fine.  Yeah, of
10  course.
11  BY MS. DONNELL:
12   Q    Okay.  So Detective Antonini, tell me how you
13  were trained with the Mount Vernon Police Department to
14  document when you conduct a strip search.
15   A    How we were trained to document?
16   Q    Yes.
17   A    The report will usually state something in
18  regards to, the strips search was conducted in the
19  presence of Sergeant Sean Fegan.  The search was either
20  recorded, the individual was found to be, or not found
21  to be, in possession of any contraband or weapons.
22  Something to that -- to those lines.
23   Q    Okay.  And you were trained to put that in a
24  incident report or a special report for the search?  Or
25  just the incident report?

Page 85

1    A    Into the case report.
2    Q    Case report.  Okay.  You mentioned that you
3  would document whether the search was recorded or not,
4  right?
5    A    That is correct.
6    Q    And did you -- were strip searches required to
7  be recorded?
8    A    Part of the search is recorded.
9    Q    What part is recorded?
10   A    Well, we don't record the individual being
11  strip-searched.  We record the audio of the individual
12  being strip-searched.  Or prior to, we'll record the
13  individuals, and so then they say, we're going to do a
14  strip search.  Is there anything you have on your
15  possession that you want to tell us now?  And if the
16  individual says, no, I have something.  Or, yes, I have
17  something.  We'll turn the camera away.  The camera's
18  still rolling.  We going to have it just for the audio
19  part of it, so that way you know there's nothing crazy
20  here going on, other than the strip search itself.  The
21  search continues after that and after the search is
22  concluded, the camera turns over back to the individual.
23  Then says, all right, we found X, Y, and Z.  Or, we did
24  not find anything.  Do you have any complaints?  No.
25  Okay.  The search is concluded.  And then that video



Kentuckiana Reporters                                    502.589.2273 Phone
30 South Wacker Drive, 22nd Floor                         502.584.0119 Fax
Chicago, Illinois 60606                        schedule@kentuckianareporters.com
                                                www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 25 of 82
The Deposition of DET. DAMION N. ANTONINI, taken on January 31, 2022

86..89

Page 86

1  gets put into evidence.
2      Q    Is it a requirement that any time a strip
3  search is going to be conducted, whether in the field or
4  at the station, that there -- be recorded in the way
5  you've just described?
6      A    If there is a search that is conducted, then
7  it is recorded.  But if there is not, there is no
8  search, there is no video, no search was conducted.
9      Q    So I take your testimony to be, anytime
10 there's a search conducted, it is mandatory to video
11 record the search in the way you've described; is that
12 true?
13     A    We do our -- we do our best to have visual --
14 a video evidence of that search.
15     Q    Okay.  And if there is video evidence of the
16 search, it is put into evidence with the case?
17     A    That is correct.
18     Q    Okay.  And then it sounds like you're saying,
19 sometimes you've conducted strip search where it hasn't
20 been possible to video record for some reason or the
21 other, right?
22     A    No.  I'm -- bearing some, you know, video
23 malfunction, but no, there's always been a recording of
24 the strip search.
25     Q    Does the narcotics unit -- when you were

Page 87

1  assigned the narcotics unit, always carry with it a
2  portable video recorder?
3      A    Yes.
4      Q    How about if you're at the station, is there a
5  recording device at the station?
6      A    Yes.
7      Q    The same one or a different one?  The same
8  video recorder that the narcotics unit has or a
9  different type of video recording?
10     A    I believe it's a different one.  They have
11 their own different -- patrol -- patrol -- the cell
12 block and the patrol unit -- the patrol division has its
13 own recording mechanism.
14     Q    When you have conducted strip searches at the
15 department, where have you conducted them physically
16 within the department?  In the narcotics unit office or
17 some other --
18     A    Usually in our narcotics room, yes.  We have
19 our own holding cell.
20     Q    Is there a recording device in the holding
21 cell within the narcotics unit?
22     A    No.  Just the recording device that we have.
23     Q    And the recording device the narcotics unit
24 has, what does it -- how do you transfer the data?  Does
25 it -- on a jump drive or how do you get it into

Page 88

1  evidence?
2      A    Either a disk drive or thumb drive.
3          MS. DONNELL:  Okay.  Thanks.  Steve, I can give
4  you a break now, if you want to go off the record.
5          MR. BUSHNELL:  Yeah, just a couple minutes.
6  Thanks.
7          MS. DONNELL:  Sure.  Let's go off the record.
8          VIDEOGRAPHER:  Okay.  We are now off the record
9  at 11:49.
10         (OFF THE RECORD)
11         VIDEOGRAPHER:  We are back on the record at
12 11:56 a.m.
13 BY MS. DONNELL:
14     Q    Okay.  Now, Detective Antonini, did you just
15 consult with your attorney regarding your testimony?
16     A    Yes.
17     Q    Okay.  What did you discuss with him regarding
18 your testimony?
19         MR. BUSHNELL:  No.  Objection.  He can't -- I
20 mean, I asked if you wanted him to clarify -- you
21 can't talk about his communications with his
22 attorney.  There was no question pending.
23         MS. DONNELL:  Well, and, you know, this might
24 be unique to your juris -- and maybe you can help
25 me, but in our jurisdiction, usually we conduct

Page 89

1  depositions as if they're trial testimony.  So once
2  the witness is under oath, the testimony or the
3  substance of the testimony isn't really discussed.
4  Perhaps it's different in the southern district, but
5  here in the Seventh Circuit, we usually conduct
6  depositions in that manner.  So once the witness is
7  under oath, then it's as if it's a -- you know,
8  testimony.
9          MR. BUSHNELL:  That's not what my understanding
10 --
11         MS. DONNELL:  At trial.  Okay.
12         MR. BUSHNELL:  That's not my understanding.  We
13 were off the record.  He was having a conversation
14 with his attorney.  It's privileged.
15         MS. DONNELL:  Okay.  So just for purposes here,
16 you're going to assert a privilege over any of your
17 communications you just had in this break at the
18 deposition with your -- with Mr. -- Detective
19 Antonini; is that correct?
20         MR. BUSHNELL:  That's correct.
21         MS. DONNELL:  Okay.  All right.  Well, I will -
22 - we'll proceed with the deposition, understanding
23 that you've asserted that privilege, but for
24 purposes of my -- I'd like to make a record, then.
25 Ask just a few questions.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 26 of 82
The Deposition of DET. DAMION N ANTONINI, taken on January 20, 2022
90..93

Page 90

BY MS. DONNELL:

1  BY MS. DONNELL:
2      Q    So Detective Antonini, are you -- on the
3  break, did you discuss with your attorney your testimony
4  pertaining to how you conduct strip searches for the
5  Mount Vernon Police Department?
6          MR. BUSHNELL:  Objection.  That's --
7          MS. DONNELL:  And that -- and you're asserting
8      an attorney-client privilege communication?
9          MR. BUSHNELL:  I am.
10 BY MS. DONNELL:
11     Q    Okay.  And Detective Antonini, are you going
12 to follow your Counsel's advice and not answer that
13 question?
14     A    Correct.
15     Q    Detective Antonini, are you in any way --
16 well, let's strike that.  But pursuant to your
17 communication with your Counsel, are you wanting to
18 clarify, modify, or change your prior testimony with
19 respect to strip searches you conducted for the Mount
20 Vernon Police Department?
21         MR. BUSHNELL:  Objection.  You can answer.
22     A    No.
23     Q    Okay.  Have you ever conducted a strip search
24 during your employment at the Mount Vernon Police
25 Department of an individual without your supervisor

Page 91

1  being physically present?
2      A    No.
3      Q    That's never happened?
4      A    No.
5      Q    In the narcotics unit, is the sergeant
6  supervising officer always out on the street with the
7  unit?
8          MR. BUSHNELL:  Objection.  You can answer.
9      A    Most times.  Yes.
10     Q    Does the unit travel together in multiple cars
11 or do you have different assignments -- you were
12 dividing the officers among different assignments?
13     A    Multiple cars.
14     Q    But are you all doing the same thing or are
15 you doing different investigations?
16     A    Depends what individual detectives or
17 investigators are investigating at the time.
18     Q    So sometimes the narcotics unit operates
19 together all as a unit in multiple cars, and sometimes
20 you each do different assignments?
21     A    Correct.
22     Q    Okay.  So have there been times when you've
23 been on assignment with another narcotics officer, and
24 the supervisor -- supervising officer, is not with you
25 and your other narcotics officers?

Page 92

1      A    Correct.
2      Q    Okay.  And have you ever had occasion, then,
3  to want to -- to believe that you needed to conduct a
4  strip search out in the field, and you didn't have a
5  supervisor present?
6      A    Absolutely not.
7      Q    Why not?
8      A    Because we don't do strip searches without the
9  supervisor being present or at the field, as you -- when
10 you say the field, what do you mean?  Like in the
11 streets?  Open view --
12     Q    In the streets, or at an apartment, or at some
13 location -- in the field, I mean, anything other -- any
14 place other than the Mount Vernon Police Department?
15     A    So, no, we don't do strip searches without the
16 supervisor being there.
17     Q    Okay.  So your testimony is you've never
18 conducted a strip search of an individual without having
19 your supervisor physically present, correct?
20         MR. BUSHNELL:  Objection -- objection.  Asked
21     and answered.  You can answer it again.
22     A    Correct.
23     Q    Have you ever conducted a strip search without
24 obtaining prior approval from your supervising officer?
25     A    No.

Page 93

1      Q    That's never happened?
2          MR. BUSHNELL:  Objection.  Asked and answered.
3      Go ahead.
4      A    No.
5      Q    Has Sergeant Fegan been present when you
6  conducted strip searches?
7      A    Yes.
8      Q    How many times?
9      A    Pretty much every single one of my strip
10 searches.
11     Q    So any time that you've conducted a strip
12 search, Sergeant Fegan was the supervising officer of
13 that search?
14         MR. BUSHNELL:  Objection.  Go ahead.
15     A    For the vast majority of my strip searches.
16 Yes.
17     Q    I forgot to say this earlier.  If, over the
18 course of the deposition, your memory is refreshed and
19 you want to modify your testimony, you can let me know
20 and I'd be happy to let you do that.  So for example, if
21 I'm asking you a lot of questions about strip searches,
22 you remember what -- how many you conducted or how many
23 Sergeant Fegan was present for, you can let me know.
24 Okay?
25     A    Okay.



Kentuckiana Reporters                    502.589.2273 Phone
30 South Wacker Drive, 22nd Floor         502.584.0119 Fax
Chicago, Illinois 60606          schedule@kentuckianareporters.com
                                 www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 27 of 82
The Deposition of DET. CAMILLE H. ANTONINI, taken on January 13, 2022

94..97

Page 94

1  Q   All right. Any other supervising officer that
2  you recall being present for a strip search you've
3  conducted, other than Sergeant Fegan?
4      A   Well, we've -- we said before how many
5  different supervisors I had in the unit, right? So
6  Sergeant Anthony McEachin, Sergeant Anthony Mitchell,
7  Sergeant Daniel Fischer, at the time, and Sergeant
8  Fegan.
9      Q   So each one of those supervisors was present
10 for a strip search you conducted, is that your
11 testimony?
12     MR. BUSHNELL: Objection. You can answer it.
13     A   All supervisors were always present for strip
14 searches.
15     Q   My question's a little bit different and maybe
16 you've already answered it. But just so the record's
17 clear, are you testifying that you conducted strip
18 searches, and each of those supervising officers that
19 you previously identified, were present for at least one
20 of your strip searches?
21     A   Were -- all of our strip searches were
22 conducted under the supervision of a supervisor.
23     MR. BUSHNELL: That's not what she's asking.
24     Q   That's not what I'm asking. Yep. I'm asking
25 something different. So I'm asking you whether Sergeant

Page 95

1  Vincent Stufano -- well, you never worked under him.
2  That's when you were on modified duty, correct?
3      A   Correct.
4      Q   Did Sergeant Anthony Mitchell supervise any of
5  your strip searches?
6      A   I -- if I recall, yes.
7      Q   How many?
8      A   I can't put a number because so -- long time
9  ago and we only worked together for such a short period
10 of times.
11     Q   How about Sergeant Anthony McEachin? Or
12 McKeow -- I'm saying that -- I might not be saying that
13 right. But did he, Sergeant McEachin supervise any
14 strip searches you performed?
15     A   I believe so. Yes.
16     Q   How many?
17     A   Can't tell you a number.
18     Q   Was it more than ten?
19     A   Again, I can -- that's not something I keep a
20 number of.
21     Q   Would it be possible to ascertain how many
22 strip searches you have performed as a Mount Vernon
23 Police Officer, because every time you performed one,
24 you documented it in a case report?
25     MR. BUSHNELL: Objection. You can answer.

Page 96

1      A   I guess you can, based on the reports.
2      Q   So is it accurate to say that anytime you
3  conducted a strip search, you documented it in a police
4  report?
5      A   Yes.
6      Q   When you were with the New York Police
7  Department did you conduct any strip searches?
8      A   I don't recall NYPD, yeah. And every search
9  that was conducted was done in -- I don't think we did
10 any strip searches at that time, no.
11     Q   Okay.
12     A   In NYPD, no.
13     Q   So to the best of your ability, your testimony
14 is that you don't remember conducting any strip searches
15 during the time you worked as a police officer with the
16 New York Police Department, correct?
17     A   That is correct.
18     Q   Okay. How about when you were assigned to the
19 patrol division with the Mount Vernon Police Department?
20 During the time you were on patrol, did you conduct any
21 strip searches?
22     A   The searches, especially for patrol, they are
23 done in the cell block, and everything is always
24 recorded in front of the supervisor. So all of our
25 searches were done in -- especially in patrol uniform,

Page 97

1  all of the searches are done in front of the supervisor.
2      Q   And is it fair to say -- I mean, I'm not sure
3  if this is accurate, but are you testifying that when
4  you did a -- you're testifying first that yes, you did
5  do strip searches while you were a patrol officer with
6  Mount Vernon Police Department, correct?
7      A   Yes.
8      Q   Okay. Do you know how many you did as a
9  patrol officer before you got to narcotics?
10     A   Again, you're asking me to put a number on
11 something I can't.
12     Q   Okay. When you were a patrol officer, did you
13 also document in a police report that you conducted a
14 strip search?
15     A   Correct.
16     Q   Okay. Did you conduct more strip searches
17 when you got to the narcotics unit than you conducted on
18 patrol, or kind of the same frequency?
19     MR. BUSHNELL: Objection. You can answer.
20     A   Well, I spent more time as a narcotics
21 detective than I did as a patrol, so...
22     Q   Understood. I guess what I'm saying is, let's
23 say as a patrol officer, you were conducting strip
24 searches X amount of times per week. And as a narcotics
25 officer, you were doing more, or less, or the same per



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 28 of 82
The Deposition of DET. CAMILO H. ANTONINI taken on January 30, 2022

98..101

Page 98

1  week.  Are you able to say?
2       MR. BUSHNELL:  Objection.  You can answer.
3    A   No.
4    Q   Do you think patrol officers are conducting
5  strip searches just as frequently as narcotics officers
6  for the Mountain Vernon Police Department; if you know.
7       MR. BUSHNELL:  Objection.  You can answer that.
8    A   I can't say.
9    Q   Where were you first trained how to conduct a
10  strip search?
11   A   Where was I first trained?
12   Q   Yes.
13   A   That's hard to say.  I want to say -- however
14  we were trained in the police academy in NYPD and
15  whatever training we had in Mount -- I had in Mount
16  Vernon.  So to say how and when, it's hard for me to
17  answer that.
18   Q   Okay.  Maybe I'll break it down.  Did you
19  receive training when you went to the academy, before
20  when you were a New York -- NYPD officer, on how to
21  conduct strip searches?
22   A   I believe I did.  Yes.
23   Q   Do you know for sure or are you guessing?
24   A   It's hard for me to -- I'm talking about,
25  what, 2000 -- what, '15, '16?

Page 99

1    Q   I know.  That's what I'm saying.  That's what
2  I'm saying.  I know -- I want you to tell me whether you
3  have a -- again, I'm not -- there's no fault.  It's just
4  whether you actually remember or not.  I'm just saying,
5  do you have an actual memory of being trained on how to
6  conduct strip searches at the academy, when you were
7  being trained as a New York Police Department officer?
8    A   No.  I don't have a memory of it.
9       MR. BUSHNELL:  So Camilo, she -- as she says --
10  Heather has said multiple times, you're only
11  testifying to what you can remember, what you can
12  testify to, what you remember today.  Okay?
13      THE WITNESS:  So yeah, I don't --
14      MR. BUSHNELL:  No guessing, nothing like that.
15      THE WITNESS:  I don't know.
16      MR. BUSHNELL:  All right.
17  BY MS. DONNELL:
18   Q   Yeah.  So we don't want you to guess.  You
19  know, I don't want you to guess or speculate.  I want
20  you to tell me what, you know, what you remember.  And
21  sometimes it's not clear, and obviously I'm asking
22  questions from a long time ago, and sometimes you just
23  don't remember.  And if you don't, you can just say, I
24  don't remember.  So it's -- I think that your testimony
25  is that you don't remember whether you received training

Page 100

1  on how to conduct strip searches, when you went to the
2  academy before becoming a New York Police Officer?
3    A   Correct.
4    Q   Okay.  Do you have an actual memory of being
5  trained on how to conduct strip searches, when you
6  received that training, when you came to Mount Vernon?
7    A   I don't remember.
8    Q   Okay.  Do you remember receiving any
9  on-the-job training, observing other officers conduct
10  strip searches, when you got to Mount Vernon?
11   A   I don't remember.
12   Q   Okay.  I think you got into this a little bit
13  already, but I want you to explain the criteria or
14  factors you considered as an officer, to determine
15  whether or not you were going to conduct a strip search
16  of an individual.  So can you tell me all the factors
17  you considered?
18   A   Historical, severity of the crime, charges of
19  the individual being arrested.  I mean, it varies of --
20  you know, how you -- why you want to conduct a strip
21  search.
22   Q   Okay.  So the things you told me is
23  historical, severity of the crime, charges of the
24  individual, and then you said it varies on the
25  situation.  But are there any other factors you

Page 101

1  considered before determining that you would conduct a
2  strip search of an individual?  Other than what you've
3  just testified to?
4       MR. BUSHNELL:  Objection.  You can answer it.
5    A   Factors such as what?  If you don't mind me
6  asking?
7    Q   No.  I'm asking you.  The factors -- I'm
8  sorry.  The way the deposition proceeds is that I ask
9  the questions and you give answers, but I can clarify my
10  question for you, which is --
11   A   Please.
12   Q   Okay.  Sounds good.  I -- my question to you
13  is, all of the factors you consider before deciding that
14  you're going to conduct a strip of an individual that's
15  in your custody -- can you please identify all the
16  factors you consider?
17   A   I guess, severity of the crime, historical --
18  you know, charges of the individual being arrested, you
19  know --
20   Q   Okay.  That's fair enough.  So you've
21  described these three.  So when you say, "Historical,"
22  what do you mean by that?  Can you please describe?
23   A   Maybe the individual has a history of hiding
24  weapons and, you know, concealing the weapons rather
25  than having them in a pocket.  And maybe they'll place



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 29 of 82
The Deposition of DET. CARMINE N. ANTONINI, taken on January 29, 2022
102..105

Page 102

1  them in areas where they don't want law enforcement to
2  find them.  If there's a historical [sic] of that then,
3  you know, that might call for a strip search to make
4  sure there's no weapons hiding.  That's an example.
5      Q    Any other examples that you consider under the
6  historical factor?
7      A    No.  That's pretty much it.
8      Q    Okay.  So you described a history of hiding or
9  concealing weapons, that is known to the officer, right?
10     A    Correct.
11     Q    Okay.  And did you also say hiding -- a
12 history of hiding contraband or just weapons?
13     A    Both.
14     Q    Both.
15     A    Could be both, yeah.
16     Q    Okay.  Okay.  Then you said, "Severity of the
17 crime."  What do you mean by that?
18     A    If you have an individual that might have, you
19 know, just assaulted somebody -- you know, committed a
20 felony crime and...
21     Q    So is it fair to say that when you're talking
22 about the severity of the crime, the more violent the
23 crime, the more that factor weighs in favor of doing a
24 strip search?
25     A    Correct.  And also historical.  They may -- I

Page 103

1  mean, you could have an individual that could -- might
2  have just had a DUI crash, under arrest, you know, you
3  kind of take that into account.  Then you conduct your
4  regular search because the individual's being placed
5  under arrest, but you know --
6      Q    Does a -- I'm sorry.  I'm sorry.  I didn't
7  mean interrupt you.  Did you finish your answer?
8      A    I did.
9      Q    Like somebody who's being arrested for a
10 felony DUI, is that a kind of severity of a crime that
11 you would conduct a strip search?
12     A    Possibly not, no.
13     Q    Why not?
14     A    Not that, but I -- then again, probably you
15 only have one, if not any DUIs or DWIs in my career, any
16 arrests like that, but -- you understand.
17     Q    Okay.  How about if someone's being arrested
18 for a narcotics offense?  Does just the fact that
19 someone's being arrested for a narcotics offense mean
20 that they should be strip-searched?
21         MR. BUSHNELL:  Objection.  You can answer.
22     A    Not necessarily.  No.
23     Q    So when you're, as a narcotics officer,
24 arresting someone for -- you believe they've committed
25 some sort of narcotics offense, what factors do you

Page 104

1  weigh into determining whether to conduct a strip search
2  or not?
3      A    Severity of the crime.  Historical.  What do
4  we know about the individual.
5      Q    Okay.  So severity of the crime, in terms of a
6  narcotics offense -- what do you mean in the terms of a
7  narcotics offense?  Like, whether it's a trafficking
8  charge, or a personal possession charge, or -- what
9  weighs in a narcotics arrest situation?
10     A    Misdemeanor possession versus a felony
11 possession.  You understand?  Like, somebody that's
12 caught for selling it versus somebody that's caught
13 trying to use it.
14     Q    So if it's a use or a possession, you're less
15 likely to conduct a strip search versus trafficking or
16 large quantities?
17         MR. BUSHNELL:  Objection.  You can answer.
18     A    It, again, varies on the severity of the
19 individual, the crime committed, or the historical --
20 what we know about the individual.
21     Q    Oka.  How about if you have no historical
22 information on the individual being arrested?  You and
23 your fellow officers never encountered the individual.
24 So you have no historical information.  What then do you
25 use to consider whether or not a strip search is

Page 105

1  necessary?
2          MR. BUSHNELL:  Objection.  You can answer.
3      A    You proceed with what knowledge you have of
4  the individual.
5      Q    So then does it just go to the severity of the
6  offense?
7          MR. BUSHNELL:  Objection.
8      A    It could, but each situation will dictate.
9      Q    Well, what other factors are you considering
10 in this -- in the hypothetical where you have no
11 historical information on the individual --
12         MR. BUSHNELL:  Objection.
13     Q    -- what other than the severity of the offense
14 do you consider?
15         MR. BUSHNELL:  Sorry.  Objection.  You can
16 answer.
17     A    Each situation will dictate.  I mean, it
18 doesn't --
19     Q    Like what?  I guess -- explain for me, when
20 you say, the "situation will dictate," what you are
21 thinking in your head?
22     A    Well, for example -- an example, you arrest an
23 individual that's very -- that's being very calm and
24 collected.  Listen, I'm sorry.  You know, I didn't mean
25 to do this X, Y, and Z.  You know.  I'm being with them

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1  -- listen, we're going to do a search.  Is there
2  anything you have on you?  The individual might come
3  forward, and says, listen, I don't have anything, but
4  you can search me.  I'll do anything you want.  So more
5  forthcoming then -- rather than you have an individual
6  that might be arrested for, you know, couple of, you
7  know, bags of -- let's say, in this example, crack.  And
8  he might be combating, and screaming at you, and says,
9  I'm going to kill you.  I'm going to kill you.  Fuck
10 you.  Fuck you.  Well, then, don't worry about it.  I'm
11 a get my knife and do this.  And actually starts talking
12 about weapons in front of you, then you'll be more apt
13 to say, you know what?  I think I'm going to have to
14 search you more in depth because I don't know, you might
15 have a weapon on you, and you are trying to hurt one of
16 us, or trying to hurt yourself in the process.  So like
17 I said, situation will dictate.
18     Q   Okay.  Understood.  So some of those factors
19 mean the compliance of the individual and how
20 forthcoming they are, versus how combative and/or
21 threatening they are.  That would be one factor you'd
22 consider in the --
23     A   That's a factor.
24     Q   -- an example.  Another example might be if
25 the individual mentions a weapon or anything of physical

Page 107

1  threat to you or your fellow officers, that would be a
2  factor you'd consider?
3     A   That is a factor.  And again, whatever we know
4  about the individual, historical -- whether there's a
5  history of that.
6     Q   Yes, yes.  This question was initially
7  prefaced with the hypothetical that you didn't have any
8  historical information, but understood.  Okay.  So let
9  me ask you this.  Have you ever obtained a weapon when
10 conducting a strip search, that was secreted on an
11 individual's person?
12     A   Yes.
13     Q   Well -- okay.  You have?  Where -- what have
14 you obtained, weapon-wise?
15     A   Well, there's been weapons tied into their
16 inner thighs.  There's been weapons tied into -- the
17 front of chest.  There's been weapons tied underneath
18 the armpits.  There's been razor blades inside the
19 mouth.  There's been razor blades tucked underneath the
20 socks, or contraband, you know, for that matter.  There's
21 been --
22     Q   Yeah, sorry.  I was just talking about weapons
23 first, but then you can tell me contraband.  So weapons,
24 you've found -- have you found -- so you found razor
25 blades.  When you found weapons on the thigh, were those

Page 108

1  guns, or knives, or what were those?
2     A   Both.
3     Q   Okay.  And how about front of the chest?  What
4  kind of weapons have you found?
5     A   Guns and knives.
6     Q   Okay.  And how about armpits?  What kind of
7  weapons?
8     A   Knives, contraband.
9     Q   Knives and contraband.
10    A   Weapons and contraband.
11    Q   And you said, razor blades in the mouth and
12 razor blades on feet?
13    A   Yes.
14    Q   Any other -- have you ever found any weapons
15 secreted in someone's buttocks?
16    A   There's been weapons that fell from the
17 buttocks.
18    Q   Okay.  What weapons have fallen from a
19 buttocks during the course of a strip search?
20    A   Knives, usually.
21    Q   Have you ever found a gun secreted in a
22 buttocks -- fallen out of a buttocks?
23    A   No.  But tucked in the waist-side, yes.  But -
24 -
25    Q   On the waist.  Okay.  Okay.  Any other --

Page 109

1  okay.  So how about contraband?  Have you found
2  contraband secreted on somebody's person in the course
3  of a strip search?
4     A   Yes.
5     Q   What kind of contraband?
6     A   Crack.  Heroin.  Marijuana, when -- when it
7  was illegal.
8     Q   Yeah.  Right.  Understood.  Yes.
9     A   I mean, coke, PCP.
10    Q   Where -- have you found drugs, narcotics or
11 the contraband you -- sorry, strike that.  The
12 contraband you've just identified, being largely
13 narcotics, have you found that secreted in individuals'
14 mouths?
15    A   Yes.
16    Q   Okay.  And you found that when you requested
17 them to open their mouth?
18    A   Yes.
19    Q   Okay.  Have you found contraband such as you
20 just described secreted in anybody's buttocks?
21    A   Yes.
22    Q   How about their anal cavity?
23    A   Tucked inside?
24    Q   Uh-huh.
25    A   Well, if you -- if we can't see it, we can't



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 31 of 82
The Deposition of DET. CAMILLO M. ANTONINI, taken on January 31, 2022
110..113

Page 110

1   assume that there isn't anything in there.
2     Q   So I'm saying when you found it in somebody's
3   buttocks -- not -- contraband in somebody's buttocks,
4   has it just been in between their crack?  Not inside
5   their anus?
6     A   Between the ass cheeks.
7     Q   Okay.  Have you -- and have -- where have you
8   -- that's come out when they've squatted and coughed, or
9   you've observed it on physical inspection, or both?  I
10   mean, on visual inspection or both?
11     MR. BUSHNELL:  Objection.  You can answer.
12     A   So I guess that's the purpose of having the
13   individual squat down and cough.  Assuming it's because
14   the reaction of the cough will loosen the muscle.  And
15   whatever is being held by the ass cheeks per se, will
16   usually just fall into the ground.  Again, that's why we
17   ask individuals who are being strip-searched to squat
18   down and cough.
19     Q   Have you ever have seen or been made aware
20   that the individual that's being strip-searched has the
21   contraband partially in their anal cavity, such as like
22   in a plastic bag, and so it doesn't fall out when you
23   ask them to squat or cough, but yet you know that
24   there's a plastic bag partially inserted into their anal
25   cavity?

Page 111

1     MR. BUSHNELL:  Objection.  You can answer.
2     A   Inserted into where?  Like their --
3     Q   Their anal cavity.  Yeah.  Have you ever done
4   an inspection where you ask them to squat and cough, it
5   doesn't fall out, but you can see that there might be
6   something still secreted or partially secreted in their
7   buttocks or anal cavity?
8     A   We -- if we don't see it, we -- that's -- you
9   know, we can't assume.  But you're saying that -- if
10   there's a visual of it?
11     Q   Yeah.  Like you were able to observe -- I'm
12   asking if you've ever observed somebody having drugs in
13   their anal cavity -- let's say in a plastic bag,
14   partially inserted into their anal cavity.  Have you
15   ever observed that?
16     A   I'm sure there's been cases, but I don't
17   recall having --
18     Q   Okay.  Have you ever requested somebody --
19   sought a warrant for someone to have a cavity search
20   performed by a medical professional?
21     A   Have I ever had a search warrant for somebody
22   to be --
23     Q   Taken to have a medical professional search
24   them?
25     A   I've never have -- I've never had to come into

Page 112

1   that situation.
2     Q   Okay.  Are you aware of any investigation in
3   which any of your narcotic officer colleagues sought a
4   warrant for a cavity search?
5     MR. BUSHNELL:  Objection.  You can answer.
6     Q   If you know?
7     A   No.
8     MS. DONNELL:  Okay.  Okay.  So let's see.  I'm
9   going to have -- so let me just see what I
10   previously marked this exhibit as.  But Steve, I'm
11   going to show him the 3.045.  I just can't remember
12   what I designated it previously, so just --
13     MR. BUSHNELL:  2 and 3, it looks like.
14 BY MS. DONNELL:
15     Q   Okay, sure.  Just give me one minute.  Okay.
16   Yes.  Okay.  So I'm going to have you look at, Detective
17   Antonini, what I previously designated as Exhibit 2 to
18   your deposition, which is the procedure number 3.045
19   that was produced in this litigation by the City of
20   Mount Vernon.  And it has a date of being issued on
21   January 4, 1993, effective January 18, 1993.  Do you
22   have that in front of you?
23     (EXHIBIT 2 MARKED FOR IDENTIFICATION)
24     A   Yes.
25     Q   Okay.  And it's a two -- let's see.  No, it's

Page 113

1   a three-page document, correct?
2     A   Yes.
3     Q   Okay, great.  Are you familiar with what I've
4   designated as Exhibit 2 to your deposition?
5     A   It says, the policies and procedures for
6   search of arrested persons?
7     Q   Yes.  Are you familiar with that document?
8     A   Yes.
9     Q   Is this one of the documents you looked at to
10   prepare for your deposition today?
11     A   Yes.
12     Q   Prior to reading this -- or reviewing Exhibit
13   2 to prepare for your deposition, when was the last time
14   you have seen this document; if you know?
15     A   Can't say.
16     Q   Okay.  Do you know if you ever saw it prior to
17   your -- preparing for your deposition?
18     A   I am sure I have.  Yes.
19     Q   Do you have a specific recollection of when
20   that was?
21     A   No recollection of when it was, no.
22     Q   So you see here, I'm going to -- well, I guess
23   you can't see, but do you see in the -- under the
24   subject it says, "Search of arrested persons", and then
25   the first subheading is "Purpose", right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 32 of 82
The Deposition of DET. DANGUILLEN ANTONINI, taken on January 31, 2022

114..117

Page 114

1    A    Yes.
2    Q    Okay.  And this says at the -- the first line
3  says, "The manual of procedures provides for the
4  thorough search of all arrested persons," correct?
5    A    Yes.
6    Q    And then the next line says, "However, a
7  person arrested will not be subject to a full strip
8  search unless there is a rational basis for doing so,"
9  correct?
10   A    Correct.
11   Q    Okay.  And then it says, "To maximize security
12  and minimize hazards to the arresting officer, the
13  arrested person," and the department, these are the
14  guidelines, right?
15   A    Yes.
16   Q    So the -- let's go down to procedure.  The
17  procedure initially has frisk and field searches, right?
18   A    Yes.
19   Q    Okay.  And the frisk is defined in this policy
20  to be, "Performed primarily to ensure the personal
21  safety of the arresting officer."  And, "Is a
22  methodical, external body examination of the arrested
23  person conducted immediately after apprehension to find
24  weapons, evidence, or contraband," right?
25   A    Yes.

Page 115

1    Q    And this is to be conducted before or just
2  immediately after the subject is handcuffed in the rear,
3  and it's a, "Feeling for weapons or other objects, with
4  special attention to the waistband, armpit, collar, and
5  groin areas," right?
6    A    Yes.
7        MR. BUSHNELL:  Just for the record, it's not a
8  verbatim recitation of the policy, but it's --
9        MS. DONNELL:  Yeah, that's true.  That's fair.
10  Thank you.
11       MR. BUSHNELL:  Okay.
12  BY MS. DONNELL:
13   Q    And then it says, a frisk or pat down may be
14  conducted, "By an officer, regardless of sex," that has,
15  "Reasonable suspicion to stop a person, where the stop
16  indicates a search is proper," right?
17   A    Yes.
18   Q    And then under subsection -- that was
19  subsection A.  And subsection B says, "By the arresting
20  officer, regardless of sex, where there is a lawful
21  arrest on probable cause," correct?
22   A    Yes.
23   Q    Okay.  And then if there's two officers
24  present and one is of the same sex, of the person -- the
25  person detained, "That officer should conduct the

Page 116

1  frisk," correct?
2    A    Correct.
3    Q    Then the policy says, at the bottom of page 1,
4  "In either case, where a more extensive search is called
5  for, the subject should be brought into the station and
6  Section B rules, 'Search at police facility,' should be
7  followed."  Do you see that?
8    A    Yes.
9    Q    Okay.  And then subsection D at the top of
10  page 2 says, "Where there is no probable cause to stop
11  or arrest a person, there is no basis to justify any
12  search of a person."  Do you see that?
13   A    Yes.
14   Q    Okay.  Now, let's go down to the search of the
15  police facility.  Here, it says -- it's under number
16  two.  "Upon arrival at police headquarters or other
17  department facility, the arresting officer or a
18  designated member of the same sex as the prisoner, will
19  conduct a thorough search of the subject's person
20  clothing to ensure the safety of all persons within the
21  facility and to remove weapons, contraband," or --
22  "Evidence not discovered by the frisk," right?
23   A    Yes.
24   Q    "Other items lawfully carried, but are
25  dangerous to life, or which could facilitate escape or

Page 117

1  deface or damage property, will also be removed from the
2  subject," right?
3    A    Yes.
4    Q    And then the policy goes on in section three
5  to say, a search at the police facility, not a 'Strip
6  search,' includes the removal of outer garments, such as
7  overcoats, jackets, sweaters, vests, hats, wigs, ties,
8  belts, shoes, and socks, handbags, and wallets," right?
9    A    Yes.
10   Q    And that, "Pockets are to be emptied," right?
11   A    Right.
12   Q    Okay.  And then you search the person by not
13  removing their clothing, but "Grabbing, crushing, and
14  squeezing garments," and sliding your body -- hands over
15  the body to detect any objects, right?
16   A    Right.
17   Q    Okay.  Then it goes on in the next section to
18  describe a strip search, right?
19   A    Right.
20   Q    Now I -- I have a question for you.  When you
21  just arrest an individual out on the street, and you
22  bring them into the station, and they're just going to
23  be processed, and put into custody, do you always
24  conduct a strip search as a narcotics officer?  Or do
25  you sometimes just turn them over to the lock up keeper

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 33 of 82
The Deposition of DET. DANILLO H. ANTONINI, taken on January 30, 2022

118..121

Page 118

1  or the desk (phonetic) sergeant for processing?
2         MR. BUSHNELL:  Objection.  You can answer.
3     A    We conduct our own searches in our office.
4     Q    For every single arrest you make?
5     A    No, not every single arrest.  It was like --
6  like we mentioned before, the severity of the crime will
7  call for or dictate whether we need to do a full,
8  thorough strip search or just (sound effect).  And then
9  whether that search is conducted in our office, since we
10  have our own holding cell, or the individual that's
11  being arrested may have not deemed, you know, a full,
12  crazy search, just bring them downstairs to the cell
13  block, being processed there, then put in a holding
14  cell.
15     Q    So it's fair to say sometimes individuals are
16  taken into custody, arrested by the narcotics unit,
17  they're frisked -- I mean, they're patted down and
18  searched, but there's no strip search conducted,
19  correct?
20     A    Correct.
21     Q    Are you able to say what percentage of arrests
22  the narcotics unit made where a strip search was
23  conducted versus not conducted?
24         MR. BUSHNELL:  Objection.
25     Q    Like 50 percent of the time, or...?

Page 119

1         MR. BUSHNELL:  Objection.  You can answer, if
2  you can.
3     A    I can't answer that.
4     Q    Can't answer that.  Okay.  All right.  So --
5  okay.  So under the strip search, the policy says that
6  "the desk officer or supervisor present will decide if a
7  strip search should be conducted and is responsible that
8  the search is conducted properly."  Do you see that?
9     A    Yes.
10     Q    "A, 'Strip search,' will be utilized when the
11  arresting officer reasonably suspects that weapons,
12  contraband, or evidence may be concealed upon the person
13  or in their underclothing, in such a manner that they
14  may not be discovered by the previous search methods."
15  Do you see that?
16     A    Yes.
17     Q    It says, "Other factors that should be
18  considered in determining the necessity for a 'Strip
19  search' include the nature of the crime; serious,
20  violent felony; arrest circumstances; subject's
21  reputation; extremely violent person; act of violence;
22  and discoveries from previous searches," right?
23     A    Yes.
24     Q    Okay.  And then the policy says that
25  "determining whether a, 'Strip search,' is necessary,

Page 120

1  the reasonableness of" such a search under the
2  circumstance will control, right?
3     A    Right.
4     Q    And then, "A, 'Strip search,' will be
5  conducted by a member of the same sex as the arrested
6  person in a secure area in uttermost privacy and with no
7  other arrestee present," correct?
8     A    Correct.
9     Q    And it should be -- "It should not be
10  necessary to touch the subject's body, except for
11  examination of the hair," correct?
12     A    Correct.
13     Q    "If a 'Strip search,' is conducted, such
14  information will be entered under, 'Details,' in the
15  arrest book," right?
16     A    Right.
17     Q    What is the arrest book?
18     A    What is the arrest book?
19     Q    Yeah.
20     A    It's a book that the patrol division is kept
21  in the cell block (phonetic).
22     Q    And earlier you testified that you would
23  document if you did a strip search in a police report,
24  right?
25     A    I'm sorry.  Repeat that question?

Page 121

1     Q    I'm sorry.  Earlier you testified that if you
2  conducted a strip-search, you would document it in your
3  police report, correct?  The case report?
4     A    I -- correct.
5     Q    Did you ever document that you conducted a
6  strip search in an arrest book?
7     A    No.
8     Q    So that --
9     A    And I don't -- and to my -- I don't think that
10  the department keeps an arrest book in the cell block
11  anymore --
12     Q    Okay.
13     A    -- to my knowledge.
14     Q    And then subsection four C says, "A
15  subsequent, 'Strip search,' will not be conducted unless
16  there is a reasonable belief that the subject has
17  acquired a weapon or contraband."  Do you see that?
18     A    Yes.
19     Q    Do you take that to mean, that once an
20  individual's been strip-searched a single occasion, they
21  won't be strip-searched a second time, unless there's a
22  belief that the subject acquired a weapon or contraband,
23  subsequent to the original strip search?
24     A    I guess.
25     Q    Have you ever been involved in an -- having an

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 34 of 82
The Deposition of DET. PASQUALE ANTONINI, taken on January 03, 2022

122..125

Page 122

1  individual be strip-searched more than once in your
2  presence, either by you or one of your fellow officers?
3       A    Yes.
4       Q    Okay.  Tell me, do you -- was that on one
5  occasion or more than one occasion?
6       A    Can't say.
7       Q    Okay.  But you -- your testimony is you have
8  been present for when a subject's been strip-searched
9  more than once; to your knowledge?
10      A    Correct.
11      Q    And you aren't able to say one way or the
12 other how often that has occurred?
13      A    Oh, we -- we've -- I mean, this -- we've
14 arrested individuals on multiple occasions.
15      MR. BUSHNELL:  So I think that's the problem.
16      MS. DONNELL:  Oh, I'm sorry.  Let me -- thank
17 you.  Let me rephrase.
18      MR. BUSHNELL:  All right.  Didn't mean to jump
19 in there.
20      MS. DONNELL:  Sorry, go -- Steve, I'm sorry I
21 interrupted you but I think I got -- understand.
22      MR. BUSHNELL:  Yeah, I was about to jump in on
23 there.  Yeah.  If you want to reclarify and say --
24 BY MS. DONNELL:
25      Q    Sure, let me clarify the question for you,

Page 123

1  Detective Antonini.  So, Detective Antonini, I'm asking
2  you in a -- during the course of a single arrest --
3       A    Okay.
4       Q    -- have you been part of either yourself or
5  observing your fellow officers conduct a strip search of
6  the same subject during a single arrest?  Not like one
7  time a month ago.
8       A    Oh, no.
9       Q    You have not?  Okay.
10      A    No.
11      Q    So it's your testimony that when you've been
12 involved in a strip search of a subject during an
13 arrest, there's only been one strip search of that
14 subject?
15      A    Correct.
16      Q    Okay.  So when you were testifying earlier,
17 you know of individuals who've been strip-searched more
18 than once, you mean on separate occasions -- on
19 different arrests?
20      A    Correct.
21      Q    So it's your testimony that you've never
22 strip-searched a single subject during one arrest, that
23 you've never participated in that?
24      MR. BUSHNELL:  Objection.  You can answer.
25      A    Strip-searched on the same single incident?

Page 124

1       Q    Correct.
2       A    Strip-searched multiple times?
3       Q    Yeah.
4       A    No.
5       Q    Let's say once out in the field and then once
6  when you brought him to the station?
7       A    Absolutely not.  Never.
8       Q    Never happened?  Okay.  All right.  And then a
9  sub -- going down the policy for section -- paragraph
10 four D, it says, "A, 'Strip search,' will not be
11 conducted after a decision is made to avoid an arrest or
12 to release the prisoner immediately upon issuance of a
13 summons."  Do you see that?
14      A    Correct.
15      Q    And then E says, "A thorough clothing search
16 will usually eliminate the necessity of a full, 'Strip
17 search,' for weapons, and ensure maintenance of safety
18 and security standards.  However, a 'Strip search' for
19 other evidence may still be necessary in some
20 instances."  Do you see that?
21      A    Yes.
22      Q    And did you follow that practice, like if you
23 do a thorough clothing search, you should be able to
24 find -- be able to feel, let's say, if there's a gun or
25 a knife on somebody's chest, or a gun or a knife in an

Page 125

1  armpit, or a gun or a knife in a waistband or in the
2  upper thigh?  Usually if you're feeling so over
3  someone's clothing, you can find those, right?
4       MR. BUSHNELL:  Objection to form.  You can
5  answer.
6       A    So if we -- if we found a gun on the armpit,
7  that doesn't mean that we stop searching.
8       Q    Right.  But like you could -- if somebody has
9  a gun under their armpit, you can usually feel that when
10 you're feeling over their clothes, correct?
11      MR. BUSHNELL:  Objection.  You can answer.
12      A    So we should stop searching everything else,
13 just because we found -- no.  We conduct a full search
14 after that, yes.
15      Q    Understood.  But the -- I think I understand
16 what you're saying.  You're saying if you find a gun
17 under the armpit, you might keep searching because there
18 might be one on the waistband, or a knife on the thigh.
19 You have to conduct a thorough search, no matter if you
20 find a weapon, right?
21      A    Correct.
22      Q    Okay.  But my question is a little bit
23 different.  My question is, as policy -- your policies
24 states, usually a thorough investigation of someone's
25 clothing will -- of -- find weapons that are on a



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 35 of 82
The Deposition of DET. DAMION N ANTONINI, taken on January 30, 2022

126..129

Page 126

1 person's body, right?  You can usually feel it?
2        MR. BUSHNELL:  Objection -- objection.  You can
3 answer.
4    A    In some instances, yes.
5    Q    Okay.  And so it -- usually, a thorough
6 clothing search will eliminate the necessity of a full
7 strip search.  Would you agree with that?
8        MR. BUSHNELL:  Objection.  You can answer.
9    A    In some instances.
10   Q    So you don't agree with that statement?  Are
11 you qualifying?
12   A    Not always.
13   Q    Okay.  You can put Exhibit 2 down.  Okay.  I'm
14 going to have you look at Exhibit 5.  Does -- can Steve
15 hand you what I previously designated as Exhibit 5 to
16 your deposition?  It's a one-page document, "Detective
17 division operational procedures, search of individuals."
18 It was issued on February 10, 2015.
19       (EXHIBIT 5 MARKED FOR IDENTIFICATION)
20       MS ACQUISTO:  Is that the right one?
21       MR. BUSHNELL:  Exhibit 5, Detective --
22       MS. DONNELL:  It's at the --
23       MR. BUSHNELL:  Detective division oper --
24 search of individuals?
25       MS. DONNELL:  Yeah.

Page 127

1        MR. BUSHNELL:  SOP 16?
2        MS. DONNELL:  You got it.
3        MR. BUSHNELL:  Thanks.
4        MS. DONNELL:  Okay.  And I previously
5    designated this as Exhibit 5 to the deposition.
6        MR. BUSHNELL:  Yep.
7 BY MS. DONNELL:
8    Q    Okay.  Okay.  Detective Antonini, do you have
9 Exhibit 5 in front of you?
10   A    I do.
11   Q    Okay.  Do you recognize Exhibit 5?
12   A    Yes.
13   Q    Did you look at Exhibit -- the -- the --
14 designated as Exhibit 5 to prepare for your deposition
15 today?
16   A    Yes.
17   Q    Prior to looking at Exhibit 5, the Detective
18 division operational procedures for search of
19 individuals to prepare for your deposition, when's the
20 last time you saw it; if you remember?
21   A    I don't remember.
22   Q    Do you have an actual memory of being trained
23 -- well, do you remember why this detective division
24 operational procedure 16 came into effect?  Do you have
25 any memory as to the history of it?

Page 128

1        MR. BUSHNELL:  Objection.  You can answer.
2    A    No.
3    Q    Do you remember -- do you have a specific
4 memory of receiving any training on when it became --
5 when it became issued in February, 2015?
6    A    No.
7    Q    But you were a narcotics officer at that time,
8 correct?
9    A    Correct.  Yes.
10   Q    And you were working under Sergeant Sean
11 Fegan, correct?
12   A    At the time, 2015?  Yes.
13   Q    Okay.  Okay.  And here it says -- this is the
14 subject matter of this operational procedures is the
15 search of individuals, right?
16   A    Yes.
17   Q    And it says that members are guided by the
18 department manual" -- "Operational procedure number
19 3.045, search of arrested persons."  That's what we just
20 looked at in Exhibit 2, right?
21   A    Yes.
22   Q    And then it says, in the event of a deviation
23 from this policy -- "In the event that a deviation from
24 this policy is required," a "strip search becomes
25 necessary, the following procedure will apply."  Do you

Page 129

1 see this?
2    A    Yes.
3    Q    Okay.  And then it says a, "Member will
4 conduct the search of," an arrested person, "In the cell
5 block whenever possible," right?
6    A    Yes.
7    Q    Is that your understanding, that strip
8 searches were supposed to be conducted at the station,
9 in a cell block, whenever possible?
10   A    Whenever possible.
11   Q    Was that your understanding?
12   A    Yes.  Whenever possible.
13   Q    Okay.  When was it not possible to transport
14 an arrestee to the station to conduct a strip search at
15 the department --
16       MR. BUSHNELL:  Heather, I think you're cutting
17 out a little bit there.
18       MS. DONNELL:  Oh, sorry.  I'm so sorry.
19       MR. BUSHNELL:  Could you repeat that?
20       MS. DONNELL:  Okay.  Yeah, you were looking at
21 me, and I was like, did he -- okay.  Sorry.  I'll
22 say it again.
23 BY MS. DONNELL:
24   Q    Can you hear me now?
25   A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 36 of 82
The Deposition of DET. DAMION H ANTONINI taken on January 30, 2022

130..133

Page 130

1    Q    Okay.  When was it not possible to bring an
2  individual to the station to be strip-searched?
3    A    There's situation -- well, the -- like I said,
4  the situation would dictate.  Like, we could have a --
5  like, specifically to search warrants is pretty much
6  what this is -- applies to.  So if we are in a location
7  where we're conducting a search warrant of an apartment
8  and there's an individual where we could conduct a strip
9  search at that location, it'll be conducted there.
10  Obviously under the supervision of our supervisor, and
11  obviously with camera in place to do it, you know, as
12  per procedure.
13    Q    Did you ever conduct a -- did you find it
14  justified to conduct a strip search out on the street?
15    A    Absolutely not.
16    Q    Never happened?
17    A    No.
18    Q    How about -- so you're saying only -- you did
19  it in the field, only when it was pursuant to a warrant
20  to search a home or apartment?  So you would do it at
21  the home where the apartment?
22    A    So I get a little confused every time you say
23  on the field.  So to be more specific, in closed
24  locations, like apartments, houses, where it's more of a
25  private -- "private setting"  Nothing in the open of

Page 131

1  street.
2    Q    What happens if you arrest somebody for -- on
3  the street?  Like you observe them, and you believe you
4  have probable cause to arrest them for trafficking
5  narcotics, and they're out on the street.  And you do a
6  pat down and you're concerned that they're secreting
7  weapons or contraband on their person?  Do you --
8    A    The strip search will be conducted back at
9  headquarters.
10    Q    Okay.  And for the individuals that are -- so
11  when you're saying you strip search people pursuant to a
12  search warrant for a home, or an apartment, or a
13  business, why do you not bring those individuals back to
14  strip search at the station?
15    A    Because it's -- it -- I guess, like I said
16  before, the situation would dictate.  Whereas, if it's
17  more convenient and easier to conduct a search at the
18  location, it's usually conducted there.  Whereas, not to
19  repeat --
20    Q    So the default was to conduct it on the
21  location?  Okay.  The default is if there's an enclosed space
22  that you could do it on location, you would -- the
23  default was to do it on location where the search was
24  being conducted?
25    A    Correct.  And then we don't have to repeat the

Page 132

1  process back at headquarters because you already
2  conducted the strip search.
3    Q    Okay.  And when you turn those persons over to
4  the watch commander or the jail, would you let them know
5  they have already been strip-searched, so they don't
6  have to be strip-searched again?  Or would the people
7  putting them into the detention facility strip search
8  them again; if you know?
9    A    No.  They would not be strip-searched again.
10    Q    Okay.  So how would you convey that to -- when
11  you brought somebody in for processing, you would let
12  them know orally they had been strip-searched?
13    A    The desk officer will respond back to the cell
14  block, in order to book the individual that's being
15  processed.  Well, at that time, we'll tell the desk
16  officers if the individual's already strip-searched.  No
17  need to conduct another search for.  All his items have
18  been removed, he's clear, you know, deemed to be safe,
19  blah, blah.  All he does after that is pretty much
20  conduct his evaluation of, you know, the individual
21  before he's placed into a cell block.
22    Q    Okay.  All right.  So let's go through section
23  C [sic].  It says -- number two, it says that the "Strip
24  searches will be conducted in accordance with parameters
25  set forth in operational procedure 3.045," right?

Page 133

1    A    Yeah.
2    Q    And then it says, "In the event that a strip
3  search is conducted, a detective division supervisor
4  will be present and will direct one member to conduct
5  the search in a private room.  A second member is to
6  video/audio record the subject being advised that he or
7  she will be strip-searched.  The recording will continue
8  from outside the private room while the searching
9  officer and subject are inside.  And, "Upon completion
10  of the search, the recording officer will conclude the
11  recording by asking the subject's name and inquiring of
12  the searching officer and subject if the search was
13  completed without incident and if any contraband was
14  recovered.  This procedure will be followed in all
15  instances in which a strip search is conducted,
16  regardless of location."  Do you see that?
17    A    Yes.
18    Q    Okay.  And is that the policy that you
19  followed when you conducted strip searches?
20    A    Yes.
21    Q    When -- you said that the narcotics
22  office had a holding cell, right?
23    A    We do.
24    Q    Is that where the strip searches were
25  conducted when you -- when you did them at the station?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 37 of 82
The Deposition of DET. CAMILO H. ANTONINI, taken on January 30, 2022

134..137

Page 134

```
1     A    If we -- no.  We have a private room inside
2  the narcotics office.
3     Q    So the searches weren't conducted in the
4  holding cell, they were in the private room?
5     A    Correct.
6     Q    Where is the private room, inside the
7  narcotics office?
8     A    Inside the narcotic office.
9     Q    Well, what -- where?  Tell me where.
10    A    So if you were standing in the office right
11 now, there's a small, enclosed room in -- behind you in
12 the corner with a door.
13    Q    Was the room used for anything else other than
14 strip searches?
15    A    Interviewing, debriefing.
16    Q    So it's like an interrogation room?
17    A    No.
18       MR. BUSHNELL:  Objection.  Go ahead.
19    A    No.
20    Q    And what do you -- when you're saying
21 interviewing, you mean like interviewing witnesses or
22 subjects?
23    A    Well, when you want to have a -- if you want
24 to debrief somebody quietly without having -- there's
25 some case instances where you have two different
```

Page 135

```
1  individuals in the same office -- two without relation
2  to the other.  So you want to have -- you want to
3  conduct your own interview with one individual in that
4  room, rather than have it in the open where the other
5  -- the other individual can hear what you are saying.
6     Q    Maybe you can explain this to me.  Does the
7  narcotics unit have an office that's within the
8  detective division?
9     A    Our own separate office?
10    Q    Yeah.  Or are you just in the detective
11 division with all the other -- all the other kinds of
12 detectives?
13    A    Yes.  The narcotics unit has his own separate
14 office away from the detective division, yes.
15    Q    And the narcotics officers, did you guys have
16 your own offices, or just desks, or lockers?  What did
17 you as officers have in there?
18    A    Open desk.
19    Q    Open desks?  And did the sergeant have -- was
20 there a sergeant's office -- or is there a sergeant's
21 office?
22    A    Yes.  He has his own separate office within
23 the narcotics office.
24    Q    Within.  Okay.  And then how many private
25 rooms or interview -- would you call them an interview
```

Page 136

```
1  room, or what would you call them?
2     A    Only one.
3     Q    There's only one.  Okay.  So there's one
4  private room within the narcotics unit that can be used
5  for interviewing individuals privately, strip-searching,
6  right?
7     A    Correct.
8     Q    But then does the detective division have its
9  own separate office, where it has interrogation -- or
10 interview rooms or interrogation rooms?
11    A    No.  The division has its own interview rooms
12 where they conduct their own interview procedures or
13 interrogating room.
14    Q    Okay.  I know we talked about taking a -- like
15 a short lunch break shortly, but before we do, in --
16 this -- the incident we're -- was in November 2017,
17 right?
18    A    (No verbal response.)
19    Q    Do you remember the narcotics officers that
20 were part of the unit in November 2017, other than
21 yourself and Sergeant Fegan?
22    A    Do I remember who was part of the unit?
23    Q    Yeah.
24    A    During -- Joseph Valente, Bobby Puff, Patrick
25 King.  Can't think of anybody else who was in the unit
```

Page 137

```
1  at that time.
2     Q    How many -- did you guys have the same on and
3  off days, or did you -- well, let me strike that.  How
4  many days a week did the narcotics unit operate back in
5  2017?
6     A    How many days a week?  I believe it was four
7  days on, two days off, four days on, three days off.
8     Q    Did you guys have the same off days?  What I'm
9  trying to understand is, was it operating seven days a
10 week and you guys rotated who was on and off?  Or was it
11 operating like four days at a time then you all had two
12 days off, four days at a time, then you all had the same
13 three days off?
14    A    Correct.  It was a --
15    Q    The latter?
16    A    Four on, two off, four on, three off,
17 everybody.
18    Q    So everybody always worked the same shifts and
19 then there'd be certain days a week there just wouldn't
20 be a narcotics unit operating?
21    A    The same working hours, but -- the same shift,
22 but the different working hours, we would dictate what
23 time we were coming in for the next day, and so on, and
24 so forth.  As long as we work the eight-hour shift.
25    Q    But is it accurate to say that you guys would
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 38 of 82
The Deposition of DET. DAMION H ANTONINI, taken on January 30, 2022

138..141

Page 138

1  work the same four days, and then you'd have the same
2  two days off, and there'd be no narcotics unit
3  operating?
4        A    Correct.
5        Q    Okay.  Is that same schedule true now; do you
6  know?
7        A    I don't know.  Can't tell.
8        Q    Okay.  Got it.
9             MS. DONNELL:  Okay.  Let's do this.  Let's go
10     off the record and then Steven, maybe you and I can
11     talk for just a minute.
12            MR. BUSHNELL:  Sure.
13            VIDEOGRAPHER:  Okay.  We are going off record
14     at 12:55 p.m.
15            (OFF THE RECORD)
16            VIDEOGRAPHER:  All right.  We are back on the
17     record at 1:35 p.m.
18     BY MS. DONNELL:
19       Q    Okay.  Detective Antonini, I'm going to call
20     your attention to what I previously designated as
21     Exhibit 13 to your deposition, and it's the "defendants'
22     limited disclosures," that were produced in this case on
23     March 22, 2021.  I think it's a six-page document, and
24     it should be there for you.
25            (EXHIBIT 13 MARKED FOR IDENTIFICATION)

Page 139

1        A    Okay.
2        Q    Okay.  Can you hear me okay?  I just got a
3  notation on my Zoom that I might not be being heard
4  okay.  Are you there?
5        A    I hear you okay.
6        Q    Okay.  Just let me know if something changes.
7  Okay.  So have you - well, are you familiar with the
8  document that I've designated as Exhibit 13 to your
9  deposition?
10       A    Yes.
11       Q    Okay.  And have you looked at that before?
12       A    Yes.
13       Q    When's the last time you saw it?
14       A    I can't recall.  Earlier today, I think.
15       Q    Earlier today?
16       A    Yes.
17       Q    Okay.  Let's call - I'm going to have you turn
18  to page 2 where it says, "Prior section 1983 lawsuits
19  filed against and served on the defendants."  Do you see
20  that?
21       A    Page 2?  Which line?
22       Q    Starting at the bottom, it's - there's
23  paragraph five.
24       A    Okay.  I see it.
25       Q    Okay.  So this is listing some lawsuits - some

Page 140

1  lawsuits filed under section 1983 against you and other
2  Defendants.  And I want to go through the list of
3  lawsuits that are here for - listed for you.  Okay?
4        A    Okay.
5        Q    Okay.  And if there's any additional ones that
6  are not listed here, you can let me know, but let's
7  start with the first one.  The first is titled Cayruth
8  versus - Cayruth?  I think I'm saying that right, or do
9  you say it a different way?
10            MR. BUSHNELL:  You're saying that, right.
11     BY MS. DONNELL:
12       Q    Cayruth, and I believe it's Komato [sic]
13  Cayruth, v. the City of Mount Vernon, including you.  Are
14  you familiar with that lawsuit against you?
15       A    I believe I am, yes.
16       Q    Okay.  And you know that that lawsuit makes an
17  allegation of an unlawful strip search against you,
18  correct?
19       A    Correct.
20       Q    Is that right?
21       A    Yes.
22       Q    Okay.  And is that one of the cases - have you
23  been deposed in that case?
24       A    I believe I was, and this happened to me a
25  long time ago.

Page 141

1        Q    Okay.  This involves a strip search where
2  there was no arrest made; is that right?
3        A    I believe so, yes.
4        Q    Okay.  Do you remember the search you
5  conducted of Mr. Komato Cayruth?
6        A    Do I remember the search?
7        Q    Yes.
8        A    No, I do not.
9             MR. BUSHNELL:  Just for the record, Heather,
10     it's Komanjo.  K-O-M-A-N-J-O.
11            MS. DONNELL:  Komanjo.  Thank you.  I'm sorry.
12            MR. BUSHNELL:  No.  You're welcome.
13     BY MS. DONNELL:
14       Q    So as you sit here today, you have no
15  recollection of your search of Mr. Cayruth?
16       A    I don't remember.
17            MR. BUSHNELL:  So also, I would just like to
18     say, too, that this is an ongoing lawsuit currently,
19     you know, to the extent that he's asked to testify
20     about deposition testimony that he's already given
21     that is going to be -- likely going to be the
22     subject of an upcoming civil trial.  He -- you can
23     ask about the facts of the case, I think, but
24     anything that goes into his deposition or anything
25     like that, I would object to.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 39 of 82
The Deposition of DET. CAMILO H. ANTONINI, taken on January 30, 2022
142..145

Page 142

1           MS. DONNELL:  Well, I -- that's -- I think
2      -- let's -- I'll take it question by question, but I
3      think I can ask him -- I mean, obviously this is
4      -- pertains to a -- not just a lawsuit, but also a
5      civilian complaint.
6           MR. BUSHNELL:  Right.  And I don't -- I don't
7      anticipate having any problems, Heather, but yeah,
8      let's take question by question.
9  BY MS. DONNELL:
10     Q    Okay.  Okay.  Well, so for purposes of this
11  portion of my questioning, you are a Defendant in the
12  ongoing lawsuit by Mr. Cayruth, that pertains to
13  allegations of an unlawful strip search, among other
14  allegations, correct?
15     A    Correct.
16     Q    Okay.  And as you sit here today, you don't
17  remember whether you were deposed in that action?
18     A    No.  I don't remember the particulars about
19  the incident.
20     Q    You don't -- I'm sorry.  Thank you.  So you
21  don't remember the particulars of the strip search that
22  Mr. Cayruth -- that's part of the subject of his
23  lawsuit, correct?
24     A    Correct.
25     Q    Okay.  Do you know the status of when that

Page 143

1  case is going to trial?
2           MR. BUSHNELL:  Objection.  You can answer, if
3      you know.
4      A    I do not.
5      Q    Okay.  Do you -- does it refresh your
6  recollection if I say this trip search was alleged to
7  occurred at the station and been videotaped?  Does that
8  refresh your recollection in any way?
9      A    No.
10          MS. DONNELL:  Okay.  Okay.  I'm going to --
11     Steve, what I'm going to do is I'm going to leave
12     the questions here and then -- well, let me see.
13     Yeah, let's do this.
14  BY MS. DONNELL:
15     Q    Okay.  Do you remember that you were -- this -
16  - Mr. Komanjo Cayruth filed a civilian complaint against
17  you related to the strip search?
18     A    Do I remember if he filed a came against me?
19     Q    Correct.
20     A    I believe --
21     Q    Correct.  Not a federal complaint.  I mean a
22  complaint with the Mount Vernon Police Department?
23     A    Yes.  Civilian complaint?
24     Q    Yep.
25     A    Yes.

Page 144

1      Q    Do you remember that you provided a statement
2  in connection with that investigation?
3      A    I believe I did, yes.
4      Q    Okay.  Did you review any of the
5  documentations pertaining to Mr. Komanjo Cayruth's
6  allegations against you to prepare for your deposition
7  today?
8      A    No.
9      Q    Okay.  Okay.  How about -- let's look at the
10  next lawsuit, Rutherford v. City of Mount Vernon.  Are
11  you familiar with the lawsuit that Mr. Rutherford and
12  Mr. Gallman have filed against you, among other
13  officers?
14     A    Rutherford?
15     Q    And Gallman.
16     A    Yes.
17     Q    Okay.  And you know that lawsuit also involves
18  allegations of an -- unlawful strip searches, correct?
19     A    Yes.
20     Q    Okay.  How about the next one?  Williamson v.
21  City of Mount Vernon.  And this is 15-CV-5635.  And I
22  think it's Terrell Williamson.
23          MR. BUSHNELL:  Tremel.  T-R-E-M-E-L.
24          THE WITNESS:  Thank you.  Tremel Williamson.
25     Thanks, Steve.

Page 145

1          MR. BUSHNELL:  Yep.
2  BY MS. DONNELL:
3      Q    Are you familiar with this lawsuit Mr. Tremel
4  Williamson has filed against you?
5      A    Yes.
6      Q    Okay.  And are you familiar with the
7  allegations that he has alleged against you?
8      A    Yes.
9      Q    And what were those?
10     A    Search.
11     Q    Okay.  An unlawful search?
12     A    Unlawful search.
13     Q    Okay.  how about number four, Collier v. City
14  of Mount Vernon?  19-CV-5230.  Are you familiar with the
15  lawsuit against you and Officers Puff and King by Mr.
16  Collier?
17     A    No.
18     Q    Okay.  I'll represent to you that it has
19  allegations of false arrest allegations.  How about this
20  -- I think it's Jonathan Long v. City of Mount Vernon,
21  18-CV-9068.  Are you familiar with this lawsuit against
22  you?
23     A    No.
24     Q    And I'll represent to you that this involves
25  an allegation of an unlawful strip search from June

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 40 of 82
The Deposition of DET. CAMILO H. ANTONINI, taken on January 03, 2022

146..149

Page 146

1   2018.  Does that refresh your recollection?
2       A    No.
3       Q    Do you, as you sit here today, have any memory
4   of searching -- strip-searching Jonathan Long?
5       A    When?
6       Q    In 2018 -- June of 2018?
7       A    No.
8       Q    Do you know who Jonathan Long is?
9       A    Yes.
10      Q    Who is Jonathan Long?
11      A    Jonathan Long.
12      Q    Have you arrested him on more occasions before
13  June 2018?
14      A    Once or twice.
15      Q    How many times have you strip-searched
16  Jonathan Long?
17      A    Probably, once or twice.
18      Q    Have you obtained any weapons or contraband in
19  your strip searches of Mr. Long?
20      A    I don't recall.
21      Q    How about for Mr. Komanjo Cayruth?  You said
22  you don't recall strip searching him at all?
23      A    I don't remember the particulars of the
24  incident.
25      Q    Do you remember anything about it at all?

Page 147

1           MR. BUSHNELL:  She's asking if you remember.
2   BY MS. DONNELL:
3       A    The particulars of that incident?
4       Q    Correct.
5       A    Okay.  I received information from a
6   confidential source that Mr. Komanjo was in possess of
7   contraband.
8       Q    What kind of contraband?  Did the confidential
9   informant tell you what kind of contraband?
10      A    Crack cocaine.
11          (CONFIDENTIAL PORTION REDACTED)
12      Q    Okay.  We can go back on -- make the rest of
13  this public.  So you received information from a
14  confidential informant that Mr. Komanjo Cayruth was in
15  possession of crack cocaine; is that right?
16      A    That is right.
17      Q    And without disclosing the identity of the
18  confidential informant, had you worked with that
19  confidential informant in the past?
20      A    Multiple times.
21      Q    For what period of time, prior to the arrest
22  of Komanjo Cayruth?
23          MR. BUSHNELL:  Objection.  You can answer.
24      Q    I want to say, probably a year.  Maybe two.
25      A    Okay.  Okay.  After -- how did you receive

Page 148

1   that information?  Orally or by text?
2           MR. BUSHNELL:  Objection.
3       Q    How did you get the information from the CI?
4       A    Phone call.
5       Q    And what happened next?
6       A    I proceeded to act on that information that I
7   received.
8       Q    What did you do?
9       A    I went to the location where Mr. Komanjo was
10  located, detained him for further investigation, drove
11  back to Mount Vernon headquarters, to the narcotics
12  office, specifically.  And he was found not to be in
13  possession of any narcotics.  He was released from that
14  location without any incident.  And I believe that --
15  that incident was documented.
16      Q    And you believe that it was videotaped?
17      A    Can't recall.
18      Q    Okay.  What was the basis of probable cause to
19  arrest Mr. Cayruth?
20      A    He was not arrested.  He was detained.
21      Q    What was the basis to detain Mr. Cayruth?
22      A    The confidential informant's information?
23      Q    Anything else, other than the confidential
24  informant's information?
25      A    No.

Page 149

1       Q    So based solely on the phone call from the
2   confidential informant, you detained Mr. Cayruth,
3   brought him into police custody, conducted a strip
4   search of him, found no drugs or other contraband on
5   this person, and then you released him?
6           MR. BUSHNELL:  Objection.  You can answer.
7       A    Correct.
8       Q    Prior to your search of Mr. Cayruth on
9   November 5, 2015, had you had any interactions with
10  Mr. Cayruth?
11      A    I believe I had, maybe in -- not directly,
12  possibly indirectly to somebody else -- to possibly a
13  coworker.
14      Q    Who?  What coworker?
15      A    I don't recall, but I -- he was, he was not a
16  -- somebody that we weren't familiar with.  We were
17  familiar with Komanjo.  Specifically, in the location
18  where he was detained.
19      Q    When you're saying, "We" -- but I'm saying,
20  did you personally have any interactions -- arrests or
21  interactions with Komanjo Cayruth prior to November 5,
22  2015?
23      A    I might have, or I might have not.  I --
24      Q    You don't know either way?
25      A    Correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 41 of 82
The Deposition of DET. CAMILO N. ANTONINI, taken on January 13, 2022

150..153

Page 150

1    Q    You don't recall?
2    A    I don't recall.
3         MR. BUSHNELL:  So Camilo, if you don't recall,
4    just tell her you don't recall.  All right.
5         THE WITNESS:  All right.
6         MR. BUSHNELL:  And that's all.
7    BY MS. DONNELL:
8    Q    Did you tell Mr. Cayruth why he was being
9    detained?
10   A    I don't recall.  No.
11   Q    Was Mr. Cayruth free to go?
12   A    Yes.
13   Q    Did -- could he have opted out of the strip
14   search?  He could have said, no, I don't want to be
15   strip-searched.
16        MR. BUSHNELL:  Objection.  You can answer.
17   A    I'm sorry.  What -- I didn't -- your last
18   question, was he free to go prior to --
19   Q    I'm saying priot -- you're saying he wasn't
20   arrested, but he wasn't free to go and he was
21   strip-searched.  So I'm a little confused.  Wasn't he
22   under your arrest --
23   A    He was detained --
24   Q    -- at the time he was stopped and
25   strip-searched?

Page 151

1    A    Correct.  So he was detained to further the
2    investigation.
3    Q    All right.  Did you have probable cause to
4    arrest him at the time that he was detained?
5    A    I had probable cause to detain him to get the
6    information received, to see if it was active.
7    Q    What was the basis for your justification to
8    conduct a strip search of Mr. Cayruth?
9         MR. BUSHNELL:  Objection.  You can answer.
10   A    Information from the informant.
11   Q    Had you done anything to independently verify
12   the confidential informant's information they gave you?
13   A    Can you repeat the question to me?
14   Q    Did you independently do anything -- did you
15   do anything, take any steps, to verify the information
16   that the confidential informant provided you before you
17   arrested Mr. Cayruth and then brought him in for a strip
18   search?
19   A    Identify him at the location of where the
20   incident was taking place.
21   Q    And what location was that?
22   A    I believe it was East Prospect Avenue.
23   Q    Okay.  Was that search videotaped?
24   A    I don't remember.
25   Q    Okay.

Page 152

1         MS. DONNELL:  Steve, can I just ask you a
2    question?  If I want to show him documents from the
3    civilian investigation for the internal
4    investigation, do you want me to put it under
5    confidential?
6         MR. BUSHNELL:  Yeah.  I would appreciate that.
7    Thank you.
8         (CONFIDENTIAL PORTION II REDACTED)
9    Q    Okay.  Let's see.  Mr. Tremel Williamson -- do
10   you know who Tremel Williamson is?
11   A    Tremel Williamson?
12   Q    Tremel Williamson?  Yeah.
13   A    Vaguely.  Yes.
14   Q    Who is he?  What -- who -- what's your
15   understanding of Tremel Williamson?
16   A    Individual that was arrested, I believe, on
17   this date.
18   Q    On what date?
19   A    Can't remember the date, but obviously he has
20   a lawsuit against me here, yeah?
21   Q    Do you have any memory of conducting a strip
22   search of Mr. Tremel Williamson on January 20, 2015?
23   A    Absolutely not.
24        MR. BUSHNELL:  Well, can I clarify that?  He
25   has no memory of it or did he conduct the search

Page 153

1    with him?
2    BY MS. DONNELL:
3    Q    Do you have -- do you have -- well, let's
4    clarify.  Were you pre -- were you present for the
5    arrest of Mr. Williamson?
6    A    For the search warrant in his apartment?  Yes.
7    Q    Were you present for the strip search of him?
8    A    I was not.
9    Q    Okay.  And who -- do you know who was?
10   A    I don't remember.  No.
11   Q    Okay.  Do you know who Officer Campo is?
12   A    Officer Campo?
13   Q    Yes.
14   A    Yes.
15   Q    Who's that?  Was that one of the narcotics
16   officers with you in 2015?
17   A    He was a part of the unit in 2015.  Yes.
18   Q    Okay.  Do you have any information or
19   knowledge about Officer Campo's search of Tremel
20   Williamson?
21   A    I do not.
22   Q    Okay.  How about Tyrone Govan?  Do you know
23   who that is?
24   A    Yes.
25   Q    Who's Tyrone Govan?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 42 of 82
The Deposition of DET. CAMILLO H. ANTONINI, taken on January 13, 2022

154..157

Page 154

1    A    Tyrone Govan.

2    Q    Yeah.  How do you know him?

3    A    How do I know Tyrone Govan?

4    Q    Yes.

5    A    Because I -- I arrested him once in 2012.  No

6    --

7    Q    In 2012?

8    A    In 2012.  Yes.

9    Q    Okay.  Did you use excessive force when you

10   arrested him in 2012?

11        MR. BUSHNELL:  Objection.  You can answer.

12   A    No.

13   Q    You deny using any excessive force when you

14   arrested Mr. Govan?

15   A    No.

16        MR. BUSHNELL:  Yeah -- no, as in you deny it?

17   Or no --

18   A    No.  I didn't use excessive --

19   Q    I'm sorry.  I can clarify.  Did you use

20   excessive force when you arrested Mr. Govan?

21   A    No.  I did not.

22   Q    Okay.  Giles v. City of Mount Vernon.  Do you

23   know of this case?

24   A    What's the name?

25   Q    Just a second --

Page 155

1        MR. BUSHNELL:  It's Michael

2        MS. DONNELL:  Michael.  Sorry.  Thank you.

3        MR. BUSHNELL:  Okay.  And, and I'll just --

4    I'll just, you know, note that this is an ongoing

5    case, but you can ask.

6    BY MS. DONNELL:

7    Q    Do you know Michael Giles?

8    A    In that -- no.  I do not.  I just happened to

9    meet him the day of this incident.

10   Q    Okay.  Do you remember the day you met him?

11   A    Specifically?  No.

12   Q    But you know who we're talking about?

13   A    Yes.

14   Q    Okay.  Are you familiar with the allegations

15   that Mr. Giles -- or Giles -- or Giles has lodged

16   against you?

17   A    And what are those allegations?

18   Q    I'm asking you if you're (inaudible)?

19   A    No.  I do not.

20   Q    The allegations pertained to an incident on

21   July 19, 2018 at the Volunteers of America homeless

22   shelter.  Does that refresh your recollection?

23   A    Yes.

24   Q    And are you familiar with the lawsuit against

25   you by Mr. Giles?

Page 156

1    A    Yes.

2    Q    Okay.  How about the lawsuit against -- by

3    Mr. King filed against you?  Are you familiar with Kevin

4    King?

5    A    I don't even know who this guy is.

6    Q    You don't know who that is.  Okay.  Okay.  How

7    about Henderson Clark?  Do you know Henderson Clark?

8    A    Yes.

9    Q    How do you know Henderson Clark?

10   A    Henderson Clark was part of a -- an undercover

11   operation, in which we utilized undercover officers to

12   buy narcotics from him.  Subsequently he was arrested

13   and --

14   Q    Did you conduct a strip search of Mr. Clark?

15        MR. BUSHNELL:  Objection.  You can answer.

16   A    I don't remember.

17   Q    Okay.  Have you ever been disciplined for any

18   of your conduct with the Mount Vernon Police Department?

19   Have you ever had any kind of discipline imposed on you?

20   A    One.

21   Q    What was that?

22   A    I forgot to mention my shield number, while

23   answering a phone call.  So I received a written

24   reprimand.  Other than that, I've never received any

25   discipline.

Page 157

1    Q    Do you recall when you received that written

2    reprimand, or what it was pertaining to?

3    A    This was, I believe early 2012, right before I

4    came off modified duty.  So while I was modified, I was

5    sitting in the front -- the front desk of the police

6    headquarters.  And it was -- I believe it was a busy

7    day, so the phones were going crazy.  So I stepped into

8    the radio room to help out with the phone calls coming

9    in.  And as I answered the phone, I forgot to mention my

10   shield number.  And because of that, I got a written

11   reprimand.

12   Q    Did this pertain to the -- your interactions

13   with, I think it's Helena Edwards, Judge Edwards wife?

14   A    Yes.  That's the one.  Yes.

15   Q    Okay.  And so to your knowledge, that's the

16   only discipline you received, was when you were on

17   modified duty, your interactions with Judge Edwards

18   wife?

19   A    That is the only discipline I've received in

20   my whole entire police career.

21   Q    Okay.  And your understanding was the

22   reprimand was just because you didn't give your badge

23   number; is that right?

24   A    That is, I believe, the section that was

25   written under the written reprimand that I signed.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 43 of 82
The Deposition of DET. CARMINE ANTONINI, taken on January 03, 2022

158..161

1    Q    Do you have knowledge of the allegations that
2  Ms. Edwards made against you?
3    A    The allegations that -- so if I recall this
4  correctly, is that the -- the whole entire incident was
5  based on somebody else answering the phone.  And when I
6  answered the phone, I didn't state my shield number.
7  Because the person that previously answered the phone
8  wasn't very cordial towards Mrs. Edwards.  So when I
9  went into the radio room to help out, I answered a phone
10  call that, you know, she had called.  And when I -- when
11  I answered, I didn't say my shield number.  So my
12  understanding is that when they went back to listen to
13  the whole entire conversation, they -- they heard me not
14  say my shield number.  And that's why -- I got written
15  up for.
16    Q    Okay.  In the -- all the citizen -- do you
17  know how many total citizen complaints have been filed
18  against you in your work as a Mount Vernon police
19  officer?
20    A    No.  I do not.
21    Q    Is there any documentation that you have as an
22  employee that would inform you how many complaints have
23  been made against you?
24    A    I'm sure the there's a di -- disciplinary file
25  that's kept within the Mount Vernon Police Department of

1  my personal records.  But as far as the number of how
2  many civilian complaints I received, no, I don't.
3  Specifically, no.  I do not.
4    Q    And do you think that the complaints are kept
5  in your personal file or a disciplinary file?
6    A    I --
7         MR. BUSHNELL:  Objection.  You can answer.
8    A    I believe it's a disciplinary file.
9    Q    Okay.  Have you ever seen it?
10    A    I -- I requested to see it about a year ago.
11    Q    Why did you request to see it a year ago?
12    A    Because I was curious to see what was in that
13  file.
14    Q    Did they show it to you?
15    A    Yes.  I saw what was in the file.
16    Q    Where did you look at it?  Did you get to take
17  it home with you or did you have to look at the station?
18    A    No.  In the police station.
19    Q    And why -- why were you curious to see what
20  was in your file?
21         MR. BUSHNELL:  Objection.  You can answer.
22    A    When you get all these -- you know, weird
23  civilian complaints, you kind of want to see -- you
24  know, I was just curious.
25    Q    And were you able to read the civilian

1  complaints that were in your file at that time?
2    A    No.  No.
3    Q    Why not?
4    A    I wasn't so much interested in reading all the
5  specifics of the civilian complaints.
6    Q    What office did you go to, to get the file?
7         MR. BUSHNELL:  Objection.  You can answer.
8    A    The office of personnel.
9    Q    So it was in the personnel department?
10    A    Yes.
11    Q    Okay.  Do you remember whose office your file
12  -- disciplinary file was in?
13         MR. BUSHNELL:  Objection.  You can answer.
14    A    Personnel file -- personnel office.
15    Q    But which employee gave you the file -- that
16  got the file and give it to you?
17         MR. BUSHNELL:  Objection.  You can answer.
18    A    Lieutenant Gregory Addison.
19    Q    Okay.  So you went in one day and said, hey,
20  can I look at my disciplinary file?  And Lieutenant
21  Gregory Addison gave it to you and said, yeah, you can
22  read it.  Here it is?
23    A    No.  You have to put in a request.
24    Q    What kind of request?  Like a written request?
25    A    You have to put in a written request to see

1  your disciplinary -- whole personnel files, which
2  everything is all in -- I believe they give you
3  everything.  And you are allowed to review it in front
4  of -- which that's how I did it, in front of Lieutenant
5  Addison.
6         (CONFIDENTIAL PORTION III REDACTED)
7         VIDEOGRAPHER:  Yeah.  Absolutely.  We are going
8  off the record at 2:25 p.m.
9         (OFF THE RECORD)
10         VIDEOGRAPHER:  We are back on the record at
11  2:34 p.m.
12  BY MS. DONNELL:
13    Q    Okay.  All right.  Detective Antonini, I'm
14  going to ask you about the incident subject to
15  Mr. Seward's lawsuit from November 7, 2017.  Okay?
16    A    Okay.
17    Q    Earlier today you testified that you do not
18  have independent recollection of any of the events,
19  other than those you reviewed in the police report or in
20  the video, is that still true?
21    A    Yes.
22    Q    Okay.  Do you have a memory, other than what
23  you observed and listened to in the video recording, of
24  conducting a search warrant of 156 South First Avenue on
25  November 7, 2017?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 44 of 82
The Deposition of DET. DOMENICK ANTONINI taken on January 03, 2022
162..165

Page 162

1   A   Yes.  I have no recollection of that incident.
2   Q   Okay.  Do you have a recollection of anything
3   you did during your shift that you worked on
4   November 7, 2017?  Do you know any other arrests you did
5   -- any other search warrants you effected?
6   A   No.
7   Q   Okay.  Did you have any interactions with my
8   client Alan Seward prior to your encounter with him on
9   November 7, 2017?
10      MR. BUSHNELL:  Objection.  You can answer.
11  A   I don't remember.
12  Q   So your testimony is you don't remember having
13  any interactions with Alan Seward, prior to your
14  interactions on November 7, 2017; is that right?
15      MR. BUSHNELL:  Objection.  You can answer.
16  A   Correct.
17  Q   Okay.  So for example, you don't ever remember
18  stopping him prior to November 7, 2017?
19  A   Correct.
20  Q   You don't have any prior arrests that you
21  recall of Mr. Seward prior to November 7, 2017?
22      MR. BUSHNELL:  Objection.  Go ahead.
23  A   I don't remember.  No.
24  Q   Okay.  Had you ever conducted any searches of
25  Mr. Seward prior to November 7, 2017?

Page 163

1       MR. BUSHNELL:  Objection.  Go ahead.
2   A   No.  I don't remember.
3   Q   I think I asked you this, but do you know how
4   many calls, or investigations, or arrests, or search
5   warrants you did prior to your interactions with
6   Mr. Seward on your shift on November 7, 2017?
7   A   No.
8   Q   So do you, as you sit here today, have a
9   memory of going out to 156 South First Avenue on
10  November 7th?
11  A   No.  I don't.
12  Q   You have no independent memory?
13  A   No.  I don't.
14  Q   Okay.  Having read the reports that you
15  reviewed and looking at the video you looked at prior to
16  your deposition, do you now know that you went out to
17  156 South First Avenue on November 7, 2017?
18  A   Yes.
19  Q   Okay.
20  A   Yes.
21  Q   Do you know what officers were with you from
22  the narcotics unit at the initial search of 156 South
23  First Avenue?
24  A   I remember a few of the officers that were
25  there.

Page 164

1   Q   Who do you remember being there?
2   A   Bobby Puff, Joseph Valente, Patrick King,
3   Sergeant Fegan, I believe Lieutenant Quinoy -- or
4   Sergeant Quinoy at the time.  That's to the extent. Yes.
5   Q   And all of the individuals you just listed,
6   those are members of the narcotics unit back in November
7   2017?
8   A   No.
9   Q   Oh, some of them were police officers; is that
10  right?  Patrol?
11  A   Sergeant Quinoy -- or Lieutenant Quinoy at the
12  time, he was not part of the narcotics unit.
13  Q   What division was he part of?
14  A   Patrol division.
15  Q   Do you know -- do you have an understanding
16  why Sergeant Quinoy was present?
17  A   No.
18  Q   Was there -- you know I should -- didn't ask
19  you this earlier, but when you started on your shift
20  with the narcotics unit, would there usually be a
21  briefing at the beginning of each shift?
22  A   No.
23  Q   Would you all meet at the department, and then
24  go out, and do various assignments?
25  A   We all showed up at the time we're supposed to

Page 165

1   show up for work and then everybody goes about their
2   daily routine.
3   Q   How would you decide what you would go about?
4   Would you be given assignments from the sergeant in
5   charge?
6   A   It could be that you have some, you know,
7   ongoing investigation into, you know, certain cases that
8   you have to look up or follow up with.  You know,
9   everybody had their own cases or investigations going on
10  at the time.
11  Q   Do you remember what cases or investigations
12  you had going on in November 2017?
13  A   No.
14  Q   Was the search warrant that was executed on
15  November 7, 2017, was that part of your case or is that
16  one of your fellow officer's cases?
17  A   It was not my case, no.
18  Q   Okay.  Was it Bobby Puff's case?
19  A   I believe so.
20  Q   Okay.  Why do you believe so?
21  A   Because I think it was his name on the
22  application for the search warrant.  Okay.
23      COURT REPORTER:  Mr. Seward is in the waiting
24  room.
25      MS. DONNELL:  Okay.  Let's see if we can let

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 45 of 82
The Deposition of DET. DAMIEN R. ANTONINI, taken on January 03, 2022
166..169

Page 166

1  him in, we don't have to go off the record, just see
2  if we can get him in. Thanks. Hi, Mr. Seward. I
3  will let the record reflect that the plaintiff Alan
4  Seward is now present on the Zoom. Mr. Seward, I'm
5  going to make sure you can hear us. Can you let us
6  know you can hear us?
7       COURT REPORTER: It says he's still connecting
8  to the audio, so he can't hear you.
9       MS. DONNELL: Okay. Since this looks like it
10  might take a minute, let's go off the record.
11  Sorry, maybe we hear -- Mr. Seward, can you hear us
12  now? Okay. Let's go off the record then.
13       VIDEOGRAPHER: All right. We are off the
14  record at 2:42 p.m.
15       (OFF THE RECORD)
16       VIDEOGRAPHER: All right, we're back on the
17  record at 2:46 p.m.
18  BY MS. DONNELL:
19       Q   Okay. Oh, okay, so I think I was asking you
20  questions pertaining this case. And you said that it
21  was your understanding that this was Bobby Puff's case
22  because he had sworn the affidavit for the search
23  warrant, is that your testimony?
24       A   Yes.
25       Q   Okay. Do you have any information -- or did

Page 167

1  you have any conversations with Officer Puff about the
2  information he had obtained to get the search warrant?
3       A   No.
4       Q   Before you went out to execute the search
5  warrant at 156 South First Avenue on November 7, 2017,
6  had there been a briefing on the search warrant?
7       A   Prior to executing the search warrant?
8       Q   Yes.
9       A   Yes. I don't recall, but yes. Always -- we
10  always have a meeting prior to executing.
11       Q   So is it your testimony that you do not have
12  an actual memory of the briefing prior to executing this
13  search warrant, but you know that prior to executing any
14  search warrant there would be a briefing before
15  executing it?
16       A   Yes.
17       Q   Okay. But as you sit here today, you have no
18  memory of any of the information that was provided at a
19  briefing, if it occurred, prior to going to 156 South
20  First Avenue on November 7, 2017; is that correct?
21       A   Yes.
22       Q   I'm sorry, what did you --
23       A   Correct. Yes.
24       Q   Thank you. Okay. Do you, as you sit here
25  today, know the confidential informant that Officer Puff

Page 168

1  relied on to make the affidavit for his search warrant?
2       MR. BUSHNELL: Objection.
3       A   No. I do not.
4       Q   Do you recall what you were wearing on
5  November 7, 2017 when you were on duty?
6       A   No. I do not.
7       Q   Okay. Do you have a memory of what time the
8  search warrant was conducted?
9       A   No. I do not.
10       Q   Do you have an independent memory of any
11  narcotics being obtained from the apartment that you
12  searched?
13       A   I don't recall.
14       Q   Did you -- so earlier today you said you were
15  the one operating the video recording that you viewed;
16  is that right?
17       A   Yes.
18       Q   Was that -- did you -- how was it determined
19  on any particular day, who was going to operate the
20  video camera? Is that something you typically did, or
21  you guys shared responsibilities?
22       A   Shared responsibilities.
23       Q   So sometimes it was you, sometimes it was
24  another officer?
25       A   Correct.

Page 169

1       Q   And was there any particular reason, like
2  would Sergeant Fegan say, you do the video today?
3  Somebody else -- was he one that determined who did the
4  video or some other method?
5       A   I want to say because I was in the apartment
6  at the time with Sergeant Fegan and nobody else was
7  there.
8       Q   Okay. So when you were operating the video,
9  it was only you and Sergeant Fegan present in the
10  apartment?
11       A   I don't recall specifically who was there at
12  the time, but he was there, and I was there.
13       Q   Okay. Did you go to the Bungalow Bar at some
14  point after going to 156 First Avenue?
15       A   No. I did not.
16       Q   It's your testimony that you never left the
17  apartment on November 7, 2017 -- I mean -- sorry, let me
18  start that again. Is it your testimony that you never
19  went to the Bungalow Bar on November 7, 2017?
20       A   That is correct.
21       Q   Okay. Do you have knowledge about who went to
22  the Bungalow Bar?
23       A   Sergeant Quinoy at the time. I know Puff
24  went. Anybody else from there, I can't -- don't recall.
25       Q   How do you know Sergeant Quinoy and Officer

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 46 of 82
The Deposition of DET. DANGION N ANTONINI, taken on January 03, 2022
170..173

Page 170

1  Puff went to the Bungalow Bar?
2      A    Because a supervisor had to stay in the
3  apartment at the time and it was Sergeant Fegan with me
4  in the apartment.
5      Q    Okay.  Did you take any photographs inside the
6  apartment or did you just video tape?
7      A    I don't recall taking photographs.  No.
8      Q    Tell me everything you recall doing in the
9  apartment?
10     A    Video recording.
11     Q    What did you video record?
12     A    The apartment.
13     Q    Why were you recording?
14     A    To show the apartment pre-search and I believe
15  post-search.
16     Q    So it's your testimony that you video recorded
17  the apartment before it was searched and after it was
18  searched?
19         MR. BUSHNELL:  Objection.  Go ahead.
20     A    Yes.
21     Q    Do you have an independent recollection of
22  children being present at the apartment?
23     A    I don't remember who was inside the apartment
24  at the time.  No.
25     Q    Do you recall how many officers first went to

Page 171

1  the apartment, other than yourself and Sergeant Fegan?
2      A    No.
3      Q    Do you remember any evidence that was found at
4  the apartment?
5      A    No.
6      Q    So you have no recollection of any of the
7  evidence that was obtained pursuant to the search
8  warrant, is that your testimony?
9      A    Yes.
10     Q    How long were you present at 156 South First
11  Avenue?
12     A    I don't remember how long we were in the
13  apartment for.  No.
14     Q    Were you present in the apartment when
15  Mr. Seward was brought to the apartment?
16     A    I don't remember that.  No.
17     Q    You have no memory of the plaintiff Alan
18  Seward being brought to 150 -- I'm sorry, 156 South
19  First Avenue?
20     A    That is correct.
21     Q    Okay.  Were you and Sergeant Fegan -- well,
22  just let me step back.  Just generally, how did
23  narcotics officers communicate with one another when you
24  were on duty?  Did you use your cellphones, radio,
25  anything else?

Page 172

1      A    How we communicate with each other when we
2  were facing each other?
3      Q    When you're on duty -- no, I'm sorry.  Could
4  you communicate with each other when you were in
5  separate cars?  Would you call each other on your
6  cellphones?  Or how did you communicate with each other
7  when you weren't face-to-face?
8      A    We use our cellphones.
9      Q    Were they department-issued cellphones?
10     A    No.  Our regular cellphone.
11     Q    Like your personal cellphone?
12     A    Yes.
13     Q    What was your cellphone number that you used
14  in November 2017?
15         MR. BUSHNELL:  Objection.
16     Q    Is it the same number you use now?
17     A    That I used on November '17 to do what?
18     Q    You said you communicated with other narcotics
19  officers on your cellphones, correct?
20         MR. BUSHNELL:  Objection.  Can I provide that
21     to you without Plaintiff being on -- putting that on
22     the record?
23         MS. DONNELL:  Sure.  Yeah, we can get that in
24     just a minute.
25  BY MS. DONNELL:

Page 173

1      Q    But I want to know -- let me just ask you
2  this.  Did you, Detective Antonini, when you were on
3  duty and you wanted to communicate with one of the other
4  narcotics officers who wasn't in the car with you, let's
5  say you're driving to execute a search warrant, would
6  you talk to each other on your cellphones?
7      A    We have a department issue at the time, Direct
8  Connect cellphone.
9      Q    Okay.
10     A    Okay.  So if that cellphone was not working at
11  the time, we resort to using our own personal phones
12  just to call each other.
13     Q    Okay.
14     A    Very rarely we use our department radio, in
15  order to avoid, you know, everybody else in the
16  department to hear what we were talking about.
17     Q    So it sounds like as a narcotics officer, if
18  you wanted to communicate with your other fellow
19  officers who weren't physically present with you, you
20  would have a Direct Connect cellphone that was issued by
21  the department as one option?
22     A    Correct.
23     Q    And if that equipment wasn't working for
24  whatever reason, you had each other's personal cellphone
25  numbers and you could call and talk to each other?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 47 of 82
The Deposition of DET. CAMILO M. ANTONINI, taken on January 13, 2022
174..177

Page 174

```
 1      A    Correct.
 2      Q    And you could also text one another on your
 3  personal cellphones?
 4      A    Yes.
 5      Q    Could you text each other on the Direct
 6  Connect cellphones?
 7      A    Can we text --
 8      Q    Could you -- do you text on the Direct Connect
 9  cellphones?
10      A    Yes, you could text.
11      Q    Okay.  Did the Direct Connect cellphones work
12  very well?  Were they frequently operational?
13      A    I don't recall.  It's hard to say.  Sometimes
14  the weather would make them go crazy, sometimes they
15  were working.  Depending on the signal -- the strength
16  of the signal, if it worked.
17      Q    Is it fair to say that you more frequently
18  just ended up using your cellphones because it worked
19  more reliably?
20          MR. BUSHNELL:  Objection.  Go ahead.
21      A    Yes and no.
22      Q    Do you know if on this date, November 7, 2017,
23  you were using the Direct Connect cellphone or your
24  personal cellphone to communicate with your fellow
25  officers?
```

Page 175

```
 1      A    On that specific day?
 2      Q    Correct.
 3      A    No.  I don't remember -- I don't remember how
 4  we communicated that day.
 5      Q    Okay.  The cellphone number that you have
 6  today, your personal cellphone number, was that the same
 7  number that you had back on November 7, 2017?
 8      A    Yes.
 9          MS. DONNELL:  Okay.  Steve, I'll ask you for
10      that, but I won't do it right now on the record,
11      okay?
12          MR. BUSHNELL:  Yeah.  Anything in writing.
13      Thanks.
14  BY MS. DONNELL:
15      Q    Okay.  All right.  So do you recall whether
16  you and Sergeant Fegan were in communication with
17  Sergeant Quinoy and Officer Puff, while they were at the
18  Bungalow Bar?
19      A    I don't recall.  No.
20      Q    Okay.  So you don't recall whether or not you
21  were receiving information from them about what was
22  going on at the Bungalow Bar; is that correct?
23      A    That is correct.
24      Q    Okay.  And you have no memory one way or the
25  other, as you sit here today, about Officer Puff and
```

Page 176

```
 1  Sergeant Quinoy returning to the apartment; is that
 2  right?
 3      A    That is correct.
 4      Q    Okay.  Do you recall learning at any point any
 5  of the -- what happened at the Bungalow Bar -- sorry,
 6  that's not a very good question.  On November 7, 2017,
 7  at any point do you remember receiving information from
 8  one of your fellow officers about what they said
 9  transpired at the Bungalow Bar?
10      A    No.
11      Q    Do you, as you sit here today, have any memory
12  of interacting with my client Alan Seward on
13  November 7, 2017 in any capacity?
14      A    No.
15      Q    Did you talk to him at the police station
16  after he was arrested?
17      A    No.
18      Q    Did you -- were you present for a strip search
19  of Mr. Seward at 156 South First Avenue?
20      A    No.
21      Q    Were you present for a strip search of
22  Mr. Alan at the station?
23      A    I don't recall anymore.
24      Q    I'm sorry, Mr. Seward.  I said Mr. Alan.  I
25  apologize, Mr. Seward.  Were you present for
```

Page 177

```
 1  Mr. Seward's arrest at the Bungalow Bar?
 2      A    No.
 3      Q    Did you -- do you deny strip searching
 4  Mr. Seward at the Bungalow Bar?
 5      A    I was never at the Bungalow Bar.
 6      Q    Never at the Bungalow.  Okay.  Did you, at any
 7  point on November 7, 2017, strike Mr. Seward in the
 8  face?
 9      A    Absolutely not.  No.
10      Q    Okay.  Did you ever have a conversation with
11  Mr. Seward, in which you asked him to become a
12  confidential informant for you?
13      A    No.
14      Q    You deny that happened?
15      A    Can you repeat that?
16      Q    You deny that happened?
17      A    It did not happen.  No.
18      Q    Okay.  So you're saying you deny that
19  happened, correct?
20      A    It did not happen.  No.
21      Q    Okay.  I'm going to have you look at exhibits
22  -- which one?  Just a second.  I can figure out how to
23  play it --
24          MR. BUSHNELL:  What exhibit is it?
25          MS. DONNELL:  I'm not sure just yet.  I need to
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 48 of 82
The Deposition of DET. DANGION N ANTONINI, taken on January 03, 2022

178..181

Page 178

1    get my computer back up.  Just a second.
2        MR. BUSHNELL:  No worries.
3    BY MS. DONNELL:
4        Q    Let's see.  Exhibit 9.  Okay.  Detective
5    Antonini, do you have what I've previously designated as
6    Exhibit 9 to your deposition?
7        (EXHIBIT 9 MARKED FOR IDENTIFICATION)
8        A    Yes.
9        Q    And this is a two page document that's a, "New
10   York State incident report"?
11       A    Okay.
12       Q    Is that right?
13       A    Yes.
14       Q    Is this one of the reports that you reviewed
15   in preparation for your deposition today?
16       A    Yes.
17       Q    Okay.  And let's see, do you recognize the
18   reporting officer's signature as Officer Puff's
19   signature down at the bottom left hand in box 78?
20       A    Yes.
21       Q    And do you recognize Sergeant Fegan's
22   signature in box 80 as the --
23       A    Yes.
24       Q    Okay.  And you'll see this is dated November
25   7, 2017, is the date of the incident, right?

Page 179

1        A    Yes.
2        Q    And let's see, the time -- the report time is
3    2002, right?
4        A    Yes.
5        Q    What does the report time mean to you in box
6    nine of an incident report?
7        A    What is the what?  Sorry.
8        Q    What is the report time?  Is that when the
9    report's being created?
10       A    2002.  The report time.  Yes.
11       Q    Okay.  And 1945 is what?  The time --
12       A    When the call was made to the radio -- radio
13   room.
14       Q    But this was a search warrant, right?
15       A    Correct.
16       Q    So there wasn't a call to the radio?  Or what
17   was that?  What do you mean?
18       A    The call would have made to the radio room
19   once the entry was made into the --
20       Q    I see.  Got you.  Okay.  And so then there's a
21   couple other times, there's time 12 and time 15 -- box
22   12 and box 15.  What are those times?
23       A    What?
24       Q    You see at the top after the date?
25       A    So it says -- so the report date is November

Page 180

1    7, '17', 2002 is the report time.  Occurrence from and
2    to, so the whole incident happened between 1945 and
3    8:25.  So between that gap is where the incident took
4    place.
5        Q    Got it.  And for this, the incident refers to
6    the search at 156 South First Avenue?
7        A    Yes.
8        Q    Okay.  So you see here, and this is -- you
9    understand this to be Officer Puff who filled out this
10   incident report; is that right?
11       A    Correct.
12       Q    Okay.  And Officer Puff indicated that at
13   above date and time, "The narcotics unit along with
14   Sergeant Quinoy, Police Officer Hutchins, Salazar and
15   Palmer conducted a search warrant signed by the
16   Honorable Adrian Armstrong at 156 South First Avenue,
17   Apartment 4N," as in Nancy.  Do you see that?
18       A    Yes.
19       Q    It says, "Upon making entry, we encountered
20   four children."  Does that refresh your recollection
21   that there were four children present in the apartment
22   4N when you went there?
23       A    No.
24       Q    There's three females in the back bedroom?  Do
25   you see that?

Page 181

1        A    Yes.
2        Q    Okay.  And the females were identified as
3    Sheila Blakey Holley, H-O-L-L-E-Y, correct?
4        A    Yes.
5        Q    Is that right?  Nakia Brabham?
6        A    Brabham?
7        Q    Brabham, sorry, Brabham.  Thank you.  And
8    Shania [sic] Riddenhour, right?
9        A    Shania Riddenhour.
10       Q    Shania.  Okay.  Do you any of those three
11   individuals?
12       A    No.
13       Q    I'm sorry.  Did you know them in November
14   2017?
15       A    No.
16       Q    Were any of those three individuals Officer
17   Puff's confidential informants to your knowledge?
18       MR. BUSHNELL:  Objection.
19       A    I can't -- I don't know.
20       Q    You don't know?  Okay.  So then it says --
21   okay.  So it says that those three females were located
22   in the back bedroom, right?
23       A    Ask that question again.  Sorry.
24       Q    I'm sorry.  I was reading that -- I was
25   repeating that "Upon making entry, we encountered four

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 49 of 82
The Deposition of DET. EDWARD H. ANTONINI, taken on January 19, 2022

182..185

Page 182

1  children in the living room and three females, AP1, AP2,
2  and AP3 in back bedroom," right?
3      A    That's what the report says.  Yes.
4      Q    Okay.  And you have no independent
5  recollection of this, right?
6      A    Correct.
7      Q    So you have no way to confirm or deny whether
8  what Officer Puff has put here is accurate, correct?
9      A    Correct.
10     Q    Okay.  And then Officer Puff goes on to write,
11 "A search of the apartment yielded one ceramic plate
12 with cocaine residue, two razor blades with cocaine
13 residue, and a digital scale on top of the wall cabinets
14 in the kitchen."  Do you see that?
15     A    Yes.
16     Q    But you have no independent recollection of
17 search to confirm or deny that evidence being found in
18 the apartment, correct?
19     A    Correct.
20     Q    Okay.  Then it says, "Mr. Seward was not in
21 the apartment at the time," right?
22     A    Correct.
23     Q    And then Officer Puff writes, "I then received
24 information that Mr. Seward was at the Bungalow Bar
25 located at 523 South Fulton Avenue."  Do you see that?

Page 183

1      A    I do.
2      Q    Do you know who provided the information that
3  I've just read in Officer Puff's report to Officer Puff?
4      A    I do not.  This report is written by Officer
5  Puff, correct?
6      Q    That's my understanding.  Do you have a memory
7  of there being information provided while you all were
8  at the house, at the apartment?
9      A    I don't recall any.
10     Q    Do you know how Officer Puff was receiving
11 information when he was at the apartment?
12     A    I don't.
13     Q    Were there undercover officers at the Bungalow
14 Bar to your knowledge?
15     A    I can't say.  I wasn't there.
16     Q    Do you know if the confidential informant that
17 Officer Puff was relying on was at the Bungalow Bar?
18     A    Can you repeat the question again?
19          MR. BUSHNELL:  No.  And we can -- and Heather,
20     sorry to interrupt real quick.  Anything that would
21     go towards, you know, ascertaining the identity of a
22     confidential informant should be marked confidential
23     under seal and not asked in the presence of
24     Plaintiff.
25          MS. DONNELL:  Well, I'm not asking about the

Page 184

1  identity.  I'm just asking if the person was there,
2  but if you want that question under seal --
3          MR. BUSHNELL:  I'm not going to direct him not
4  to answer that.  I'm just saying, you asked before
5  if any of those three women were the CI --
6          MS. DONNELL:  Oh, I see.  I'm sorry.
7          MR. BUSHNELL:  I would just appreciate --
8          MS. DONNELL:  Sure.  Thank you for reminding
9  me.  Yeah.  That's fair.  I'm sorry.  I won't ask
10     the identity.  Okay.  Unless we put under seal and I
11     asked Mr. Seward to leave.  Understood.
12 BY MS. DONNELL:
13     Q    Okay.  This part that Officer Puff wrote, "I
14 then received information that Mr. Seward was at the
15 Bungalow Bar," you have no knowledge about who provided
16 that information, correct?
17     A    No knowledge.  No.
18     Q    Okay.  And then it says, "Sergeant Fegan,
19 Detective Antonini, PO Salazar, and PO Palmer remained
20 in the apartment."  Do you see that?
21     A    Yes.
22     Q    Okay.  Do you know Police Officer Salazar and
23 Police Officer Palmer?
24     A    Salazar, I have no idea who that is.  And
25 Palmer, I believe she just transferred out of the Mount

Page 185

1  Vernon to go to another department.
2      Q    Okay.  Officer Puff wrote, "Sergeant Quinoy,
3  PO King, PO Hutchins, PO Valente, and myself responded
4  to the Bungalow Bar to investigate."  Do you see that in
5  Exhibit 9?
6      A    Yes.
7      Q    Okay.  And this part you're saying you weren't
8  present for, correct?
9      A    Correct.
10     Q    Okay.  So I want to call -- so anything that
11 Officer Puff wrote about what transpired at the Bungalow
12 Bar, your testimony is you had no knowledge of, correct?
13     A    Correct.
14     Q    Okay.  I'm going to call your attention to the
15 bottom paragraph under, "Additional narrative."  Do you
16 see this?  Where it says, "Mr. Seward was transported
17 from the Bungalow Bar to 156 South First Avenue,
18 Apartment 4N."  Do you see that?
19     A    Yes.
20     Q    Does that refresh your recollection that
21 Mr. Seward was brought back to 156 South Avenue,
22 Apartment 4N while you were still there?
23     A    No.
24     Q    Okay.  And so that has not refreshed your
25 recollection in any way, as to Mr. Seward being in the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 50 of 82
The Deposition Of: DET. CAMILO H. ANTONINI, taken on January 30, 2022
186..189

Page 186

1  apartment with you on November 7, 2017, correct?
2      A    Correct.
3      Q    Okay.  Okay.  It says then that, "There were
4  no further narcotics found in the apartment.  It was
5  turned over to the lessee, Ms. Thompson at approximately
6  2110 hours."  Do you see that -- do you see that?
7      A    Yes.
8      Q    Okay.  And "At the conclusion of the search,
9  Mr. Seward was transported to the MVPD, and booked by
10  Detective Sergeant Fegan on the above charges."  Do you
11  see that?
12      A    Yes.
13      Q    Were you involved in booking or -- I'm sorry,
14  were you involved in transporting Mr. Seward back to the
15  police department?
16          COURT REPORTER:  Ms. Donnell, I'm sorry to
17      interrupt.  I'm sorry to interrupt.  I did not catch
18      that question.  I think there was internet lag.
19          MS. DONNELL:  I am so sorry.  Thanks for
20      letting me know.
21  BY MS. DONNELL:
22      Q    I asked, did you transport Mr. Seward back to
23  the police department?
24      A    I don't recall.  No.
25      Q    Meaning you could have, you don't recall one

Page 187

1  way or the other, correct?
2      Q    I don't recall.
3      A    Right.  Meaning you could have, you just don't
4  recall one way or the other, right?
5          MR. BUSHNELL:  Objection, guys.
6      A    I don't recall.
7      Q    Okay.  Well then, it's possible that you did
8  transport him, you just don't recall, correct?
9      A    And possible that I didn't.
10      Q    Okay.  Did you have any information about
11  Mr. Seward in any of his -- well, strike that.  Prior to
12  going to the apartment on November 7, 2017, to execute
13  the search warrant, were you provided any information
14  pertaining to Mr. Seward's arrest record or criminal
15  history; if you recall?
16      A    No.  No.  I don't recall, ma'am.
17      Q    Prior to going to execute the search warrant
18  at 156 South First Avenue, were you provided any
19  information about any prior searches of Mr. Alan Seward
20  that you recall?
21      A    No.  I don't recall.
22          MS. DONNELL:  Okay.  I'm going to have you look
23      at Exhibit 11.  Do you have Exhibit 11, Steve, for
24      the witness?
25          (EXHIBIT 11 MARKED FOR IDENTIFICATION)

Page 188

1          MR. BUSHNELL:  I should, yeah.  One second.
2          MS. DONNELL:  Let me know when you've got it.
3      I'm sorry.  Do you have Exhibit 11 now?
4          MR. BUSHNELL:  Yeah.  Sorry --
5  BY MS. DONNELL:
6      Q    I'm sorry.  I was waiting for you guys.  Okay.
7  Detective Antonini, I have in front of you what I've
8  previously designated as Exhibit 11 to your deposition,
9  which is a felony complaint arrest warrant for the "City
10  Court, City of Mount Vernon, County of Westchester,"
11  for, "MV case number 17-4539."  Do you recognize your
12  signature on this felony complaint?
13      A    I do.
14      Q    Okay.  And is it -- you signed this on April
15  24, 2018?
16      A    Yes.
17      Q    Okay.  And it says this is a felony complaint
18  against Mr. Alan Seward, correct?
19      A    Yes.
20      Q    Okay.  And what information did you -- well,
21  do you remember swearing out this complaint -- I'm
22  sorry, this arrest warrant?
23      A    This arrest warrant?
24      Q    Yeah.
25      A    No.  I don't remember right now.

Page 189

1      Q    Okay.  Do you remember what information you
2  obtained before you prepared it?
3      A    The information that was given to me by
4  Officer Puff to go and file to the District Attorney's
5  Office.
6      Q    Uh-huh.
7      A    Specific if I remember the details.  No.  I do
8  not.
9      Q    So is it your testimony that the information
10  that you used to out this arrest warrant you obtained
11  from Officer Puff; is that right?
12          MR. BUSHNELL:  Objection.  You can answer.
13      A    No.  I don't remember it specifically.  No.
14      Q    I'm saying that the information, did you --
15  what did you do to get the information --
16      A    You have to come a little closer to the mic --
17      Q    I'm sorry.  What did -- what did you do to get
18  the information before you swore out the felony
19  complaint?
20      A    This is of the information that was provided
21  to the assistant district attorney.  Yeah.  Allow me to
22  explain?
23      Q    Yeah, please.
24      A    All right.  So in some instances, there's been
25  situations where the arresting officer or the case

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 51 of 82
The Deposition of DET. DAMIAN H. ANTONINI, taken on January 13, 2022

190..193

Page 190

1  detective cannot respond to the District Attorney's
2  Office, in order to file the charges for the individual.
3  So in cases like this, they'll ask somebody if they
4  could go upstairs to the District Attorney's Office and
5  file the charges for that individual. So the fact that
6  my signature is in this here felony complaint, not
7  necessarily means that I filed the charges specifically
8  for Alan Seward. Other than I provided the information
9  given to me, to the District Attorney's Office, in order
10  to file the charges for Alan Seward. So my signature
11  pretty much validates.
12      MR. BUSHNELL: And Heather, you might be
13  getting confused too, if I may at this point. Did
14  you read through this? I think this relates to a
15  different incident based on what I'm reading here in
16  the information section.
17      MS. DONNELL: Yeah. Well, I think it's part of
18  the -- that gets re -- like a revised one. But I
19  think there's some mistakes in it. Yeah. I mean, I
20  think the date's wrong.
21      MR. BUSHNELL: So --
22      MS. DONNELL: I don't want to -- I want to ask
23  the witness questions about it.
24      MR. BUSHNELL: Yeah, of course. Of course. I
25  just wanted to make sure he knows what's he looking

Page 191

1  at.
2      MS. DONNELL: So let me do that. Yeah. But I
3  don't want coach the witness --
4  BY MS. DONNELL:
5      A   Just so -- look this over. So this felony
6  complaint has nothing to do with the incident that
7  happened on November -- what, 7th with Detective Puff.
8  This felony complaint is a totally different complaint
9  than the incident that happened with Detective Puff and
10  Alan Seward's search warrant.
11      Q   Okay. Well, then -- please explain then for
12  me?
13      A   This is a totally different incident.
14      Q   So you arrested Alan on October 19, 2017 at
15  3:00 p.m. in front of 156 South First Street?
16      A   I did not. No.
17      Q   Who did?
18      A   The arresting officer at the time -- which I
19  can't remember who did.
20      Q   Where did you get the information to swear out
21  that felony affidavit -- the felony complaint?
22      A   This complaint was in regards to a narcotics
23  operation conducted utilizing undercover officers, in
24  which an undercover officer purchased narcotics from
25  Alan Seward. So this is why this complaint was filed.

Page 192

1      Q   Why was this complaint being filed in April
2  24, 2018?
3      A   Because that's when the complaint was filed
4  for the incident of Alan Seward selling to an undercover
5  officer,
6      Q   But you had nothing to do with that undercover
7  controlled buy?
8      A   My duty was -- I was the assigned case
9  detective for the whole entire operation. So when the
10  undercover officer went into the location and purchased
11  the drugs from Alan Seward, I was not next to the
12  undercover officer at the time. No. I wasn't.
13      Q   Were you part of the surveillance? Or were
14  you in any way part of the operation?
15      A   I was part of the operation and the
16  surveillance.
17      Q   Okay. On October 19, 2017 at 3:00 p.m., where
18  were you?
19      A   Working.
20      Q   Were you at the station? Were you --
21      A   In the field.
22      Q   Okay. How long -- what was that operation
23  called, that this felony warrant was a part of?
24      A   I don't remember the name of the operation.
25      Q   How long was the operation -- well, how long

Page 193

1  did the operation last?
2      A   A couple of months. Four or five months,
3  maybe.
4      Q   What was the purpose of the operation?
5      A   To utilize undercover officers to buy illegal
6  narcotics from individuals that were selling.
7      Q   Did you use any confidential informants in
8  this particular operation?
9      A   Yes. We did.
10      Q   How many?
11      A   I can't say how many, but we did.
12      Q   Was this operation a joint task force -- a
13  joint operation --
14      A   Yes.
15      Q   -- with what other agencies?
16      A   Westchester County Police Department.
17      Q   Anyone other than Westchester County Police
18  Department?
19      A   No.
20      Q   Was the search conducted on November 7, 2017
21  of 156 South First Avenue, was that part of this
22  operation as well?
23      A   No.
24      Q   Was Officer Puff also assigned to the
25  operation?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 52 of 82
The Deposition of DET. DOMINICK ANTONINI, taken on January 5, 2022

194..197

Page 194

```
 1    A    The whole unit.
 2    Q    It was a whole --
 3    A    The whole narcotics unit.
 4    Q    Okay.  But you said you were the case officer.
 5  Did you have a special role for this operation?
 6    A    Yes.  I was the case -- the whole operation
 7  -- the case detective.
 8    Q    What does that mean?  Define what the case
 9  detective means for the operation?
10    A    Meaning I was in charge of the whole operation
11  investigation, per se.
12    Q    What were your responsibilities and duties?
13    A    Conduct my reports, secure evidence, obtain
14  reports from surveillance and undercover officers.
15    Q    Were you authorized to use wires -- like wire
16  taps for this for surveillance, for this operation?
17    A    This was not a wire top investigation.
18    Q    Okay.  So by surveillance, you mean just
19  physically surveilling out on the street?
20    A    Correct.
21    Q    And you said it operated for about four to
22  five months?
23    A    Give or take.  Yes.
24    Q    And was April 2018 towards the end of the
25  investigation -- or operation?
```

Page 195

```
 1    A    No.
 2    Q    When was the end of the operation?
 3    A    April 19, 2017 was the date that the
 4  undercover buy took place with Mr. Alan Seward, and
 5  April 24, 2018 was the date that this was -- the
 6  complaint was signed.
 7    Q    And I'm asking about the overall operation.
 8  What was the duration?
 9    A    I don't remember the exact date when it ended,
10  but the date that is in here was the date that this
11  complaint was signed.
12    Q    Okay.  How many arrests were made as part of
13  this operation?
14         MR. BUSHNELL:  Objection.  You can answer.
15    A    I don't recall.
16    Q    Did you receive any recommendations or rewards
17  for your work on this particular operation?
18    A    I don't recall.
19         MS. DONNELL:  Okay.  Mr. Seward, I'm going to
20  ask some questions of Detective Antonini that are
21  going to be considered confidential and pursuant.
22  So you're going to have to drop off and then I can
23  call you when you can jump back on, okay, Mr.
24  Seward?
25         MR. SEWARD:  Yes.  I have a couple of questions
```

Page 196

```
 1  too.
 2         MS. DONNELL:  Well, I'll talk to you.  You
 3  could jump off for now and then I'm going to give
 4  you a call.  Okay?
 5         COURT REPORTER:  Ms. Donnell, I can just put
 6  him in the waiting room so he doesn't have to log
 7  out of the meeting.
 8         MS. DONNELL:  Oh, sure.  That's okay.  Mr.
 9  Seward, we'll just put you in the waiting room.
10         MR. SEWARD:  Okay.
11         COURT REPORTER:  Okay.  He is now in the
12  waiting room, and I can get him whenever everyone is
13  ready.
14         (CONFIDENTIAL PORTION IV REDACTED)
15         MR. BUSHNELL:  Heather, do you have any idea
16  how much longer you're going to be?  I'm just
17  asking, because my client has to pick up his
18  daughter later, so...
19         MS. DONNELL:  Oh, sure.  I think under an hour.
20         MR. BUSHNELL:  Okay
21         MS. DONNELL:  Is that okay?
22         MR. BUSHNELL:  Yeah, sure.  Let's get back at
23  3:45 then; is that okay?
24         MS. DONNELL:  Yep.
25         MR. BUSHNELL:  Great.  Thank you so much.
```

Page 197

```
 1         VIDEOGRAPHER:  Okay.  Off the record at 3:39
 2  p.m.
 3         (OFF THE RECORD)
 4         VIDEOGRAPHER:  We are back on the record at
 5  3:49 p.m.
 6  BY MS. DONNELL:
 7    Q    Detective Antonini, I'm going to play for you,
 8  which I'm designating as Exhibit 26 to your deposition.
 9  It's a video recording that was produced by the
10  Defendant City in this action as I think Exhibit B.  And
11  so I'm going to share my screen and play it for you, and
12  then ask you some questions about it.  I might stop it
13  along the way, but I'll start now and hopefully this'll
14  work.  Let me know if you can see and hear it.  Okay?
15  Okay.  Can you see it?  I haven't -- can you see that on
16  your screen?
17         (EXHIBIT 26 MARKED FOR IDENTIFICATION)
18    A    Yes.
19    Q    Okay.  Let me go back to the beginning and
20  start playing.  Okay.  I'm going to start playing at
21  timestamp zero.  Fortunately, the -- hold on just a
22  second.  My apologies.
23         MS. ACQUISTO:  24, right?  Oh yeah.  Maybe
24  you're right.
25    Q    I don't know why it's stopping.  Detective
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK Document 187-8 Filed 12/24/22 Page 53 of 82
The Deposition of DET. CAMILO N ANTONINI, taken on January 30, 2022
198..201

Page 198

1   Antonini, can you hear that?  Was that your voice?
2       A    Can't hear it.
3           MR. BUSHNELL:  We can't hear anything.
4           MS. DONNELL:  You couldn't hear anything?  Let
5   me go back again and see.  Okay.  Let me try again.
6   I'm going to pause there at timestamp 11.
7   BY MS. DONNELL:
8       Q    Detective Antonini, is that your voice?
9           MR. BUSHNELL:  We can't hear anything, Heather.
10          MS. DONNELL:  Oh, you can't.  Phooey.  Okay.
11  Let me see what I can do.  Usually that works.  So
12  you're not hearing any of the audio?
13      A    No.
14          COURT REPORTER:  Myself and Krystal might be
15  able to help you out, if you would like to go off
16  record for a moment.
17          MS. DONNELL:  Sure.  Let's go off record and
18  see if we can get the technical stuff worked out.
19          (OFF THE RECORD)
20          VIDEOGRAPHER:  Back on the record at 3:52 p.m.
21  My apologies.
22  BY MS. DONNELL:
23      Q    Okay.  Detective Antonini, we're going to try
24  this again and see if it will work to share the video.
25  Can you hear me right now?

Page 199

1       A    Yes.
2       Q    Okay.  Let's try it again.  Let's see if I can
3   -- that did not work, did it?  Sometimes it works so
4   easy and sometimes it doesn't.  Let me try again.  Thanks
5   for your patience.  Okay.  Can you -- oh, let's see.
6   Okay.  Let's see.  All right.  Let's try it now. Can you
7   see the video right now?
8       A    Yes.
9       Q    Okay.  Let me see if this is going to work to
10  play it.
11          (VIDEO PLAYS IN FULL)
12          (VIDEO STOPS)
13      Q    Could you hear that before it lagged?
14      A    Yes.
15      Q    Okay.  I'm so sorry.  I think it's having
16  trouble doing all of the things I'm asking it to do.  Was
17  that -- do you recognize your voice?
18      A    That is my voice.
19      Q    Okay.  Let me try it again.
20          (VIDEO PLAYS)
21          THE WITNESS:  156 South First Avenue.
22          (VIDEO STOPS)
23          MS. DONNELL:  It's pausing at timestamp six.
24  Let me see if I can move it forward.  I'm going to
25  start playing at timestamp 10.  It doesn't want to

Page 200

1   work for me.
2           COURT REPORTER:  Sorry to interrupt again,
3   Ms. Donnell, but if you would like Krystal or myself
4   to play it --
5           MS. DONNELL:  Yeah.
6           COURT REPORTER:  I can send you a Dropbox link
7   or e-mail address and we can try and do that for
8   you.
9   BY MS. DONNELL:
10      Q    I think let's try that because I think mine's
11  going to keep lagging.  I'm not quite sure why.  It
12  usually works for me, but for some reason it's not right
13  now.  So, let's try that.  Can we go off the record and
14  I will try -- is it working now?
15          (VIDEO PLAYS)
16          (VIDEO STOPS)
17      A    Yes.
18          MS. DONNELL:  I think it's -- here, I'm going
19  to just pause it and try sending it, because I think
20  it's going to work better that way.  I'm so sorry,
21  you guys.  So let's go off the record and if you
22  guys -- if you put your e-mail in the chat, I'll do
23  it really quick.
24          COURT REPORTER:  Yes, ma'am.
25          VIDEOGRAPHER:  Okay.  Off the record at 3:55

Page 201

1   p.m.
2           (OFF THE RECORD)
3           VIDEOGRAPHER:  We are back on the record at
4   4:02 p.m.
5   BY MS. DONNELL:
6       Q    Okay.  Now we've been able to get some
7   assistance on the technology from our court reporter.
8   Detective Antonini, I'm going to have Aalayah play
9   Exhibit 26 for you.  Maybe we'll play it once all the
10  way through, and then I can ask you some questions about
11  it, so let's go and ahead and play Exhibit 26.
12          (VIDEO PLAYS IN FULL)
13          (VIDEO STOPS)
14  BY MS. DONNELL:
15      Q    Okay.  Detective Antonini, were you able to
16  view and hear all of Exhibit 26?
17      A    Yes.
18      Q    And was that the video that you testified
19  earlier that you reviewed prior to your deposition
20  today?
21      A    Yes.
22      Q    And to your knowledge, is that the only video
23  that exists from the November 7, 2017 incident?
24      A    To my knowledge.  Yes.
25      Q    And that's the only one you've ever seen to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 54 of 82
The Deposition of DEK. CAMILON H ANTONINI taken on January 03, 2022
202..205

Page 202

1  prepare for your deposition; is that right?
2      A    Yes.
3      Q    Okay.  And this video appears to be one
4  minute, 18 seconds; is that right?
5      A    Yes.
6      Q    And when you heard Exhibit 26 being played,
7  you authenticated that that's your voice operating the
8  video recorder?
9      A    Yes.
10     Q    And is that one seamless video taken -- like
11  you kept -- push to record and kept it recording the
12  whole time?
13     A    Yes.
14     Q    As you walked through the apartment; is that
15  right?
16     A    Yes.
17     Q    Okay.  Do you recall during -- and we could
18  play it again if you need to see it, but in the video,
19  when you look back towards the kitchen, there's an
20  officer that you can see standing in the kitchen.  Do
21  you know what officer that is?
22     A    Sergeant Fegan.
23     Q    That's Sergeant Fegan.  How about the officer
24  that's standing in the bedroom when you go into the back
25  bedroom?

Page 203

1      A    Joseph Valente.
2      Q    That's Joseph Valenti.  Okay.  And then in
3  this video, there's two women handcuffed sitting on the
4  bed in the back, correct?
5      A    Yes.
6      Q    Okay.  So -- and can you identify for me when,
7  in the course of executing the search warrant, you did
8  this video tape?
9      A    I want to say immediately after entering the
10  apartment.
11     Q    Okay.  You know how when we looked at the
12  police report, I think it was Exhibit 15 -- or the
13  incident report from Puff, there was three women who
14  were located in the back bedroom when the search was
15  conducted, and all three of those women were listed on
16  the incident report.  Do you remember that?
17     A    Yes.
18     Q    At this point when you were videotaping,
19  there's only two African American women in the back
20  bedroom handcuffed in the back, correct?
21     A    Yes.
22     Q    Do you have any information or knowledge as to
23  where the third woman is?
24     A    No.
25     Q    When you were doing this videotape, you have -

Page 204

1  - it does not appear to be in the apartment, correct?
2      A    I didn't see her during the video.  No.
3      Q    And also the children don't appear to be
4  depicted either; is that correct?
5      A    Correct.
6      Q    Is Officer Puff -- do you see or hear Officer
7  Puff in your video?
8      A    No.
9      Q    Okay.  When Mr. Seward was brought back to the
10  apartment, you did not do any videotaping; is that
11  right?
12     A    Correct.
13     Q    Okay.  Cause if that was -- he was videotaped
14  when he was in the apartment, that would be on this same
15  piece of evidence; is that right?
16     A    I guess -- I don't -- I wouldn't know.
17     Q    Do you recall trying to videotape when
18  Mr. Seward was in the apartment?
19         MR. BUSHNELL:  Objection.  Go ahead.
20     A    No.
21     Q    Okay.  So your testimony today is that this
22  video was recorded immediately after you executed the
23  search warrant, right?
24     A    Yes.
25     Q    Okay.  But it was -- is it your testimony that

Page 205

1  it was before Officer Puff returned with Sergeant Quinoy
2  and Mr. Seward back to the apartment?
3      A    This video was done immediately after the
4  search warrant.
5      Q    Okay.  Understood.  Okay.  And again, I guess,
6  based on your practice, when you were the videographer
7  for one of the search warrants, if you videotaped, you
8  know, after the search warrant was conducted, or if
9  there was a strip search conducted at the apartment
10  pursuant to this search warrant, it would have all been
11  part of the same videotape evidence, correct?
12     A    Correct.
13     Q    Okay.  And it would've been secured as
14  evidence just like this video tape was, right?
15     A    Yes.
16     Q    Okay.  So seeing the video again, that I
17  designated as Exhibit 26 to your deposition, refresh
18  your recollection to the events of November 7, 2017 in
19  any way?
20     A    Yes.  It assures that I was not at the
21  Bungalow.
22     Q    Why does that ensure for you that you were not
23  at the Bungalow?
24     A    Because in your -- in the lawsuit, it says
25  that I was at the Bungalow, right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 55 of 82
The Deposition of DET. CAMILO M. ANTONINI, taken on January 03, 2022
206..209

Page 206

1  Q   Yes.  But why does the video mean for you that
2  you didn't go to the Bungalow?
3  A   Kind of proves that I was not at the Bungalow.
4  Q   I know, explain.
5  A   I was not at the Bungalow.
6  Q   Okay.  But why does the video prove that?
7  A   You hear my voice in the video?  Correct.
8  Q   Understood.  But you could videotape and then
9  go to the Bungalow, correct?
10  A   No.
11  Q   Okay.  Not according to your view.  Okay.  So
12  let's see.  Aalayah, I think you can take down Exhibit
13  26.  Do you use a memo book in your -- like a department
14  issued memo book, in your capacity as a narcotics
15  officer?
16  A   Note take -- just to take notes.
17  Q   What kind of notes do you take?
18  A   Things you want to remember, phone numbers,
19  you know, nothing specific.
20  Q   I see.  Is there anything that the department
21  trains you on to put into your memo book?
22  A   Unless you are assigned to the patrol division
23  -- the patrol division, you have to notate your daily
24  log in that memo book.
25  Q   I see.  But when you're a narcotics officer,

Page 207

1  you don't have that same obligation?
2  A   No.  It's just note taking.
3  Q   Did you take any notes in your memo book on
4  November 7, 2017?
5  A   Search warrant date?
6  Q   Yes.
7  A   No.
8  Q   Have you searched your -- do you have your
9  memo book from back --
10  A   No.
11  Q   I'm sorry.  Just make -- let me get the
12  question all out.  Do you have your memo book anymore
13  from November 2017?
14  A   No.
15  Q   Why not?
16  A   It's -- there was no need for me to keep it.
17  Q   Did you destroy it?
18  A   I don't know what happened to it.  Probably
19  garbage, by now.
20  Q   When you fill up a memo book, do you throw it
21  away, typically?
22  A   When there's no more pages in it.  Yes.
23  Q   Okay.  So you don't -- you only have a memo
24  book, like one memo book at a time?
25  A   It's books to write notes in.  It's not a

Page 208

1  issue -- department issue for us to keep tabs of
2  everything that's happening.  It's just something to
3  write on like scrapbook -- memo book.  Unless you are
4  assigned to the patrol division where those books are
5  kept, you know, as records.
6  Q   Okay.  But a narcotics officer -- like if you
7  were going to interview a suspect or make an arrest,
8  would you note that in your memo book as a narcotics
9  officer?
10  A   No.  You can notate it on pieces of paper,
11  depending on what you are using.  And if you need those
12  notes for some evidential value, then you will submit
13  those notes into evidence, but no.
14  Q   You know this operation you were testifying
15  earlier to, that occurred in the 2017, 2018 time period
16  for four to five months.  Has it refreshed your
17  recollection of the name of that operation?
18
19
20
21  A   No.
22  Q   Who else worked with you on it?
23  A   In regards to what?  Who else, meaning?
24  Q   Well, you were the case officer, like the lead
25  officer; is that right?

Page 209

1  A   Yes.
2  Q   But did other narcotics officers assist you in
3  that operation?
4  A   Yeah.  The whole narcotics unit.
5  Q   Okay.  And was Sergeant Fegan your supervising
6  officer during that operation?
7  A   Yes.
8  Q   How many operations did you work on while you
9  were a narcotics officer?
10  A   Numerous, can't recall a specific number.
11  Q   How many were you assigned as the case
12  officer?
13  A   Numerous.
14  Q   More than five?
15  A   More or less, yes.
16  Q   Do you remember the names that were assigned -
17  - I mean, is it fair to say that anytime you had like an
18  operation there was given a sort of name that the
19  department would refer to it as?
20  A   Usually.  Yes.
21  Q   Okay.  Do you remember any of the names of the
22  operations you were assigned as the case officer -- as a
23  narcotic officer?
24  A   No.
25  MR. BUSHNELL:  Objection.  Go ahead.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 56 of 82
The Deposition of DET. DANUSH N. ANTONINI, taken on January 30, 2022

210..213

Page 210

1    Q    None of them?

2    A    Correct.

3    Q    Do you remember the focus of any of the
4    operations?

5         MR. BUSHNELL:  Objection.  Go ahead.

6    A    To target individuals selling illegal
7    narcotics in the City of Mount Vernon.

8    Q    But like -- did any of them like have a focus
9    let's say on heroin, or a different one on PCP, or a
10   different one on crack?  Did they ever have a focus like
11   that, or certain area of the city, or anything like
12   that?

13   A    Any and all illegal narcotics in anywhere
14   throughout the City of Mount Vernon.

15   Q    So what was the difference between having an
16   operation and just, like, being a narcotics officer?

17        MR. BUSHNELL:  Objection.  Go ahead.

18   A    Because you're trying to target as many
19   individuals all at once, while utilizing the services of
20   another department providing an undercover officer.
21   Whereas, if it's just the City of Mount Vernon,
22   conducting daily operations, it's different.  You're
23   just utilizing somebody else's services in order to --

24   Q    I see.  So it makes it an operation is when
25   you use the assistance of another law enforcement agency

Page 211

1    either to provide somebody undercover or some other
2    support service.  That's what made it considered an
3    operation versus regular narcotics unit conduct?

4    A    You could say that.  Yes.

5         MS. DONNELL:  Okay.  Okay.  I might be done,
6    but I want to look at my notes.  So maybe I could
7    have five minutes and then we could come back on.

8         MR. BUSHNELL:  You got it.

9         VIDEOGRAPHER:  Okay.  We are going off the
10   record at 4:15 p.m.

11        (OFF THE RECORD)

12        VIDEOGRAPHER:  Back on the record at 4:20 p.m.

13   BY MS. DONNELL:

14   Q    Detective Antonini, I just have a few --
15   hopefully just a few questions for you.  First of all,
16   do you remember -- well in fact, when you worked as a
17   narcotics officer, would you be issued a department car
18   to drive around on your shifts?

19   A    No.

20   Q    Would you --

21   A    You take what's available.

22   Q    But it was like a department issued car,
23   right?  Not your personal car.  You'd use a department -
24   -

25   A    Oh, yes.  It's a department vehicle.  It's an

Page 212

1    unmarked department vehicle.

2    Q    Thank you.  So for narcotics officers, you
3    used unmarked vehicles, right?

4    A    Correct.

5    Q    Did they have, like, a specific -- like, could
6    you tell by the license plate that it was a police
7    department car?  Like, did it have like an MP, like a
8    municipal license plate or was it completely unmarked?
9    Like, it would look like a civilian car?

10   A    It would look like a civilian car most times,
11   or it would look like a regular police car without
12   emblems or anything on it.

13   Q    Got it.  Back in 2017, was there certain cars
14   that the narcotics units was assigned regularly; do you
15   remember?

16   A    I don't remember.  I don't recall, because
17   cars came and went very frequently with our unit, that
18   they were very unreliable.

19   Q    Were you guys sometimes using cars that had
20   been possessed as part of an arrest?

21   A    To my knowledge, no.  We hardly came across
22   vehicles that were confiscated if that's what You mean?

23   Q    Yeah.  What -- do you remember what car you
24   were assigned on this shift on November 7, 2017?

25   A    No.

Page 213

1    Q    No idea.  Okay.  Okay.  And I think I forgot
2    to ask you; did you have a -- what was your highest rank
3    when you were a Marine?

4    A    Sergeant.

5    Q    Okay.  And did you have any specific jobs as a
6    sergeant or roles?

7    A    Infantry.

8    Q    You were infantry.  Okay.  And you said you
9    had received some college credit.  Do you remember the
10   college credit you received or the courses you got while
11   you were a Marine?

12   A    No.  The courses that we received throughout
13   my Marine Corps career were deemed college credit.  The
14   -- you get college credits for them.  Most of them were
15   usually infantry related, you know, leadership courses
16   and stuff like that.  I accumulated enough credits to
17   have -- possibly an Associate's degree.

18   Q    But did you ever get an Associate's degree?

19   A    No.

20        MS. DONNELL:  Okay.  I think that that's all I
21   have for you at this time.  Thank you so much for
22   your time.  Would you like to reserve signature,
23   Steve?

24        MR. BUSHNELL:  Yes.  Thank you.

25        MS. DONNELL:  Okay.  So witness will reserve

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 7:18-cv-10706-AEK Document 187-8 Filed 12/24/22 Page 57 of 82
The Deposition of DET. CAMILLO N. ANTONINI, taken on January 03, 2022
214..216

Page 214

1  signature.
2      MR. BUSHNELL:  I should have said that at the
3  beginning.  Sorry.
4      MS. DONNELL:  No problem.  We can go off the
5  record.
6      COURT REPORTER:  Okay.  Before we go off the
7  record, Ms. Donnell, how would you like your copy?
8      MS. DONNELL:  I can just get a regular e-tran.
9      COURT REPORTER:  Okay.
10     MS. DONNELL:  And I don't need a copy of the
11 video.
12     COURT REPORTER:  Okay, great.  And Steven?
13     MR. BUSHNELL:  I'm not going to be requesting a
14 copy, because Ms. Donnell will serve us with a copy
15 to be signed and we'll get that one.
16     VIDEOGRAPHER:  Okay.  Then I'll take us -- us
17 officially off --
18     MR. BUSHNELL:  Have you -- we're still on the
19 record.  I'm sorry.
20     COURT REPORTER:  We are.  I will have Krystal
21 take us officially off.  Okay.  Yeah.
22     VIDEOGRAPHER:  And I'm sorry, just for
23 clarification, the video for you, Steven?
24     MR. BUSHNELL:  No.  Sorry.  Thank you.
25     VIDEOGRAPHER:  All right.

Page 215

1      MR. BUSHNELL:  At this time.
2      VIDEOGRAPHER:  Okay.  And we are now officially
3  off the record at 4:24 p.m.
4      (DEPOSITION CONCLUDED AT 4:24 P.M.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 216

1           CERTIFICATE OF REPORTER
2             STATE OF ILLINOIS
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Stipulation page hereof, by me
7  after first being duly sworn to testify the truth, the
8  whole truth, and nothing but the truth; and that the
9  said matter was recorded by me and then reduced to
10 typewritten form under my direction, and constitutes a
11 true record of the transcript as taken, all to the best
12 of my skill and ability. I certify that I am not a
13 relative or employee of either counsel and that I am in
14 no way interested financially, directly or indirectly,
15 in this action.
16
17
18
19
20  
21
22 AALAYAH PURNELL,
23 COURT REPORTER/NOTARY
24 MY COMMISSION EXPIRES: 11/15/2022
25 SUBMITTED ON:  01/14/2022

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**EXHIBIT 2_ ANOTNINI**
112:17,23
113:4,12,13
126:13 128:20

**EXHIBIT 5_ ANOTNINI**
126:14,15,19,
21 127:5,9,11,
14,17

**EXHIBIT 9_ ANOTNINI**
178:4,6,7 185:5

**EXHIBIT 11_ ANOTNINI**
187:23,25
188:3,8

**EXHIBIT 13_ ANOTNINI**
138:21,25
139:8

**0**

**0800** 43:6,11

**1**

**1** 116:3

**10** 126:18
199:25

**101** 7:7

**10:00** 7:8 55:12

**10:14** 17:16

**11** 187:23,25
188:3,8 198:6

**11:12** 64:8

**11:21** 64:11

**11:49** 88:9

**11:56** 88:12

**12** 179:21,22

**12:55** 138:14

**13** 138:21,25
139:8

**15** 36:25 98:25
179:21,22
203:12

**15-CV-5635**
144:21

**150** 171:18

**156** 161:24
163:9,17,22
167:5,19
169:14 171:10,
18 176:19
180:6,16
185:17,21
187:18 191:15
193:21 199:21

**16** 98:25 127:1,
24

**1600** 43:6,11,
13

**17** 172:17

**17'** 180:1

**17-4539**
188:11

**18** 41:8 47:22
112:21 202:4

**18-CV-9068**
145:21

**19** 155:21
191:14 192:17
195:3

**19-CV-5230**
145:14

**1945** 179:11
180:2

**1983** 139:18
140:1

**1993** 112:21

**1999** 26:1
29:25

**1:00** 55:13

**1:20-cv-9251**
7:14

**1:35** 138:17

**2**

**2** 112:13,17,23
113:4,13
116:10 126:13
128:20 139:18,
21

**20** 36:25 152:22

**200** 42:24,25

**2000** 98:25

**2002** 25:18
26:11 179:3,10
180:1

**2003** 25:18
26:1,11,14

**2006** 24:21
26:16 27:15
30:14

**2008** 24:14,22
35:9

**2009** 45:6
48:24 54:9,18
55:2 56:1,14,
20,22

**2010** 49:4,15,
24 54:7

**2012** 49:24
54:7 57:15
154:5,7,8,10
157:3

**2013** 62:18

**2015** 126:18
128:5,12 149:9,
22 152:22
153:16,17

**2017** 16:10,15
18:7 136:16,20
137:5 161:15,
25 162:4,9,14,
18,21,25 163:6,
17 164:7
165:12,15
167:5,20 168:5
169:17,19
172:14 174:22
175:7 176:6,13
177:7 178:25
181:14 186:1

**187**:12 191:14
192:17 193:20
195:3 201:23
205:18 207:4,
13 208:15
212:13,24

**2018** 146:1,6,
13 155:21
188:15 192:2
194:24 195:5
208:15

**2019** 58:13

**2020** 60:14

**2021** 15:17
46:1 48:25
54:10 56:4
138:23

**2022** 7:8

**2110** 186:6

**22** 138:23

**23rd** 31:11,13,
21

**24** 188:15 192:2
195:5 197:23

**2400** 43:13

**25** 48:20

**25th** 17:6

**26** 197:8,17
201:9,11,16
202:6 205:17
206:13

**26th** 31:22

**27th** 17:5

**2:25** 161:8

**2:34** 161:11

**2:42** 166:14

**2:46** 166:17

**3**

**3** 24:22 112:13

**3.045** 112:11,
18 128:19
132:25

**3:00** 191:15
192:17

**3:39** 197:1

**3:45** 196:23

**3:49** 197:5

**3:52** 198:20

**3:55** 200:25

**3rd** 7:7

**4**

**4** 112:21

**4.4** 42:19

**40202** 7:7

**4:00** 43:6

**4:02** 201:4

**4:15** 211:10

**4:20** 211:12

**4:24** 215:3,4

**4N** 180:17,22
185:18,22

**5**

**5** 126:14,15,19,
21 127:5,9,11,
14,17 149:9,21

**50** 118:25

**523** 182:25

**6**

**6:00** 55:12

**7**

**7** 16:10,15 18:7
161:15,25
162:4,9,14,18,
21,25 163:6,17
165:15 167:5,
20 168:5
169:17,19
174:22 175:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

176:6,13 177:7
178:25 180:1
186:1 187:12
193:20 201:23
205:18 207:4
212:24

**730** 7:6

**78** 178:19

**7th** 163:10
191:7

---

**8**

**8** 35:9

**80** 178:22

**8:25** 180:3

---

**9**

**9** 24:21 30:14
178:4,6,7 185:5

**9:00** 55:13

---

**A**

**A-B-R-E-U**
59:7

**A-C-Q-U-I-S-T-O** 8:6

**a.m.** 7:8 17:16
64:11 88:12

**Aalayah** 7:4
8:13 35:1 201:8
206:12

**ability** 40:20
96:13

**Abrelo** 59:3

**Abreu** 59:2,4,5,
12,14

**Absolutely**
8:11 92:6 124:7
130:15 152:23
161:7 177:9

**academy**
30:17,18 35:13,
19,21,22 36:17

37:9 38:7
43:20,22,23
98:14,19 99:6
100:2

**accommodate**
9:19

**accordance**
132:24

**account** 103:3

**accumulated**
213:16

**accurate** 16:9
24:20 54:16
96:2 97:3
137:25 182:8

**acquaintance**
50:10 53:8

**acquired**
121:17,22

**Acquisto** 8:4,5
10:2,4,8,11
126:20 197:23

**act** 119:21
148:6

**action** 142:17
197:10

**actions** 11:14
35:4 76:1,14,17

**active** 25:19,25
28:10,14 151:6

**activity** 44:25

**actual** 99:5
100:4 127:22
167:12

**Addison**
160:18,21
161:5

**additional**
32:13 35:25
37:11 140:5
185:15

**address** 32:7
200:7

**admit** 17:20

**Adrian** 180:16

**advice** 90:12

**advised** 133:6

**affairs** 52:13

**affidavit**
166:22 168:1
191:21

**affirm** 8:15

**African** 203:19

**agencies** 25:3,
6,11 27:20
28:8,16 193:15

**agency** 210:25

**agree** 126:7,10

**ahead** 8:13
18:17 23:11
44:18 51:5
53:2,12 64:2
75:7 93:3,14
134:18 162:22
163:1 170:19
174:20 201:11
204:19 209:25
210:5,17

**Alan** 7:11 8:25
162:8,13 166:3
171:17 176:12,
22,24 187:19
188:18 190:8,
10 191:10,14,
25 192:4,11
195:4

**allegation**
140:17 145:25

**allegations**
142:13,14
144:6,18 145:7,
19 155:14,17,
20 158:1,3

**alleged** 143:6
145:7

**Allen** 7:20

**allowed** 161:3

**altercation**
50:6,7,9,16
51:21,25 53:7,
11,19

**altogether**
37:1

**America**
155:21

**American**
203:19

**amount** 37:17
97:24

**anal** 109:22
110:21,24
111:3,7,13,14

**and/or** 106:20

**Angela** 7:21

**answering**
156:23 158:5

**answers**
10:15,16 34:24
101:9

**Anthony**
57:13,15,17,21
58:5 94:6 95:4,
11

**anticipate** 84:3
142:7

**Antonini** 7:10,
12 8:1,11,23
10:17 17:18
64:13 73:21
75:22 84:12
88:14 89:19
90:2,11,15
112:17 123:1
127:8 138:19
161:13 173:2
178:5 184:19
188:7 195:20
197:7 198:1,8,
23 201:8,15
211:14

**anus** 70:15,21
71:22 72:5
78:20 79:1,6,10
110:5

**anybody's**
72:12 109:20

**anymore**
46:20,22
121:11 176:23

207:12

**anytime** 86:9
96:2 209:17

**AP1** 182:1

**AP2** 182:1

**AP3** 182:2

**apartment**
15:9,12 16:6
92:12 130:7,20,
21 131:12
153:6 168:11
169:5,10,17
170:3,4,6,9,12,
14,17,22,23
171:1,4,13,14,
15 176:1
180:17,21
182:11,18,21
183:8,11
184:20 185:18,
22 186:1,4
187:12 202:14
203:10 204:1,
10,14,18 205:2,
9

**apartments**
130:24

**apologies**
197:22 198:21

**apologize** 76:7
176:25

**appearance**
7:15 8:4

**appearing** 8:6

**appears** 202:3

**application**
25:10 44:6
165:22

**applied** 25:5
28:9

**applies** 130:6

**apply** 27:11
28:13 34:12
128:25

**applying**
27:20,22 28:7

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

apprehension 114:23

approval 66:19 92:24

approximately 13:10 37:15 41:20 45:8 48:24 49:24 54:6 55:5 186:5

April 26:11 188:14 192:1 194:24 195:3,5

apt 106:12

area 31:12 120:6 210:11

areas 32:7 102:1 115:5

arm 78:11,13

armpit 115:4 125:1,6,9,17

armpits 107:18 108:6

arms 78:23

Armstrong 180:16

arrest 67:22,25 69:1 75:12 77:5 103:2,5 104:9 105:22 115:21 116:11 117:21 118:4,5 119:20 120:15,17,18 121:6,10 123:2, 6,13,22 124:11 131:2,4 141:2 145:19 147:21 148:19 150:22 151:4 153:5 177:1 187:14 188:9,22,23 189:10 208:7 212:20

arrested 68:25 100:19 101:18 103:9,17,19 104:22 106:6 113:6,24 114:4, 7,13,22 118:11, 16 120:5

122:14 128:19 129:4 146:12 148:20 150:20 151:17 152:16 154:5,10,14,20 156:12 176:16 191:14

arrestee 120:7 129:14

arresting 103:24 114:12, 21 115:19 116:17 119:11 189:25 191:18

arrests 81:1 103:16 118:21 123:19 149:20 162:4,20 163:4 195:12

arrival 116:16

ascertain 95:21

ascertaining 183:21

aspect 84:6

ass 110:6,15

assaulted 102:19

assert 89:16

asserted 89:23

asserting 90:7

assigned 31:5, 8,19,24 32:18 41:19,21 43:15, 16,18 44:3,7 45:18,20,22 47:20 54:7,17 55:2,17 56:1,5 58:16 61:24 62:17 87:1 96:18 192:8 193:24 206:22 208:4 209:11, 16,22 212:14, 24

assignment 40:25 41:1 44:1 55:21 91:23

assignments 54:23 91:11,12, 20 164:24 165:4

assist 209:2

assistance 201:7 210:25

assistant 189:21

associate 63:5

Associate's 213:17,18

assume 9:13 76:18 110:1 111:9

Assuming 110:13

assures 205:20

attached 45:21 47:23

attend 29:17 30:17

attended 30:1, 3

attending 7:15,16 35:22 43:22

attention 115:4 138:20 185:14

attorney 8:3 88:15,22 89:14 90:3 189:21

Attorney's 24:2,8 189:4 190:1,4,9

attorney-client 90:8

attorneys 12:9,12,17 14:10 16:25 17:23 18:13,14, 22

audio 85:11,18 166:8 198:12

authenticated 202:7

authorized 70:25 194:15

Avenue 15:19 151:22 161:24 163:9,17,23 167:5,20 169:14 171:11, 19 176:19 180:6,16 182:25 185:17, 21 187:18 193:21 199:21

avoid 124:11 173:15

aware 19:2,7 20:3,5,12,13 21:5 23:4,5 34:18 110:19 112:2

awareness 19:6 20:1 23:13 35:3

---

B

---

back 25:18 28:3,5,23 29:1 35:7,12 44:2,3 57:15 60:23,24, 25 64:4,10 77:25 78:2 85:22 88:11 131:8,13 132:1, 13 137:4 138:16 147:12 148:11 158:12 161:10 164:6 166:16 171:22 175:7 178:1 180:24 181:22 182:2 185:21 186:14,22 195:23 196:22 197:4,19 198:5, 20 201:3 202:19,24 203:4,14,19,20 204:9 205:2 207:9 211:7,12 212:13

background 29:13

badge 157:22

bag 110:22,24 111:13

bags 106:7

Bar 169:13,19, 22 170:1 175:18,22 176:5,9 177:1, 4,5 182:24 183:14,17 184:15 185:4, 12,17

Barnes 7:3

based 38:8,14 77:10 96:1 149:1 158:5 190:15 205:6

basic 30:5,7

basically 35:20

basis 114:8 116:11 148:18, 21 151:7

bathroom 64:6

bearing 86:22

beats 42:14

bed 203:4

bedroom 180:24 181:22 182:2 202:24, 25 203:14,20

begin 8:20 77:13 78:1

beginning 60:14 164:21 197:19 214:3

belief 121:16, 22

belts 77:14,21 117:8

bend 71:21 72:15,20 73:24 74:6,16,21 75:1 78:24 79:4



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

80:3,6,8

**benefits** 33:13, 16

**big** 34:21

**bit** 28:22 94:15 100:12 125:22 129:17

**blades** 107:18, 19,25 108:11, 12 182:12

**blah** 44:25 45:1 132:19

**Blakey** 181:3

**block** 87:12 96:23 118:13 120:21 121:10 129:5,9 132:14, 21

**Bobby** 136:24 164:2 165:18 166:21

**body** 39:17 69:18,20,22,23 70:5,9,10,12, 19,20,21,25 72:12 77:8 114:22 117:14, 15 120:10 126:1

**bones** 51:10, 12

**book** 120:15, 17,18,20 121:6, 10 132:14 206:13,14,21, 24 207:3,9,12, 20,24 208:3,8

**booked** 186:9

**booking** 186:13

**books** 207:25 208:4

**border** 25:12, 14 27:21 28:9 29:6,7

**bottom** 77:14 116:3 139:22

178:19 185:15

**box** 178:19,22 179:5,21,22

**Brabham** 181:5,6,7

**break** 9:18,19, 21 17:12 49:2, 3,5 54:5 63:22 64:6 83:20 88:4 89:17 90:3 98:18 136:15

**briefing** 164:21 167:6,12,14,19

**Briefly** 18:2 57:19

**bring** 117:22 118:12 130:1 131:13

**broken** 38:23 51:10,12

**brought** 116:5 124:6 132:11 149:3 151:17 171:15,18 185:21 204:9

**Bungalow** 169:13,19,22 170:1 175:18, 22 176:5,9 177:1,4,5,6 182:24 183:13, 17 184:15 185:4,11,17 205:21,23,25 206:2,3,5,9

**Bushnell** 7:24, 25 8:8 10:13 12:19 17:10,13 18:17 19:16 22:9 23:11,16, 21 24:5,9 34:23 40:4,10 42:3 51:5,11 53:2, 12,16,20 58:1, 20 60:17 61:3 63:25 64:3 65:18 66:10 67:8 68:5 69:2 70:2,7 71:2,7 73:13 74:4

75:4,9 80:13,25 81:18,20,24 82:9,20,23 83:10,19 84:2,9 88:5,19 89:9, 12,20 90:6,9,21 91:8 92:20 93:2,14 94:12, 23 95:25 97:19 98:2,7 99:9,14, 16 101:4 103:21 104:17 105:2,7,12,15 110:11 111:1 112:5,13 115:7, 11 118:2,24 119:1 122:15, 18,22 123:24 125:4,11 126:2, 8,21,23 127:1, 3,6 128:1 129:16,19 134:18 138:12 140:10 141:9, 12,17 142:6 143:2 144:23 145:1 147:1,23 148:2 149:6 150:3,6,16 151:9 152:6,24 154:11,16 155:1,3 156:15 159:7,21 160:7, 13,17 162:10, 15,22 163:1 168:2 170:19 172:15,20 174:20 175:12 177:24 178:2 181:18 183:19 184:3,7 187:5 188:1,4 189:12 190:12,21,24 195:14 196:15, 20,22,25 198:3, 9 204:19 209:25 210:5, 17 211:8 213:24 214:2, 13,18,24 215:1

**business** 131:13

**busy** 157:6

**butt** 79:5

**buttock** 73:11 78:19,25 79:1

**buttocks** 71:21 72:5,7 74:7 75:2 79:10,16 108:15,17,19, 22 109:20 110:3 111:7

**buy** 156:12 192:7 193:5 195:4

---

**C**

**cabinets** 182:13

**cadets** 36:18

**California** 28:25 29:5

**call** 28:23 102:3 118:7 135:25 136:1 138:19 139:17 148:4 149:1 156:23 158:10 172:5 173:12, 25 179:12,16, 18 185:10,14 195:23 196:4

**called** 32:12 46:23 116:4 158:10 192:23

**calls** 157:8 163:4

**calm** 105:23

**cam** 15:13

**camera** 85:17, 22 130:11 168:20

**camera's** 85:17

**Camilo** 7:10,11 99:9 150:3

**Campo** 153:11, 12

**Campo's** 153:19

**capacity** 176:13 206:14

**Cappuccilli** 40:8,13,14

**car** 173:4 211:17,22,23 212:7,9,10,11, 23

**career** 28:1,4 45:17 47:3 62:9 81:9 103:15 157:20 213:13

**carried** 116:24

**carry** 87:1

**cars** 91:10,13, 19 172:5 212:13,17,19

**case** 7:13 15:3 17:22 62:14 77:19 85:1,2 86:16 95:24 116:4 121:3 134:25 138:22 140:23 141:23 143:1 154:23 155:5 165:15, 17,18 166:20, 21 188:11 189:25 192:8 194:4,6,7,8 208:24 209:11, 22

**cases** 11:6,14, 23 111:16 140:22 165:7,9, 11,16 190:3

**catch** 65:25 186:17

**caught** 104:12

**cavities** 72:2, 22

**cavity** 39:18 69:19,20,22,23 70:5,9,10,12, 18,19,20,21,25 71:5 109:22 110:21,25 111:3,7,13,14, 19 112:4



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Cayruth** 140:7, 8,12,13 141:5, 15 142:12,22 143:16 146:21 147:14,22 148:19,21 149:2,8,10,21 150:8,11 151:8, 17

**Cayruth's** 144:5

**cell** 87:11,19, 21 96:23 118:10,12,14 120:21 121:10 129:4,9 132:13, 21 133:22 134:4

**cellphone** 172:10,11,13 173:8,10,20,24 174:23,24 175:5,6

**cellphones** 171:24 172:6,8, 9,19 173:6 174:3,6,9,11,18

**cents** 48:20

**ceramic** 182:11

**cetera** 8:10 75:11

**change** 47:17 90:18

**changed** 34:1

**changing** 34:2

**charge** 104:8 165:5 194:10

**charges** 53:4 77:5 100:18,23 101:18 186:10 190:2,5,7,10

**chat** 200:22

**cheeks** 71:22 73:11 78:19,25 79:1,5,12,16 110:6,15

**chest** 107:17 108:3 124:25

**Chicago** 61:16

**children** 170:22 180:20, 21 182:1 204:3

**choice** 34:3 44:23

**choose** 32:24 71:14

**Christmas** 12:22 13:6 17:4,6

**CI** 148:3 184:5

**Circuit** 89:5

**circumstance** 75:5 80:14 120:2

**circumstances** 66:11 74:11, 13 75:12 119:20

**citizen** 13:24 14:2,8,16 15:18 34:18 158:16, 17

**city** 20:4 22:22 29:20 33:11,21 38:22 42:9,11 112:19 140:13 144:10,21 145:13,20 154:22 188:9, 10 197:10 210:7,11,14,21

**city's** 42:17

**civil** 11:20,22, 24 141:22

**civilian** 142:5 143:16,23 152:3 159:2,23, 25 160:5 212:9, 10

**clarification** 73:14 214:23

**clarify** 17:19 18:12 19:9

22:16 37:7 88:20 90:18 101:9 122:25 152:24 153:4 154:19

**clarifying** 61:11

**Clark** 156:7,9, 10,14

**class** 36:21 43:20,22

**classes** 30:2

**classroom** 30:24 31:2,3 36:11 37:11

**classrooms** 30:25

**clear** 9:2 12:3,6 20:22 21:16 22:3 52:1 75:21,23 78:18 94:17 99:21 132:18

**clearer** 73:19

**client** 162:8 176:12 196:17

**close** 29:2 40:13 45:25 50:10,11

**closed** 130:23

**closer** 189:16

**clothes** 65:21, 22 78:2,3 125:10

**clothing** 66:2, 5,18 71:20 72:2,3,11 73:1, 23 77:17,19,22 116:20 117:13 124:15,23 125:3,25 126:6

**clothing's** 72:17

**coach** 191:3

**cocaine** 147:10,15 182:12

**codes** 38:19

**coke** 109:9

**collar** 115:4

**colleague** 62:20

**colleagues** 18:24 112:3

**collected** 105:24

**college** 29:10 30:2,8,9 213:9, 10,13,14

**Collier** 145:13, 16

**combating** 106:8

**combative** 106:20

**commander** 132:4

**commands** 38:24

**commenced** 17:24

**comment** 19:23

**committed** 68:2,3,13 76:6 102:19 103:24 104:19

**communicate** 171:23 172:1,4, 6 173:3,18 174:24

**communicated** 172:18 175:4

**communication** 90:8,17 175:16

**communications** 12:5 18:13 88:21 89:17

**company** 26:21,24 27:4

**Compared** 33:21

**complaint** 14:14 51:25 142:5 143:16, 21,22,23 188:9, 12,17,21 189:19 190:6 191:6,8,21,22, 25 192:1,3 195:6,11

**complaints** 13:19,21,23,24 14:2,8,16 15:18 34:19 85:24 158:17,22 159:2,4,23 160:1,5

**completed** 40:23 133:13

**completely** 212:8

**completion** 133:9

**compliance** 106:19

**computer** 178:1

**concealed** 119:12

**concealing** 68:16 69:11 101:24 102:9

**concerned** 131:6

**conclude** 133:10

**concluded** 85:22,25 215:4

**conclusion** 186:8

**conduct** 37:23 64:25 65:12 66:9,19 67:6, 12,16,17,18 68:9,11 69:16 70:1,3,24,25 73:17 75:17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DEPO CAMILO R ANTONINI taken on January 03, 2022
Case 7:18-cv-10706-AEK   Document 187-8   Filed 12/24/22   Page 63 of 82
222

76:10,20,22
77:7,16 81:11
83:12 84:14
88:25 89:5 90:4
92:3 96:7,20
97:16 98:9,21
99:6 100:1,5,9,
15,20 101:1,14
103:3,11 104:1,
15 115:25
116:19 117:24
118:3 123:5
125:13,19
129:4,14 130:8,
13,14 131:17,
20 132:17,20
133:4 135:3
136:12 151:8
152:25 156:14,
18 194:13
211:3

**conducted**
55:14 68:25
74:2 79:20
80:10,16,19,23
81:16 82:16
83:2,6 84:18
86:3,6,8,10,19
87:14,15 90:19,
23 92:18,23
93:6,11,22
94:3,10,17,22
96:3,9 97:13,17
114:23 115:1,
14 118:9,18,23
119:7,8 120:5,
13 121:2,5,15
124:11 129:8
130:9 131:8,18,
24 132:2,24
133:3,15,19,25
134:3 141:5
149:3 162:24
168:8 180:15
191:23 193:20
203:15 205:8,9

**conducting**
39:5,14 76:19,
24 79:9 80:24
83:1 96:14
97:23 98:4
107:10 130:7
152:21 161:24
210:22

**conference**
7:9

**confidential**
147:6,8,11,14,
18,19 148:22,
23 149:2
151:12,16
152:5,8 161:6
167:25 177:12
181:17 183:16,
22 193:7
195:21 196:14

**confirm** 182:7,
17

**confiscated**
212:22

**confused**
130:22 150:21
190:13

**Connect**
173:8,20 174:6,
8,11,23

**connecting**
166:7

**connection**
144:2

**considered**
100:14,17
101:1 119:18
195:21 211:2

**constitute**
72:11 78:7

**constitutes**
69:22 70:4,12
73:17 75:17

**consult** 88:15

**contact** 24:1

**contagious**
47:1

**continue** 38:6
133:7

**continues**
85:21

**contraband**
66:13 68:17
69:12 72:6 76:3
77:12 79:17

84:21 102:12
107:20,23
108:8,9,10
109:1,2,5,11,
12,19 110:3,21
114:24 116:21
119:12 121:17,
22 131:7
133:13 146:18
147:7,8,9 149:4

**contract** 28:24

**control** 120:2

**controlled**
192:7

**convened** 7:9

**convenient**
131:17

**conversation**
89:13 158:13
177:10

**conversations**
18:21,23 167:1

**convey** 132:10

**Cool** 9:25

**cop** 34:5

**copy** 214:7,10,
14

**cordial** 158:8

**corner** 134:12

**Coronavirus**
46:24

**Corps** 25:17,
20,25 26:13
28:10,14,25
29:4 30:4
213:13

**correct** 13:4
14:1,15,17,18
19:17 21:11,19,
20 23:4,7
24:15,16 25:16
28:11,12 32:14
34:14 35:23,24
36:13 37:13
39:7 40:21 46:8
48:10 53:3,9
54:11 56:1,2,23

57:8 60:8 61:14
65:23 66:24
67:2,23 69:1,8,
12,13 70:22
71:3,12 72:18
73:2,4,5,6
74:13,20 75:2
76:11 79:24
80:3,4 85:5
86:17 89:19,20
90:14 91:21
92:1,19,22
95:2,3 96:16,17
97:6,15 100:3
102:10,25
113:1 114:4,9,
10 115:21
116:1,2 118:19,
20 120:7,8,11,
12 121:3,4
122:10 123:15,
20 124:1,14
125:10,21
128:8,9,11
131:25 134:5
136:7 137:14
138:4 140:18,
19 142:14,15,
23,24 143:19,
21 144:18
147:4 149:7,25
151:1 162:16,
19 167:20,23
168:25 169:20
171:20 172:19
173:22 174:1
175:2,22,23
176:3 177:19
179:15 180:11
181:3 182:6,8,
9,18,19,22
183:5 184:16
185:8,9,12,13
186:1,2 187:1,8
188:18 194:20
203:4,20 204:1,
4,5,12 205:11,
12 206:7,9
210:2 212:4

**correctly**
158:4

**cough** 72:15,
21,25 77:24,25
79:3,22 80:2,8
110:13,14,18,

23 111:4

**coughed** 110:8

**coughing**
78:14

**Counsel** 7:17
8:19 15:17
23:18 90:17

**Counsel's**
90:12

**counselor**
43:20

**count** 61:5,6,9
82:22 83:11

**County** 33:11
35:19 37:9
43:19 45:21,23
46:6 51:18
54:20 56:4
59:13,21,22
188:10 193:16,
17

**couple** 36:9,11
57:19 88:5
106:6 179:21
193:2 195:25

**courses** 30:10
213:10,12,15

**coursework**
30:25

**court** 7:4,5,12
8:14,19 65:24
83:23 165:23
166:7 186:16
188:10 196:5,
11 198:14
200:2,6,24
201:7 214:6,9,
12,20

**coworker**
149:13,14

**crack** 106:7
109:6 110:4
147:10,15
210:10

**crash** 103:2

**crazy** 85:19
118:12 157:7
174:14



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**created** 179:9

**credit** 30:8,9
213:9,10,13

**credits** 213:14,
16

**crime** 45:20,23
46:13 47:7
54:10,20 60:16
67:25 68:2,3
76:6 100:18,23
101:17 102:17,
20,22,23
103:10 104:3,5,
19 118:6
119:19

**crimes** 32:8

**criminal** 11:22
53:4 68:13 76:5
187:14

**criteria** 100:13

**crushing**
117:13

**curious** 33:25
159:12,19,24

**custodial** 39:5

**custody** 67:19,
20 69:3,4 77:4
101:15 117:23
118:16 149:3

**cutting** 129:16

_____ D _____

**D-O-N-N-E-L-L**
7:19

**daily** 165:2
206:23 210:22

**damage** 117:1

**dangerous**
116:25

**Daniel** 56:15,
17,18,19 94:7

**data** 87:24

**date** 30:14 45:5
112:20 152:17,
18,19 174:22

**date's** 190:20

**dated** 178:24

**daughter**
196:18

**day** 7:8 17:2
137:23 155:9,
10 157:7
160:19 168:19
175:1,4

**days** 137:3,4,6,
7,8,9,11,12,13,
19 138:1,2

**DEA** 25:12,16
27:21 28:9 29:9

**deal** 34:9

**debrief** 134:24

**debriefing**
134:15

**December**
13:7 15:17
26:1,13 58:13

**decide** 119:6
165:3

**deciding**
101:13

**decision**
124:11

**deemed**
118:11 132:18
213:13

**deface** 117:1

**default** 131:20,
21,23

**defendant**
11:18 18:15
142:11 197:10

**defendants**
8:1 63:3 139:19
140:2

**defendants'**
138:21

**defending** 8:9

**define** 64:14
194:8

**defined** 114:19

**definition**
65:16,19 66:1
70:5

**degree** 213:17,
18

**delivery** 27:5,7

**deny** 154:13,16
177:3,14,16,18
182:7,17

**department**
11:11 13:18
19:3,4,14,15,19
20:2,3,11,13,
14,21 21:1,6
22:14,18,23
23:10,14,19
24:14,18,21
25:7 26:15
30:13 31:10
32:18,22,25
33:2 34:5,13
35:5,16,21
36:2,4,7 38:10,
12 41:1 42:8,
10,16 43:17
44:11 45:4,9,
15,21,23 46:5
48:23 54:8,18
58:21 60:21,24
80:20 83:3,7,14
84:13 87:15,16
90:5,20,25
92:14 96:7,16,
19 97:6 98:6
99:7 114:13
116:17 121:10
128:18 129:15
143:22 156:18
158:25 160:9
164:23 173:7,
14,16,21 185:1
186:15,23
193:16,18
206:13,20
208:1 209:19
210:20 211:17,
22,23,25 212:1,
7

**department-
issued** 172:9

**departmental**
36:4

**departments**
34:8 48:16

**depend** 55:11

**depending**
55:13 74:11,13,
14 80:14
174:15 208:11

**depends** 49:13
65:5 91:16

**depicted** 204:4

**deposed** 10:18
11:1,15,18
140:23 142:17

**deposition**
7:10,22 8:9
10:21 12:3,9
13:4 14:4
17:21,24 18:22,
24,25 21:12
23:7 89:18,22
93:18 101:8
112:18 113:4,
10,13,17
126:16 127:5,
14,19 138:21
139:9 141:20,
24 144:6
163:16 178:6,
15 188:8 197:8
201:19 202:1
205:17 215:4

**depositions**
11:3,9 89:1,6

**depth** 38:25
77:6 106:14

**describe** 15:7
29:13 70:10
75:25 76:13,20
101:22 117:18

**designated**
47:25 48:2,5
112:12,17
113:4 116:18
126:15 127:5,
14 138:20

**designating**
197:8

**designation**
48:7,16,17,18,
19

**desk** 49:21,23
118:1 119:6
132:13,15
135:18 157:5

**desks** 135:16,
19

**destroy** 207:17

**details** 120:14
189:7

**detain** 65:7
67:14 148:21
151:5

**detained**
115:25 148:10,
20 149:2,18
150:9,23 151:1,
4

**detaining**
65:15

**detect** 117:15

**detective** 7:10,
11 8:1,11,23
10:17 17:18
42:1 44:5,7,10,
13 45:13 47:18,
20,23 48:1,2,5,
10,13,15 62:11,
13 64:13 73:21
75:22 84:12
88:14 89:18
90:2,11,15
97:21 112:16
123:1 126:16,
21,23 127:8,17,
23 133:3 135:8,
10,14 136:8
138:19 161:13
173:2 178:4
184:19 186:10
188:7 190:1
191:7,9 192:9
194:7,9 195:20
197:7,25 198:8,

**139:8 178:5
188:8 205:17**



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

23 201:8,15
211:14

**detectives**
91:16 135:12

**detention**
132:7

**determine**
100:14

**determined**
168:18 169:3

**determining**
76:9 101:1
104:1 119:18,
25

**deviation**
128:22,23

**device** 87:5,20,
22,23

**devoid** 75:10

**di** 158:24

**dictate** 105:8,
17,20 106:17
118:7 130:4
131:16 137:22

**Diego** 29:3,5

**difference**
210:15

**digital** 182:13

**diploma** 29:14,
15

**direct** 8:21
133:4 173:7,20
174:5,8,11,23
184:3

**directly** 20:16
149:11

**discharge**
26:2

**discharged**
27:8

**disciplinary**
35:3 158:24
159:5,8 160:12,
20 161:1

**discipline**

156:19,25
157:16,19

**disciplined**
156:17

**disclose** 12:4
18:12

**disclosing**
147:17

**disclosures**
138:22

**discovered**
116:22 119:14

**discoveries**
119:22

**discuss** 88:17
90:3

**discussed**
89:3

**disk** 88:2

**district** 7:13
24:2,8 42:10,
11,17 89:4
189:4,21 190:1,
4,9

**districts** 42:18

**divided** 42:6

**dividing** 91:12

**division** 31:6,9
41:23,24,25
42:1,6 44:5,7,
14 45:14 47:20,
23 87:12 96:19
120:20 126:17,
23 127:18,23
133:3 135:8,11,
14 136:8,11
164:13,14
206:22,23
208:4

**divisions**
44:10

**divulge** 12:4
18:12

**document**
83:14,17 84:14,
15 85:3 97:13
113:1,7,14

120:23 121:2,5
126:16 138:23
139:8 178:9

**documentatio
n** 158:21

**documentatio
ns** 144:5

**documented**
16:21 95:24
96:3 148:15

**documenting**
84:6

**documents**
13:12,15 14:19
16:2,18 18:1,2,
3,4 113:9 152:2

**Donnell** 7:18,
19 8:22,25
10:7,9,14
17:12,14,17
22:12 63:21
64:5,12 73:16,
20 75:6,14,20
83:22,24 84:4,
11 88:3,7,13,23
89:11,15,21
90:1,7,10 99:17
112:8,14 115:9,
12 122:16,20,
24 126:22,25
127:2,4,7
129:18,20,23
138:9,18
140:11 141:11,
13 142:1,9
143:10,14
145:2 147:2
150:7 152:1
153:2 155:2,6
161:12 165:25
166:9,18
172:23,25
175:9,14
177:25 178:3
183:25 184:6,8,
12 186:16,19,
21 187:22
188:2,5 190:17,
22 191:2,4
195:19 196:2,5,
8,19,21,24
197:6 198:4,7,

10,17,22
199:23 200:3,5,
9,18 201:5,14
211:5,13
213:20,25
214:4,7,8,10,14

**door** 134:12

**downstairs**
118:12

**drinking**
53:19,21

**drive** 87:25
88:2 211:18

**driver** 27:5,7

**driving** 173:5

**drop** 195:22

**Dropbox** 200:6

**drove** 148:10

**drugs** 71:5
109:10 111:12
149:4 192:11

**due** 74:16

**DUI** 103:2,10

**DUIS** 103:15

**duration** 55:21
60:22,23 195:8

**duties** 194:12

**duty** 25:19,25
28:1,10,14
49:7,10,12,14,
18,19 50:6
52:16,23 54:6,
14,22 56:7
57:1,6 95:2
157:4,17 168:5
171:24 172:3
173:3 192:8

**DWIS** 103:15

───────

**E**

───────

**e-mail** 200:7,22

**e-tran** 214:8

**ear** 70:20

**earlier** 21:17
22:5 28:17
70:23 79:25
93:17 120:22
121:1 123:16
139:14,15
161:17 164:19
168:14 201:19
208:15

**early** 157:3

**ears** 70:14 77:8

**easier** 131:17

**East** 31:15,16
151:22

**easy** 199:4

**educational**
29:13

**Edwards**
157:13,17
158:2,8

**effect** 118:8
127:24

**effected** 162:5

**effective**
112:21

**eight-hour**
137:24

**eliminate**
124:16 126:6

**else's** 210:23

**emblems**
212:12

**emoji** 10:16

**employed**
24:17,20 25:2,8
27:6,14,23

**employee**
158:22 160:15

**employment**
11:10 26:15
30:13 90:24

**emptied**
117:10

**enclosed**
131:21 134:11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

encounter 162:8

encountered 104:23 180:19 181:25

end 28:24 194:24 195:2

ended 28:5 31:20 174:18 195:9

enforcement 25:3,6,11 28:1, 4,16 51:21 102:1 210:25

ensure 114:20 116:20 124:17 205:22

entered 120:14

entering 203:9

entire 45:16 55:16,20 157:20 158:4, 13 192:9

entry 179:19 180:19 181:25

equipment 173:23

escape 116:25

estimate 10:23 13:9 81:15 83:5,8

et al 7:12

evaluation 132:20

event 128:22, 23 133:2

events 15:20, 25 16:10,14,20 161:18 205:18

everybody's 41:7

evidence 86:1, 14,15,16 88:1 114:24 116:22 119:12 124:19 171:3,7 182:17

194:13 204:15 205:11,14 208:13

evidential 208:12

exact 37:16,17 195:9

examination 8:21 114:22 120:11

examples 102:5

excessive 154:9,13,18,20

execute 167:4 173:5 187:12, 17

executed 165:14 204:22

executing 167:7,10,12,13, 15 203:7

exhibit 112:10, 17,23 113:4,12 126:13,14,15, 19,21 127:5,9, 11,13,14,17 128:20 138:21, 25 139:8 177:24 178:4,6, 7 185:5 187:23, 25 188:3,8 197:8,10,17 201:9,11,16 202:6 203:12 205:17 206:12

exhibits 177:21

exists 201:23

experience 77:11

explain 65:8 67:13 100:13 105:19 135:6 189:22 191:11 206:4

expose 75:1 78:25 79:1

exposed 74:8

expressed 19:23 20:17

extend 45:1

extensive 116:4

extent 16:7 141:19 164:4

external 114:22

extremely 119:21

—————

F

face 177:8

face-to-face 172:7

facial 51:7,8,9 70:17

facilitate 116:25

facility 116:6, 15,17,21 117:5 132:7

facing 172:2

fact 103:18 190:5 211:16

factor 102:6,23 106:21,23 107:2,3

factors 76:9 100:14,16,25 101:5,7,13,16 103:25 105:9 106:18 119:17

facts 141:23

Fagan 58:9

fair 62:8 97:2 101:20 102:21 115:9 118:15 174:17 184:9 209:17

fall 78:12,15 110:16,22 111:5

fallen 108:18, 22

false 145:19

familiar 31:13 113:3,7 139:7 140:14 144:11 145:3,6,14,21 149:16,17 155:14,24 156:3

fault 99:3

favor 77:24 102:23

FBI 23:23

February 45:6 46:1,3 48:24,25 49:4,25 54:9,18 126:18 128:5

federal 19:2 143:21

feel 22:2 64:22 124:24 125:9 126:1

feeling 115:3 125:2,10

feet 108:12

Fegan 58:9,11, 15,22,24 60:1,4 61:16,17 62:9, 21 84:19 93:5, 12,23 94:3,8 128:11 136:21 164:3 169:2,6,9 170:3 171:1,21 175:16 184:18 186:10 202:22, 23 209:5

Fegan's 178:21

fell 108:16

fellow 82:17 104:23 107:1 122:2 123:5 165:16 173:18 174:24 176:8

felony 102:20 103:10 104:10 119:20 188:9,

12,17 189:18 190:6 191:5,8, 21 192:23

female-wise 70:16

females 180:24 181:2, 21 182:1

field 80:12,17, 23,24 81:5,16 82:8,17 83:13 86:3 92:4,9,10, 13 114:17 124:5 130:19, 23 192:21

fight 50:17,18, 19 53:15

figure 177:22

file 158:24 159:5,8,13,15, 20 160:1,6,11, 12,14,15,16,20 189:4 190:2,5, 10

filed 13:20,22, 23,25 34:19 51:25 139:19 140:1 143:16, 18 144:12 145:4 156:3 158:17 190:7 191:25 192:1,3

files 161:1

fill 207:20

filled 180:9

find 28:6 85:24 102:2 114:23 124:24 125:3, 16,20,25 130:13

fine 69:21 84:9

finish 24:5 83:24 103:7

Firm 7:25 8:7

Fischer 56:15, 17,18,19 94:7

fist 50:19



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

Case 7:18-cv-10706-AEK Document 187-8 Filed 12/24/22 Page 67 of 82
The Deposition of DET. CAMILO R. ANTONINI, taken on January 03, 2022

226

focus 210:3,8, 10

follow 84:5 90:12 124:22 165:8

force 31:25 32:1,3,18 154:9,13,20 193:12

forgot 34:17 93:17 156:22 157:9 213:1

form 125:4

formal 28:20, 23 29:7

format 9:2

forthcoming 106:5,20

Fortunately 197:21

forward 106:3 199:24

found 84:20 85:23 107:24, 25 108:4,14,21 109:1,10,13,16, 19 110:2 125:6, 13 148:12 149:4 171:3 182:17 186:4

frame 27:18 36:9,16 49:25

free 150:11,18, 20

frequency 97:18

frequently 98:5 174:12,17 212:17

friend 50:12,17 53:22

friends 50:10 62:20 63:4

frisk 114:17,19 115:13 116:1, 22

frisked 118:17

front 96:24 97:1 106:12 107:17 108:3 112:22 127:9 157:5 161:3,4 188:7 191:15

Fuck 106:9,10

full 114:7 118:7,11 124:16 125:13 126:6 199:11 201:12

Fulton 182:25

_____

**G**

Gallman 144:12,15

gap 180:3

garbage 207:19

garment 64:17,18,24 67:18 77:2,8

garments 117:6,14

gave 151:12 160:15,21

gears 63:21

gender-wise 70:16

general 58:16, 19 59:18,20,23, 24 60:2,5,9,13 62:13 73:16 75:12,16

generally 22:16 171:22

generation 34:7

geographic 31:12

George 29:18, 21

get all 159:22

Giles 154:22 155:7,15,25

give 8:15 13:2, 11 27:17 34:3, 25 35:10 37:16 38:17 44:3 45:6 47:22 49:25 55:4 58:3,6 60:11 64:4 66:17 88:3 101:9 112:15 157:22 160:16 161:2 194:23 196:3

gloved 79:15

good 7:2,18,24 8:23 47:25 62:9 101:12 176:6

Govan 153:22, 25 154:1,3,14, 20

government 25:15

Grabbing 117:13

graduate 29:16,21

graduated 35:18 36:24 38:7,8

graduating 36:21

great 113:3 196:25 214:12

Greenburgh 51:18

Gregory 160:18,21

Griffin 59:9,10, 11,13,15

Griffith 59:2

groin 115:5

ground 110:16

guess 96:1 97:22 99:18,19 101:17 105:19 110:12 113:22

121:24 131:15 204:16 205:5

guessing 98:23 99:14

guided 128:17

guidelines 114:14

gun 108:21 124:24,25 125:1,6,9,16

guns 108:1,5

guy 156:5

guys 36:24 53:15 62:5 135:15 137:2,8, 10,25 168:21 187:5 188:6 200:21,22 212:19

_____

**H**

H-O-L-L-E-Y 181:3

hair 120:11

half 58:6

hand 8:12 79:15 126:15 178:19

handbags 117:8

handcuffed 115:2 203:3,20

handcuffs 73:25 77:3

handle 44:24

hands 64:19 117:14

hanging 62:23

happen 177:17,20

happened 10:3 52:4 58:14 91:3 93:1 124:8 130:16 140:24 148:5 155:8

176:5 177:14, 16,19 180:2 191:7,9 207:18

happening 22:24 208:2

happy 9:5,11, 19 93:20

hard 98:13,16, 24 174:13

Harlem 31:15, 16

hats 117:7

hazards 114:12

head 105:21

headquarters 116:16 131:9 132:1 148:11 157:6

hear 9:3 21:1 49:8 75:14 129:24 135:5 139:2,5 166:5, 6,8,11 173:16 197:14 198:1,2, 3,4,9,25 199:13 201:16 204:6 206:7

heard 21:14 23:5 46:23 139:3 158:13 202:6

hearing 19:22 198:12

Heather 7:19 8:25 17:10 64:3 99:10 129:16 141:9 142:7 183:19 190:12 196:15 198:9

held 110:15

Helena 157:13

helpful 22:9

Henderson 156:7,9,10

heroin 109:6 210:9

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

hesitate 34:5

hey 160:19

hidden 66:18

hide 77:12

hiding 77:10
101:23 102:4,8,
11,12

high 29:14,15,
17,18,21

highest 213:2

hired 27:9,17
33:1 34:14

hiring 27:10

historical
100:18,23
101:17,21
102:2,6,25
104:3,19,21,24
105:11 107:4,8

history 68:16
76:5 101:23
102:8,12 105:5
127:25 187:15

hold 78:11,22
197:21

holding 78:13
87:19,20
118:10,13
133:22 134:4

Holley 181:3

home 130:20,
21 131:12
159:17

homeless
155:21

Honorable
180:16

Honorably
26:3

hot 32:6

hour 13:1,2,10
196:19

hours 43:14
137:21,22
186:6

house 36:8
183:8

houses 130:24

hundred 81:23
82:7,11,12

hurt 106:15,16

Hutchins
180:14 185:3

hypothetical
105:10 107:7

_____

I

_____

i.e. 77:20

idea 53:6
184:24 196:15
213:1

IDENTIFICATI
ON 112:23
126:19 138:25
178:7 187:25
197:17

identified
94:19 109:12
181:2

identify 38:14
101:15 151:19
203:6

identity 147:17
183:21 184:1,
10

II 152:8

III 161:6

illegal 22:25
109:7 193:5
210:6,13

imagine 9:17

immediately
114:23 115:2
124:12 203:9
204:22 205:3

important
75:11

imposed
156:19

in-depth 66:16

in-house 37:1
38:12

inaudible
155:18

incident 14:14
16:4,8 49:17
50:2,4,6 51:14
54:1,3 84:24,25
123:25 133:13
136:16 142:19
146:24 147:3
148:14,15
151:20 155:9,
20 158:4
161:14 162:1
178:10,25
179:6 180:2,3,
5,10 190:15
191:6,9,13
192:4 201:23
203:13,16

incidents 18:7
32:5,13

include 119:19

includes 117:6

including
140:13

increase
47:10,12,13,15,
16,17 48:19

independent
15:20,24
161:18 163:12
168:10 170:21
182:4,16

independently
151:11,14

indirectly
149:12

individual
36:20,23 37:10
41:14 44:12
65:14,21,22
66:12 67:7,14,
19,22 68:13,15,
19 69:4,10
71:4,10,19
72:4,20 73:23

74:6,9 76:15
77:2,3,9,11,17,
24 78:2,9,15,
19,20 79:8,21
84:20 85:10,11,
16,22 90:25
91:16 92:18
100:16,19,24
101:2,14,18,23
102:18 103:1
104:4,19,20,22,
23 105:4,11,23
106:2,5,19,25
107:4 110:13,
20 117:21
118:10 122:1
130:2,8 132:14,
20 135:3,5
152:16 190:2,5

individual's
53:10 66:2,5
71:6 79:16
103:4 107:11
121:20 132:16

individuals
14:17 39:20
40:5 41:11
72:23,25 73:9
74:2,15 85:13
110:17 118:15
122:14 123:17
126:17,24
127:19 128:15
131:10,13
135:1 136:5
164:5 181:11,
16 193:6 210:6,
19

individuals'
109:13

infantry 213:7,
8,15

inform 158:22

informant
147:9,14,18,19
149:2 151:10,
16 167:25
177:12 183:16,
22

informant's
148:22,24
151:12

informants
181:17 193:7

information
21:4,13 22:1,4
23:4 104:22,24
105:11 107:8
120:14 147:5,
13 148:1,3,6,
22,24 151:6,10,
12,15 153:18
166:25 167:2,
18 175:21
176:7 182:24
183:2,7,11
184:14,16
187:10,13,19
188:20 189:1,3,
9,14,15,18,20
190:8,16
191:20 203:22

initial 163:22

initially 41:3,
21 107:6
114:17

injured 50:21
51:1,3 78:16

injuries 51:4,8,
9 74:15

inquired 69:9

inquiring 11:4
133:11

inserted
110:24 111:2,
14

inside 27:23
107:18 109:23
110:4 133:9
134:1,6,8
170:5,23

inspect 76:2
78:20 79:6,10,
16 80:7,9

inspection
71:22 72:5 74:8
75:2 110:9,10
111:4

instances
124:20 126:4,9
133:15 134:25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DEP - CAMILO A ANTONINI - taken on January 03, 2022
Case 7:18-cv-10706-AEK Document 187-8 Filed 12/24/22 Page 69 of 82
228

189:24

**instructor**
43:22

**interacting**
176:12

**interaction**
34:10

**interactions**
149:9,20,21
157:12,17
162:7,13,14
163:5

**interested**
160:4

**internal** 52:5,8,
12 152:3

**internet** 186:18

**interrogating**
136:13

**interrogation**
134:16 136:9,
10

**interrupt** 38:5
75:8 103:7
183:20 186:17
200:2

**interrupted**
122:21

**interview**
23:15 28:20,23
29:7 135:3,25
136:10,11,12
208:7

**interviewed**
23:9,23 24:7
52:11,14

**interviewing**
134:15,21
136:5

**interviews**
24:4

**investigate**
185:4

**investigated**
50:1,3,5,8

**investigating**

19:8,10,14
20:2,4,5,9,14
21:7,23 22:19
91:17

**investigation**
19:3,6 20:22
21:17,18 22:16,
20 23:10,20
49:16 52:5,8,
10,12,17,21
53:1 55:14
59:23 60:3
112:2 125:24
144:2 148:10
151:2 152:3,4
165:7 194:11,
17,25

**investigations**
58:17,19 59:18,
21,24 60:5,9,13
62:13 91:15
163:4 165:9,11

**investigators**
91:17

**invitation** 45:1

**involved** 46:19
51:24 52:3
68:18 81:9
121:25 123:12
186:13,14

**involves** 141:1
144:17 145:24

**involving** 11:4

**Iraq** 26:7,8

**issuance**
124:12

**issue** 14:14
173:7 208:1

**issued** 112:20
126:18 128:5
173:20 206:14
211:17,22

**item** 77:18

**items** 77:17,22
116:24 132:17

**IV** 196:14

———

**J**

**jackets** 117:7

**jail** 132:4

**January** 7:8
24:14,21,22
26:16 30:14
34:14 35:9 45:7
46:1 48:24
49:4,15,24,25
54:9,18 112:21
152:22

**Jersey** 26:25
27:1

**jewelry** 77:14

**job** 28:6 47:25
49:21,23

**jobs** 213:5

**join** 25:5 45:3

**joined** 60:7

**joint** 193:12,13

**Jonathan**
145:20 146:4,8,
10,11,16

**Jose** 63:9,15,
17

**Joseph** 40:8,
14 63:18,19
136:24 164:2
203:1,2

**Judge** 157:13,
17

**July** 155:21

**jump** 87:25
122:18,22
195:23 196:3

**June** 145:25
146:6,13

**juris** 88:24

**jurisdiction**
88:25

**Justice** 19:3,
14,19 20:2,3,13
21:6 22:15,18
23:10,14

**Justice's**
20:21 23:19

**justification**
65:11 67:5
69:10 151:7

**justified**
130:14

**justify** 68:1,3,
14 116:11

———

**K**

**K-O-M-A-N-J-
O** 141:10

**keeper** 117:25

**Kentuckiana**
7:5

**Kentucky** 7:7

**Kevin** 156:3

**kill** 106:9

**kind** 13:17
14:13 30:9
83:14 97:18
103:3,10 108:4,
6 109:5 147:8,9
156:19 159:23
160:24 206:3,
17

**kinds** 135:11

**King** 63:7
136:25 145:15
156:3,4 164:2
185:3

**kitchen** 182:14
202:19,20

**kneel** 72:25
73:24 74:19,25

**knees** 72:21

**knew** 21:17
22:4,16 23:6

**knife** 106:11
124:25 125:1,
18

**knives** 108:1,5,
8,9,20

**Justice's**
20:21 23:19

**justification**
65:11 67:5
69:10 151:7

**justified**
130:14

**justify** 68:1,3,
14 116:11

**knowledge**
19:6,7,13 51:22
54:2 68:15
75:11 76:5
77:11 105:3
121:13 122:9
153:19 157:15
158:1 169:21
181:17 183:14
184:15,17
185:12 201:22,
24 203:22
212:21

**Komanjo**
141:10,11
143:16 144:5
146:21 147:6,
14,22 148:9
149:17,21

**Komato**
140:12 141:5

**Krystal** 7:3
198:14 200:3
214:20

———

**L**

**laces** 78:5

**lag** 186:18

**lagged** 199:13

**lagging** 200:11

**LAPD** 25:12,14
27:21 28:9,19

**large** 104:16

**largely** 109:12

**law** 7:25 8:7
25:2,5,11 28:1,
4,16 51:20
102:1 210:25

**lawful** 115:20

**lawfully**
116:24

**lawsuit** 11:7
15:21 16:1
18:15 140:14,
16 141:18
142:4,12,23
144:10,11,17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

145:3,15,21
152:20 155:24
156:2 161:15
205:24

**lawsuits** 11:4
139:18,25
140:1,3

**lawyers** 12:6

**lead** 208:24

**leadership**
213:15

**learn** 22:6

**learned** 22:6,
10,17

**learning** 21:13
22:1,3 53:1
176:4

**leave** 33:3,10
58:15 60:12
143:11 184:11

**leaving** 18:20

**left** 26:13
169:16 178:19

**leg** 74:15

**length** 60:20

**lessee** 186:5

**letting** 186:20

**level** 44:25

**Lewis** 7:19

**license** 212:6,8

**lieutenant**
39:24 40:17
56:7,10 160:18,
20 161:4 164:3,
11

**life** 25:9 116:25

**limited** 16:1,10
138:22

**lines** 84:22

**link** 200:6

**list** 140:2

**listed** 140:3,6
164:5 203:15

**listen** 44:23
47:1 65:8
105:24 106:1,3
158:12

**listened** 22:17
23:3 161:23

**listing** 139:25

**litigation**
112:19

**living** 182:1

**located** 7:6
26:22,25 29:19
148:10 181:21
182:25 203:14

**location** 7:16
92:13 130:6,9
131:18,21,22,
23 133:16
148:9,14
149:17 151:19,
21 192:10

**locations**
130:24

**lock** 117:25

**lockers** 135:16

**lodged** 155:15

**log** 196:6
206:24

**long** 12:16,24
13:10 25:19
26:10 27:6,12,
13,14 28:2
30:20 32:17
36:5 39:23
40:19 41:5,16
43:16 45:13
49:18 53:17
54:13 56:18
57:17 58:5,10
59:24 60:15,18,
19 61:1 84:2
95:8 99:22
137:24 140:25
145:20 146:4,8,
10,11,16,19
171:10,12
192:22,25

**longer** 26:12
196:16

**looked** 15:17
44:16 113:9
128:20 139:11
163:15 203:11

**loosen** 110:14

**lot** 34:10 48:16
81:10 93:21

**Louisville** 7:7

**lunch** 136:15

---

**M**

---

**M-A-N-Z-I-O-
N-E** 40:4

**M-C-E-A-C-H-
I-N** 58:1

**M-E-C-Q** 57:25

**made** 20:12,13,
20 21:5,21
25:10 110:19
118:22 124:11
141:2 158:2,23
179:12,18,19
195:12 211:2

**Main** 7:6

**maintenance**
124:17

**major** 32:5
62:14

**majority** 93:15

**make** 9:2 20:18
42:15 44:6
73:19 75:21
78:11 89:24
102:3 118:4
147:12 166:5
168:1 174:14
190:25 207:11
208:7

**makes** 140:16
210:24

**making** 21:4
180:19 181:25

**malfunction**
86:23

**mandatory**

86:10

**Manhattan**
31:23,24 32:1,
2,3,6,18

**manner** 89:6
119:13

**manual** 114:3
128:18

**Manzione**
39:24,25 40:1,
2,3,17

**March** 26:11
138:23

**Marijuana**
109:6

**Marine** 25:17,
20,25 26:13
28:10,14,25
29:4 30:3
213:3,11,13

**marked**
112:10,23
126:19 138:25
178:7 183:22
187:25 197:17

**Marykate** 8:3,5
12:5

**Mason** 26:17,
19,20,21,23
27:4,6

**matter** 7:11,20
9:1 18:25
21:18,22 22:14
37:18 38:15
107:20 125:19
128:14

**matters** 20:21

**maximize**
114:11

**Mceachin**
57:21,23,24
58:2,5 94:6
95:11,13

**Mckeow** 95:12

**Mckitchy**
57:22

**meaning** 70:24
76:24 186:25
187:3 194:10
208:23

**means** 18:6
190:7 194:9

**mechanism**
87:13

**media** 19:24
20:15

**medical** 80:1
111:20,23

**meet** 12:9,11
17:23 155:9
164:23

**meeting** 12:16,
24 13:3,9,13
14:3,9,24 15:16
16:24,25 17:1
167:10 196:7

**meetings**
12:14 18:14

**member** 45:11
116:18 120:5
129:3 133:4,5

**members**
128:17 164:6

**memo** 206:13,
14,21,24 207:3,
9,12,20,23,24
208:3,8

**memory** 16:1,
10,11,14 38:15
93:18 99:5,8
100:4 127:22,
25 128:4 146:3
152:21,25
161:22 163:9,
12 167:12,18
168:7,10
171:17 175:24
176:11 183:6

**mentality**
34:11

**mention**
156:22 157:9

**mentioned**
27:20 28:8 85:2



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

118:6

**mentions** 106:25

**met** 8:24 155:10

**metal** 77:14

**method** 169:4

**methodical** 114:22

**methods** 119:14

**mic** 189:16

**Michael** 155:1, 2,7

**midnight** 43:6, 8,9

**Miguel** 53:13, 22

**miles** 42:19

**military** 27:8, 23 28:1

**mind** 68:6 75:17 101:5

**mine** 50:10 65:9

**mine's** 200:10

**minimize** 114:12

**minute** 63:22 112:15 138:11 166:10 172:24 202:4

**minutes** 64:5 88:5 211:7

**Misdemeanor** 104:10

**misheard** 25:24

**missed** 59:20

**mistakes** 190:19

**Mitchell** 57:13, 15,18 94:6 95:4

**modified** 49:7, 10,12,14,18,19 52:16,23 54:5, 14,22 57:1,6 95:2 157:4,17

**modify** 90:18 93:19

**moment** 198:16

**Monday** 17:5

**month** 13:7 123:7

**months** 30:21, 24,25 31:3 34:15 35:23 41:8,10,21 43:18,20,24,25 44:3 47:22 54:6,7 57:19 62:12,16 193:2 194:22 208:16

**morning** 7:3, 18,24 8:23 17:24 18:1,3

**Mount** 11:5,11, 21 19:4,15 20:4,10,14 21:1 22:22 23:24 24:10,14 25:3,7 33:1,3,9,21 34:12 35:7,8, 11,16 36:1,6 37:2,3,12,14, 19,23 38:2,9, 10,11,16,22 39:2,3,4,13,17 41:1,16,23 42:6,9,16,22,25 43:4,5,16 44:2 45:4,9,14 46:5, 10 48:9,14,23 51:13,15,24 53:7 54:3,8,17 60:24,25 61:2, 5,8 74:3 80:20 81:16 83:2,6,13 84:13 90:5,19, 24 92:14 95:22 96:19 97:6 98:15 100:6,10 112:20 140:13 143:22 144:10,

21 145:14,20 148:11 154:22 156:18 158:18, 25 184:25 188:10 210:7, 14,21

**Mountain** 40:24 98:6

**mouth** 70:13, 20 71:5,6,8,10, 14 77:8 107:19 108:11 109:17

**mouths** 109:14

**move** 34:17 60:4 199:24

**moved** 47:14

**MP** 212:7

**multiple** 50:24 91:10,13,19 99:10 122:14 124:2 147:20

**municipal** 212:8

**municipality** 61:13

**muscle** 110:14

**MV** 188:11

**MV5** 44:14

**MVPD** 186:9

──────────

**N**

**Nakia** 181:5

**name's** 8:25

**named** 8:1 11:18 18:15

**names** 11:13 209:16,21

**Nancy** 180:17

**narcotic** 45:2 48:23 112:3 134:8 209:23

**narcotics** 44:5,7,10,14 45:3,11,14

47:14,19 54:8, 17,24,25 55:2, 3,7,17,25 56:4, 8,14,25 57:10, 18 58:11,15,19 59:15 60:5,12 61:17,25 62:2, 6,17 82:17 86:25 87:1,8, 16,18,21,23 91:5,18,23,25 97:9,17,20,24 98:5 103:18,19, 23,25 104:6,7,9 109:10,13 117:24 118:16, 22 128:7 131:5 133:21 134:2,7 135:7,13,15,23 136:4,19 137:4, 20 138:2 148:11,13 153:15 156:12 163:22 164:6, 12,20 168:11 171:23 172:18 173:4,17 180:13 186:4 191:22,24 193:6 194:3 206:14,25 208:6,8 209:2, 4,9 210:7,13,16 211:3,17 212:2, 14

**narrative** 185:15

**nature** 22:25 119:19

**necessarily** 103:22 190:7

**necessity** 119:18 124:16 126:6

**needed** 92:3

**news** 19:24 20:16 21:14 22:7,10,17 23:3,5

**North** 31:25 32:2,3,18

**northern** 32:6

**nostrils** 70:14, 20

**notate** 206:23 208:10

**notation** 139:3

**note** 155:4 206:16 207:2 208:8

**notes** 206:16, 17 207:3,25 208:12,13 211:6

**notice** 44:12

**noting** 81:20

**November** 16:10,15 18:7 136:16,20 149:9,21 161:15,25 162:4,9,14,18, 21,25 163:6,10, 17 164:6 165:12,15 167:5,20 168:5 169:17,19 172:14,17 174:22 175:7 176:6,13 177:7 178:24 179:25 181:13 186:1 187:12 191:7 193:20 201:23 205:18 207:4, 13 212:24

**number** 7:13 36:24 42:23 55:4 81:4,8,15 95:8,17,20 97:10 112:18 116:15 128:18 132:23 145:13 156:22 157:10, 23 158:6,11,14 159:1 172:13, 16 175:5,6,7 188:11 209:10

**numbers** 173:25 206:18



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Numerous**
209:10,13

**NYPD** 24:18
25:3 27:9,11
28:7,13 30:22
33:3,19 34:3
35:23 36:23
37:10 41:12
61:6 96:8,12
98:14,20

**NYPD's** 31:14

**O**

**oath** 89:2,7

**object** 141:25

**objection**
18:17 19:16
23:11,16,21
51:5,11 53:2,
12,16,20 58:20
60:17 61:3
65:18 66:10
67:8 68:5 69:2
70:2,7 71:2,7
73:13 74:4
75:4,14 80:13,
25 81:18,21,24
82:9,20,23
83:10 88:19
90:6,21 91:8
92:20 93:2,14
94:12 95:25
97:19 98:2,7
101:4 103:21
104:17 105:2,7,
12,15 110:11
111:1 112:5
118:2,24 119:1
123:24 125:4,
11 126:2,8
128:1 134:18
143:2 147:23
148:2 149:6
150:16 151:9
154:11 156:15
159:7,21 160:7,
13,17 162:10,
15,22 163:1
168:2 170:19
172:15,20
174:20 181:18
187:5 189:12

195:14 204:19
209:25 210:5,
17

**objections**
8:10

**objects** 77:15
115:3 117:15

**obligation**
207:1

**observe**
111:11 131:3

**observed** 15:8
16:16 110:9
111:12,15
161:23

**observing**
7:23 100:9
123:5

**obtain** 194:13

**obtained**
107:9,14
146:18 167:2
168:11 171:7
189:2,10

**obtaining**
92:24

**occasion** 92:2
121:20 122:5

**occasions**
10:20 11:17
12:11 122:14
123:18 146:12

**occur** 51:14,17

**occurred**
16:20 122:12
143:7 167:19
208:15

**Occurrence**
180:1

**October** 26:11
191:14 192:17

**off-duty** 50:7
54:3

**offense** 68:13
103:18,19,25
104:6,7 105:6,
13

**offered** 28:19

**office** 24:2,8
36:6 69:11
87:16 118:3,9
133:22 134:2,7,
8,10 135:1,7,9,
14,20,21,22,23
136:9 148:12
160:6,8,11,14
189:5 190:2,4,9

**officer** 11:5,21
23:24 24:11,13
31:6,9 34:7,20
35:5,12,16 38:8
41:3 43:16
44:12 46:5
47:21 56:11,13,
25 57:10,18
58:11 61:2
62:2,11 63:4
70:24 74:3
75:11 76:1,14
78:8 81:16
91:6,23,24
92:24 93:12
94:1 95:23
96:15 97:5,9,
12,23,25 98:20
99:7 100:2,14
102:9 103:23
112:3 114:12,
21 115:14,20,
25 116:17
117:24 119:6,
11 128:7
132:13 133:9,
10,12 153:11,
12,19 158:19
167:1,25
168:24 169:25
173:17 175:17,
25 178:18
180:9,12,14
181:16 182:8,
10,23 183:3,4,
10,17 184:13,
22,23 185:2,11
189:4,11,25
191:18,24
192:5,10,12
193:24 194:4
202:20,21,23
204:6 205:1
206:15,25
208:6,9,24,25

209:6,9,12,22,
23 210:16,20
211:17

**officer's** 40:15
165:16 178:18

**officers** 18:15
32:13 33:9 37:8
39:22 40:9,16
42:21 55:2,25
56:5 61:11 62:6
68:17 82:17
91:12,25 94:18
98:4,5 100:9
104:23 107:1
115:23 122:2
123:5 132:16
135:15,17
136:19 144:13
145:15 153:16
156:11 163:21,
24 164:9
170:25 171:23
172:19 173:4,
19 174:25
176:8 183:13
191:23 193:5
194:14 209:2
212:2

**offices** 135:16

**official** 83:14

**officially**
214:17,21
215:2

**Oka** 104:21

**on-the-job**
100:9

**one-page**
126:16

**ongoing**
141:18 142:12
155:4 165:7

**online** 7:3

**open** 71:10,14
92:11 109:17
130:25 135:4,
18,19

**oper** 126:23

**operate** 55:7
137:4 168:19

**operated**
55:18 194:21

**operates**
91:18

**operating**
15:13 137:9,11,
20 138:3
168:15 169:8
202:7

**operation**
156:11 191:23
192:9,14,15,22,
24,25 193:1,4,
8,12,13,22,25
194:5,6,9,10,
16,25 195:2,7,
13,17 208:14,
17 209:3,6,18
210:16,24
211:3

**operational**
126:17 127:18,
24 128:14,18
132:25 174:12

**operations**
209:8,22 210:4,
22

**opportunity**
47:5

**opted** 150:13

**option** 173:21

**orally** 132:12
148:1

**order** 33:1,11
44:15 64:22
65:12 66:9
67:16,18,25
68:11 69:16
132:14 173:15
190:2,9 210:23

**original** 121:23

**other's** 173:24

**outcome** 52:7,
9,20,22 53:1

**outer** 64:17,18,
24 67:17 77:2,8
117:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

outlets 19:24
20:15

overcoats
117:7

overseas 26:4

**P**

p.m. 138:14,17
161:8,11
166:14,17
191:15 192:17
197:2,5 198:20
201:1,4 211:10,
12 215:3,4

pages 207:22

paid 33:17

pair 77:19,20
78:5

Palmer 180:15
184:19,23,25

pants 71:20
78:5

paper 26:21
208:10

paragraph
124:9 139:23
185:15

parameters
132:24

pardon 64:1

part 19:9 31:1
44:13 45:1
46:16 49:8
73:18,22 75:18
80:24 83:1
85:8,9,19 123:4
136:20,22
142:22 153:17
156:10 164:12,
13 165:15
184:13 185:7
190:17 192:13,
14,15,23
193:21 195:12
205:11 212:20

partially
110:21,24

111:6,14

participated
123:23

participating
8:2

particulars
142:18,21
146:23 147:3

pass 47:23

past 147:19

pat 64:15,17,18
65:9 67:17 77:1
115:13 131:6

pat-down
37:23 64:14,21,
25 65:2,10,12
66:15

patience 199:5

Patrick 63:7
136:24 164:2

patrol 25:12,14
27:21 28:9
29:6,7 31:6,9
32:10,11,13
35:16 41:2,20,
21,22,24,25
42:5 43:1,4,16,
18 44:3,25
47:14,19,21
61:20,21 87:11,
12 96:19,20,22,
25 97:5,9,12,
18,21,23 98:4
120:20 164:10,
14 206:22,23
208:4

patted 118:17

pattern 19:20
20:9,25 22:24
23:2

patterns 19:13
20:1 21:5 22:24

patting 64:23

pause 198:6
200:19

pausing
199:23

pay 33:7,9,13,
16,18,25 34:9
47:11,12,13,15,
16 48:19

paycheck 46:9
48:20

PCP 109:9
210:9

PD 37:2,3

Pedro 59:2,3,4,
12,14

pending 7:12
9:20 77:5 88:22

pension 61:7

pensions
61:12

people 37:7
50:24 131:11
132:6

percent 118:25

percentage
118:21

performed
95:14,22,23
111:20 114:20

period 27:10,
19 31:17,20
35:17 41:4,5,8,
9 47:22,24 95:9
147:21 208:15

Perkins 7:21

permissible
73:22 74:25
76:1

permitted
71:12 76:1,14
77:18 78:3,8,18

person 12:14
16:25 18:20
50:23,24,25
51:2,3,4 52:11
76:4 78:14
107:11 109:2
114:7,13,23
115:15,24,25
116:11,12,19
117:12 119:12,

21 120:6 129:4
131:7 149:5
158:7 184:1

person's
126:1

personal
104:8 114:20
159:1,5 172:11
173:11,24
174:3,24 175:6
211:23

personally
149:20

personnel
160:8,9,14
161:1

persons 113:6,
24 114:4
116:20 128:19
132:3

pertain 157:12

pertained
155:20

pertaining
15:3,25 90:4
144:5 157:2
166:20 187:14

pertains 142:4,
12

phone 148:4
149:1 156:23
157:8,9 158:5,
6,7,9 206:18

phones 157:7
173:11

phonetic 44:15
118:1 120:21

Phooey 198:10

photographs
14:21 170:5,7

physical 74:17
80:2 106:25
110:9

physically
66:25 68:11
69:6 72:22
74:19 78:9

87:15 91:1
92:19 173:19
194:19

pick 196:17

piece 204:15

pieces 208:10

place 50:2,4
92:14 101:25
130:11 151:20
180:4 195:4

places 47:5

Plains 8:2,7

plaintiff 7:20
166:3 171:17
172:21 183:24

plaintiff's 7:17

plaintiffs 11:14

plan 60:15,18,
19 61:2

plans 60:20

plastic 110:22,
24 111:13

plate 182:11
212:6,8

play 177:23
197:7,11
199:10 200:4
201:8,9,11
202:18

played 202:6

playing 197:20
199:25

PLAYS 199:11,
20 200:15
201:12

PO 184:19
185:3

pocket 101:25

pockets 64:18,
24 66:18 77:15
117:10

point 47:2
169:14 176:4,7
177:7 190:13
203:18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

police 11:5,11,
21 14:12,13
15:18 16:12,15
18:6 19:4,15
20:10,14 21:1
22:22 23:24
24:11,14,18,21
25:6,7 26:15
30:13,17 31:9
32:17,22,25
33:2,9,17 34:7,
13,20 35:4,12,
16,19,21 36:2,
6,7,17 37:8,9
38:8,9,10,11
41:1 42:8,10,
16,17,20 43:17,
20,22 45:4,9,
15,21,23 46:5
48:16,23 51:13
52:3 54:8,18
61:2 62:11
67:19 69:3,4
70:24 73:3
76:14 77:4
80:20 81:16
83:2,6,13,15,18
84:13 90:5,20,
24 92:14 95:23
96:3,6,15,16,19
97:6,13 98:6,14
99:7 100:2
116:6,15,16
117:5 120:23
121:3 143:22
149:3 156:18
157:5,20
158:18,25
159:18 161:19
164:9 176:15
180:14 184:22,
23 186:15,23
193:16,17
203:12 212:6,
11

policies 19:5
22:21 36:1,3,4,
7 37:20 38:2
39:1,4,17 40:25
113:5 125:23

policy 39:13
114:19 115:8
116:3 117:4
119:5,24 124:9
125:23 128:23,

24 133:18

portable 87:2

portion 37:14,
15 62:9 142:11
147:11 152:8
161:6 196:14

position 27:3
32:15

positions
28:19

possess 147:6

possessed
212:20

possession
84:21 85:15
104:8,10,11,14
147:15 148:13

possibly 13:18
18:18 25:18
57:19 82:12
103:12 149:12
213:17

post-high 30:1

post-search
170:15

practice 19:20
20:9,25 23:2
39:14 124:22
205:6

practices 19:5,
13 20:2 21:6
36:1 38:2 39:5,
17

Practicing
22:21

pre 153:4

pre-search
170:14

Precinct
31:11,13,21,22
42:5

precincts
31:14 42:4,6

prefaced
107:7

preparation
17:21 178:15

prepare 12:2,
9,12,17 14:3
16:25 18:22
113:10,13
127:14,19
144:6 202:1

prepared
189:2

preparing 13:4
113:17

presence
84:19 122:2
183:23

present 7:22
15:10,11 18:16
66:21 67:1
68:11 69:6
82:16,18 91:1
92:5,9,19 93:5,
23 94:2,9,13,19
115:24 119:6
120:7 122:8
133:4 153:4,7
164:16 166:4
169:9 170:22
171:10,14
173:19 176:18,
21,25 180:21
185:8

presented
16:3 18:4

pretty 16:13
27:9 28:5 32:4
37:20 38:3,18
45:16 78:6 93:9
102:7 130:5
132:19 190:11

previous
119:14,22

previously
11:15 94:19
112:10,12,17
126:15 127:4
138:20 158:7
178:5 188:8

primarily
114:20

prior 10:20
11:9,17 12:21,
22 15:16 17:19,
20 24:17 27:16
34:15 53:19
59:13,15 66:20
68:15 75:10
76:5 77:11
85:12 90:18
92:24 113:12,
16 127:17
139:18 147:21
149:8,21
150:18 162:8,
13,18,20,21,25
163:5,15 167:7,
10,12,13,19
187:11,17,19
201:19

priot 150:19

prisoner
116:18 124:12

privacy 120:6

private 11:7
130:25 133:5,8
134:1,4,6
135:24 136:4

privately 136:5

privilege
89:16,23 90:8

privileged
89:14

probable
67:10,11,16,22,
25 68:2,9,12
69:1 115:21
116:10 131:4
148:18 151:3,5

probationary
31:5,8,17,20
35:17 41:3,8,9,
20 47:21,24

problem 68:7
122:15 214:4

problems
142:7

procedure
112:18 114:16,
17 127:24

128:18,25
130:12 132:25
133:14

procedures
37:21 39:1
113:5 114:3
126:17 127:18
128:14 136:12

proceed 89:22
105:3

proceeded
148:6

PROCEEDING
S 7:1

proceeds
101:8

process 28:2
76:19 78:1
106:16 132:1

processed
117:23 118:13
132:15

processing
118:1 132:11

produced
112:19 138:22
197:9

professional
111:20,23

promoted
59:16

promotion
47:6,8 48:5,6
62:6

proper 115:16

properly 119:8

property 117:1

Prospect
151:22

prove 206:6

proves 206:3

provide 172:20
211:1

provided
39:21 144:1



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

151:16 167:18
183:2,7 184:15
187:13,18
189:20 190:8

**providing** 76:8
210:20

**public** 147:13

**Puff** 63:4
136:24 145:15
164:2 167:1,25
169:23 170:1
175:17,25
180:9,12 182:8,
10,23 183:3,5,
10,17 184:13
185:2,11 189:4,
11 191:7,9
193:24 203:13
204:6,7 205:1

**Puff's** 165:18
166:21 178:18
181:17 183:3

**purchased**
191:24 192:10

**Purnell** 7:4

**purpose** 33:10
64:21 110:12
113:25 193:4

**purposes** 8:8
9:24 23:19
89:15,24
142:10

**pursuant**
67:21 90:16
130:19 131:11
171:7 195:21
205:10

**push** 202:11

**put** 8:4 46:12
49:20 78:2
81:4,22 84:23
86:1,16 95:8
97:10 117:23
118:13 126:13
152:4 160:23,
25 182:8
184:10 196:5,9
200:22 206:21

**puts** 44:11

**putting** 44:21,
22 132:7
172:21

---

**Q**

**qualifying**
126:11

**quantities**
104:16

**question** 9:6,
14,20 20:7,19
21:3,25 24:6
39:16 52:18
54:12 65:1
66:12 68:12
73:19 76:8
88:22 90:13
101:10,12
107:6 117:20
120:25 122:25
125:22,23
142:2,8 150:18
151:13 152:2
176:6 181:23
183:18 184:2
186:18 207:12

**question's**
94:15

**questioning**
15:24 65:7
83:25 84:3
142:11

**questions** 9:4,
10,20 12:2
40:19 75:15,16,
21 84:7 89:25
93:21 99:22
101:9 143:12
166:20 190:23
195:20,25
197:12 201:10
211:15

**quick** 17:13
64:6 83:19
183:20 200:23

**quickly** 68:8

**quietly** 134:24

**Quinn** 7:25 8:7

---

**R**

**radio** 38:19,23
157:8 158:9
171:24 173:14
179:12,16,18

**raise** 8:12

**rank** 47:18
213:2

**rarely** 173:14

**rational** 114:8

**razor** 107:18,
19,24 108:11,
12 182:12

**reached** 47:2

**reaction**
110:14

**read** 16:15
159:25 160:22
163:14 183:3
190:14

**reading** 113:12
160:4 181:24
190:15

**ready** 61:4
196:13

**real** 17:13
45:20,22 46:13
47:7 54:10,20
60:16 183:20

**rear** 115:2

**reason** 9:3
33:8 48:12 65:7
67:20 86:20
169:1 173:24
200:12

**reasonable**
115:15 121:16

**reasonablene
ss** 120:1

**Quinoy** 63:9
164:3,4,11,16
169:23,25
175:17 176:1
180:14 185:2
205:1

**reasons** 77:22
80:2

**reassigned**
44:4,9,21 46:2
47:6 58:18
59:18 62:12

**reassignment**
47:9

**recall** 10:22
11:19,24 13:4
14:2 17:2 18:18
26:12 37:18
39:6,7 40:6
44:22 51:12
52:9 94:2 95:6
96:8 111:17
139:14 146:20,
22 148:17
149:15 150:1,2,
3,4,10 157:1
158:3 162:21
167:9 168:4,13
169:11,24
170:7,8,25
174:13 175:15,
19,20 176:4,23
183:9 186:24,
25 187:2,4,6,8,
15,16,20,21
195:15,18
202:17 204:17
209:10 212:16

**receive** 98:19
147:25 195:16

**received** 99:25
100:6 147:5,13
148:7 151:6
156:23,24
157:1,16,19
159:2 182:23
184:14 213:9,
10,12

**receiving**
100:8 128:4
175:21 176:7
183:10

**recently** 54:19

**recitation**
115:8

**reclarify**
122:23

**recognize**
127:11 178:17,
21 188:11
199:17

**recollection**
15:20,25 16:7,
19 39:13
113:19,21
141:15 143:6,8
146:1 155:22
161:18 162:1,2
170:21 171:6
180:20 182:5,
16 185:20,25
205:18 208:17

**recommendati
ons** 195:16

**record** 7:2 8:24
17:14,15 63:23
64:7,8,9,11
85:10,11,12
86:11,20 88:4,
7,8,10,11
89:13,24 115:7
133:6 138:10,
13,15,17 141:9
161:8,9,10
166:1,3,10,12,
14,15,17
170:11 172:22
175:10 187:14
197:1,3,4
198:16,17,19,
20 200:13,21,
25 201:2,3
202:11 211:10,
11,12 214:5,7,
19 215:3

**record's** 94:16

**recorded**
84:20 85:3,7,8,
9 86:4,7 96:24
170:16 204:22

**recorder** 15:14
87:2,8 202:8

**recording** 16:6
86:23 87:5,9,
13,20,22,23
133:7,10,11
161:23 168:15
170:10,13
197:9 202:11



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

records 159:1
208:5

recovered
133:14

REDACTED
147:11 152:8
161:6 196:14

redressed
78:2

refer 209:19

referring 13:22
22:11 41:11

refers 180:5

reflect 166:3

reframe 9:11

refresh 16:19
143:5,8 146:1
155:22 180:20
185:20 205:17

refreshed
16:11 93:18
185:24 208:16

refresher 36:3,
6 40:23

regard 24:9,10

regular 103:4
172:10 211:3
212:11 214:8

regularly
212:14

related 11:8,
10,21 14:13
21:23 38:3,9,11
39:2 143:17
213:15

relates 190:14

relation 135:1

relationship
50:12

release 124:12

released
148:13 149:5

reliably 174:19

relied 168:1

relying 183:17

remained
184:19

remember
11:13 14:8 16:5
27:12 28:18,22
29:8 30:11
34:15 36:8,16,
24 37:16,22,24
38:20 39:10,11,
15,19,20 40:1,
17 41:5,15
44:19,22 45:5
52:3,14,19,20,
25 53:14,21
93:22 96:14
99:4,11,12,20,
23,24,25 100:7,
8,11 112:11
127:20,21,23
128:3 136:19,
22 141:4,6,16
142:17,18,21
143:15,18
144:1 146:23,
25 147:1
151:24 152:19
153:10 155:10
156:16 160:11
162:11,12,17,
23 163:2,24
164:1 165:11
170:23 171:3,
12,16 175:3
176:7 188:21,
25 189:1,7,13
191:19 192:24
195:9 203:16
206:18 209:16,
21 210:3
211:16 212:15,
16,23 213:9

reminding
184:8

removal 117:6

remove 65:22
72:1 77:14,16,
22 116:21

removed
71:20 72:17
73:1 77:23
117:1 132:18

removing
72:11 117:13

repeat 14:6
20:6 26:18
54:12 56:16
65:1 68:23
120:25 129:19
131:19,25
151:13 177:15
183:18

repeating 68:6
181:25

rephrase
122:17

replaced 58:22

report 16:4
18:6 22:11,18
83:15,18 84:17,
24,25 85:1,2
95:24 96:4
97:13 120:23
121:3 161:19
178:10 179:2,5,
6,8,10,25
180:1,10 182:3
183:3,4 203:12,
13,16

report's 179:9

reported 54:3

reporter 7:5
8:14,19 65:24
83:23 165:23
166:7 186:16
196:5,11
198:14 200:2,6,
24 201:7 214:6,
9,12,20

Reporters 7:6

reporting 84:6
178:18

reports 13:16,
17,18,19 14:12,
13 15:18 16:12,
16,21 96:1
163:14 178:14
194:13,14

represent
7:20,25 8:25
19:18 20:7

145:18,24

representation
20:20 21:21

representing
7:5

reprimand
156:24 157:2,
11,22,25

reputation
119:21

request 9:19
44:15,18,19,21,
23 46:12 60:25
66:14 74:21
76:15 159:11
160:23,24,25

requested
76:18 109:16
111:18 159:10

requesting
214:13

required 85:6
128:24

requirement
86:2

requirements
67:3

reserve
213:22,25

residue
182:12,13

resign 32:24

resignation
32:20

resigned
32:21

resort 173:11

respect 39:5,
14,16 90:19

respond 38:23
51:13,20
132:13 190:1

responded
185:3

responding

32:5

response
136:18

responsibilitie
s 168:21,22
194:12

responsible
119:7

rest 147:12

restate 9:6

retained 23:18

retire 61:4

retired 39:23
40:7

returned 205:1

returning
176:1

review 12:1
15:4 144:4
161:3

reviewed 14:3,
9,12,16,19,24
16:12 18:2
161:19 163:15
178:14 201:19

reviewing
16:19 113:12

revised 190:18

rewards
195:16

Riddenhour
181:8,9

Robert 63:3

role 194:5

roles 213:6

rolling 85:18

romantic
50:12

room 8:3 87:18
133:5,8 134:1,
4,6,11,13,16
135:4 136:1,4,
13 157:8 158:9
165:24 179:13,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

18 182:1 196:6,
9,12

**rooms** 135:25
136:10,11

**rotated** 137:10

**roughly** 30:21
36:25 42:24

**routine** 65:10
66:16 165:2

**rules** 116:6

**run** 30:22 37:3
79:15

**Rutherford**
144:10,11,14

---

**S**

---

**safe** 132:18

**safety** 65:9,14,
15 68:17,18
69:11 114:21
116:20 124:17

**sake** 67:15

**Salazar** 63:11,
13 180:14
184:19,22,24

**San** 29:3,5

**Sanchez**
53:13,22 54:3

**sat** 10:20

**Saturday** 17:6

**scale** 182:13

**scenario** 75:10

**scenarios**
71:17

**scene** 51:13

**schedule**
138:5

**school** 29:14,
15,17,18,22
30:1

**scrapbook**
208:3

**screaming**
106:8

**screen** 9:25
197:11,16

**Sea** 58:10

**seal** 183:23
184:2,10

**seamless**
202:10

**seams** 66:16,
17

**Sean** 58:9,11
60:4 61:16,17
62:20 84:19
128:10

**search** 15:9,19
64:14,21 65:12,
17,19 66:1,4,9,
14,20,22,23
67:6,12,15,18
68:1,4,9,11,14,
18,24 69:6,16,
19,22,24 70:5,
12,19,21,25
71:6,18,23,24,
25 72:1,2,7,10,
22 73:3,10,15,
18,22 74:2,10,
24 75:18,24
76:2,10,16,19,
20,21 77:5,7,16
78:7,10 79:9,
20,23 80:14,22
81:8,11,12
83:12 84:14,18,
19,24 85:3,8,
14,20,21,25
86:3,6,8,10,11,
14,16,19,24
90:23 92:4,18,
23 93:12,13
94:2,10 96:3,8
97:14 98:10
100:15,21
101:2 102:3,24
103:4,11 104:1,
15,25 106:1,4,
14 107:10
108:19 109:3
111:19,21,23
112:4 113:6,24
114:4,8 115:16

116:4,6,12,14,
19 117:5,12,18,
24 118:8,9,12,
18,22 119:5,7,
8,10,14,25
120:1,4,13,23
121:6,15,23
123:5,12,13
124:10,15,18,
23 125:13,19
126:6,7,17,24
127:18 128:15,
19,24 129:4,14
130:5,7,9,14,20
131:8,11,12,14,
17,23 132:2,7,
17 133:3,5,10,
12,15 140:17
141:1,4,6,15
142:13,21
143:6,17
145:10,11,12,
25 149:4,8
150:14 151:8,
18,23 152:22,
25 153:6,7,19
156:14 161:24
162:5 163:4,22
165:14,22
166:22 167:2,4,
6,7,13,14
168:1,8 171:7
173:5 176:18,
21 179:14
180:6,15
182:11,17
186:8 187:13,
17 191:10
193:20 203:7,
14 204:23
205:4,7,8,9,10
207:5

**search'** 119:19

**search,'** 117:6
124:17

**searched**
118:18 168:12
170:17,18
207:8

**searchers**
69:20

**searches**
19:21 20:10,25

21:23 22:25
23:3 37:23
39:5,14,18
64:25 65:2
80:11,17,19,23
81:15 82:15
83:1,2,6 84:7
85:6 87:14
90:4,19 92:8,15
93:6,10,15,21
94:14,18,20,21
95:5,14,22
96:7,10,14,21,
22,25 97:1,5,
16,24 98:5,21
99:6 100:1,5,10
114:17 118:3
119:22 129:8
132:24 133:19,
24 134:3,14
144:18 146:19
162:24 187:19

**searching**
67:15 70:9
72:12 125:7,12,
17 133:8,12
146:4,22 177:3

**seat** 20:14

**Sebastian**
63:11,13

**Secaucus**
26:25 27:1

**seconded** 46:6
54:19

**secondment**
54:10 56:3
59:13

**seconds** 202:4

**secreted** 72:6
76:3 107:10
108:15,21
109:2,13,20
111:6

**secreting** 71:5
131:6

**section** 116:6
117:4,17 124:9
132:22 139:18
140:1 157:24
190:16

**sectors** 38:23

**secure** 73:25
77:2 120:6
194:13

**secured**
205:13

**security**
114:11 124:18

**seek** 67:6

**selling** 104:12
192:4 193:6
210:6

**send** 200:6

**sending**
200:19

**sentiment**
34:7

**separate**
123:18 135:9,
13,22 136:9
172:5

**sergeant**
56:10,15 57:13,
14,17,21 58:5,
9,10,14,22,23
59:12,16 62:3,
6,9 63:9 84:19
91:5 93:5,12,23
94:3,6,7,25
95:4,11,13
118:1 128:10
135:19 136:21
164:3,4,11,16
165:4 169:2,6,
9,23,25 170:3
171:1,21
175:16,17
176:1 178:21
180:14 184:18
185:2 186:10
202:22,23
205:1 209:5
213:4,6

**sergeant's**
135:20

**sergeants**
58:23

**serve** 26:6
45:13 214:14



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA**
COURT REPORTERS

**served** 61:6
139:19

**service** 61:7
211:2

**services** 42:1
210:19,23

**set** 132:25

**setting** 130:25

**Seventh** 89:5

**severity** 76:5
100:18,23
101:17 102:16,
22 103:10
104:3,5,18
105:5,13 118:6

**Seward** 7:11,
20 8:25 162:8,
13,21,25 163:6
165:23 166:2,4,
11 171:15,18
176:12,19,24,
25 177:4,7,11
182:20,24
184:11,14
185:16,21,25
186:9,14,22
187:11,19
188:18 190:8,
10 191:25
192:4,11 195:4,
19,24,25 196:9,
10 204:9,18
205:2

**Seward's**
14:14 16:1
161:15 177:1
187:14 191:10

**sex** 115:14,20,
24 116:18
120:5

**Shania** 181:8,
9,10

**share** 197:11
198:24

**shared** 168:21,
22

**Shawn** 60:1

**Sheila** 181:3

**shelter** 155:22

**shield** 156:22
157:10 158:6,
11,14

**shift** 43:7,9,11,
13 55:8,9,10,
18,19,22,23
137:21,24
162:3 163:6
164:19,21
212:24

**shifts** 43:1,2,4
137:18 211:18

**shirt** 78:5

**shoe** 78:5

**shoelaces**
77:18 78:4

**shoes** 77:17
78:4 117:8

**short** 41:4
63:22 95:9
136:15

**shorter** 35:17

**shortly** 136:15

**show** 112:11
152:2 159:14
165:1 170:14

**showed**
164:25

**shy** 24:24

**sic** 102:2
132:23 140:12
181:8

**side** 31:22,23

**sides** 70:16

**sign** 9:24 10:10

**signal** 174:15,
16

**signature**
178:18,19,22
188:12 190:6,
10 213:22
214:1

**signed** 157:25
180:15 188:14

195:6,11
214:15

**significance**
16:5

**single** 93:9
118:4,5 121:20
123:2,6,22,25

**sir** 8:14 65:24

**sit** 15:23 19:12
38:13 40:6 53:6
81:14 141:14
142:16 146:3
163:8 167:17,
24 175:25
176:11

**sitting** 157:5
203:3

**situation** 49:13
65:5,6 100:25
104:9 105:8,17,
20 106:17
112:1 130:3,4
131:16

**situations**
189:25

**six-month**
41:9

**six-page**
138:23

**sliding** 117:14

**small** 134:11

**sneakers** 78:4

**social** 62:20
63:4

**socially** 62:22

**socks** 77:17,20
78:5 107:20
117:8

**solely** 149:1

**solemnly** 8:14

**somebody's**
68:25 72:24
74:24 109:2
110:2,3 124:25

**someone's**
80:1 103:17,19

108:15 125:3,
24

**SOP** 127:1

**sort** 32:4 43:21
65:11 70:20
103:25 209:18

**sought** 23:14
111:19 112:3

**sound** 35:9
48:25 118:8

**sounded** 22:13

**sounds** 28:8
32:12 48:22
76:8 86:18
101:12 173:17

**source** 147:6

**South** 161:2
163:9,17,22
167:5,19
171:10,18
176:19 180:6,
16 182:25
185:17,21
187:18 191:15
193:21 199:21

**southern** 7:13
24:1,8 89:4

**space** 131:21

**speak** 68:7

**speaking** 8:10
70:15

**special** 32:9,11
84:24 115:4
194:5

**specific** 17:2
36:8 37:24
38:9,15 39:12
40:25 41:15
45:5 55:4 64:4
75:13 113:19
128:3 130:23
175:1 189:7
206:19 209:10
212:5 213:5

**specifically**
20:16 44:14
130:5 148:12
149:17 155:11

159:3 169:11
189:13 190:7

**specifics**
160:5

**speculate**
99:19

**speculating**
34:6

**spell** 40:10,12
59:5

**spent** 97:20

**spoken** 54:1

**spread** 71:21
72:4 73:10
78:19,25 79:5,
9,12

**square** 42:19

**squat** 72:25
73:24 74:16,19
75:1 77:24,25
78:23 79:3,22
80:2 110:13,17,
23 111:4

**squatted** 110:8

**squatting**
78:14,23

**squeezing**
117:14

**sta** 26:24

**standards**
124:18

**standing**
134:10 202:20,
24

**start** 35:15
77:1,13 140:7
169:18 197:13,
20 199:25

**started** 35:8
36:2 56:21
164:19

**starting** 7:16
139:22

**starts** 106:11

**state** 7:15 9:6

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

61:9,10,12
84:17 158:6
178:10

**statement**
126:10 144:1

**states** 7:12
19:3,14 25:17
125:24

**station** 86:4
87:4,5 116:5
117:22 124:6
129:8,14 130:2
131:14 133:25
143:7 159:17,
18 176:15,22
192:20

**stationed** 29:3
31:21

**stations** 42:18

**status** 26:2
142:25

**stay** 28:6,25
60:19,20 170:2

**step** 171:22

**stepped** 157:7

**steps** 151:15

**Steve** 12:5
88:3 112:10
122:20 126:14
143:11 144:25
152:1 175:9
187:23 213:23

**Steven** 7:24
75:7 138:10
214:12,23

**stop** 115:15
116:10 125:7,
12 197:12

**stopped**
150:24

**stopping**
162:18 197:25

**STOPS** 199:12,
22 200:16
201:13

**street** 7:6 31:1
36:12 49:20

65:7 91:6
117:21 130:14
131:1,3,5
191:15 194:19

**streets** 46:20,
21 92:11,12

**strength**
174:15

**stress** 34:9

**strike** 42:15
52:25 90:16
109:11 137:3
177:7 187:11

**strip** 19:20
20:10,25 21:23
22:25 23:3
39:14 65:16,19
66:1,2,4,9,14,
20,23 67:6,12,
18 68:1,3,9,11,
14,18,24 69:6,
16 71:18,23,24,
25 72:1,7,10
73:3,10,15,17,
18,22 74:2,9,24
75:18,24 76:2,
10,16,19,20,21
77:16 78:7,10
79:9,20,23
80:10,17,19,22,
23 81:11,15
82:15 83:1,2,5,
12 84:6,14
85:6,14,20
86:2,19,24
87:14 90:4,19,
23 92:4,8,15,
18,23 93:6,9,
11,15,21 94:2,
10,13,17,20,21
95:5,14,22
96:3,7,10,14,21
97:5,14,16,23
98:5,10,21 99:6
100:1,5,10,15,
20 101:2,14
102:3,24
103:11 104:1,
15,25 107:10
108:19 109:3
114:7 117:5,18,
24 118:8,18,22
119:5,7,10,18,

25 120:4,13,23
121:6,15,23
123:5,12,13
124:10,16,18
126:7 128:24
129:7,14 130:8,
14 131:8,11,14
132:2,7,23
133:2,15,19,24
134:14 140:17
141:1 142:13,
21 143:17
144:18 145:25
146:19,22
149:3 150:13
151:8,17
152:21 153:7
156:14 176:18,
21 177:3 205:9

**strip-search**
121:2

**strip-searched**
68:19 72:24
76:15 85:11,12
103:20 110:17,
20 121:20,21
122:1,8 123:17,
22,25 124:2
130:2 132:5,6,
9,12,16 133:7
146:15 150:15,
21,25

**strip-
searching**
136:5 146:4

**stripped** 65:21

**stripping** 66:2,
5

**strips** 84:18

**Stufano** 57:2,4
95:1

**stuff** 47:3 62:23
66:18 198:18
213:16

**subdivided**
42:17

**subheading**
113:25

**subject** 15:21
18:24 20:21

21:18,22 22:14
37:18 38:15
53:14 84:8
113:24 114:7
115:2 116:5
117:2 121:16,
22 123:6,12,14,
22 128:14
133:6,9,12
141:22 142:22
161:14

**subject's**
116:19 119:20
120:10 122:8
133:11

**subjects** 37:24
134:22

**submit** 44:14,
17,18 208:12

**submitting**
44:19

**subsection**
115:18,19
116:9 121:14

**subsequent**
121:15,23

**Subsequently**
156:12

**substance**
89:3

**sufficient**
68:3,13

**Suite** 7:6

**summons**
124:13

**supervise**
95:4,13

**supervising**
56:11,13,24
57:9 58:4,11
91:6,24 92:24
93:12 94:1,18
209:5

**supervision**
94:22 130:10

**supervisor**
57:2 60:2 62:18
66:21,25 68:10

69:5 90:25
91:24 92:5,9,
16,19 94:22
96:24 97:1
119:6 130:10
133:3 170:2

**supervisors**
94:5,9,13

**supplemental**
30:7

**supply** 26:21

**support** 42:1
43:21 211:2

**supposed**
129:8 164:25

**surveillance**
192:13,16
194:14,16,18

**surveilling**
194:19

**suspect** 208:7

**suspects**
119:11

**suspicion**
115:15

**sustain** 51:4

**swear** 8:13,14
30:14 191:20

**swearing**
188:21

**sweater** 77:21

**sweaters**
117:7

**switch** 63:21

**swore** 189:18

**sworn** 10:11
24:13 42:21
166:22

---

**T**

**T-R-E-M-E-L**
144:23

**T-SHIRT** 77:21



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**tabs** 208:1

**tactical** 32:9

**taking** 136:14
151:20 170:7
207:2

**talk** 30:12
61:16 80:22
83:25 88:21
138:11 173:6,
25 176:15
196:2

**talked** 136:14

**talking** 13:24
73:14 75:5,9
98:24 102:21
106:11 107:22
155:12 173:16

**tape** 170:6
203:8 205:14

**taps** 194:16

**target** 210:6,18

**task** 31:25
32:1,3,18
193:12

**tasked** 32:5

**taught** 38:22

**technical**
198:18

**technician** 7:4

**technology**
9:5 201:7

**ten** 95:18

**Ten-codes**
38:18

**terms** 66:3
104:5,6

**Terrell** 144:22

**test** 34:16 48:7,
9,12,13,14,15

**testified** 11:20
13:13 28:17
68:21 69:15
70:23 101:3
120:22 121:1
161:17 201:18

**testify** 99:12
141:19

**testifying**
11:24 94:17
97:3,4 99:11
123:16 208:14

**testimony**
8:15 79:20 86:9
88:15,18 89:1,
2,3,8 90:3,18
92:17 93:19
94:11 96:13
99:24 122:7
123:11,21
141:20 162:12
166:23 167:11
169:16,18
170:16 171:8
185:12 189:9
204:21,25

**text** 148:1
174:2,5,7,8,10

**there'd** 137:19
138:2

**thigh** 107:25
125:2,18

**thighs** 107:16

**thing** 9:9 10:12
28:22 69:5
70:17 91:14

**things** 19:19
20:8 47:4
100:22 199:16
206:18

**thinking**
105:21

**this'll** 197:13

**Thompson**
186:5

**thought** 44:17
71:4

**threat** 107:1

**threatening**
106:21

**three-page**
113:1

**throw** 207:20

**thumb** 88:2

**thumbs** 9:23
10:6,9

**tied** 107:15,16,
17

**ties** 117:7

**time** 7:8 13:6
17:16,20 19:21
20:11 21:4,12
22:1,4,23 25:9
26:24 27:13,14,
17,19 28:3,4
29:1 31:24
32:16 33:7,8,
14,16,24,25
35:20 36:4,9,
16,22 37:2,17
40:19,24 41:4,
5,8 43:23
45:20,22 46:13
47:7 49:6,25
53:23 54:10,14,
20,22 55:15,16
56:15 57:11,21
59:17 60:16,20
61:23 62:14,16
64:4 73:14 78:4
81:11,13 86:2
91:17 93:11
94:7 95:8,23
96:10,15,20
97:20 99:22
113:13 118:25
121:21 123:7
127:20 128:7,
12 130:22
132:15 137:1,
11,12,23
139:13 140:25
147:21 150:24
151:4 160:1
164:4,12,25
165:10 168:7
169:6,12,23
170:3,24 173:7,
11 179:2,5,8,
10,11,21 180:1,
13 182:21
191:18 192:12
202:12 207:24
208:15 213:21,
22 215:1

**timeframe**

38:4

**times** 10:17,23
91:9,22 93:8
95:10 97:24
99:10 124:2
146:15 147:20
179:21,22
212:10

**timestamp**
197:21 198:6
199:23,25

**timing** 12:18,
25

**titled** 140:7

**today** 7:7 9:18
12:3,12,17
15:23,24 16:25
18:9,24,25
19:12 23:7
38:14 40:6 53:6
79:20 81:14
99:12 113:10
127:15 139:14,
15 141:14
142:16 144:7
146:3 161:17
163:8 167:17,
25 168:14
169:2 175:6,25
176:11 178:15
201:20 204:21

**told** 21:16
100:22

**top** 77:8,13,20
78:6 116:9
179:24 182:13
194:17

**total** 158:17

**totally** 191:8,
13

**touch** 78:9
120:10

**touched** 79:8

**tour** 26:8,9,10

**tours** 26:4

**Town** 51:18

**trafficking**
104:7,15 131:4

**trained** 36:18
37:1,8,19,22
38:16 39:4,13
84:13,15,23
98:9,11,14
99:5,7 100:5
127:22

**training** 30:6,7
35:25 36:8,20
37:6,11 38:12
39:4,21 40:9
42:2 98:15,19
99:25 100:6,9
128:4

**trains** 206:21

**transcript** 35:1

**transfer** 32:19
34:4 46:13 54:9
87:24

**transferred**
41:18 184:25

**transferring**
37:10

**transfers**
36:23

**transition**
27:25 28:4

**transpired**
176:9 185:11

**transport**
129:13 186:22
187:8

**transported**
185:16 186:9

**transporting**
186:14

**travel** 91:10

**Tremel** 144:23,
24 145:3 152:9,
10,11,12,15,22
153:19

**trial** 11:20,25
89:1,11 141:22
143:1

**trials** 11:22

**trip** 143:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

trouble 199:16

truck 27:5,7

true 9:9 55:16
82:4 86:12
115:9 138:5
161:20

truth 8:16,17
42:24 53:17

truthfully 9:15

tucked 107:19
108:23 109:23

turn 85:17
117:25 132:3
139:17

turned 186:5

turns 85:22

Twelve 49:1

two-minute
83:20

type 87:9

typically
168:20 207:21

Tyrone 153:22,
25 154:1,3

———

U

Uh-huh 109:24
189:6

unclothed
73:23 74:24

underclothing
119:13

undercover
156:10,11
183:13 191:23,
24 192:4,6,10,
12 193:5
194:14 195:4
210:20 211:1

underneath
107:17,19

understand
9:10 70:3 75:22
103:16 104:11
122:21 125:15

137:9 180:9

understanding
20:19 22:19
64:20 65:13
66:4,8 68:24
69:18,21,23
70:4,6,11,19
71:1 89:9,12,22
129:7,11
152:15 157:21
158:12 164:15
166:21 183:6

understood
9:14 76:8 97:22
106:18 107:8
109:8 125:15
184:11 205:5
206:8

underwear
71:20 78:5

underwears
77:20

undressed
79:21

uniform 39:1
41:22 96:25

uniformed
32:15

unique 88:24

unit 32:4,9,10,
11 37:6 42:2
44:5,7,10,14
45:2,3,11,14,
20,23 46:13,16
47:7,9,14 54:8,
10,17,20,24,25
55:2,3,7,17
56:4,8,14,25
57:10 58:12,15,
17 59:15,18,19,
23 60:16 61:18
62:3,10,13,14,
17 86:25 87:1,
8,12,16,21,23
91:5,7,10,18,19
94:5 97:17
118:16,22
135:7,13 136:4,
20,22,25 137:4,
20 138:2
153:17 163:22

164:6,12,20
180:13 194:1,3
209:4 211:3
212:17

United 7:12
19:3,14 25:17

units 48:23
212:14

unlawful 19:20
20:10,25 21:23
23:2 140:17
142:13 144:18
145:11,12,25

unmarked
212:1,3,8

unreliable
212:18

upcoming
141:22

upper 31:23
125:2

upstairs 190:4

utilize 193:5

utilized 119:10
156:11

utilizing
191:23 210:19,
23

uttermost
120:6

———

V

vacation 17:7

vagina 70:21

Vaguely
152:13

Valente 63:15,
17,18,19
136:24 164:2
185:3 203:1

Valenti 203:2

validates
190:11

varied 55:11

varies 100:19,
24 104:18

vast 93:15

vehicle 211:25
212:1

vehicles
212:3,22

verbal 10:15,
16 34:24,25
35:2 136:18

verbatim
115:8

verify 151:11,
15

Vernon 11:5,
11,21 19:4,15
20:4,10,14 21:1
22:22 23:24
24:10,14 25:3,7
33:1,4,9,21
34:13 35:8,11,
16 36:2,6,7
37:2,3,12,14,
19,23 38:3,9,
10,11,16,22
39:2,3 41:1,16,
23 42:7,9,16,22
43:1,5,17 44:2
45:4,9,14 46:5,
10 48:10,14,23
51:13,15,24
53:7 54:3,8,17
60:25 61:2,5,8
74:3 80:20
81:16 83:2,6,13
84:13 90:5,20,
24 92:14 95:22
96:19 97:6
98:6,16 100:6,
10 112:20
140:13 143:22
144:10,21
145:14,20
148:11 154:22
156:18 158:18,
25 185:1
188:10 210:7,
14,21

Vernon's 39:4,
13,17 40:24

versus 104:10,

12,15 106:20
118:23 140:8
211:3

vests 117:7

video 7:4,9
9:24 14:21,22,
23,24 15:1,2,3,
4,5,6,7,9,10,13,
19 16:2,4,12,
16,21 18:9
85:25 86:8,10,
14,15,20,22
87:2,8,9
161:20,23
163:15 168:15,
20 169:2,4,8
170:6,10,11,16
197:9 198:24
199:7,11,12,20,
22 200:15,16
201:12,13,18,
22 202:3,8,10,
18 203:3,8
204:2,7,22
205:3,14,16
206:1,6,7
214:11,23

video/audio
133:6

videos 16:19

videotape
203:25 204:17
205:11 206:8

view 73:21
74:25 92:11
201:16 206:11

viewed 168:15

Vincent 39:24,
25 40:17 57:2,3
95:1

Vinny 57:2

violence
119:21

violent 102:22
119:20,21

virtually 8:6

virus 46:23

visual 71:22

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

72:5 74:8 75:2
86:13 110:10
111:10

**visually** 78:20
79:6 80:7,8

**voice** 15:11
198:1,8 199:17,
18 202:7 206:7

**Volunteers**
155:21

_____

**W**
_____

**W.B.** 26:17,19,
20,21,23 27:3,6

**waist** 74:7,23
75:1 80:3,6,8
108:25

**waist-side**
108:23

**waistband**
115:4 125:1,18

**wait** 28:21

**waiting** 27:10
28:23 165:23
188:6 196:6,9,
12

**waive** 35:22

**walked** 202:14

**wall** 182:13

**wallets** 117:8

**wanted** 27:25
46:16 88:20
173:3,18
190:25

**wanting** 90:17

**war** 28:3

**warrant** 81:12
111:19,21
112:4 130:7,19
131:12 153:6
161:24 165:14,
22 166:23
167:2,5,6,7,13,
14 168:1,8
171:8 173:5
179:14 180:15

187:13,17
188:9,22,23
189:10 191:10
192:23 203:7
204:23 205:4,8,
10 207:5

**warrants**
80:15 81:9
130:5 162:5
163:5 205:7

**Washington**
29:18,21

**watch** 132:4

**watched** 15:18

**weapon** 69:11
72:6 106:15,25
107:9 121:17,
22 125:20

**weapon-wise**
107:14

**weapons**
66:13 68:16
76:3 77:12
79:17 84:21
101:24 102:4,9,
12 106:12
107:15,16,17,
22,23,25 108:4,
7,10,14,16,18
114:24 115:3
116:21 119:11
124:17 125:25
131:7 146:18

**wearing** 78:6
168:4

**weather**
174:14

**week** 17:3,4,5,
8 97:24 98:1
137:4,6,10,19

**weeks** 36:10,
11,15 37:15

**weigh** 104:1

**weighs** 102:23
104:9

**weird** 159:22

**Wendell** 59:2,
10,11,12,15

**west** 7:6 31:22,
23

**Westchester**
33:11 35:18,22
37:9 43:19
45:21,23 46:6
51:18 54:20
56:4 59:13,21,
22 60:10
188:10 193:16,
17

**whatnot** 44:25
77:15

**when's** 127:19
139:13

**White** 8:2,7

**who've** 123:17

**wife** 157:13,18

**wigs** 117:7

**Williamson**
144:20,22,24
145:4 152:9,10,
11,12,15,22
153:5,20

**winter** 54:6,7

**wire** 194:15,17

**wires** 194:15

**witness'** 75:17

**witnesses**
134:21

**woman** 203:23

**women** 184:5
203:3,13,15,19

**words** 43:21
66:15 77:7

**work** 11:5,7,8,
10,21 18:23
23:24 24:10
26:14 32:17
43:1 56:18
57:3,17 58:5
59:11,16 61:2
62:5,20,23,25
63:6 137:24
138:1 158:18
165:1 174:11
195:17 197:14

198:24 199:3,9
200:1,20 209:8

**worked** 48:22
57:14 61:24
62:8,15,16
95:1,9 96:15
137:18 147:18
162:3 174:16,
18 198:18
208:22 211:16

**working** 26:23
45:9 60:24
61:20 128:10
137:21,22
173:10,23
174:15 192:19
200:14

**works** 198:11
199:3 200:12

**worries** 178:2

**worry** 106:10

**would've**
35:18 205:13

**write** 182:10
207:25 208:3

**writes** 182:23

**writing** 175:12

**written** 156:23
157:1,10,25
158:14 160:24,
25 183:4

**wrong** 190:20

**wrote** 13:19
30:14 184:13
185:2,11

_____

**Y**
_____

**year** 12:21
27:16 29:24
45:6,8,24,25
56:21 58:6
59:25 60:10
147:24 159:10,
11

**years** 24:25
25:21,22,23,24,
25 49:1,19,23

52:17 54:6
58:13 61:6

**yielded** 182:11

**York** 7:13 8:2,7
24:2,8,18,21
25:6 26:15 28:6
29:1,20 30:13
31:9 32:17,22,
24 33:10,17
34:19 35:4,21
51:19 61:11
96:6,16 98:20
99:7 100:2
178:10

**you-** 27:24

**younger** 34:7

_____

**Z**
_____

**zones** 32:6

**Zoom** 8:2 9:1,
4,25 10:16
139:3 166:4



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com