UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

RAYVON RUTHERFORD and
REGINALD GALLMAN,

                    Plaintiffs,                        **OPINION AND ORDER**

        -against-                       18 Civ. 10706 (AEK)

CITY OF MOUNT VERNON; P.O. ROBERT
G. PUFF, Badge No. 2154; P.O. BRIANNA
M. MECCA, Badge No. 2177; P.O. PETER
VITELLI, Shield No. 2055; DET. CAMILO R.
ANTONINI, Badge No. D111; DET. SGT.
SEAN J. FEGAN, Badge No. DS001; and P.O.
JOSEPH B. VALENTE, Shield No. 2059,

                    Defendants.
------------------------------------------------------------x

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.[1]**

       Plaintiffs Rayvon Rutherford and Reginald Gallman bring this action against the City of

Mount Vernon ("Mount Vernon"), P.O. Brianna M. Mecca, Det. Camilo R. Antonini, Det. Sgt.

Sean J. Fegan, P.O. Joseph B. Valente, P.O. Robert G. Puff, and P.O. Peter Vitelli[2] (collectively

with Mount Vernon, "Defendants"), asserting various claims pursuant to 42 U.S.C. § 1983

---

[1] On January 3, 2019, the Honorable Kenneth M. Karas endorsed and docketed a fully
executed Form AO 85, "Notice, Consent, and Reference of A Civil Action to A Magistrate
Judge," in which the parties consented to the reassignment of this matter to a United States
Magistrate Judge in accordance with 28 U.S.C. § 636(c). ECF No. 14. This matter was then
assigned to the Honorable Lisa Margaret Smith, and, on October 15, 2020, reassigned to the
undersigned.

[2] Although Defendants Puff and Vitelli are listed in the caption as police officers
("P.O.s"), the parties agree that at all relevant times, Puff and Vitelli were detectives with the
Mount Vernon Police Department. ECF No. 184 ¶¶ 6, 12. Accordingly, the Court refers to these
defendants throughout the remainder of this Opinion and Order as "Det. Puff" and "Det. Vitelli."

arising out of a March 31, 2017 search of a residential apartment that resulted in Plaintiffs' arrests.  *See generally* ECF No. 115 ("Second Amended Complaint" or "SAC").

Currently before the Court is Defendants' motion for partial summary judgment as to the following claims: (i) Mr. Rutherford's false arrest claim; (ii) Mr. Rutherford's malicious prosecution claim; (iii) Mr. Rutherford's denial of the right to fair trial claim; (iv) both Plaintiffs' failure to intervene claim; (v) both Plaintiffs' *Monell* claim[3]; and (vi) both Plaintiffs' Section 1983 supervisory liability claim.[4]  ECF Nos. 177 (Notice of Motion), 181 (Memorandum of Law or "Defs.' Mem.").  For the reasons that follow, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I.  BACKGROUND

### A.  Factual Background

The following facts are undisputed unless otherwise noted and are taken from Defendants' Rule 56.1 Statement, ECF No. 178 ("Defs.' 56.1 Statement"), Plaintiffs' Response to Defendants' Rule 56.1 Statement, ECF No. 184 ("Pls.' 56.1 Resp."), Plaintiffs' Statement of

---

[3] References to Plaintiffs' "*Monell* claim" or to "*Monell* discovery" relate to Plaintiffs' assertion that Mount Vernon should be liable to Plaintiffs in accordance with *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), because a municipal policy or custom caused Plaintiffs to be subjected to the deprivation of a constitutional right.  *See Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020) (listing the elements required to establish a *Monell* claim).

[4] In their Second Amended Complaint, Plaintiffs allege that they were subjected to excessive force and unlawful strip and/or cavity searches at the hands of certain officers of the Mount Vernon Police Department ("MVPD").  Defendants have not moved for summary judgment as to those claims, and they will proceed to trial.

Additional Material Facts, ECF No. 185[5] ("Pls.' 56.1 Statement"), and the exhibits submitted by the parties.

### 1.      The Parties

Plaintiffs Rutherford and Gallman are cousins who, at all relevant times, were residents of Mount Vernon.  Defs.' 56.1 Statement ¶¶ 1-2; Pls.' 56.1 Statement ¶ 3; ECF No. 187 ("Donnell Decl.") Ex. 1 ("Rutherford Dep.") at 18:11-20.  Mr. Gallman sometimes was known by the street name "Noble."  Defs.' 56.1 Statement ¶ 3.

The individual defendants, at all relevant times, were employed by the MVPD.  Defs.' 56.1 Statement ¶¶ 4-15.  As of March 31, 2017, Defendants Antonini, Puff, and Vitelli were detectives with the MVPD; Defendant Fegan was a detective sergeant; and Defendants Mecca and Valente were police officers.  *Id.*  Det. Sgt. Fegan, Det Antonini, Det. Puff, P.O. Valente, and P.O. Mecca were all members of the MVPD Narcotics Unit.  Pls.' 56.1 Statement ¶ 7; Donnell Decl. Ex. 11 ("Mecca Dep.") at 18:20-22; *see* Donnell Decl. Ex. 10 ("Valente Dep.") at 32:12-16 (listing certain members of the Narcotics Unit as of March 31, 2017).

---

[5] Defendants contend that "Plaintiffs' [Statement of Additional Material Facts] far exceeds the permitted bounds set forth in Local [Civil] Rule 56.1(b)," ECF No. 193 ("Defs.' Reply") at 10 n.4, though they fail to elaborate on the basis for their objection.  The Court does not agree that Plaintiffs' statement violates Local Civil Rule 56.1(b), which expressly authorizes the party opposing a motion for summary judgment to submit "additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  To the extent Defendants' concern is that Plaintiffs' Statement of Additional Material Facts is not sufficiently "short and concise," it bears noting that Defendants' required "separate, short and concise statement" pursuant to Local Civil Rule 56.1(a) consists of 126 paragraphs in 21 pages, whereas Plaintiffs' Local Civil Rule 56.1(b) statement consists of 99 paragraphs in 19 pages.  *Compare* ECF No. 178, *with* ECF No. 185.  In any event, the Court has conducted its own assiduous review of the record for purposes of deciding the instant motion.  *Cf. Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (explaining that a district court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file [a Local Civil Rule 56.1] statement" (quotation marks omitted)).

Defendant Mount Vernon is a municipal corporation organized and existing under the laws of the state of New York.  Defs.' 56.1 Statement ¶ 16.

### 2.     The March 31, 2017 Search and Related Criminal Proceedings

In March 2017, Michelle Campbell resided in Mount Vernon at 145 South 1st Avenue in apartment 5E, a small apartment that she rented.  Pls.' 56.1 Statement ¶¶ 9-10; Donnell Decl. Ex. 13 ("Campbell Dep.") at 10:1-7.  Ms. Campbell considered Mr. Gallman like a stepson or a son, and the two had known each other for many years prior to March 2017.  *Id.* ¶ 12.  Mr. Rutherford had met Ms. Campbell through Mr. Gallman and considered her to be like his aunt.  *Id.*

Prior to March 31, 2017, the MVPD received multiple complaints about illegal drug activity taking place in and around the apartment building where Ms. Campbell resided.  *See* Defs.' 56.1 Statement ¶ 17.  For that reason, the MVPD sought and received permission to access the apartment building's video surveillance system.  *Id.* ¶ 19.

On March 23, 2017, Det. Antonini signed an affidavit in support of an application for a search warrant for two apartments at 145 South 1st Avenue.  *Id.* ¶ 20.  In the affidavit, Det. Antonini described information he purportedly received from confidential informants about the sale and use of illegal narcotics in 145 South 1st Avenue, and more specifically, in and about apartments 5E and 5D on the fifth floor.  *Id.* ¶¶ 20, 22.  Det. Antonini also wrote in the affidavit that "Noble" sold crack cocaine from apartment 5E.  *Id.* ¶¶ 23-25.  Mount Vernon City Court Judge Nichelle Johnson signed a search warrant authorizing a "no-knock" search of apartment 5E.  *Id.* ¶ 26; Donnell Decl. Ex. 54.  The search warrant also authorized the MVPD to search Mr. Gallman and "any individuals on the premises at the time of the search warrant execution." Donnell Decl. Ex. 54.

On the evening of March 31, 2017 at approximately 10:30 p.m., Det. Antonini and other MVPD officers[6] executed the search warrant for apartments 5E and 5D.  Pls.' 56.1 Statement ¶ 18; Donnell Decl. Ex. 55 (surveillance video of building hallway, with time stamp).  Det. Antonini, leading the group of officers, used a ram to enter apartment 5E.  Defs.' 56.1 Statement ¶ 38; Donnell Decl. Ex. 55.  Upon entering the apartment, Det. Antonini and Det. Vitelli observed Mr. Rutherford, Mr. Gallman, and Ms. Campbell standing in the kitchen, cooking food.  Defs.' 56.1 Statement ¶ 40; Donnell Decl. Ex. 62 ("Antonini Dep. II") at 66:11-25; Donnell Decl. Ex. 12 ("Vitelli Dep.") at 52:10-15.  At the time of the search, four other adults were also in apartment 5E, spread between the living room and Ms. Campbell's bedroom.  Defs.' 56.1 Statement ¶ 47; Antonini Dep. II at 66:22-67:13 (describing locations of individuals inside the apartment).

The parties differ as to what happened when the officers entered the apartment.  Det. Antonini and Det. Vitelli assert that they saw Mr. Gallman hand Ms. Campbell a plastic bag containing a clear granular substance.  Defs.' 56.1 Statement ¶¶ 41-42.  According to Det. Vitelli, he then watched Ms. Campbell place a bag containing "70-something rocks of crack," "in her pants."  Donnell Decl. Ex. 18 ("Felony Hr'g Tr.") at 56:9-17, 57:25-58:5.  Plaintiffs and Ms. Campbell deny that any bag was passed from Mr. Gallman to Ms. Campbell when the officers entered the apartment.  Pls.' 56.1 Resp. ¶¶ 41-42; Donnell Decl. Ex. 3 ("Gallman Dep. I") at 22:16-23:6; Campbell Dep. at 15:13-16:15.  Neither Det. Puff (who entered the apartment before Det. Vitelli) nor P.O. Mecca saw any plastic bag passed.  Donnell Decl. Ex. 17 ("Puff Dep. II") at 77:19-22; Mecca Dep. at 59:8-12.  According to Plaintiffs, the officers entered the apartment

---

[6] The MVPD "crime report" lists the officers involved as Det. Antonini, Det. Sgt. Fegan, Det. Vitelli, Det. Puff, P.O. Mecca, P.O. Valente, Det. Bruce, Det. Garcia, Det. Medina, P.O. Ferreira, P.O. Howard, and P.O. King.  Donnell Decl. Ex. 57 at 0010, 0012-13.

and immediately ordered Mr. Gallman and Mr. Rutherford to get on the ground.  Pls.' 56.1

Statement ¶ 23.  Mr. Gallman and Mr. Rutherford complied with this direction, and they were

placed in handcuffs.  *Id.*

The parties also dispute whether there was a glass pipe on the floor in the kitchen when

officers entered the apartment.  Det. Vitelli testified at a felony hearing for Mr. Gallman and Ms.

Campbell that he observed a "crack pipe" on the floor of the kitchen.  Felony Hr'g Tr. at 49:13-

19.  But Mr. Rutherford testified that while he had been using a pipe to smoke crack cocaine

prior to the officers' arrival, he threw the pipe out the kitchen window when he heard police

officers entering the apartment.  Rutherford Dep. at 70:22-71:11, 73:22-74:10.  Further, P.O.

Mecca testified at the felony hearing that she observed a "crack pipe" on the floor of the

bedroom.  Felony Hr'g Tr. at 23:1-7.  Following the search, the officers catalogued the

contraband that was seized, and only one pipe is listed on the search warrant returns.  ECF No.

179 ("Loomba Decl.") Ex. P; Donnell Decl. Ex. 15 at 0004-05.

Mr. Gallman stated that after he was placed in handcuffs on the ground, Det. Antonini

brought him into the apartment bathroom and began "smacking" him, "punching" him, and

"[t]hrowing [his] face into the bathroom pipe."  Pls.' 56.1 Statement ¶ 25; Gallman Dep. I at

25:4-13, 27:7-28:9.  Mr. Gallman also testified that "[e]verybody was screaming 'stop hitting

him, stop beating him.'"  Gallman Dep. I at 28:14-24.  According to Mr. Gallman, Det. Sgt.

Fegan came into the bathroom and told Det. Antonini to "chill out," and Ms. Campbell also

attempted to intervene to stop the Det. Antonini.  *Id.* at 28:10-24.

At some point during the search, Ms. Campbell told Det. Antonini that she had narcotics

inside her vagina.  *See id.*; Defs.' 56.1 Statement ¶ 51.  According to Mr. Gallman, Ms.

Campbell told Det. Antonini about the narcotics while Det. Antonini was "beating [him] up" in

the bathroom; Mr. Gallman testified, "[t]hat's why Michelle came and gave up the drugs.  She

voluntarily gave 'em up because she feared for my life."  Gallman Dep. I at 27:11-14, 28:17-24.

Sometime thereafter, P.O. Mecca was directed to go to the apartment bathroom to

conduct a search of Ms. Campbell.  Defs.' 56.1 Statement ¶ 52.  In the bathroom, Ms. Campbell

told P.O. Mecca that she had narcotics inside her vagina.  *Id.* ¶ 54.  P.O. Mecca then assisted Ms.

Campbell in removing her pants before Ms. Campbell extracted the narcotics from inside of

her—Ms. Campbell testified that "it was like having a baby"—and handed them to P.O. Mecca.

*Id.* ¶¶ 55-56; Pls.' 56.1 Resp. ¶ 56; Campbell Dep. at 46:13-48:1.  Although MVPD policy

requires that all strip searches[7] be partially recorded on video, there is no video evidence of this

search.  Donnell Decl. Ex. 59 ("S.O.P. 16.00"); Pls.' 56.1 Statement ¶ 37; Donnell Decl. Ex. 16

("Fegan Dep. II") at 69:1-70:6.

The parties differ as to what Ms. Campbell said regarding how and when she put the

narcotics inside of her.  Det. Vitelli testified that he heard Ms. Campbell tell P.O. Mecca that

"Noble" told her to put the drugs in her vagina.  Defs.' 56.1 Statement ¶ 58; Felony Hr'g Tr. at

---

[7] The Second Circuit has defined three types of intrusive body searches, which are listed here in order of escalating invasiveness:

> (1) a "strip search" occurs when a suspect is required to remove his [or her] clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out.

*Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013); *see also Murphy v. Hughson*, --- F.4th ---, 2023 WL 6151382, at *2 n.3 (2d Cir. Sept. 21, 2023).

For purposes of this opinion and order, the Court has generally adopted the parties' characterizations of the searches that are alleged to have taken place, both on March 31, 2017 and in other instances.  The Court has not, however, decided as a matter of law that these characterizations of events at issue in this matter are necessarily consistent with the definitions set forth here.

60:18-61:21; Vitelli Dep at 67:2-20.  But Ms. Campbell testified that she had put the narcotics

inside her "that afternoon" with her boyfriend's assistance, and that during the search of her

person, she did not say anything to P.O. Mecca about Mr. Gallman.  Campbell Dep. at 16:5-15,

26:2-6.  P.O. Mecca likewise testified that Ms. Campbell did not say anything to her during the

search about where or who the narcotics had come from, and did not say anything about Mr.

Gallman.  Mecca Dep. at 67:20-68:8.  In an incident report completed by Det. Antonini

following the search, Det. Antonini wrote: "Ms. Michelle Campbell stated to the undersigned the

following, 'When you guys were coming in I was in the kitchen with 'NOBLE' (Reginald

Gallman) and 'Rayvon' (Rayvon Rutherford), 'NOBLE' gave me the bag and told me to put it in

there, (pointing towards her groin area)'."  Donnell Decl. Ex. 15 at 0003.

Mr. Gallman also was strip searched; the beginning and conclusion of Mr. Gallman's

strip search were captured on video.  *See* Donnell Decl. Ex. 19 (Gallman search video).  The

video begins with an officer saying, "[a]ll right Reginald, you know the deal.  We got a search

warrant.  Do you have any drugs or weapons on you?"  *Id.*  Mr. Gallman replies, "no."  *Id.*  At

that point, the officer who was holding the camera turns the camera away from Mr. Gallman.  *Id.*

After approximately three minutes, the officer picks the camera back up and turns it once again

to face Mr. Gallman.  *Id.*  The officer holding the camera states, "[s]earch is done.  Any

complaints or issues?"  Mr. Gallman first replies "yes," but then shakes his head and says "no."

*Id.*  Mr. Gallman testified that he was subjected to a strip search during which Det. Antonini

directed him to bend over, squat, and cough.  Defs.' 56.1 Statement ¶ 103.

Mr. Rutherford also maintains that he was strip searched, but there is no video of any such search.[8]  *See* Defs.' 56.1 Statement ¶ 106; Pls.' 56.1 Statement ¶ 89.  According to Mr. Rutherford, he was ordered by Det. Sgt. Fegan to go into the apartment bathroom to be searched. Rutherford Dep. at 124:22-125:25.  Mr. Rutherford walked into the bathroom, followed by Det. Puff, who Mr. Rutherford observed putting on gloves.  *Id.* at 126:8-15, 130:13-23.  Det. Puff then removed Mr. Rutherford's handcuffs.  *Id.* at 126:20-24.  In the bathroom, Mr. Rutherford said to Det. Puff, "I'm not stripping.  You gonna have to kill me here.  I'm not stripping."  *Id.* at 127:11-16.  At this point, Det. Puff called Det. Antonini into the bathroom.  *Id.* at 127:17-23. According to Mr. Rutherford, Det. Antonini entered the bathroom and put Mr. Rutherford in a "submission lock and grabbed [him] to the floor."  *Id.* at 128:10-15.  Mr. Rutherford then felt his "pants go down," felt one of the officers "frisk [his] testicle area," and then felt one of the officers "st[i]ck his finger inside of" his rectum at least two times.  *Id.* at 128:19-129:8, 130:24-131:8.  Mr. Rutherford then got dressed, walked out of the bathroom, and said to an officer, "I want to speak to the sergeant."  *Id.* at 133:24-134:10.  Mr. Rutherford then told Det. Sgt. Fegan, "this dude stuck his finger in my ass"; according to Mr. Rutherford, Det. Sgt. Fegan replied, "stop bitching.  It's called a cavity search."  *Id.* at 134:12-16.

A search warrant return signed by Det. Antonini states that the following items were recovered from the search of apartment 5E: (1) five plastic bags containing 96 plastic twists with crack cocaine; (2) a plastic bag containing three grams of crack cocaine; (3) a plastic bag containing loose crack cocaine; (4) one glass pipe with residue; (5) one mirror with residue; (6)

---

[8] Notably, in the video of the search of Mr. Gallman, an officer can be heard in the background stating, "alright, let's search Rayvon."  Donnell Decl. Ex. 19 at 00:39-00:55.  The same voice can later be heard saying, "[w]here's Rayvon's other shoe, right there?  Bring them with you.  Puff, get some gloves."  *Id.*  Det. Sgt. Fegan testified that it was him speaking in this part of the video.  *See* Fegan Dep. II at 106:19-107:16.

one razor blade with residue; (7) clear plastic bags and sandwich bags; (8) digital scales; (9)

cellular phones; and (10) $921 in U.S currency.  Loomba Decl. Ex. P.  According to an "incident

report" signed by Det. Antonini and Det. Sgt. Fegan, "3 clear plastic bags which contained a total

of 88 clear plastic knotted twists containing approximately 26 Grams of alleged Crack Cocaine"

were "[r]ecovered from Ms. Campbell's groin area."[9]  Donnell Decl. Ex. 15 at 0002-03.

Additionally, an unsigned "crime report" completed following the search states that the vast

majority of the items seized were recovered from either the "defendant" or a "bedroom dresser."

Loomba Decl. Ex. Q at 0013.  The only items listed as having been obtained from elsewhere are

"loose crack cocaine" from the "living room floor," "glass pipe" from "kitchen window," and

"cellular phones" from "apartment."  *Id.*  Mr. Rutherford testified that the narcotics he was using

prior to the MVPD's arrival were not lying out on a table, desk, or otherwise in open view by the

time the officers entered apartment 5E.  Rutherford Dep. at 71:19-22.

 Among the materials submitted to the Court in connection with this motion, there is no

evidence that any narcotics were recovered from any individual other than Ms. Campbell.  *See*

Donnell Decl. Ex. 15 at 0003 (noting that "[i]n addition to the items recovered from Ms.

Campbell, further evidence was also recovered from inside the bedroom, kitchen and living room

area," but not from other arrestees).  Both Ms. Campbell and Mr. Gallman testified that during

the search, Ms. Campbell told the officers that everything found in the apartment belonged to

her.  *See* Pls.' 56.1 Statement ¶ 34; Campbell Dep. at 26:15-21; Gallman Dep. I at 25:18-26:3.

Specifically, Ms. Campbell testified that she made this statement to Det. Antonini.  Campbell

---

[9] This report contains no reference to a strip or cavity search of Ms. Campbell.  Det. Antonini testified that he did not describe how the narcotics were extracted from inside of Ms. Campbell "to keep the report, more, you know, clean," and that there was no need to be specific because Ms. Campbell "cooperated at the scene saying, 'I want to give you what I have,' which is fine."  Antonini Dep. II at 88:1-89:21.

Dep. at 26:15-21.  She also testified that she made the same statement before a judge at her

arraignment.  *Id.* at 29:2-16.

Following the search, Det. Antonini signed felony complaints charging Mr. Gallman, Mr.

Rutherford and two other individuals with criminal possession of a controlled substance in the

third degree, pursuant to N.Y. Penal Law § 220.16(1).  Loomba Decl. Ex. R.  The narrative of

the felony complaint, which is identical in the filings for both Mr. Gallman and Mr. Rutherford,

states:

> On the above time and date a duly signed search warrant signed by the Honorable
> Nichelle Johnson was conducted and the following was recovered throughtout [*sic*]
> the apartment: 99 [c]lear plastic twists of crack cocaine totaling approx 30 grams,
> and $921.00 US Currency.  The above defendants were all in the residence at the
> time of the search warrant.

*Id.*  On April 3, 2017, P.O. Ferreira signed a superseding felony complaint charging Mr.

Gallman, Mr. Rutherford, Ms. Campbell, and four others with the same criminal violation.

Loomba Decl. Ex. S.  Mr. Gallman eventually pled guilty to criminal possession of a controlled

substance in the seventh degree and was sentenced to three years of probation.  Defs.' 56.1

Statement ¶ 67; *see* Pls.' 56.1 Resp. ¶ 67.  Mr. Rutherford testified that after he was arraigned, he

"had to go to court for another six months until eventually charges were dismissed."  Rutherford

Dep. at 137:6-15.

### 3.    MVPD Strip Search Policy

The MVPD adopted a strip search policy on January 4, 1993.  Defs.' 56.1 Statement ¶ 69.

The policy provides that "a person will not be subject to a full strip search unless there is a

rational basis for doing so" and unless "the arresting officer reasonably suspects that weapons,

contraband or evidence may be concealed upon the person or in their underclothing, in such a

manner that they may not be discovered by [] previous search methods."  *Id.* ¶¶ 70-71.  As set

forth in the policy, other factors that should be considered in determining whether a strip search

should be conducted include "the nature of the crime," the "arrest circumstances," the "subject's reputation," whether the arrest involved an "act of violence," and "discoveries from previous searches." *Id.* ¶ 72. According to the policy, a strip search should be conducted at a police station. Donnell Decl. Ex. 56 at 1 ("In either case, where a more extensive search is called for, the subject should be brought into the station . . . ."); *see also* Donnell Decl. Ex. 26 ("Hastings Dep.") at 75:3-76:3 (explaining that it was not permissible for MVPD officers to conduct strip searches at the premises where a search warrant was executed because "[i]t wasn't necessary" and "anything else can be recovered through the regular policies and procedures either in the interview room again, or in the holding area"). Further, pursuant to the policy, in conducting a strip search, "[i]t should not be necessary to touch the subject's body, except for the examination of the hair." Donnell Decl. Ex. 56 at 2; *see also* Hastings Dep. at 70:11-20.

The policy also specifies procedures to be followed with respect to body cavity searches, including that "[u]nder no condition shall a 'Body Cavity Search' be conducted by any Member of the Department" and that "[a]s a general rule, a warrant must be obtained before" such a search is performed. Donnell Decl. Ex. 56 at 3. The policy further provides that a body cavity search should only be performed "where the arrestee or police officer would clearly be in danger or if there was a clear indication that evidence would be destroyed," and that "[c]ompelling, exigent circumstances must be presented before the warrant requirement can be waived." *Id.* Moreover, a body cavity search "must be conducted by a medical doctor in privacy, in an examining room . . . so as to insure hygienic surroundings and minimal discomfort." *Id.*

In February 2015, the MVPD issued a supplemental strip search policy, S.O.P. 16.00, which, among other things, calls for videotaping of strip searches, regardless of location. Defs.' 56.1 Statement ¶¶ 75-77; Pls.' 56.1 Resp. ¶ 77; S.O.P. 16.00. Pursuant to the 2015 policy:

In the event that a strip search is conducted a Detective Division supervisor will be present and will direct one member to conduct the search in a private room. A second member is to video/audio record the subject being advised that he/she will be strip searched. The recording will continue from outside the private room while the searching officer and subject are inside. Upon completion of the search, the recording officer will conclude the recording by asking the subject[']s name and inquiring of the searching officer and subject if the search was completed without incident and if any contraband was recovered. This procedure will be followed in all instances in which a strip search is conducted regardless of location.

S.O.P. 16.00.

### 4. *Monell* Evidence

During discovery, Mount Vernon produced certain documents responsive to Plaintiffs' *Monell*-related discovery requests, including all civilian complaints made against MVPD officers accused of misconduct for a three-year period between 2014 and 2017.[10] *See* Pls.' 56.1 Statement ¶ 51. In addition, the discovery record includes civilian complaints made against the individual defendant officers from a broader time period. *See id.* ¶ 52. Plaintiffs also conducted depositions of the individual defendants and other Mount Vernon personnel related to the city's policies and practices surrounding strip searching, and how MVPD officers are trained.

The record includes 14 civilian complaints made by members of the public to the MVPD in which individuals alleged that they were subjected to unlawful strip searches by MVPD personnel. *See* Donnell Decl. Exs. 30-33, 35-44; Loomba Decl. Ex. LL. This includes eight complaints that were made during the 2014-2017 time period, plus additional complaints that

---

[10] Plaintiffs refer to the three-year *Monell* discovery period as the "three years prior to November 7, 2017." Pls. 56.1 Statement ¶ 51. Yet during discovery, at least one joint submission to the Court indicated that the *Monell* discovery period would be the three-year period between March 31, 2014 and March 31, 2017. *See* ECF No. 151. The exact beginning and end dates of the three-year *Monell* discovery period from 2014 through 2017 are not material for purposes of resolving Defendants' motion for summary judgment.

Plaintiffs state were produced as part of with the individual defendants' disciplinary histories.[11]
*See* Pls.' 56.1 Resp. ¶ 88.

Along with documentation of the complaints themselves, the record contains materials
from the MVPD's investigations into those complaints, including the outcomes of those
investigations.  Following an investigation, the MVPD typically determined that a complaint fell
into one of four categories: "unfounded," "exonerated," "substantiated," or "unsubstantiated."
*See, e.g.*, Donnell Decl. Ex. 31 (Civ. Complaint No. 13-12) (listing the adjudication outcomes as
follows: "unfounded – allegations never occurred"; "exonerated – allegations occurred however
there was no misconduct"; "substantiated – incident occurred as alleged"; and "unsubstantiated –
allegations can neither be proven nor disproven").  The complaints and related investigations are
summarized as follows:

- B.B. alleged that on February 22, 2007, Det. Sgt. Fegan conducted a body cavity search
  that involved "spreading [B.B.'s] buttocks, inserting his fingers in [B.B.'s] rectum, and
  then pulling the plastic bag out of [B.B.'s] rectum."  Donnell Decl. Ex. 30 (Civ.
  Complaint No. 07-33) at 1 (MV7070); *see also* Defs.' 56.1 Statement ¶ 89.  Det. Sgt.
  Fegan submitted a report which stated: "During my search of [B.B.] he removed his
  underwear and bent over, at that time I observed a clear plastic bag containing crack
  cocaine fall from between his butt cheeks and into his boxers."  Donnell Decl. Ex. 30 at
  13 (MV7082). The investigation file in the record here does not include an interview with
  the complainant.  Following an investigation conducted by the MVPD's internal affairs
  division, the MVPD concluded the complaint was unfounded.  *Id.* at 1-3 (MV7070-72).

- R.C. alleged that on August 8, 2011, an MVPD officer conducted an unlawful body
  cavity search at MVPD headquarters.  Donnell Decl. Ex. 42 (Civ. Complaint No. 11-23);
  *see also* Defs.' 56.1 Statement ¶ 90.  The MVPD has been unable to locate any records as

---

[11] Defendants' statement that "between 2008 and 2021 there were only fourteen (14)
civilian complaints . . . involving allegations of improper strip searches" is inaccurate and
misleading.  *See* Defs.' Mem. at 8; Defs.' 56.1 Statement ¶ 88.  Plaintiffs did not have access to
*all* civilian complaints from 2008 to 2021—the *Monell* discovery production was limited to
2014-2017, and other complaint information in the record from outside that three-year period
was limited to complaints made against the individual defendants in this litigation.  *See* Pls.' 56.1
Statement ¶¶ 51-52.

to whether this complaint was investigated and/or how it was resolved.  Defs.' 56.1 Statement ¶ 90; Pls.' 56.1 Resp. ¶ 90.

- C.D. and D.C. alleged that on March 14, 2013, Det. Antonini and two other officers conducted unlawful strip searches at MVPD headquarters.  Donnell Decl. Exs. 31 (Civ. Complaint No. 13-12), 32 (Civ. Complaint No. 13-16); *see also* Defs.' 56.1 Statement ¶¶ 91-92.  Both men alleged that they were directed to take off their clothes and to bend over and cough, and that during the strip searches, the detectives "physically spread [their] buttocks."  Donnell Decl. Ex. 32 at 18 (MV0340); *see also* Donnell Decl. Ex. 31 at 6-7 (MV0308-09).  Investigation records indicate that one of the complainants was interviewed, and that he reiterated that he and his friend "were picked up by the Narcotics unit, taken back to HQ and strip searched."  Donnell Decl. Ex. 32 at 10 (MV0332).  The complainant also stated that he complained "because he felt like he was violated when he was searched" and "he had never heard of a search like that being done before."  *Id.*  Documentation from the MVPD's investigation states that "[s]everal attempts to contact [the other complainant] were made" but "[a]ll were negative."  *Id.*  The complainants were both released from headquarters without any charges.  Donnell Decl. Ex. 32 at 11 (MV0333).  The MVPD closed both complaints as unsubstantiated.  Donnell Decl. Exs. 31 at 2 (MV0304), 32 at 1 (MV0323).

- M.H. alleged that on June 4, 2013, an MVPD officer conducted a body cavity search at MVPD headquarters.  Donnell Decl. Ex. 33 (Civ. Complaint No. 14-09); *see also* Defs.' 56.1 Statement ¶ 93.  According to M.H.'s allegations, a detective "put on purple latex gloves and proceeded to stick his hands up and down the crack of my buttox [*sic*]" and then "stuck his finger inside my rectum."  Donnell Decl. Ex. 33 at 24 (MV09912).  Det. Sgt. Fegan conducted an initial investigation and found that "the officers involved conducted a lawful search incident to arrest."  *Id.* at 6 (MV09894).  The investigating captain's report notes that one of the subject officers stated in an interview that "during the initial search it appeared that [M.H.] was attempting to conceal contraband in his rectum and that he felt an immediate necessity to conduct the strip search . . . ."  *Id.* at 3 (MV09891).  The officer "performed a 'swipe' of [M.H.'s] cheeks and recovered the contraband."  *Id.*  The investigating captain found that the MVPD strip search policy had not been followed because the detective failed to obtain a supervisor's approval before conducting the search.  *Id.*; *see also id.* at 4 (MV09892) ("S[g]t. Baily, who was a detective at the time[,] was unaware that supervisor notification was necessary."), 21 (MV09909) (memorandum to "all detective division personnel" reminding members that strip searches "are not to be performed without the authorization of a supervisor who is present during the process").  The captain also wrote that "[t]he fact that [M.H.] was found to be in possession of contraband during the search and that he pled guilty to the accompanying charge support the strip search . . . ."  *Id.* at 4 (MV09891).  The ultimate conclusion of the MVPD investigation was that the complaint was unfounded.  *Id.* at 1 (MV09889).

- R.S., who was in custody at the time, alleged that on September 9, 2014, an MVPD officer conducted an unlawful strip search when he "put his hands on [R.S.'s] private area and then he put his hand on [R.S.'s] buttocks and squeeze[d] them."  Donnell Decl. Ex. 43 (Civ. Complaint No. 14-33) at 10 (MV8136); *see also* Defs.' 56.1 Statement ¶ 94.

The alleged strip search took place while R.S. was in a hospital.  Donnell Decl. Ex. 43 at 11 (MV8137).  The MVPD officer denied conducting a strip search.  Donnell Decl. Ex. 43 at 29 (MV8154).  Two other officers were present on the scene; one stated that "the curtain was closed in the room and I was unable to see . . . during the search," *id.* at 1 (MV8127), and the other stated that he "stepped outside the room and didn't observe said search," *id.* at 3 (MV8129).  The investigating captain concluded "[t]here has not been any plausible explanation as to why [the officer] chose to walk to Mount Vernon ER to personally search the clothing of the prisoner, when he was being guarded by two uniformed officers," but recommended that the complaint be classified as unsubstantiated.  *Id.* at 6 (MV8132), 13 (MV8139).

- R.W. alleged that on September 9, 2014, Det. Antonini and another officer conducted an unlawful strip search.  Donnell Decl. Ex. 39 (Civ. Complaint No. 15-05); *see also* Defs.' 56.1 Statement ¶ 95.  The only document that was produced for this investigation is a memorandum from the deputy chief of police reflecting his recommendations as to the complaint.  *See* Donnell Decl. Ex. 39 at 1 (MV2549).  The deputy chief of police recommended the strip search complaint be classified as exonerated.  *Id.*

- D.S. alleged that on November 13, 2014, Det. Antonini and two other officers used excessive force and conducted an unlawful strip search.  *See* Donnell Decl. Ex. 35 (Civ. Complaint No. 14-51) at 7 (MV8804); *see also* Defs.' 56.1 Statement ¶ 96; Pls.' 56.1 Resp. ¶ 96.  Det. Sgt. Fegan completed the initial investigation into the complaint and made a finding of exonerated as to the officers.  *See* Donnell Decl. Ex. 35 at 7-9 (MV8804-06).  Documents show that an MVPD captain was directed to investigate the complaint by the Office of the Police Commissioner, *id.* at 2 (MV8799), and that captain directed an MVPD lieutenant to investigate the complaint, *id.* at 1 (MV8798).  No final disposition as to this complaint is included with the investigation documents.

- M.D. alleged that on November 14, 2014, Det. Antonini, Det. Vitelli, and three other officers conducted unlawful strip and body cavity searches at MVPD headquarters.  Donnell Decl. Ex. 38 (Civ. Complaint No. 14-46); *see also* Defs.' 56.1 Statement ¶ 97; Pls.' 56.1 Resp. ¶ 97.  M.D. alleged that Det. Antonini inserted his finger into M.D.'s rectum to retrieve contraband.  Donnell Decl. Ex. 38 at 29 (MV09626).  Det. Sgt. Fegan was present during the search, and also conducted the investigation into the other officers' alleged misconduct.  *See id.* at 5 (MV09602), 53 (MV09650).  A report signed by the deputy chief of police regarding this complaint states, "Detective Antonini reported that he did in fact slap [M.D.] one time on the buttocks in an effort to overcome his resistance to the recovery of contraband.  I therefore recommend the complaint be deemed EXONERATED."  *Id.* at 4 (MV09601).  A report from an MVPD captain states that contraband was "recovered from the complainant[']s rectal crack." *Id.* at 18 (MV09615); *see also id.* at 22 (MV09618) ("A clear plastic wrap containing 32 small plastic Ziploc bags of alleged crack cocaine was recovered by Det. Antonini from in between the complainant's buttocks inside the Narcotics Office.").  MVPD closed the complaint as exonerated as to the strip search, and unsubstantiated as to the cavity search.  *Id.* at 3-4 (MV09600-01).

- T.W. alleged that on January 20, 2015, Det. Sgt. Fegan and Det. Antonini conducted an unlawful strip and cavity search in a private residence and did not record the incident on camera.  Donnell Decl. Ex. 36 (Civ. Complaint No. 15-01).  According to T.W., Det. Antonini "put his fingers in my anal [*sic*] then he squeeze[d] my intestines w[h]ere I had a hernia . . . ."  Donnell Decl. Ex. 36 at 13 (MV7408).  Det. Sgt. Fegan submitted a report stating that another officer, not Det. Antonini, conducted the strip search of T.W. "in the hallway . . . outside of the bathroom, out of view of 3 other parties who were being held for investigation . . . ."  *Id.* at 23 (MV7418).  Det. Sgt. Fegan authorized the strip search based on "[T.W.'s] reputation and narcotic discoveries from previous searches."  *Id.* at 6 (MV7401).  Following an investigation, the complaint was deemed unfounded.  *Id.* at 3 (MV7398).

- S.W. alleged that on August 5, 2015, two MVPD officers conducted a body cavity search during an arrest.  Donnell Decl. Ex. 37 (Civ. Complaint No. 15-32); *see also* Defs.' 56.1 Statement ¶ 98.  Det. Sgt. Fegan was present for and authorized the search, and also conducted the investigation into the other officers' alleged misconduct.  *See* Donnell Decl. Ex. 37 at 9 (MV9053).  Det. Sgt. Fegan recommended that the complaint be categorized as unfounded.  *Id.*  A final disposition is not included with the investigation documents.

- D.G. alleged that on September 2, 2015, an MVPD detective conducted a strip search and touched his rectum.  Donnell Decl. Ex. 40 (Civ. Complaint No. 15-42); *see also* Defs.' 56.1 Statement ¶ 99.  The MVPD has been unable to locate any record demonstrating how this complaint was resolved.  Defs.' 56.1 Statement ¶ 99.

- K.C. alleged that on November 5, 2015, Det. Antonini and P.O. Vitelli arrested him and brought him to headquarters where he was strip searched and then released without any charges.  Donnell Decl. Ex. 41 (Civ. Complaint No. 15-41); *see also* Defs.' 56.1 Statement ¶ 100.  Det. Sgt. Fegan stated that D.G. was seized based on information from a confidential informant, who reported that "a male black wearing a Mets hat, Mets shirt and a jean jacket" and standing in a certain area "was in possession of both Crack Cocaine and Heroin and that the drugs were concealed in his groin/buttocks area."  Donnell Decl. Ex. 41 at 8 (MV09806).  The report goes on to state that K.C. was observed "standing in front of that location" and was brought back to headquarters, where Det. Sgt. Fegan authorized a strip search.  *Id.* at 8-9 (MV09806-07).  Det. Sgt. Fegan was present for the search, and also conducted the investigation into the other officers' alleged misconduct.  *Id.*  The MVPD closed the complaint as exonerated.  *Id.* at 2 (MV09800).

- Y.R. alleged that on February 15, 2018, Det. Antonini and another officer took him into custody and conducted an unlawful strip search.  Loomba Decl. Ex. LL (Civ. Complaint No. 18-06) at 10-11 (MV9197-98); *see also* Defs.' 56.1 Statement ¶ 102.  The complainant also alleged that excessive force was used against him and that he was taken into custody for no reason.  Loomba Decl. Ex. LL at 1 (MV9188).  The complaint was investigated by Det. Sgt. Fegan.  *See id.*  Det. Sgt. Fegan's report details a conversation with the complainant, but does not indicate that Det. Sgt. Fegan asked any questions about the alleged unlawful strip search.  *See id.*  Det. Sgt. Fegan concluded that "a strip search was never performed as there was no valid reason for one."  *Id.* at 2-4 (MV9189-

91).  As to any unlawful strip search, the complaint was closed as unfounded.  *Id.* at 1 (MV9188).

The parties also submitted documents related to an investigation the MVPD conducted into the searches at issue in this litigation.  On September 1, 2020, the news outlet *Gothamist* published an article discussing the strip searches that allegedly took place in apartment 5E on March 31, 2017.  *See* Donnell Decl. Ex. 34 (Civ. Complaint No. IA 20-10).[12]  After the article was published, the MVPD opened an investigation into the alleged strip searches of Mr. Gallman and Mr. Rutherford.  *See id.*  The investigation was conducted by an MVPD detective.  In his report, the detective wrote, "the search warrant revealed that the person Reginald Gallman and any individuals on the premises at the time of the search warrant execution were to be searched as well."  *Id.* at 3 (MV0797).  The investigator concluded, "[d]ue to this incident being a narcotics (no knock) search warrant and the amount of narcotics discovered at the scene of this search warrant, a visible cavity inspection is reasonable incident to arrest in this incident."  *Id.* at 4 (MV0798).  MVPD closed the investigation as exonerated, and that conclusion was approved by an MVPD deputy commissioner.  *Id.* at 4-5 (MV0798-99).

In addition to these documents, MVPD personnel testified regarding the MVPD's practices surrounding strip and cavity searches.  Det. Sgt. Fegan explained his understanding of the circumstances in which police officers have the authority to conduct a strip search, stating that such searches "have been done at homes where there is a search warrant present that gives us permission to search people that are present on the premise the search warrant[']s for."

---

[12] Although this set of documents is labeled as a "civilian complaint," Mr. Rutherford and Mr. Gallman never actually filed a civilian complaint with the MVPD.  If this incident were to be included in the tally of civilian complaints in the record, there would be 15 such complaints, rather than 14.

Donnell Decl. Ex. 7 ("Fegan Dep. I") at 52:15-20.  Det. Antonini and Det. Puff testified

similarly:

> Q:  Did you have an understanding that you needed something above and beyond
> the search warrant for the premises to give you the ability to authorize an actual
> strip search of an individual who was located on the premises?
>
> A:  No.
>
> Q:  So, did you think you could just strip search anybody who was located in the
> home or apartment that you had a . . . search warrant for?
>
> A: Yes.
>
> Q:  And what was the basis of that understanding?
>
> A: The individuals were found in a location where drugs were found throughout
> the location.

Antonini Dep. II at 146:15-147:3.

> Q:  So it was the narcotics unit practice to conduct strip serches at the location of
> the search warrants, when the search warrant was being executed?
>
> A: Correct.
>
> Q:  Okay.  And that – was that standard practice?  Like any time you had a
> warrant to search a premises and the individuals present in that premises, then you
> would conduct – typically conduct a strip search of the individual named in the
> warrant?
>
> A:  Usually, yes.

Donnell Decl. Ex. 9 ("Puff Dep. I") at 70:9-18.

In addition, none of the individual defendants' training records indicate that they were

provided any sort of training specifically related to body or cavity searches.  *See* Donnell Decl.

Exs. 46 (Antonini training records), 47 (Puff training records), 48 (Fegan training records), 49

(Valente training records), 50 (Mecca training records), 51 (Vitelli training records).  Det. Sgt.

Fegan testified that he did not recall receiving formal training as to how to conduct a strip search,

and did not recall specifically any in-house training regarding MVPD strip search policies.

Fegan Dep. I at 47:20-49:18, 55:1-6.  Likewise, Det. Antonini testified that he did not recall

being trained on the MVPD's policies with respect to conducting strip searches or body cavity

searches, and did not remember receiving any training when the supplemental policy was issued

in 2015.  Donnell Decl. Ex. 8 ("Antonini Dep. I") at 39:12-19, 128:3-6.  Det. Puff testified that

he did not receive any training at the police academy or in house at the MVPD regarding

conducting strip searches, but did receive training "in the field with a senior officer" as to how to

conduct strip searches.  Puff Dep. I at 47:25-48:19; Puff Dep. II at 23:12-24:3.  P.O. Mecca

testified that she recalled she "was told how to do" a strip search upon joining the Narcotics Unit

in 2016, but that "they couldn't teach me because they can't conduct it on a female."  Mecca

Dep. at 32:22-33:13.

### 5.    Craig Miller's Expert Report

Plaintiffs retained Craig Miller to serve as an expert witness in police practices and

procedures.  Defs.' 56.1 Statement ¶ 80.  Mr. Miller was employed by the Dallas Police

Department between 1982 and 2011 and, among other senior supervisory positions, served as the

Deputy Chief of the Crimes Against Persons Division.  Pls.' 56.1 Statement ¶ 48.  From 1997 to

2003, Mr. Miller was a sergeant in the Dallas Narcotics Unit, where he oversaw both street level

enforcement squads and mid/upper-level squads.  *Id.* ¶ 49.  Mr. Miller later served as a street

squad lieutenant, and was responsible for supervising four sergeants with detectives who focused

on small drug house locations.  *Id.*  Mr. Miller retired from law enforcement in 2019.  *Id.* ¶ 50.

Among the documents Mr. Miller reviewed in connection with forming his expert

opinions were civilian complaints regarding officers accused of misconduct, MVPD officer

disciplinary histories, MVPD policies and guidance, and transcripts of depositions taken in this

and another pending lawsuit against MVPD personnel.  Donnell Decl. Ex. 20 ("Miller Report")

at 3-4.  Following this review, Mr. Miller rendered numerous opinions as to the MVPD's

practices with respect to strip searches.  *See generally id.*

Mr. Miller opined that the MVPD had a widespread practice of conducting strip and body

cavity searches that did not comport with acceptable police practices, and that the searches of

Plaintiffs are evidence of this practice.  *Id.* at 11-15.  In support of this conclusion, Mr. Miller

cited documents and testimony evincing that it was the understanding of police officers serving

in the MVPD's Narcotics Unit that the authority granted to execute a search warrant is

coextensive with the authority to conduct strip searches.  Of the 96 investigations into officer

misconduct that Mr. Miller reviewed, approximately 14 involved allegations of improper strip

and/or body cavity searches.  *Id.* ¶¶ 45-46.  Mr. Miller also identified a category of searches

where "people were strip[] searched and then released and not charged with any crime."  *Id.* ¶ 63.

According to Mr. Miller, this sort of practice "is a confirmation [ ] that MVPD did [strip

searches] as a matter of routine business."  *Id.*  Mr. Miller also cited to several federal civil rights

cases that involve allegations of improper strip and/or body cavity searches, a letter from the

Westchester County District Attorney expressing concern about the MVPD's practices, and an

ongoing investigation by the United States Department of Justice into whether the MVPD has a

pattern and practice of using strip searches on arrestees.  *Id.* ¶¶ 47, 50.

Mr. Miller also opined that the MVPD failed to conduct complete and thorough

administrative investigations into the actions of officers accused of misconduct, and that the

MVPD's investigations departed from the accepted practices in the field of police administration.

*Id.* at 15-21.  In support of this conclusion, Mr. Miller identified the MVPD's routine practice of

assigning Det. Sgt. Fegan to investigate complaints of strip searches that he had authorized as the

direct supervisor of the MVPD Narcotics Unit.  *Id.* ¶¶ 53-59.  Further, Mr. Miller noted that in

his review of the cases investigated by Det. Sgt. Fegan and the MVPD, "none of the strip searches have ever come back with a finding of substantiated departmental violation." *Id.* ¶ 59. In other instances, Mr. Miller identified that no disciplinary action was taken by the MVPD even in cases involving "obvious violation[s]" of acceptable police practices. *Id.* Mr. Miller cited complaints of unlawful strip searches in which there are no records of any investigation into the allegations, *see id.* ¶ 62 (citing Civ. Complaint No. 15-42), and where the MVPD did not appear to have taken any steps to contact the complainant and/or civilian witnesses, *id.* ¶ 60 (citing Civ. Complaint Nos. 14-09). According to Mr. Miller, "[f]ailure to investigate allegations at all is a clear departure from the accepted practices of police administration. Not only does it permit possible misconduct to go unchecked, but it also conveys to the community that complaints are not taken seriously by the MVPD." *Id.* ¶ 62.

Finally, Mr. Miller concluded that the MVPD failed to train and supervise department personnel in a manner consistent with acceptable police practices. *Id.* at 21-25. Mr. Miller opined that after the MVPD updated its strip search policy in 2015 to require video recording of strip searches, the policy was not followed. *Id.* ¶ 67. Mr. Miller also stated that he failed to find any evidence that any member of the MVPD ever attended any trainings dealing specifically with strip or body cavity searches. *Id.* ¶¶ 70-72. With respect to supervision, Mr. Miller cited to evidence that the command staff of the MVPD was aware of numerous, similar complaints made against members of the Narcotics Unit related to strip searches, but that the complaints were insufficiently investigated—if they were investigated at all—and that even where violations of policy were "obvious," the MVPD did not appear to discipline the offending officers, or to change its practices in any meaningful way. *Id.* ¶¶ 73-76; *see also id.* ¶ 59.

**B.     Procedural History**

Plaintiffs, who originally were proceeding *pro se*, initiated this action on November 13, 2018, ECF No. 3, and filed an amended complaint on February 8, 2019, ECF No. 21.  Now represented by counsel, Plaintiffs, through counsel, filed the operative Second Amended Complaint on March 30, 2021.   ECF No. 115.

On October 11, 2022, following the completion of discovery, the parties entered into a stipulation dismissing certain claims and parties from the action.  ECF No. 174.  Specifically, (1) Plaintiffs' claims against six individual defendants were dismissed; (2) Mr. Gallman withdrew his claims against the remaining defendants for false arrest, malicious prosecution, and denial of the right to fair trial; and (3) Plaintiffs withdrew any claims challenging the validity of the warrant that authorized the March 31, 2017 search, or the warrant-based entry and search of the premises, but Plaintiffs expressly maintained their claims that they were subjected to unlawful strip and/or body cavity searches.  *Id.*  Pursuant to the stipulation, Defendants agreed not to move for summary judgment with respect to: (1) Plaintiffs' claims that they were subjected to unlawful strip and/or body cavity searches, or (2) Plaintiffs' excessive force claims.  *Id.*

Defendants moved for summary judgment on October 14, 2022.  ECF Nos. 177-81. Plaintiffs filed their opposition to Defendants' motion on December 23, 2022, ECF Nos. 184-89, and Defendants submitted their reply on January 20, 2023, ECF No. 193 ("Defs.' Reply").

**II.     SUMMARY JUDGMENT LEGAL STANDARD**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 320-23 (1986).  A dispute about a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine
issue of material fact exists, a court is required to "constru[e] the evidence in the light most
favorable to the nonmoving party and draw[] all reasonable inferences in its favor."  *Mount
Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002); *Farias v. Instructional
Sys., Inc.*, 259 F.3d 91, 97 (2d Cir. 2001); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764
(2d Cir. 1998); *see also Anderson*, 477 U.S. at 261 n.2.  A party cannot overcome summary
judgment by relying on "mere speculation or conjecture as to the true nature of the facts"
because "conclusory allegations or denials" cannot "create" genuine disputes of material fact
"where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)
(quotation marks omitted).  Moreover, "[c]redibility determinations, the weighing of the
evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of
a judge[.]"  *Anderson*, 477 U.S. at 255; *accord Williams v. N.Y.C. Housing Auth.*, 61 F.4th 55, 76
(2d Cir. 2023).  "Only when no reasonable trier of fact could find in favor of the nonmoving
party should summary judgment be granted."  *Cruden v. Bank of N.Y.*, 957 F.2d 961, 975 (2d
Cir. 1992) (citing *H.L. Hayden Co. v. Siemens Med. Sys. Inc.*, 879 F.2d 1005, 1011 (2d Cir.
1989)).

## III.      DISCUSSION

The Second Amended Complaint contains eight causes of action brought under 42 U.S.C.
§ 1983.  *See* SAC ¶¶ 139-86.  Defendants have moved for summary judgment as to six of the
eight counts.  The Court considers each of Defendants' arguments in turn.

## A.      False Arrest (Count III)

Defendants seek dismissal of Mr. Rutherford's false arrest claim on the ground that there

was probable cause to arrest him.  *See* Defs.' Mem. at 10-12.  A § 1983 claim for false arrest is

"substantially the same as a claim for false arrest under New York law."  *Gonzalez v. City of*

*Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013).  "To state a claim for false arrest under New

York law, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the

plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement,

and (4) the confinement was not otherwise privileged."  *Savino v. City of New York*, 331 F.3d 63,

75 (2d Cir. 2003) (quotation marks omitted).  "[T]he existence of probable cause is an absolute

defense to a false arrest claim."  *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006).  "[S]ummary

judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate

that the arresting officer's probable cause determination was objectively reasonable.  If,

however, on the undisputed facts the officer would be unreasonable in concluding probable cause

existed, or if the officer's reasonableness depends on material issues of fact, then summary

judgment is inappropriate . . . ."  *Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007)

(citation omitted).

### 1.      Probable Cause—Legal Standard

"An officer has probable cause to arrest when he or she has 'knowledge or reasonably

trustworthy information of facts and circumstances that are sufficient to warrant a person of

reasonable caution in the belief that the person to be arrested has committed or is committing a

crime.'"  *Abreu v. Romero*, 466 F. App'x 24, 26 (2d Cir. 2012) (summary order) (quoting *Jaegly*,

439 F.3d at 152).  To assess whether an officer had probable cause for an arrest, courts "examine

the events leading up to the arrest and then decide whether these historical facts, viewed from the

standpoint of an objectively reasonable police officer, amount to probable cause."  *District of*

*Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quotation marks omitted).  This analysis focuses

on "the reasonable conclusion to be drawn from the facts known to the arresting officer at the

time of the arrest."  *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (quoting *Devenpeck*

*v. Alford*, 543 U.S. 146, 152 (2004)); *Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022)

("To determine the existence of probable cause, a court considers the totality of the

circumstances based on a full sense of the evidence that led the officer to believe that there was

probable cause to make an arrest." (cleaned up)).  Whether or not probable cause to arrest exists

"may be determinable as a matter of law if there is no dispute as to the pertinent events and the

knowledge of the officers."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

### 2.    Application

Defendants argue that Mr. Rutherford maintained "constructive possession" of the

narcotics found in Ms. Campbell's apartment, and therefore that there was probable cause to

arrest him.  Under certain circumstances, a person may be said to be in constructive possession

of contraband where there is evidence that he or she "'has the power and intention to exercise

dominion and control' over the contraband."  *United States v. Willis*, 14 F.4th 170, 181 (2d Cir.

2021) (quoting *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998)); *see also Pettiford v.*

*City of Yonkers*, No. 14-cv-6271 (JCM), 2022 WL 4538423, at *10 (S.D.N.Y. Sept. 28, 2022)

(applying same standard under New York law); *Turyants v. City of New York*, No. 18-cv-841

(PKC) (PK), 2020 WL 804900, at *4 (E.D.N.Y. Feb. 18, 2020) (same).  "Mere presence [at the

location of the contraband] is insufficient," but "'presence under a particular set of circumstances

from which a reasonable jury could conclude that the defendant constructively possessed

contraband' is sufficient to establish constructive possession."  *Willis*, 14 F.4th at 181 (quoting

*United States v. Facen*, 812 F.3d 280, 287 (2d Cir. 2016)).  "For example, documents pertaining

to a defendant found in the same location as narcotics, possession of a key to the location where

26

drugs are found, or whether the drugs are in plain view, are factors relevant to constructive possession."[13] *Id.* (citing *Facen*, 812 F.3d at 287).

There is no dispute that Mr. Rutherford did not reside in apartment 5E at 145 South 1st Avenue, nor do Defendants suggest that they believed Mr. Rutherford resided there. *See, e.g.*, Donnell Decl. Ex. 57 (listing Mr. Rutherford's address as "145 South 4th Avenue Apt 12"); Donnell Decl. Ex. 61 (listing Mr. Rutherford's address as "145 South 4th Avenue Apt [] 2B"); *cf. Roberts v. City of New York*, No. 16-cv-5409 (BMC), 2017 WL 4357291, at *5-6 (E.D.N.Y. Sept. 29, 2017) (finding probable cause to arrest where officers reasonably believed that arrestee resided in the apartment where narcotics were found); *Jenkins v. City of New York*, No. 10-cv-4535 (AJN), 2013 WL 870258, at *8 (S.D.N.Y. Mar. 6, 2013) (finding officers had probable cause to arrest tenant of apartment where narcotics were found given that she resided in the apartment).  There also is no evidence to suggest that any documents pertaining to Mr. Rutherford were found in the apartment, or that Mr. Rutherford possessed a key to the apartment. Additionally, there is no evidence that any narcotics were found on Mr. Rutherford himself, and although Mr. Rutherford testified that he was smoking crack cocaine before the police arrived, Rutherford Dep. at 70:22-71:11, he further testified that the narcotics he smoked prior to the officers' arrival were not out and visible in the apartment, Pls.' 56.1 Statement ¶ 17, and there is

---

[13] Plaintiffs are incorrect that the Court must assess whether probable cause existed to arrest Mr. Rutherford at the precise moment he was handcuffed very shortly after the individual defendants entered the apartment, without considering anything observed by the individual defendants during the course of the judicially-authorized search of the premises. *See* ECF No. 189 ("Pls.' Opp.") at 3.  "An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Muehler v. Mena*, 544 U.S. 93, 98 (2005).  Thus, "[p]olice executing a search warrant are privileged to detain individuals, even to the point of handcuffing them, while the search is carried out." *Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 403 (S.D.N.Y. 2009).

no evidence that any of the arresting officers witnessed Mr. Rutherford, or any other occupant of the apartment, using narcotics.

Accordingly, Defendants focus on what they claim to have witnessed and the evidence that they contend was in plain view during the course of the search, but nearly all of this evidence is disputed.  The parties disagree as to (1) whether any of the individual defendants witnessed Mr. Gallman pass Ms. Campbell a plastic bag of crack cocaine upon entering the apartment; (2) whether there was a glass pipe in the kitchen when officers entered the apartment; and (3) the extent to which the narcotics and paraphernalia that were found in Ms. Campbell's bedroom were even visible to visitors to the apartment such as Mr. Rutherford.  *See* Pls.' 56.1 Resp. ¶¶ 41-42, 45-46, 63-64.[14]

First, there is a dispute regarding whether Mr. Gallman passed Ms. Campbell a bag of narcotics after the officers entered the apartment—as Det. Antonini and Det. Vitelli testified— and whether Det. Vitelli observed Ms. Campbell place a bag containing "70-something rocks of

---

[14] The only item of contraband that reportedly was found in the apartment outside of Ms. Campbell's person or Ms. Campbell's bedroom is "loose crack cocaine," which, according to one document, was found on the living room floor.  *See* Loomba Exs. P, Q.  The only evidence regarding this "loose crack cocaine" is the search warrant return, which includes "Plastic bag containing Loose Crack Cocaine" without listing where that bag was located in the apartment, *see* Loomba Ex. P, and the MVPD "crime report," which lists "loose crack cocaine" as having been obtained from the living room floor, but makes no reference to it being found in a plastic bag, *see* Loomba Ex. Q.  Defendants have not pointed to any testimony or other sworn statement by anyone present for the search on March 31, 2017 regarding precisely how or where the "loose crack cocaine" was found, or how much "loose crack cocaine" was retrieved.  The only potentially relevant testimony regarding "loose crack cocaine" on the Plaintiffs side is Mr. Rutherford's testimony that the crack cocaine that he was using prior to the arrival of the officers was not "out in the open" on a table, or a desk, or "something like that."  Rutherford Dep. at 71:12-22.  At this stage of the litigation, viewing the evidence in the light most favorable to Mr. Rutherford, the references in the search warrant return and the "crime report" to "loose crack cocaine" are not sufficient to establish the circumstances surrounding any "loose crack cocaine" that may have been located in the apartment, or that Mr. Rutherford was in close proximity to any loose crack cocaine.

crack," "in her pants."  *See* Defs.' 56.1 Statement ¶ 41; Felony Hr'g Tr. at 56:9-17, 57:25-58:5.

Contrary to Defendants' testimony, Mr. Gallman and Ms. Campbell deny that any bag was

passed from Mr. Gallman to Ms. Campbell at all.  Pls.' 56.1 Resp. ¶¶ 41-42; Gallman Dep. I at

22:16-23:6; Campbell Dep. at 15:13-16:15.  Ms. Campbell further testified that she, with the

assistance of her boyfriend, had placed the narcotics in her vagina earlier that afternoon, and not

during the frantic seconds after the officers entered her apartment.  *See* Campbell Dep. at 16:5-

15.  Second, the parties dispute whether there was a glass pipe on the floor in the kitchen when

the officers entered the apartment.  Det. Vitelli testified that he observed a pipe on the floor of

the kitchen, Felony Hr'g Tr. at 49:13-19, but Mr. Rutherford testified that while he was using a

pipe to smoke crack cocaine prior to the officers' arrival, he threw the pipe out the kitchen

window when he heard the police entering the apartment, Rutherford Dep. at 70:22-71:11, 73:22-

74:6.  There is further evidence that only one pipe was recovered from the apartment, and P.O.

Mecca testified that she observed a "crack pipe" on the floor of the bedroom, raising further

questions about whether any pipe was found in the kitchen area.  Loomba Decl. Ex. P; Felony

Hr'g at 23:1-7.  Third, documents completed by MVPD officers following the search reveal that

of the "approx[imately] 30 grams" of crack cocaine recovered during the search, the vast

majority of the narcotics—"approximately 26 [g]rams"—were found on Ms. Campbell's person

in her "groin area."  Donnell Decl. Ex. 15 at 0003; Loomba Decl. Ex. R.  The remaining

contraband was largely recovered from Ms. Campbell's bedroom dresser.  Loomba Decl. Ex. Q

at 0011, 0013.  There is no indication that Mr. Rutherford was ever able to see into Ms.

Campbell's bedroom from the kitchen area, or that the officers had any reason to believe Mr.

Rutherford had knowledge of any narcotics or drug paraphernalia located in Ms. Campbell's

bedroom or inside of her body.  Therefore, there is no basis to conclude that Mr. Rutherford was

in constructive possession of any of those items. *See Haskins v. City of New York*, No. 15-cv-2016 (MKB), 2017 WL 3669612, at *9-11 (E.D.N.Y. Aug. 24, 2017) (holding that disputed issues of fact as to whether narcotics were in plain view precluded finding of probable cause for constructive possession arrest at summary judgment stage); *cf. United States v. Heath*, 455 F.3d 52, 57 (2d Cir. 2006) (probable cause existed where narcotics were in plain view in a location where plaintiff "could see them, and in fact would be expected to see them, in the regular course of walking through the small home's public spaces").

Viewing the evidence in the light most favorable to Mr. Rutherford, and considering the totality of the circumstances, the Court cannot conclude as a matter of law that the individual defendants had probable cause to arrest Mr. Rutherford for constructive possession of crack cocaine. *See Minter v. County of Westchester*, No. 08-cv-7726 (WHP), 2011 WL 856269, *8-9 (S.D.N.Y. Jan. 20, 2011) (declining to find probable cause to arrest existed where plaintiff was not a resident of the home that was searched, and evidence of possession of crack cocaine was "(1) the bag of drugs in the kitchen closet [which were thrown there by a different individual], (2) additional drugs and paraphernalia in the house, and (3) a single drug purchase allegedly made while [plaintiff] was in the house" (citing *Heath*, 455 F.3d at 56)).

In their motion, Defendants invoke the so-called "drug factory" presumption pursuant to New York law. *See* Defs.' Reply at 4 (citing *Miranda v. Lacy*, No. 96-cv-1730 (JFK), 1997 WL 695574 (S.D.N.Y. Nov. 6, 1997)). New York Penal Law 220.25(2) provides that:

> The presence of a narcotic drug . . . in open view in a room, other than a public place, under circumstances evincing an intent to unlawfully mix, compound, package or otherwise prepare for sale such controlled substance is presumptive evidence of knowing possession thereof by each and every person in close proximity to such controlled substance at the time such controlled substance was found[.]

Even assuming that this presumption is available to Defendants in this context, *see Minter*, 2011 WL 856269, at *8 (discussing N.Y. Penal Law 220.25(2) and noting that "state statutes do not preempt federal [Fourth Amendment] law"), Defendants have not definitively established that it applies to the facts of this case.  At the time of the search on March 31, 2017, Mr. Rutherford was located in the kitchen, where he, Ms. Campbell, and Mr. Gallman were making dinner. The record indicates that the vast majority of the narcotics were recovered from Ms. Campbell's person, and that certain paraphernalia was found in Ms. Campbell's bedroom.  *See* Donnell Decl. Ex. 15 at 0003; Loomba Decl. Ex. R; Loomba Decl. Ex. Q at 0011, 0013.  Defendants have not demonstrated that the contraband was out in Ms. Campbell's apartment in plain view such that the officers could have fairly inferred that Mr. Rutherford—a visitor in the apartment—had any intent to use any of the narcotics or to unlawfully prepare narcotics for distribution.  In other words, viewing the evidence in the light most favorable to Mr. Rutherford, the circumstances in which Defendants found him do not indisputably demonstrate that any narcotics were in "open view" to Mr. Rutherford, or that Mr. Rutherford was in "close proximity" to any controlled substance found during the search.  Accordingly, the "drug factory" presumption is not a sufficient basis for Mr. Rutherford's arrest.  *See Minter*, 2011 WL 856269, at *8-9.

### 3. Qualified Immunity

Defendants maintain that in any case, the individual defendants are entitled to qualified immunity as to Mr. Rutherford's false arrest claim because "there was arguable probable cause to believe that placing Rutherford under arrest would not violate his constitutional rights." Defs.' Mem. at 12.

"Under federal law, a police officer is entitled to qualified immunity where '(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe

that his actions were lawful at the time of the challenged act.'" *Jenkins*, 478 F.3d at 87 (quoting *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001)).  An officer's decision to arrest is objectively reasonable "if there was 'arguable' probable cause at the time of arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Lennon v. Miller*, 66 F.3d 416, 423-24 (2d Cir. 1995)).  "'Arguable' probable cause should not be misunderstood to mean 'almost' probable cause . . . .  If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Id.*

As already discussed, there are disputed facts that might, or might not, support a finding of probable cause to arrest Mr. Rutherford; while it is possible that a jury's findings of fact as to these disputed issues may compel a conclusion that the individual defendants had probable cause—or at least arguable probable cause—to arrest Mr. Rutherford, the Court cannot make such determinations at this stage.  These material factual disputes are essential to the qualified immunity analysis here because, contrary to Defendants' contention, the law was clearly established at the time of the search on March 31, 2017 that constructive possession of contraband could not be established by an individual's mere presence at the location where contraband was found.  *See* Defs.' Reply at 4-6; *see, e.g.*, *United States v. Barner*, 561 F. App'x 33, 37 (2d Cir. 2014) (summary order) ("a defendant's mere presence at the location of contraband cannot establish unlawful possession" (cleaned up)); *United States v. Rodriguez*, 392 F.3d 539, 548 (2d Cir. 2004) ("Mere proximity or presence is [ ] insufficient to support a finding of constructive possession." (citing *United States v. Gordils*, 982 F.2d 64, 71 (2d Cir. 1992))).  Because there are questions that cannot be resolved by the Court as a matter of law, Defendants

are not entitled to qualified immunity on this claim at this time.  *See Chase v. Penney*, No. 20-3234-cv, 2021 WL 4519707, at *2-3 (2d Cir. Oct. 4, 2021) (summary order).

* * * * * * * * * *

For all of these reasons, Defendants' motion for summary judgment as to Mr. Rutherford's false arrest claim is DENIED.

## B.     Malicious Prosecution (Count IV)

In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff "'must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law.'"  *Cornelio v. Connecticut*, 32 F.4th 160, 178 (2d Cir. 2022) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010)).  Specifically, under New York law and federal law, "'a plaintiff must show: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice.'"  *Franco v. Gunsales*, Nos. 22-71, 22-339, 2023 WL 3590102, at *4 (2d Cir. May 23, 2023) (summary order) (quoting *Kee v. City of New York*, 12 F.4th 150, 161-62 (2d Cir. 2021)).  Additionally, "[f]or a malicious prosecution claim under Section 1983, a plaintiff also must demonstrate a 'sufficient post-arraignment liberty restraint.'"  *Kee*, 12 F.4th at 162 (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).

### 1.     Commencement of Criminal Proceedings

To satisfy the first element of a malicious prosecution claim against a police officer, the "plaintiff must show that the officer brought formal charges and had the person arraigned, or filled out complaining and corroborating affidavits or swore to and signed a felony complaint. Alternatively, an officer initiates a prosecution by creating material, false information and

forwarding that information to a prosecutor or by withholding material information from a prosecutor." *Israel v. City of New York*, No. 16-cv-6809 (PGG), 2018 WL 11219076, at *6 (S.D.N.Y. Sept. 29, 2018) (cleaned up); *see also Torres v. Jones*, 26 N.Y.3d 742, 760-61, 767-68 (2016) (explaining that under New York law, "a defendant other than a public prosecutor may be liable [for malicious prosecution] for supplying false information to the prosecutor in substantial furtherance of a criminal action against the plaintiff").

Plaintiffs assert that Mr. Rutherford "is only proceeding against [Det.] Antonini for his malicious prosecution claim and does not oppose summary judgment on this claim as to Defendants Puff, Vitelli, Mecca, and Fegan."[15]  Pls.' Opp. at 10 n.2.[16]  Yet in the following pages of their brief, Plaintiffs go on to argue that "there is evidence that Defendants Puff, Vitelli, Mecca, and Fegan withheld relevant and material information, subjecting them to liability for Plaintiff Rutherford's malicious prosecution claim." *Id.* at 11-12.

There is no dispute that a prosecution was initiated against Mr. Rutherford, and that it was Det. Antonini alone who signed the original felony complaint charging Mr. Rutherford with criminal possession of a controlled substance in the third degree.  *See* Loomba Decl. Ex. R.

Defendants argue that Mr. Rutherford's claim cannot proceed against Det. Antonini because "the independent decision of the prosecutor to charge and prosecute [Mr. Rutherford] breaks the chain of causation."  Defs.' Mem. at 14-15.  This argument, however, is inapposite here, because Det. Antonini prepared the original accusatory instrument used in the prosecution

---

[15] Plaintiffs presumably also intended to include P.O. Valente in this list of individual defendants.

[16] Defendants, understandably, relied on Plaintiffs' statement that Mr. Rutherford was only proceeding against Det. Antonini as to the malicious prosecution claim, and did not offer any further arguments on behalf of the other individual defendants in their reply brief.  Defs.' Reply at 6-8 & n.2.

of Mr. Rutherford, and there is no evidence that a prosecutor independently made the decision to charge Mr. Rutherford.  In other words, the prosecution began with Det. Antonini's preparation of the complaint, and not based on a prosecutorial decision informed by investigative materials presented to a prosecutor by police officers.  Under New York law, where there is no pre-arrest indictment, a criminal action is commenced by the filing of an accusatory instrument, which is "a felony complaint for a felony charge, or a misdemeanor complaint or an information for a misdemeanor charge." *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) (cleaned up).  "Absent a subsequent indictment, the officers who sign a complaint and corroborating affidavit can be found to have initiated a prosecution—and therefore satisfied one of the elements of a malicious prosecution claim—as a matter of law." *Jenkins*, 2013 WL 870258, at *12.  In such cases, "[t]he prosecutor's actions do not supersede the complaining officer's actions; they only determine whether the officer's actions come to fruition—that is, whether the officer committed the tort of malicious prosecution, or merely *attempted* to prosecute maliciously." *Cameron*, 598 F.3d at 65 (emphasis in original).  There is nothing in the record indicating that Mr. Rutherford was indicted before or after his arrest, and the fact that the parties submitted a felony hearing transcript related to charges brought against Ms. Campbell and Mr. Gallman, but not Mr. Rutherford, further confirms that he was not.  Thus, the Court has no basis to find that a prosecutor's actions in this case "br[oke] the chain of causation" at any point in time.  *See* Defs.' Mem. at 14.  Accordingly, Det. Antonini's preparation of the criminal complaint against Mr. Rutherford is sufficient establish the first element of the malicious prosecution claim against him.  *See Delanuez v. City of Yonkers*, No. 20-cv-4476 (PED), 2022 WL 16540682, at *7 (S.D.N.Y. Oct. 28, 2022) (holding that first element of malicious prosecution claim was satisfied when the defendant police officer swore to and signed the felony

complaint); *Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 406, 414 (S.D.N.Y. 2018) (finding that reasonable jury could conclude that officer who signed criminal complaint initiated proceedings against plaintiff).

The same cannot be said for the defendants who did not prepare the criminal complaint, as there is no evidence that any of them, for example, "processed [Mr. Rutherford's] arrest paperwork," *see Rodriguez*, 291 F. Supp. 3d at 414, "discussed [Mr. Rutherford's] prosecution with the [District Attorney's] Office," *Costello v. Milano*, 20 F. Supp. 3d 406, 419 (S.D.N.Y. 2014), "provided [] paperwork to the [District Attorney's] office," *Jenkins*, 2013 WL 870258, at *12, "create[ed] false information" that they then "reported . . . to the complaining officer," *Roman v. City of Mount Vernon*, No. 21-cv-2214 (KMK), 2022 WL 2819459, at *11 (S.D.N.Y. July 19, 2022), or otherwise involved themselves in Mr. Rutherford's prosecution.

Plaintiffs suggest that the record supports the conclusion that Defendants Puff, Vitelli, Mecca, and Fegan "heard [Ms. Campbell's] statement that the drugs in the apartment belonged to her but did not disclose it."  Pls.' Opp. at 11.  But importantly, Ms. Campbell testified that she made this statement to Det. Antonini.  *See* Pls.' 56.1 Statement ¶ 34; Campbell Dep. at 26:15-21. Thus, even assuming this statement were relevant,[17] there is no evidentiary support for the

---

[17] Plaintiffs also argue that there was no probable cause to arrest or prosecute Mr. Rutherford because Ms. Campbell claimed ownership of the narcotics while the search was ongoing.  Pls.' Opp. at 11.  But as discussed in Section III.C, *infra*, that statement was later made in open court at Ms. Campbell's arraignment and thus was not "withheld" from the District Attorney's office.  And in any event, this argument is unpersuasive because "multiple individuals may have constructive possession of contraband," *Turyants*, 2020 WL 804900, at *5, and this statement does not impact the other (disputed) facts that may have led the officers to believe that Mr. Rutherford was in constructive possession of narcotics, *see Waddlington v. City of New York*, 971 F. Supp. 2d 286, 294 (E.D.N.Y. 2013) ("Even assuming that [another individual] informed [the searching officer] that the illegal items belonged to him . . . such facts in no way impact whether [the p]laintiff was in close proximity to [the contraband] at the time [the contraband] was found.").

proposition that the other defendant officers heard Ms. Campbell make the statement and failed

to disclose it to Det. Antonini.  Accordingly, to the extent he was intending to pursue his

malicious prosecution claim against Defendants Puff, Vitelli, Mecca, Valente, and Fegan despite

the statement to the contrary in Plaintiffs' opposition brief, Mr. Rutherford's cause of action for

malicious prosecution is dismissed as to these defendants, because Mr. Rutherford has not

offered sufficient evidence to demonstrate that a reasonable jury could conclude that any of these

defendants commenced the criminal proceedings against him.

### 2.  Favorable Termination

There no dispute that the proceedings against Mr. Rutherford terminated in his favor.

"To demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth

Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his

prosecution ended without a conviction." *Thompson v. Clark*, 142 S. Ct. 1332, 1335 (2022).

Several months after Mr. Rutherford was first arrested, all criminal charges against him were

dismissed.  *See* Rutherford Dep. at 137:6-15.  This is sufficient to establish that the proceedings

ended in Mr. Rutherford's favor, *see Walker v. Carrozzo*, No. 21-cv-2975 (KMK), --- F. Supp.

3d ---, 2023 WL 2664610, at *13 (S.D.N.Y. Mar. 28, 2023), and there is no basis for summary

judgment on this element of the malicious prosecution claim.

### 3.  Lack of Probable Cause

Defendants argue that Mr. Rutherford's malicious prosecution claim fails because Det.

Antonini had probable cause to believe Mr. Rutherford was in constructive possession of

narcotics at the time of the arrest.  Defs.' Mem. at 15.

"Probable cause is a 'complete defense' to malicious prosecution." *Jeanty v. Cerminaro*,

No. 21-1974-cv, 2023 WL 325012, at *5 (2d Cir. Jan. 20, 2023) (summary order) (quoting

*Savino*, 331 F.3d at 72); *see also Buari v. City of New York*, 530 F. Supp. 3d 356, 384 (S.D.N.Y.

2021) ("[n]o claim for malicious prosecution can survive if there was probable cause for the prosecution").  "The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases," *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013)—for a malicious prosecution claim, "probable cause" means "probable cause to believe that [the prosecution] could succeed," or, alternatively, "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty," *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).

For the reasons discussed above, *see* Section III.A.2, *supra*, there are material facts in dispute that prevent the Court from making a finding as to whether there was probable cause to arrest Mr. Rutherford, let alone to pursue a prosecution.  *See Diop v. City of New York*, 50 F. Supp. 3d 411, 421 (S.D.N.Y. 2014) (denying summary judgment on malicious prosecution claim because "the same facts that undermine the existence of probable cause to arrest in this case also undermine the existence of probable cause to prosecute").  Accordingly, the Court is unable to conclude as a matter of law that there was probable cause to prosecute Mr. Rutherford for criminal possession of a controlled substance.

### 4. Malice

"'Lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment.'"  *Walker*, 2023 WL 2664610, at *15 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997)); *see also Boyd*, 336 F.3d at 78 ("A lack of probable cause generally creates an inference of malice.").  Here, because there is "an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well." *Boyd*, 336 F.3d at 78.

### 5.   Restraint of Mr. Rutherford's Liberty

With respect to the "liberty restraint" element, the Second Circuit has "consistently held that a post-arraignment defendant who is obligated to appear in court in connection with criminal charges whenever his attendance is required suffers a Fourth Amendment deprivation of liberty." *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013) (cleaned up); *accord Franco*, 2023 WL 3590102, at *4. Though neither Plaintiffs nor Defendants address this element, it is clear from the record that Mr. Rutherford was required to attend various court conferences in connection with the criminal charges that were lodged against him following the March 31, 2017 search. *See* Rutherford Dep. at 137:6-15. Accordingly, there is no basis for summary judgment on this element of the malicious prosecution claim.

### 6.   Qualified Immunity

Defendants briefly argue that Det. Antonini is entitled to qualified immunity as to Mr. Rutherford's malicious prosecution claim based on the lack of any clearly established law "putting him on fair notice that it would be manifestly unreasonable to charge Rutherford with possession of illegal narcotics" and because "reasonable officers could certainly disagree on that point." *See* Defs.' Reply at 8. But because there is a material dispute of fact as to whether there was probable cause to arrest Mr. Rutherford based on possession of narcotics, there is likewise a material dispute of fact as to whether it was reasonable to bring related criminal charges against him. *See Walker*, 2023 WL 2664610, at *18 ("Because the Court cannot determine whether there was arguable probable cause to arrest Plaintiff, it also cannot determine whether there was arguable probable cause to believe Plaintiff could be successfully prosecuted for the obstructing governmental administration offense or a controlled substance offense based on the heroin discovered after handcuffing."). As discussed above, a reasonable jury could conclude that the only evidence connecting Mr. Rutherford with any contraband on March 31, 2017 was his

presence in the apartment, and the law was clearly established at that time that mere presence is insufficient to establish constructive possession of narcotics. *See* Section III.A.3, *supra*. Again, because there are questions that cannot be resolved by the Court as a matter of law, Det. Antonini is not entitled to qualified immunity on this claim at this time.

* * * * * * * * * *

For all of these reasons, Defendants' motion for summary judgment as to Mr. Rutherford's malicious prosecution claim is GRANTED as to Det. Puff, Det. Vitelli, P.O. Mecca, P.O. Valente, and Det. Sgt. Fegan, and DENIED as to Det. Antonini.

### C.      Denial of the Right to a Fair Trial (Count V)

For a plaintiff to succeed on a claim that he or she was denied the right to a fair trial, he or she must show that an "(1) investigating official (2) fabricate[d] evidence (3) that is likely to influence a jury's decision, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of liberty as a result." *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order). "A plaintiff need not have proceeded to trial to have an actionable § 1983 claim based on the denial of the right to a fair trial, but rather need only show that the allegedly false information is material, such that it would 'likely influence a jury's decision[.]'" *Fowler-Washington v. City of New York*, No. 19-cv-6590 (KAM) (RER), 2023 WL 2390538, at *5 (E.D.N.Y. Mar. 7, 2023) (quoting *Ricciuti*, 124 F.3d at 130); *see also Rodriguez*, 291 F. Supp. 3d at 415 ("It is of no matter that a plaintiff's case is never put before a grand or trial jury—this claim may be sustained where charges are dismissed before trial.").

As an initial matter, in his opposition, Mr. Rutherford only offers arguments as to why this claim should be allowed to proceed against Det. Antonini. Pls.' Opp. at 12-13. Accordingly, the Court deems Mr. Rutherford to have abandoned this claim as to the remaining

individual defendants.  *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the

case of a counseled party, a court may, when appropriate, infer from a party's partial opposition

[to summary judgment] that relevant claims or defenses that are not defended have been

abandoned.").

Mr. Rutherford maintains that his denial of a fair trial claim should proceed because

"there is specific evidence that Defendant[] Antonini withheld the exculpatory evidence that

Michelle Campbell told him that all the drugs found in the apartment belonged to her."  Pls.'

Opp. at 12.  This is the full and complete extent of Mr. Rutherford's response to Defendants'

motion as to this cause of action.  That statement alone, however, is insufficient to defeat

summary judgment in light of the facts and circumstances of this case.  A claim for denial of a

fair trial "may [ ] arise where the police or prosecutors withhold material exculpatory or

impeaching evidence from a defendant.  [This] theory of liability is essentially a civil claim

seeking damages for a *Brady* violation."  *Fappiano v. City of New York*, 640 F. App'x 115, 118

(2d Cir. 2016) (summary order).  When plaintiffs make such claims, they must prove three

elements:  "'The evidence at issue must be favorable to the accused, either because it is

exculpatory, or because it is impeaching; that evidence must have been suppressed by the State,

either willfully or inadvertently; and prejudice must have ensued.'"  *Id.* (quoting *United States v.

Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)).  "To establish prejudice, a plaintiff must show the

evidence was material; *i.e.*, whether the 'evidentiary suppression undermines confidence in the

outcome of the trial.'"  *Id.* (quoting *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001)).

Here, Plaintiffs cannot demonstrate that Det. Antonini withheld exculpatory evidence or

that Mr. Rutherford experienced any prejudice as a result of Det. Antonini's non-disclosure of

Ms. Campbell's statement claiming ownership of the narcotics found in apartment 5E.  The fact

that Ms. Campbell took responsibility for the narcotics is not exculpatory—it does not mean that

Mr. Rutherford could not have been in constructive possession of the narcotics. *Turyants*, 2020

WL 804900, at *5 ("constructive possession is not a single-possessor theory, and multiple

individuals may have constructive possession of contraband"); *Waddlington*, 971 F. Supp. 2d at

294. Moreover, at the arraignment the morning after Mr. Rutherford's arrest, Ms. Campbell

stated—before the court and a representative from the District Attorney's office—that all of the

narcotics in the apartment belonged to her. Campbell Dep. at 29:2-16. Ms. Campbell's assertion

of ownership was therefore well known to prosecutors within hours of the arrest, and thus the

alleged withholding of this information at the time Det. Antonini prepared the complaint against

Mr. Rutherford cannot be said to have been material. *See Bleiwas v. City of New York*, No. 15-

cv-10046 (ER), 2019 WL 4747984, at *11 (S.D.N.Y. Sept. 30, 2019) (granting summary

judgment as to fair trial claim where the plaintiff was arrested in April, the allegedly withheld

evidence was presented by plaintiff to a court in June, and the criminal case against the plaintiff

was dismissed in September, and noting that the plaintiff "has not produced any facts that would

suggest the result would have been any different if [the defendant officer] had forwarded [the

allegedly suppressed evidence] to [prosecutors] earlier").

Defendants' motion for summary judgment is therefore GRANTED as to Mr.

Rutherford's claim for denial of the right to a fair trial.

### D.     Failure to Intervene (Count VI)

Defendants seek summary judgment as to Plaintiffs' claim that Det. Valente and P.O.

Mecca failed to intervene to prevent other officers from committing constitutional violations

during the search of apartment 5E. Defs.' Mem. at 16-18. Defendants also move for summary

judgment as to Det. Antonini and Det. Puff "to the extent [Plaintiffs are] alleging they failed to intervene to prevent their own allegedly unlawful conduct."[18]  *Id.* at 17 n.4.

"Law enforcement officers have an affirmative duty to intervene to prevent their fellow officers from infringing on a citizen's constitutional rights."  *Rodriguez*, 291 F. Supp. 3d at 417. "An officer can be held liable under § 1983 for 'the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that: (1) excessive force is being used, (2) a citizen has been unjustifiably arrested, or (3) any constitutional violation has been committed by a law enforcement official.'"  *Kayo v. Mertz*, 531 F. Supp. 3d 774, 799 (S.D.N.Y. 2021) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  "'[F]or liability to attach' for failure to intervene, 'there must have been a realistic opportunity to intervene to prevent the harm from occurring.'"  *Id.* (quoting *Anderson*, 17 F.3d at 557).

### 1.    Det. Valente

Defendants first assert that Det. Valente cannot be held liable for failure to intervene because he was never present in apartment 5E.  Defs.' Mem. at 17.  The Court agrees.  There is no evidence in the record to indicate that Det. Valente was present in apartment 5E at any point on March 31, 2017.  Indeed, to the contrary, Det. Valente testified that he was stationed outside the building during the initial part of the search, and that when he entered the building later, he only entered apartment 5D, not 5E.  Valente Dep. at 31:23-32:2 ("So I was standing outside in the rain, making sure nobody threw anything out the window."), 34:6-35:2 ("I wasn't in the main one.  I was in the – I believe – I believe the door was straight ahead to the end of the hallway and obviously the apartment that was to the left of it.").

---

[18] Defendants have not sought summary judgment on this claim as to Det. Sgt. Fegan or Det. Vitelli.  *See* Defs.' Mem. at 16-18.

Plaintiffs maintain that none of the officers could definitively account for the identities of all of the officers who entered apartment 5E, or the order in which the officers entered that apartment. Pls.' Opp. at 9. But even if this contention is accurate, it does not contradict Det. Valente's testimony that he never entered apartment 5E, and none of the witnesses specifically recalled Det. Valente having been present in the apartment. Plaintiffs also argue that because the surveillance video of the building hallway, *see* Donnell Decl. Ex. 55, does not show any officers in the hallway where apartments 5E and 5D were located after the entry by the original group, Det. Valente must have gone in with the original group, rather than entering apartment 5D at a later time. Pls.' Opp. at 9. This brief video, however, is not sufficient to create a material issue of fact as to the question of whether Det. Valente entered apartment 5E. The video is only 42 seconds long it begins with the officers preparing the enter apartment 5E, and ends with two officers entering apartment 5D. *See* Donnell Decl. Ex. 55. There is no dispute that the search of apartments 5E and 5D lasted far longer than 42 seconds, and the video therefore does not provide any definitive proof as to the movements of officers outside of that limited time period. Plaintiffs further assert that Det. Valente could not have been outside the apartment because another officer, Det. Garcia, was stationed outside of apartment 5E. Pls.' Opp. at 9 (citing Fegan Dep. II at 91:2-13). Again, this testimony does not give rise to a material factual dispute—Det. Valente testified that he was stationed outside *the building*, not outside the *apartment*, Valente Dep. at 31:23-32:2, which is not inconsistent with Det. Sgt. Fegan's testimony that Det. Garcia was positioned outside *the apartment*, Fegan Dep. II at 91:2-13. Ultimately, Plaintiffs' arguments amount to "mere speculation or conjecture as to the true nature of the facts," which, standing alone, cannot "create" genuine disputes of material fact "where none would otherwise exist." *Hicks*, 593 F.3d at 166.

Accordingly, Det. Valente cannot be liable for failure to intervene to prevent any constitutional violations that allegedly took place inside apartment 5E, because there is no evidence from which a reasonable jury could conclude that Det. Valente had an opportunity to intercede to prevent the harm from occurring.

### 2.    P.O. Mecca

Defendants also argue that the failure to intervene claim should be dismissed as to P.O. Mecca because "she went straight into the living room and then into the bedroom [in apartment 5E]" and thus had no "opportunity to prevent any alleged improper search or excessive use of force against [P]laintiffs."  Defs.' Mem. at 18.  There is no dispute that P.O. Mecca was inside apartment 5E for the entirety of the search.  *See id.* at 17-18; Mecca Dep. at 58:22-69:22; Felony Hr'g Tr. at 6:5-20:7, 24:5-18.  "Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'"  *Terebesi v. Torreso*, 764 F.3d 217, 243-44 (2d Cir. 2014) (quoting *Anderson*, 17 F.3d 557).  Given the small size of apartment 5E, Mr. Gallman's testimony that "[e]verybody was screaming 'stop hitting him, stop beating him'" while Det. Antonini was with Mr. Gallman in the bathroom, Gallman Dep. I at 28:14-24, and the undisputed evidence that P.O. Mecca was present in apartment 5E throughout the execution of the search warrant, a reasonable jury could conclude that she had an opportunity to intervene in the alleged violations.  Accordingly, summary judgment is not warranted as Plaintiffs' failure to intervene claim against P.O. Mecca.

### 3.    Det. Antonini and Det. Puff

Defendants contend that Plaintiffs' failure to intervene claims against Det. Antonini and Det. Puff should be dismissed "to the extent [Plaintiffs are] alleging they failed to intervene to

prevent their own allegedly unlawful conduct." Defs.' Mem. at 17 n.4. This is not correct. "Although [Defendants] cannot be held directly liable for [particular constitutional] violations *and* for failure to intervene and stop those alleged violations, [Plaintiffs] may proceed with these claims in the alternative" at this stage of the litigation. *Marshall v. Port Auth. of N.Y. & N.J.*, No. 19-cv-2168 (WHP), 2020 WL 5633155, at *8 (S.D.N.Y. Sept. 21, 2020) (emphasis added) (collecting cases); *accord Buchy v. City of White Plains*, No. 14-cv-1806 (VB), 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015).

* * * * * * * * * *

Accordingly, Defendants' motion for summary judgment as to Plaintiffs' failure to intervene claim is GRANTED as to Det. Valente, and DENIED as to P.O. Mecca, Det. Antonini, and Det. Puff.

### E.    *Monell* Claim Against Mount Vernon (Count VII)

Defendants also move for summary judgment as to Plaintiffs' *Monell* claim against Mount Vernon. Defs.' Mem. at 18-23. Plaintiffs have alleged two theories of *Monell* liability: (1) that the MVPD had a widespread practice of conducting illegal strip searches; and (2) that the MVPD failed to train, investigate, and supervise its employees. *See* SAC ¶¶ 174-83.

#### 1.    Legal Standard

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. Thus, "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*,

542 F.3d 31, 36 (2d Cir. 2008); *accord Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 636 (S.D.N.Y. 2015).

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003) (summary order). A plaintiff may satisfy the "policy or custom" requirement by proving one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Buari*, 530 F. Supp. 3d at 397-98 (collecting cases). In addition, to prevail on a *Monell* claim, a plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("Governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

Defendants' motion for summary judgment as to this claim focuses exclusively on whether there is sufficient evidence for a reasonable jury to find that Mount Vernon's allegedly problematic practices with respect to strip and/or cavity searches amounted to an "official policy" of the city.

### 2. Evidence from Plaintiffs' Expert in Support of the *Monell* Claim

In their opposition to Defendants' motion for summary judgment on the *Monell* claim, Plaintiffs rely in part on the findings and opinions of Mr. Miller, who is proffered as an expert in

police practices and procedures.  *See* Pls.' Opp. at 14-19; *see also* Miller Report.  Defendants argue—for the first time in their reply—that Mr. Miller's opinions should be disregarded because (1) he "opines on an ultimate issue to be decided by the jury," and (2) his opinions are "conclusory."  Defs.' Reply at 11-13.

As to Defendants' first argument, as long as an expert does not "tell the jury what result to reach" and thereby "substitute [his or her] judgment for the jury's," *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994), the expert's "opinion is not inadmissible 'just because it embraces an ultimate issue' to be decided by the trier of fact," *City of Almaty, Kazakhstan v. Ablyazov*, No. 15-cv-5345 (AJN), 2021 WL 5154110, at *6 (S.D.N.Y. Nov. 5, 2021) (quoting Fed. R. Evid. 704(a)).  Defendants point to four excerpts from Mr. Miller's report and deposition testimony in support of the argument that Mr. Miller's opinions consist of improper legal conclusions.  Defs.' Reply at 12.  The language in these statements, however, does not track the elements of Plaintiffs' claim for *Monell* liability; "it is therefore not a 'legal conclusion' and does not 'communicat[e] a legal standard—explicit or implicit—to the jury.'"  *Ablyazov*, 2021 WL 5154110, at *6 (quoting *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992)).  Mr. Miller's opinions support Plaintiffs' position that there was a widespread practice of conducting strip searches in Mount Vernon, but the assertions highlighted by Defendants "do[] not direct the jury to find one way or another on the issue."  *Id.*  Accordingly, the specified opinions will not be excluded for purposes of analyzing Defendants' summary judgment motion.  To the extent more precise direction may be appropriate to avoid any trial testimony from Mr. Miller regarding improper legal conclusions, such issues can be addressed in the pretrial submission process.

With respect to Defendants' second argument, Defendants' attempt to cast doubt on Mr. Miller's opinions by characterizing them as conclusory and "based merely on [his] say so" is

also unpersuasive.  *See* Defs.' Reply at 11-12.  Defendants offer an excerpt of Mr. Miller's

deposition, which they describe as the "best demonstrate[ion]" of this problem with his analysis.

*See id.* at 12-13.  Mr. Miller testified that based on his experience, even one complaint of an

unlawful strip search would be "unusual," and that 14 times that number is "extremely rare and

indicative of a problem."  Donnell Decl. Ex. 21 ("Miller Dep.") at 61:21-62:20, 69:12-25.

Contrary to Defendants' contention, Mr. Miller's report and testimony make clear that this

conclusion is not based merely on his "say so," but rather on his 38 years of experience,

including experience in the "eighth largest police department in America," where he spent many

years as a sergeant in the Dallas Narcotics Unit, and "never experienced an officer . . . ever

having a strip search complaint against them."  *See id.* at 62:5-20.  And to the extent Defendants

take issue with the fact that Mr. Miller "was not asked to and did not seek comparative data from

other police departments," that objection ultimately goes to the weight of Mr. Miller's testimony

rather than to its admissibility.  *See, e.g.*, *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d

Cir. 1995) ("Disputes as to the strength of [an expert's] credentials, faults in his use of different

etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the

admissibility, of his testimony."); *Vazquez v. City of New York*, No. 10-cv-6277 (JMF), 2014 WL

4388497, at *12 (S.D.N.Y. Sept. 5, 2014) (denying motion to exclude proposed expert on police

practices and standards where "although [expert's] opinions may not rest on statistical studies or

traditional scientific methods, they are, nevertheless, based on data—including personal

experience, interviews, review of police manuals and other primary sources . . ." (citation

omitted)); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999)

(acknowledging that, in some fields, the reliability inquiry may turn on personal knowledge and

experience rather scientific method).

If Defendants believe certain of Mr. Miller's conclusions to be weak, they may test those opinions through cross examination at trial. *Daubert v. Merrell Dow Pharms., Inc*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). At this stage, the Court denies Defendants' request that Mr. Miller's opinions be "disregarded." *See* Defs.' Reply at 11.

### 3.       Widespread Practice of Unlawful Strip Searches

Turning to the merits of Plaintiffs' *Monell* claim, Defendants first argue that Plaintiffs' "widespread practice" theory fails. Defs.' Mem. at 20-21. To sustain a *Monell* claim based on a widespread practice, a municipality's policy or custom "need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996). The practice must, however, "be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992).

### a.       Civilian Complaints and Investigations

Plaintiffs have come forward with evidence that raises a material question of fact as to whether Mount Vernon's allegedly problematic practices with respect to strip searches were "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Id.*

The record before the Court includes 14 civilian complaints made against the MVPD regarding strip searches, and the manner in which those complaints were investigated. Eight of the 14 complaints were made over a 36-month period between 2014 and 2017, and additional complaints during different windows of time came to light here because they were part of the individual defendants' disciplinary histories. *See* Donnell Decl. Ex. 23; Pls.' 56.1 Statement ¶ 52. Mr. Miller testified that based on his experience, even one complaint of an unlawful strip

search would be "unusual," and that 14 times that number is "extremely rare and indicative of a problem."  Miller Dep. at 61:21-62:20, 69:12-25.

Although the MVPD's investigations of these complaints generally resulted in findings of no wrongdoing on the part of the accused officers, there are multiple reasons to doubt these outcomes.

First, these complaints detail substantially similar conduct on the part of the MVPD Narcotics Unit; the consistency of the allegations, and especially the manner in which the searches allegedly were conducted, strongly suggests that the searches took place, even in cases where the MVPD found the complainants' allegations that they had been strip searched to be unfounded or unsubstantiated.  Numerous complainants stated that they were seized by the accused MVPD officers, directed to remove their underwear, and directed to "squat" or "bend over" and "cough."  *See, e.g.*, Donnell Decl. Ex. 31 at 6-7 (MV0308-09) (March 14, 2013 complaint closed as unsubstantiated in which complainant alleged, "[s]tanding there in the nude, I was told to bend over and cough"); Donnell Decl. Ex. 32 at 7 (MV0329) (different March 14, 2013 complaint closed as unsubstantiated in which complainant alleged that he "was ordered to bend over, while in said position detectives in question physically spread [complainant's] buttocks while [complainant] was naked . . ."); Donnell Decl. Ex. 33 at 24 (MV09912) (March 11, 2014 complaint closed as unfounded in which complainant alleged, "they told me to drop my boxers, squat and cough"); Donnell Decl. Ex. 40 at 7 (MV7506) (September 2, 2015 complaint for which no investigatory documents are available alleging, "Detective Griffin . . . instructed me to remove all my clothes . . . and then when I was fully naked he instructed me to turn around and bend over and spread my butt cheeks.  I did so.  He then instructed me to squat and cough

and I did so."); *see also* Gallman Dep. II at 7:19-8:4 ("I got searched in the bathroom, and they told me bend over, squat, cough.").

Second, other complaints show that the MVPD investigators generally failed to adequately grapple with the legal standards applicable to strip searches. For example, in connection with the investigation conducted into Mr. Rutherford and Mr. Gallman's strip searches, the investigating officer concluded that "visible cavity searches" of the individuals found in the apartment were reasonable "[d]ue to this incident being a narcotics (no knock) search warrant and the amount of narcotics discovered at the scene of this search warrant." Donnell Decl. Ex. 34 at 4 (MV0798). In another instance, the MVPD determined that one 2013 complaint was unfounded based not on the officers' reasonable suspicion that the individual had concealed contraband on his person, but rather on "[t]he fact that [M.H.] was found to be in possession of contraband during the search and that he pled guilty to the accompanying charge." Donnell Decl. Ex. 33 at 4 (MV09892). Additionally, Det. Sgt. Fegan authored a report following an investigation into a November 14, 2014 complaint, in which he stated he did not find the accused officer had violated MVPD policies in part because the officers "acted within the scope of . . . the permission granted to them by the Search Warrant Order." Donnell Decl. Ex. 38 at 54 (MV09651).

Third, in at least three instances, Det. Sgt. Fegan served as the "investigating officer," even though he had also authorized and been present for the strip searches at issue. *See* Donnell Decl. Ex. 37 at 9 (MV9053) (August 5, 2015 complaint for which Det. Sgt. Fegan authorized strip search and recommended complaint be deemed unfounded); Donnell Decl. Ex. 38 at 53 (MV09650) (November 14, 2014 complaint for which Det. Sgt. Fegan authorized searches and recommended complaints as to cavity search and strip search be deemed unfounded); Donnell

Decl. Ex. 41 at 8 (MV09806) (November 6, 2015 complaint for which Det. Sgt. Fegan authorized strip search and recommended complaint be categorized as exonerated). Mr. Miller opined that Det. Sgt. Fegan's role in authorizing these searches "made him a part of any complaint even if he was not listed as the named officer," and that "it did not comport with acceptable police practices for Sgt. Fegan to be assigned or complete any of the [investigations of] complaints received where he was present and/or involved." Miller Report ¶ 58; *see also id.* ¶ 64.

Fourth, records of MVPD's investigations have limited utility insofar as in certain instances, they are incomplete. Of the 14 civilian complaints regarding strip searches in the record, four contain no information as to how they were resolved. *See* Donnell Decl. Ex. 42 (August 8, 2011 complaint for which MVPD has been unable to locate any records reflecting how the complaint was resolved); Donnell Decl. Ex. 35 (November 13, 2014 complaint for which Det. Sgt. Fegan recommended that conduct by officers be categorized as exonerated, and there are no records demonstrating that any MVPD superior officer reviewed that recommendation); Donnell Decl. Ex. 37 (August 5, 2015 complaint for which Det. Sgt. Fegan recommended that conduct by officers be categorized as unfounded, and there are no records demonstrating that any MVPD superior officer reviewed that recommendation); Donnell Decl. Ex. 40 (September 2, 2015 complaint for which MVPD has been unable to locate any records reflecting how the complaint was resolved). Meanwhile, in an investigation into a February 15, 2018 complaint of an unlawful strip search, Det. Sgt. Fegan concluded that "a strip search was never performed as there was no valid reason for one" even though there is no evidence of any investigation related to an alleged strip search. *See* Loomba Decl. Ex. LL. Taken together, the quality of the MVPD's investigations, and the arguable conflict of interest in certain

investigations raises material questions of fact as to whether the MVPD properly considered, evaluated, and addressed the numerous complaints presented regarding strip and/or cavity searches.

      **b.**      **Overbroad Understanding of Authority to Conduct Strip Searches**

Plaintiffs also have presented evidence that the MVPD Narcotics Unit operated under the incorrect understanding that the authority to search a person or a premises granted by a search warrant was coextensive with the authority to conduct strip searches. *See, e.g.*, *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 292 (S.D.N.Y. 2015) ("[I]t is clear that the existence of a warrant authorizing search of a person or persons, without more, does not justify the extraordinary invasion of privacy caused by a strip search, let alone a visual or invasive body cavity search." (quotation marks omitted)) (collecting cases); *Bolden v. Vill. of Monticello*, 344 F. Supp. 2d 407, 419 (S.D.N.Y. 2004) ("the issuance of a warrant authorizing a search of the premises and persons located therein does not automatically authorize the officers executing the warrant to perform strip or cavity searches (either visual or invasive) on the persons located on the premises").

Det. Antonini testified:

Q:  Did you have an understanding that you needed something above and beyond the search warrant for the premises to give you the ability to authorize an actual strip search of an individual who was located on the premises?

A:  No.

Q:  So, did you think you could just strip search anybody who was located in the home or apartment that you had a . . . search warrant for?

A: Yes.

Q:  And what was the basis of that understanding?

A: The individuals were found in a location where drugs were found throughout the location.

Antonini Dep. II at 146:15-147:3.  Det. Sgt. Fegan testified in a similar manner:

> Q: How about, do you do strip searches at homes or businesses where you have a search warrant?
>
> A:  They have been done at homes where there is a search warrant present that gives us permission to search people that are present on the premise the search warrant[']s for.

Fegan Dep. I at 52:15-20.  Det. Puff also provided similar testimony:

> Q: Okay.  Ever – other than the one you testified earlier that was conducted at the Mount Vernon Hospital, have you conducted any strip searches in any place other than the police headquarters?
>
> A: Yeah.  When we would do a search warrant, we would conduct a search at the premises for the warrant.
>
> Q:  So it was the [N]arcotics [U]nit practice to conduct strip searches at the location of search warrants, when the search warrant was being executed?
>
> A:  Correct.
>
> Q:  Okay.  And that – was that standard practice?  Like any time you had a warrant to search a premises and the individuals present in that premises, then you would conduct – typically conduct a strip search of the individual named in the warrant?
>
> A:  Usually, yes.
>
> Q:  Okay.  Do you – well – so I understand, so usually the [N]arcotics [U]nit practice was when you had a search warrant you were executing at an apartment or a home, then you would also conduct a strip search at that location rather than the police station; is that right?
>
> A:  Correct.

Puff Dep. I at 70:3-25.  Read in the light most favorable to Plaintiffs, this testimony indicates that the MVPD Narcotics Unit had a practice of strip searching in most, if not all, cases where a search warrant was issued, regardless of whether a strip search was authorized under the Fourth Amendment as long as narcotics were found at the premises.  Such a practice violates the Fourth Amendment.  *See Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) ("The Fourth Amendment requires an individualized reasonable suspicion that [an] arrestee is concealing weapons or other contraband . . . before she may be lawfully subjected to a strip search." (quotation marks

omitted)); *Bolden*, 344 F. Supp. 2d at 417 ("The United States Court of Appeals for the Second

Circuit has exhibited considerable regard for the right of any person . . . not to be subjected to a

strip search unless there exists particularized suspicion that an individual is secreting

contraband.") (collecting cases).  A reasonable jury certainly could infer from this testimony that

the number of instances of strip searches being conducted without appropriate legal authorization

based on this mistaken understanding of the scope of the MVPD's authority pursuant to a search

warrant far exceeds the number of civilian complaints made to the MVPD during any particular

window of time.

Additionally, in the video of the strip search of Mr. Gallman, the officer holding the

camera clearly states, "all right Reginald, you know the deal.  We got a search warrant," before

proceeding to strip search Mr. Gallman.  Donnell Decl. Ex. 19.  Yet the warrant issued on March

23, 2017 for the search of apartment 5E does not specifically authorize any strip searches,

Donnell Decl. Exs. 53 (search warrant filed under seal), 54 (public version), nor is there

undisputed evidence that Defendants had "an individualized reasonable suspicion that [Plaintiffs

were] concealing weapons or other contraband," as is required to conduct a strip search in

accordance with the Fourth Amendment, *see Hartline*, 546 F.3d at 100.  Nevertheless, there is

evidence from which a reasonable jury could conclude that every individual present in apartment

5E on March 31, 2017 was strip searched.  Rutherford Dep. 126:8-131:8; Puff Dep. II at 135:7-

11; Defs.' 56.1 Statement ¶¶ 52-56; Donnell Decl. Ex. 19.

Taken together, this evidence supports the inference that members of the MVPD

Narcotics Unit believed that a search warrant to search a premises or a person also gave officers

the authority to strip search all individuals present at the location named in a search warrant, at

least as long as narcotics were found at the location.

\*   \*   \*   \*   \*   \*

Based on the significant number of civilian complaints alleging similar conduct against MVPD Narcotics Unit officers, evidence that the MVPD's investigations into those complaints were insufficient, and admissions by multiple MVPD officers of an overbroad and inaccurate understanding of when it was permissible to conduct strip searches, a reasonable jury could conclude that the MVPD had a widespread practice of conducting strip and body cavity searches that did not comport with acceptable police practices.  *See Sorlucco*, 971 F.2d at 872-73 (holding that statistical evidence, paired with plaintiff's testimony about her own experiences, was sufficient to sustain jury verdict on *Monell* widespread practice claim against her police department employer); *Davis*, 959 F. Supp. 2d at 351-55 (holding that testimony of officers and civilians, statistical evidence, and expert analysis regarding practice of unconstitutional stops and arrests was sufficient to overcome summary judgment on widespread practice *Monell* claim).

### 4.      Mount Vernon's Failure to Train, Investigate, and Supervise

"A policy, custom, or practice may also be inferred where 'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'"  *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (quoting *Kern*, 93 F.3d at 44).  In *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), the Second Circuit identified three requirements that must be satisfied before a municipality's failure to train or supervise constitutes deliberate indifference:

> First, the plaintiff must show that a policymaker knows "to a moral certainty" that her employees will confront a given situation . . . .  Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation . . . .  Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Id.* at 297-98 (citations omitted); *accord Roches-Bowman v. City of Mount Vernon*, No. 21-cv-
5572 (KMK), 2022 WL 3648394, at *9-10 (S.D.N.Y. Aug. 24, 2022).  "There is 'a heavy burden
of proof' to show that the municipality's 'response was so patently inadequate to the task as to
amount to deliberate indifference.'"  *Floyd v. City of New York*, 813 F. Supp. 2d 417, 441
(S.D.N.Y. 2011) (quoting *Reynolds v. Giuliani*, 506 F. 3d 183, 192-93 (2d Cir. 2007)).

Plaintiffs have presented sufficient evidence to enable a reasonable jury to find that the
MVPD failed to train, investigate, and supervise officers regarding strip searches and cavity
searches to such a degree that the failure amounted to deliberate indifference to the constitutional
rights of the people of Mount Vernon.  First, MVPD officials knew, to a moral certainty, that
MVPD officers would make assessments as to whether to conduct strip searches.  *See generally*
Hastings Dep. at 83:18-87:1 (testifying regarding circumstances in which strip searches are
proper for purposes of recovering contraband).  Indeed, there is ample evidence in the record that
strip searches were performed regularly.  Second, as discussed below, Plaintiffs presented
evidence that members of the MVPD had a misunderstanding of their authority to conduct strip
searches and that officers therefore would be likely to "mishandle" such situations.  Third, it is
reasonable to infer that the wrong choices by officers regarding when it was permissible to
conduct strip searches likely would cause frequent deprivations of rights.  *See Floyd*, 813 F.
Supp. 2d 454 (explaining that in case where supervisory police official had misunderstanding of
Fourth Amendment law regarding stops and frisks, "it is difficult to imagine how the
[d]epartment's disciplinary practices would be adequate to enforce [department policy] or to
ensure that its officers are conducting constitutional stops").

Defendants maintain that Plaintiffs' failure to train, investigate, and supervise theory fails
for the same reason as their widespread practice theory.  Citing to the Second Amended

Complaint, Defendants insist that this theory is "logically tethered to the claim that a widespread practice of illegal strip searches exists in Mount Vernon and was the proximate cause of plaintiffs' alleged strip searches."  Defs.' Mem. at 21; *see* Defs.' Reply at 15.  But Defendants misunderstand Plaintiffs' argument.  Plaintiffs have alleged—and provided evidence to support—a failure to train, investigate, and supervise theory of *Monell* liability that is *separate* from the widespread practice theory of *Monell* liability.  *See, e.g.*, Miller Report at 20-25.  While particular facts supporting each claim are certainly related, the theories are distinct.  *See, e.g.*, *Buari*, 530 F. Supp. 3d at 408 (denying motion to dismiss *Monell* claim because even though claim failed under widespread practice theory, it survived pursuant to theory of failure to train, supervise, and discipline).

Plaintiffs have provided evidence sufficient to raise a material question of fact as to the failure to train, investigate, and supervise theory of liability.  Specifically, a reasonable jury could conclude, based on the evidence in the record, that MVPD officers and detectives, who regularly conducted strip searches, received no formal training on how to conduct such searches.  Multiple individual defendants testified that they received no specific training as to how to properly conduct a strip search and/or what circumstances permit a strip search.  Det. Sgt. Fegan testified that he did not recall receiving formal training as to how to conduct a strip search, and did not recall specifically any in-house training regarding MVPD strip search policies.  Fegan Dep. I at 47:20-49:18, 55:1-6.  Likewise, Det. Antonini testified that he did not recall being trained on the MVPD's policies with respect to conducting strip searches or body cavity searches, and did not remember receiving any training when the supplemental strip search policy was issued in 2015.  Antonini Dep. I at 39:12-19, 128:3-6.  Det. Puff testified that he did not receive any training at the police academy or in house training at the MVPD regarding

conducting strip searches, though he did receive some "in the field" training from a senior officer.  Puff Dep. I at 47:25-48:19; Puff Dep. II at 23:12-24:3.  P.O. Mecca testified that she recalled she "was told" about strip searches upon joining the Narcotics Unit in 2016, but that "they couldn't teach me because they can't conduct it on a female."  Mecca Dep. at 32:22-33:13.  Moreover, the training records supplied for the individual defendants do not indicate that they attended any trainings specifically related to performing strip searches.  *See* Donnell Decl. Exs. 46 (Antonini training records), 47 (Puff training records), 48 (Fegan training records), 49 (Valente training records), 50 (Mecca training records), 51 (Vitelli training records); *see also* Miller Report ¶ 70 ("In my review of the documents I was supplied I have not seen that any members of the MVPD ever attended any training that dealt with performing strip searches or body cavity searches.").

Defendants maintain that there is adequate evidence of on-the-job training, and that such training is sufficient to defeat a *Monell* claim based on a failure to train theory.  *See* Defs.' Reply at 16.  Defendants cite to *Reape v. City of New York*, where the court explained that with respect to use of handcuffs, whether police officers learned the "finger test" and "double-locking" procedures "in an academy or in on the job training, through written handouts or oral instruction, none of these possible versions is consistent with a failure to train; both police officers knew through their jobs how to protect against excessively tight handcuffing."  No. 09-cv-1363 (BMC) (LB), 2010 WL 4789285, at *3 (E.D.N.Y. Nov. 17, 2010).  The critical difference between the police officers in *Reape* and the MVPD personnel here, however, is that in *Reape*, there was no material question as to whether the officers knew how to protect against the constitutional violation at issue.  *See id.* (noting that both plaintiffs "testified that they were well aware that in handcuffing suspects, they should use the 'finger test' and the 'double-locking' procedure").

Here, while Defendants point to some limited testimony about on-the-job training, *see* Defs.'

Reply at 16; *see also* Puff Dep. II at 23:12-24:3, testimony from MVPD officers reveals

significant discrepancies between the officers' understanding of their authority to conduct strip

searches, and the MVPD's own policies and clearly established law.  For example, MVPD policy

is clear that "where a more extensive search [*i.e.*, a strip or cavity search] is called for, the

subject should be brought into the [police] station . . . ."  Donnell Decl. Ex. 56; *see also* Hastings

Dep. at 75:3-76:3 (explaining that it was not permissible for MVPD officers to conduct strip

search on the premises where a search warrant was issued because "[i]t wasn't necessary" and

"anything else can be recovered through the regular policies and procedures either in the

interview room again, or in the holding area").  Yet multiple officers testified to regularly

conducting strip searches at the location of a search rather than at the police station because, as

Det. Puff explained, "during transport, somebody could dump something outside or stash it in the

car."  Puff Dep. I at 70:19-71:7; *see also* Fegan Dep. I at 52:15-20 ("Q: How about, do you do

strip searches at homes or business where you have a search warrant?  A: They have been done

at homes where there is a search warrant present that gives us permission to search the people

that are present on the premise the search warrant[']s for."); Antonini Dep. I at 131:20-132:2;

Vitelli Dep. at 29:2-16 ("when we do search warrants, a lot of the times we've done [strip

searches] in the bathroom").  Additionally, MVPD policy is clear that "a person arrested will not

be subject to a full strip search unless there is a rational basis for doing so," and that prior to

conducting a strip search, the arresting officer must suspect "that weapons, contraband or

evidence may be concealed upon the person or in their underclothing, in such manner that they

may not be discovered by the previous search methods."  Donnell Decl. Ex. 56.  But contrary to

this policy, multiple members of the Narcotics Unit, including Det. Sgt. Fegan, testified that

where a search warrant for a premises was issued, it was standard practice to conduct strip searches of the individuals present on the scene. *See, e.g.*, Fegan Dep. I at 52:15-20; Puff Dep. I at 70:3-18; Antonini Dep. II at 146:21-147:3 ("Q:  So, did you think you could just strip search anybody who was located in the home or apartment that you had a . . . search warrant for? . . . A: Yes.  Q:  And what was the basis of that understanding?  A: The individuals were found in a location where drugs were found throughout the location."); *see also* Miller Report ¶¶ 36-42, 57.

Further, as discussed above, Plaintiffs have adduced evidence that Mount Vernon's investigations into complaints of unconstitutional strip searches were insufficient.  "'[D]eliberate indifference may be inferred if [] complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.'"  *Buari*, 530 F. Supp. 3d at 400 (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)); *see also Vann*, 72 F.3d at 1049 ("An obvious need [to protect against constitutional violations] may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 331 (2d Cir. 1986) (finding, in case involving allegations of failure to supervise, that "[t]he jury was free to reason that the very failure of the City defendants to conduct a nonsuperficial investigation into civilian claims of excessive force indicated that the City and the chief simply did not care what a thorough investigation would reveal, that they were indeed indifferent to whether or not excessive force was used").

Notwithstanding Mount Vernon's clear policy regarding lawful strip searches, there is substantial evidence that MVPD employees were not properly trained with respect to the policies, and that Mount Vernon failed to properly investigate officers for constitutional

violations.  Accordingly, there are material questions of fact as to whether the MVPD failed to

provide adequate training or supervision to such an extent that it amounts to deliberate

indifference to the rights of those who come into contact with MVPD personnel.  *See Floyd*, 813

F. Supp. 2d at 456 (denying summary judgment on failure-to-train *Monell* claim where city had

taken remedial steps to address constitutional violations by police officers, but evidence showed

"significant shortcomings in the ways that the City's policies have been put into practice").

\* \* \* \* \* \* \* \* \*

For all of these reasons, there is sufficient evidence for a reasonable jury to find that

Mount Vernon's allegedly problematic practices with respect to strip and/or cavity searches

amounted to an official policy of the city.  Accordingly, Defendants' motion for summary

judgment as to Plaintiffs' Monell claim is DENIED.[19]

### F.      Supervisory Liability (Count VIII)

Finally, Defendants argue that Plaintiffs' supervisory liability claim against Det.

Antonini, Det. Puff and Det. Sgt. Fegan should be dismissed.  Defs.' Mem. at 23-24.  Plaintiffs

maintain that Det. Sgt. Fegan is potentially liable as a supervisor based on his authorization of

the allegedly unlawful strip searches that took place on March 31, 2017.  *See* Pls.' Opp. at 29.

Plaintiffs concede, however, that Det. Antonini and Det. Puff "are not supervisors and therefore

cannot be held liable under this theory."  *Id.* at 29 n.8.

---

[19] Of course, to succeed on their *Monell* claim at trial, Plaintiffs will have to prove each of the elements of the claim, including establishing "a causal link between [Mount Vernon's unconstitutional policy or custom] and the alleged constitutional injury."  *City of Canton*, 489 U.S. at 385.  As previously noted, Defendants' motion for summary judgment was limited to the question of whether there was sufficient evidence as to the "official policy" element.  The Court therefore has not addressed Plaintiffs' arguments as to any other elements of the *Monell* claim.

To establish liability for any individual defendant pursuant to § 1983, a plaintiff must demonstrate "that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  "The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary."  *Id.* at 618 (cleaned up).  Therefore, "[t]he violation must be established against the supervisory official directly" through his or her own individual conduct as it relates to the specific, underlying offenses at issue.  *Id.*

Defendants contend that Det. Sgt. Fegan cannot be found liable as a supervisor because Plaintiffs cannot "proffer any admissible proof that he personally participated in any conduct that violated their constitutional rights."  Defs.' Mem. at 24.  Yet there is no dispute that Det. Sgt. Fegan was present in apartment 5E during the search, and Defendants acknowledge that "there is evidence that Det. Sgt. Fegan authorized the strip searches that took place in apartment 5E on March 31, 2017."  Defs.' Reply at 17; *see* Pls.' 56.1 Statement ¶¶ 35, 56.

Because the parties stipulated that Plaintiffs' claim that their Fourth Amendment rights were violated as a result of the allegedly improper strip and/or cavity searches performed on them on March 31, 2017 would proceed to trial, *see* Defs.' 56.1 Statement ¶ 124, the parties (understandably) spent little space in their briefing presenting their competing versions of the manner in which these searches were carried out, and by whom.  This leaves the Court with a less nuanced basis from which to evaluate this aspect of Defendants' motion.  At this stage, viewing the facts in the light most favorable to Plaintiffs, the Court cannot conclude, as a matter of law, that Det. Sgt. Fegan's authorization of the strip searches did not constitute personal participation in the alleged violation of Plaintiffs' right to be free from unreasonable searches

pursuant to the Fourth Amendment.  Summary judgment therefore is not warranted as to the Plaintiffs' supervisory liability claim against Det. Sgt. Fegan.[20]

Accordingly, Defendants' motion for summary judgment as to Plaintiffs' claim for supervisory liability is GRANTED as to Det. Antonini and Det. Puff, and DENIED as to Det. Sgt. Fegan.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment (ECF No. 177) is GRANTED IN PART and DENIED IN PART.

The following claims in the Second Amended Complaint are dismissed: (1) Mr. Rutherford's malicious prosecution claim as to Det. Puff, Det. Vitelli, P.O. Valente, P.O. Mecca, and Det. Sgt. Fegan; (2) Mr. Rutherford's denial of the right to fair trial claim; (3) Plaintiffs' failure to intervene claim as to Det. Valente; and (4) Plaintiffs' supervisory liability claim as to Det. Antonini and Det. Puff.

All other claims remain part of the case, and will proceed to trial.

An in-person status conference is hereby scheduled for October 10, 2023 at 11:00 a.m. in Courtroom 250 in the White Plains federal courthouse.  In advance of the conference, counsel

---

[20] Plaintiffs' theory of "supervisory liability" appears to be that Det. Sgt. Fegan was personally involved in the allegedly improper strip and/or cavity searches of Mr. Rutherford and Mr. Gallman by virtue of his having authorized the searches and having been present in apartment 5E while those searches were carried out, and in the aftermath of the searches.  *See Tangreti*, 983 F.3d at 619 ("[Plaintiff] must . . . establish that [Defendant] violated the [constitutional provision] by [Defendant's] own conduct, not by reason of [Defendant's] supervision of others who committed the violation.").  What is not clear, then, is whether Plaintiffs' "supervisory liability" claim against Det. Sgt. Fegan (under Count VIII of the Second Amended Complaint) is duplicative of the claim against Det. Sgt. Fegan for his alleged participation in the improper searches of the Plaintiffs (under Count I of the Second Amended Complaint), or whether the "supervisory liability" claim can stand on its own.  The Court may invite further briefing on this point as part of pretrial submissions, and the parties should be prepared to discuss this question at the next conference with the Court.

must meet and confer to discuss potential trial dates in December 2023 and January, February, and March 2024.

Dated: September 29, 2023
       White Plains, New York

                                        **SO ORDERED.**

                                        _____
                                        ANDREW E. KRAUSE
                                        United States Magistrate Judge